Walker G. Harman, Jr. [WH-8044]
THE HARMAN FIRM, P.C.
*Attorneys for Plaintiff*
200 West 57th Street, Suite 900
New York, New York 10019
212-425-2600

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
RICHARD LEBLANC,                                    Index No.:

                        *Plaintiff*,          **COMPLAINT**
    -against-

UNITED PARCEL SERVICE,                              **PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY**

                      *Defendant*.
------------------------------------------------------------------------X

Plaintiff, RICHARD LEBLANC, by his attorneys, THE HARMAN FIRM, P.C., as and for his Complaint for employment discrimination against Defendant alleges as follows:

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is proper under 28 USC § 1332 in that diversity of citizenship exists between all parties.

2. Venue is properly laid in the Southern District of New York under U.S.C. § 1391(a)(2), in that a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

## PARTIES

3. Plaintiff, RICHARD LEBLANC (hereinafter "LEBLANC"), is a resident of

Newtown, Connecticut.

4. Defendant, UNITED PARCEL SERVICE, (hereinafter "UPS"), at all times relevant and hereinafter mentioned is the company that employed Plaintiff LEBLANC.

## DEMAND FOR TRIAL BY JURY

5. Plaintiff demands a trial by jury.

## FACTUAL BACKGROUND

6. On or about April 15, 1991, Plaintiff LEBLANC was hired by UPS as a "Driver," earning fifteen ($15) dollars an hour with benefits at the Manhattan South Location.

7. Up until April 20, 2011, Plaintiff LEBLANC worked at UPS, receiving promotions, positive performance evaluations, and salary increases yearly until 2011, going from Driver to On Car supervisor to a "PDS" (Dispatch Supervisor).

8. Plaintiff LEBLANC, through his tenure with UPS, never once received a negative performance review.

9. Before June 2008, Plaintiff LEBLANC had never had a serious medical condition.  However, in or about June 2008, Plaintiff LEBLANC was admitted to the hospital and diagnosed as having had a heart attack.

10. Plaintiff LEBLANC, as a result of this heart attack, was out of work on medical leave for six (6) weeks.  As a result of his medical condition, Plaintiff LEBLANC was not able to renew his DOT Card, which would have enabled him to drive for UPS.

11. Due to his medical condition, Plaintiff LEBLANC's cardiologist wrote a

letter to UPS requesting an accommodation for Plaintiff LEBLANC, specifically that Plaintiff LEBLANC be transferred to a location closer to where he lived. A transfer closer to Plaintiff LEBLANC's home would have reduced his commute by two (2) hours per day, thus alleviating a extremely stressful commute that exacerbated his medical condition.

12. Upon information and belief, Plaintiff LEBLANC could have been transferred to Watertown, a UPS location situated 4 miles away from Plaintiff LEBLANC's home, or to Brookfield, another UPS location situated 10 miles away from Plaintiff LEBLANC's home.

13. On or about February 15, 2008, Plaintiff LEBLANC submitted the letter from his cardiologist to HR Manager Yvonne Quiones.

14. When Plaintiff LEBLANC submitted the letter from his cardiologist to HR, the HR managers were not responsive and did not take his request seriously. Plaintiff LEBLANC followed up on his request for a medical accommodation multiple times by phoning HR and discussing the request with his supervisors; however, no accommodation was ever provided. The only answer Plaintiff LEBLANC was ever given was by Rita Tureios, an HR Manager, who said she was "looking into it." HR failed to provide Plaintiff LEBLANC with any accommodation whatsoever.

15. In or about March 2009, Plaintiff LEBLANC submitted this same letter again to Rita Tureios.

16. Although upon information and belief, there were open positions in both Watertown and Brookfield, two UPS locations closer to where Plaintiff LEBLANC lived, Plaintiff LEBLANC's request for this necessary and legitimate medical accommodation

was repeatedly denied without reason.

17. In fact, not only was Plaintiff LEBLANC's request for medical accommodation denied without justification, but in January 2008, Plaintiff LEBLANC was also moved to night shifts as a PDS Supervisor. The only reason given to Plaintiff LEBLANC was that he was unable to obtain a DOT card, a fact about which Plaintiff LEBLANC's supervisor, Division Manager Mike Michalak, complained frequently. This change of schedule happened subsequent to Plaintiff LEBLANC submitting a request for medical accommodation.

18. As a PDS Supervisor, Plaintiff LEBLANC was made to work night shifts with arduous hours, which exacerbated Plaintiff LEBLANC's medical condition and created undue stress. Plaintiff LEBLANC was having insomnia and had trouble sleeping; he worked twelve (12) to thirteen (13) hours a day. This created a serious strain on his family, which further exacerbated Plaintiff LEBLANC's heart condition.

19. Plaintiff LEBLANC continued to seek a position closer to his home as well as a position that did not entail him working at night.

20. In or about February 2010, Plaintiff LEBLANC again submitted the letter from his cardiologist to Roberta Ellis, an HR supervisor, and phoned her multiple times after regarding the requested medical accommodation.

21. Plaintiff LEBLANC's request for an accommodation due to his medical condition was continuously denied.

22. Plaintiff LEBLANC was subjected to a high level of stress because of his lengthy commute every morning, and because he had to work long hours at night. This undue stress caused Plaintiff LEBLANC to be hospitalized for chest pains two (2)

additional times, both of which resulted in Plaintiff LEBLANC having to stay in the hospital for three (3) consecutive days.

23. In or about February 2011, Plaintiff LEBLANC again asked Rita Tureios about the transfer, at which point she told Plaintiff LEBLANC again that she was "looking into it."

24. In or about February 2011, Plaintiff LEBLANC also asked Pat Shepard, the Division Manager, about his request for a medical accommodation, to which Mr. Shepard responded that he was "working on it."

25. Upon information and belief, Ruth Herring, another UPS employee requested a move to Atlanta, Georgia for personal reasons not motivated by any medical issues. This request was granted shortly after it was made.

26. Plaintiff LEBLANC was never provided with <u>any</u> medical accommodation whatsoever, in spite of his repeat submission of medical documentation and repeated follow-up requests.

### Plaintiff LEBLANC'S Illegal Termination

27. In or around mid March 2011, seven (7) employees under the direct supervision of Plaintiff LEBLANC participated in hazmat training.

28. After the training for which Plaintiff LEBLANC was present, all seven (7) employees signed the roster, vouching that they had been present for the hazmat training.

29. As per the protocol and practice of UPS, Plaintiff LEBLANC handed the signed roster to the Safety Supervisors, who in the past had frequently lost various important documents, including signed rosters.

30. The morning that Keter, a company that was hired to do inspections of safety

was scheduled to do an audit of UPS, the same Safety Supervisors who previously had in their possession the signed roster approached Plaintiff LEBLANC and requested that all seven (7) employees repeat the hazmat training because they had misplaced the signed roster.

31. Upon information and belief, at least two (2) other supervisors, John Argiento and Donna Manuza, were asked that their employees re-complete the hazmat or other trainings because the signed rosters had been lost.

32. Because the Safety Supervisors approached these three (3) supervisors at 10am when the employees had left at 8am, and because the hazmat training had to be completed before the Keter Audit that day, Plaintiff LEBLANC, along with the two (2) other supervisors, re-created the same safety roster which had been lost by the Safety Supervisors and previously signed by the seven (7) employees.

33. In or about mid April 2011, Plaintiff LEBLANC was approached about the safety roster, which was submitted as part of the Keter Audit, by a Security Manager.

34. Plaintiff LEBLANC never denied re-creating the safety roster, which had been lost by the Safety Supervisors – in fact he had been present for the hazmat training of all seven (7) employees and was able to confirm that they had all been present.

35. Despite never having previously received a negative performance evaluation in his twenty-one (21) years of employment at UPS and having received a salary increase three (3) weeks prior based on positive performance reviews, Plaintiff LEBLANC was summarily terminated. The reason alleged was dishonesty with regard to the list.

36. In addition to his exemplarily performance, Plaintiff LEBLANC in the past few years had not had any injuries among the ninety-four (94) people he supervised as a

6

Safety Supervisor. This excellent result is extremely rare and potentially unprecedented in the country.

37. However, based on Plaintiff LEBLANC's continuous requests for medical accommodation, which were always denied and the commendation he received immediately prior to his termination, Defendant UPS clearly terminated Plaintiff LEBLANC in retaliation for him continuously requesting medical accommodations.

38. Upon information and belief, <u>both other Supervisors who were accused by Defendant UPS of the same actions in regard to the safety roster were not terminated.</u> John Argiento and Donna Manuza both received nominal disciplinary action for one year only and were otherwise not subjected to any other adverse employment action.

39. Furthermore, at a UPS Peer Review, the peer review board unanimously voted to reinstate Plaintiff LEBLANC's job, however, Plaintiff LEBLANC's job was ultimately not reinstated by Defendant UPS.

40. Upon information and belief, it is extremely uncommon, if it happens at all, for employees to not have their jobs reinstated when the peer review board unanimously votes to reinstate that employee.

41. However, despite the official Peer Review Recommendation, Defendant UPS chose to summarily terminate Plaintiff LEBLANC, in direct retaliation for continuously requesting medical accommodation.

42. Furthermore, Plaintiff LEBLANC was hospitalized four (4) weeks before his termination and due to that hospitalization was out of work for three (3) days.

43. Moreover, Division Manager Mike Michalak vocalized at least three (3) times his frustrations with scheduling Plaintiff LEBLANC because Plaintiff LEBLANC no

7

longer had a DOT card, as a direct result of his medication and medical condition. Accordingly, Plaintiff LEBLANC was limited in his position as a PDS Dispatch Supervisor.

44. Plaintiff LEBLANC previously had a DOT card but was not eligible for the DOT card after he began taking medication for his heart condition. Plaintiff LEBLANC could perform all of his job duties at UPS except driving trucks.

45. As a result of this termination, Plaintiff LEBLANC suffered from a stress-creating strain on his family life.

### FIRST CAUSE OF ACTION

46. Plaintiff LEBLANC repeats and realleges each and every allegation contained in paragraphs "1" though "45" with the same force and effect as if separately alleged and reiterated herein.

47. Defendant UPS subjected Plaintiff LEBLANC to disability discrimination, disparate treatment, a hostile work environment, and retaliation in violation of the New York City Human Administrative Code § 8-101, *et seq*.

48. As a result, Plaintiff LEBLANC suffered damages for past and future earnings, other employment benefits, and emotional injuries in an amount to be determined at trial.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

(i) On the First Cause of Action, actual damages to be determined at trial, but in no event less than $2,000,000;

(ii) A bridge to Plaintiff's pension, inclusive of continued health insurance, which pension would have accrued with thirty (30) years of full-time employment;

(iii) Disbursements and other costs; and

(iv) For such other and further relief which the Court deems just and proper.

Dated:   New York, New York
         October 5, 2011

                                                                                         /s/
                                          Walker G. Harman, Jr.
                                          THE HARMAN FIRM, PC
                                          *Attorneys for Plaintiff*
                                          200 West 57th Street, Suite 900
                                          New York, New York 10019
                                          (212) 425-2600