DAY PITNEY LLP
7 TIMES SQUARE
NEW YORK, NY 10036-7311
(212) 297-5800
*Attorneys for Defendant*
United Parcel Service, Inc.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| RICHARD LEBLANC, | : | Docket No. 1:11-cv-06983-KPF |
| Plaintiff, | : | |
| v. | : | **AFFIRMATION OF HEATHER WEINE BROCHIN, ESQ. IN SUPPORT OF UPS'S MOTION FOR SUMMARY JUDGMENT** |
| UNITED PARCEL SERVICE, | : | |
| Defendant. | : | (Document Electronically Filed) |

HEATHER WEINE BROCHIN, of full age, hereby affirms as follows:

1.      I am an attorney-at-law of the States of New York and New Jersey and the United States District Courts for the four Districts in the State of New York and the District of New Jersey.  I am also a member of the law firm of Day Pitney LLP, attorneys for defendant United Parcel Service, Inc. ("UPS") in the above-captioned matter.  I submit this affirmation in support of UPS's motion for summary judgment.

2.      Attached hereto as Exhibit A is a true and correct copy of the Complaint, filed on October 5, 2011 (Docket Entry No. 1).

3.      Attached hereto as Exhibit B is a true and correct copy of the Amended Complaint, filed on November 4, 2011 (Docket Entry No. 5).

84903083.1

4.      Attached hereto as Exhibit C is a true and correct copy of UPS's Answer to the Amended Complaint, filed on January 20, 2012 (Docket Entry No. 9).

5.      Attached hereto as Exhibit D are true and correct copies of the relevant pages from the transcript of the April 19, 2012 deposition of plaintiff Richard LeBlanc.

6.      Attached hereto as Exhibit E is a true and correct copy of a February 12, 2008 letter from Harvey M. Kramer, M.D., which was marked and identified at plaintiff's deposition as Exhibit D-8.

7.      Attached hereto as Exhibit F is a true and correct copy of a September 28, 2012 Certification of Debra Wirag with exhibits, which was produced during discovery. According to her certification, Ms. Wirag is in charge of the Record Room for Southbury Cardiology.  She includes with her certification a copy of a February 12, 2008 letter from Harvey M. Kramer, M.D. and an electronic record of the "Document History/Tracking" system corresponding to when the aforementioned letter was accessed and printed.

8.      Attached hereto as Exhibit G are true and correct copies of the relevant pages from the transcript of the August 8, 2013 deposition of Daniel Minesinger.

9.      Attached hereto as Exhibit H is a true and correct copy of a signed statement of plaintiff Richard LeBlanc dated March 30, 2011, which was marked and identified at LeBlanc's deposition as Exhibit D-6.

10.      Attached hereto as Exhibit I is a true and correct copy of a signed statement of plaintiff Richard LeBlanc dated March 30, 2011, which was marked and identified at LeBlanc's deposition as Exhibit D-5.

84903083.1

11.     Attached hereto as Exhibit J is a true and correct copies of a newspaper article entitled "Mysterious mail left on street," which was marked and identified at LeBlanc's deposition as Exhibit D-4.

12.     Attached hereto as Exhibit K is a true and correct copy of an April 17, 2013 letter filed by plaintiff's counsel, Walker G. Harman, Jr. (Docket Entry No. 27).

13.     Attached hereto as Exhibit L is a true and correct copy of the following electronic decision: *Aka v. Jacob K. Javits Convention Center of N.Y.*, No. 09-cv-8195, 2011 U.S. Dist. LEXIS 114002 (S.D.N.Y. Sept. 30, 2011).

14.     Attached hereto as Exhibit M is a true and correct copy of the following electronic decision: *Bresloff-Hernandez v. Horn*, No. 05-cv-0384, 2007 U.S. Dist. LEXIS 71257 (S.D.N.Y. Sept. 21, 2007).

15.     Attached hereto as Exhibit N is a true and correct copy of the following electronic decision: *Fitzpatrick v. New York Cornell Hospital*, No. 00-cv-8594, 2002 U.S. Dist. LEXIS 25166 (S.D.N.Y. Jan. 9, 2003).

16.     Attached hereto as Exhibit O is a true and correct copy of the following electronic decision: *Hart v. New York University Hospitals Center*, No. 09-cv-5159, 2011 U.S. Dist. LEXIS 116538 (S.D.N.Y. Oct. 7, 2011).

17.     Attached hereto as Exhibit P is a true and correct copy of the following electronic decision: *Milne v. Navigant Consulting, Inc.*, No. 08-cv-8964, 2012 U.S. Dist. LEXIS 114005 (S.D.N.Y. Aug. 13, 2012).

18.     Attached hereto as Exhibit Q is a true and correct copy of the following electronic decision: *Nixon-Tinkelman v. New York City Department of Health*, No. 10-3317-cv, 2011 U.S. App. LEXIS 16569 (2d Cir. Aug. 10, 2011).

19.     Attached hereto as Exhibit R is a true and correct copy of the following electronic decision: *O'Connor v. Smith & Laquercia, LLP*, No. 08-cv-4559, 2010 U.S. Dist. LEXIS 94088 (E.D.N.Y. Sept. 9, 2010).

20.     Attached hereto as Exhibit S is a true and correct copy of the following electronic decision: *Ragin v. E. Ramapo Cent. Sch. Dist.*, No. 05-cv-6496, 2010 U.S. Dist. LEXIS 32576 (S.D.N.Y. Mar. 31, 2010).

21.     Attached hereto as Exhibit T is a true and correct copy of the following electronic decision: *Saunders v. New Horizons Computer Learning Center*, No. 99-cv-9532, 2002 U.S. Dist. LEXIS 9495 (S.D.N.Y. May 29, 2002).

22.     Attached hereto as Exhibit U is a true and correct copy of the following electronic decision: *Scheiner v. Wallace*, No. 93-cv-0062, 1996 U.S. Dist. LEXIS 9843 (S.D.N.Y. July 11, 1996).

23.     Attached hereto as Exhibit V is a true and correct copy of the following electronic decision: *Smith v. Regional Plan Association, Inc.*, No. 10-cv-5857, 2011 U.S. Dist. LEXIS 117712 (S.D.N.Y. Oct. 7, 2011).

24.     Attached hereto as Exhibit W is a true and correct copy of the following electronic decision: *Stuevecke v. N.Y. Hospital Medical Center of Queens*, No. 01-cv-326, 2003 U.S. Dist. LEXIS 14793 (E.D.N.Y. Aug. 26, 2003).

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 13, 2013.                    By:     /s/ Heather Weine Brochin

84903083.1

# EXHIBIT A

Walker G. Harman, Jr. [WH-8044]
THE HARMAN FIRM, P.C.
*Attorneys for Plaintiff*
200 West 57th Street, Suite 900
New York, New York 10019
212-425-2600

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X

RICHARD LEBLANC,                                       Index No.:

                 *Plaintiff,*                          **COMPLAINT**

    -against-

                                        **PLAINTIFF**
UNITED PARCEL SERVICE,                              **HEREBY DEMANDS**
                                        **A TRIAL BY JURY**

                 *Defendant.*
------------------------------------------------------------------------X

Plaintiff, RICHARD LEBLANC, by his attorneys, THE HARMAN FIRM, P.C., as and

for his Complaint for employment discrimination against Defendant alleges as follows:

<u>**JURISDICTION AND VENUE**</u>

1.    Jurisdiction of this Court is proper under 28 USC § 1332 in that diversity of

citizenship exists between all parties.

2.    Venue is properly laid in the Southern District of New York under U.S.C. §

1391(a)(2), in that a substantial part of the events or omissions giving rise to the claims

occurred in the Southern District of New York.

<u>**PARTIES**</u>

3.    Plaintiff, RICHARD LEBLANC (hereinafter "LEBLANC"), is a resident of

Newtown, Connecticut.

4.     Defendant, UNITED PARCEL SERVICE, (hereinafter "UPS"), at all times relevant and hereinafter mentioned is the company that employed Plaintiff LEBLANC.

## DEMAND FOR TRIAL BY JURY

5.     Plaintiff demands a trial by jury.

## FACTUAL BACKGROUND

6.     On or about April 15, 1991, Plaintiff LEBLANC was hired by UPS as a "Driver," earning   fifteen ($15) dollars an hour with benefits at the Manhattan South Location.

7.     Up until April 20, 2011, Plaintiff LEBLANC worked at UPS, receiving promotions, positive performance evaluations, and salary increases yearly until 2011, going from Driver to On Car supervisor to a "PDS" (Dispatch Supervisor).

8.     Plaintiff LEBLANC, through his tenure with UPS, never once received a negative performance review.

9.     Before June 2008, Plaintiff LEBLANC had never had a serious medical condition.  However, in or about June 2008, Plaintiff LEBLANC was admitted to the hospital and diagnosed as having had a heart attack.

10.  Plaintiff LEBLANC, as a result of this heart attack, was out of work on medical leave for six (6) weeks.   As a result of his medical condition, Plaintiff LEBLANC was not able to renew his DOT Card, which would have enabled him to drive for UPS.

11.  Due to his medical condition, Plaintiff LEBLANC's cardiologist wrote a

letter to UPS requesting an accommodation for Plaintiff LEBLANC, specifically that Plaintiff LEBLANC be transferred to a location closer to where he lived.  A transfer closer to Plaintiff LEBLANC's home would have reduced his commute by two (2) hours per day, thus alleviating a extremely stressful commute that exacerbated his medical condition.

12.  Upon information and belief, Plaintiff LEBLANC could have been transferred to Watertown, a UPS location situated 4 miles away from Plaintiff LEBLANC's home, or to Brookfield, another UPS location situated 10 miles away from Plaintiff LEBLANC's home.

13.  On or about February 15, 2008, Plaintiff LEBLANC submitted the letter from his cardiologist to HR Manager Yvonne Quiones.

14.  When Plaintiff LEBLANC submitted the letter from his cardiologist to HR, the HR managers were not responsive and did not take his request seriously.  Plaintiff LEBLANC followed up on his request for a medical accommodation multiple times by phoning HR and discussing the request with his supervisors; however, no accommodation was ever provided.  The only answer Plaintiff LEBLANC was ever given was by Rita Tureios, an HR Manager, who said she was "looking into it."  HR failed to provide Plaintiff LEBLANC with any accommodation whatsoever.

15.  In or about March 2009, Plaintiff LEBLANC submitted this same letter again to Rita Tureios.

16.  Although upon information and belief, there were open positions in both Watertown and Brookfield, two UPS locations closer to where Plaintiff LEBLANC lived, Plaintiff LEBLANC's request for this necessary and legitimate medical accommodation

was repeatedly denied without reason.

17.   In   fact,   not   only   was   Plaintiff   LEBLANC's   request   for   medical accommodation denied without justification, but in January 2008, Plaintiff LEBLANC was also moved to night shifts as a PDS Supervisor.  The only reason given to Plaintiff LEBLANC was that he was unable to obtain a DOT card, a fact about which Plaintiff LEBLANC's supervisor, Division Manager Mike Michalak, complained frequently.  This change of schedule happened subsequent to Plaintiff LEBLANC submitting a request for medical accommodation.

18.   As a PDS Supervisor, Plaintiff LEBLANC was made to work night shifts with arduous hours, which exacerbated Plaintiff LEBLANC's medical condition and created undue stress.  Plaintiff LEBLANC was having insomnia and had trouble sleeping; he worked twelve (12) to thirteen (13) hours a day.  This created a serious strain on his family, which further exacerbated Plaintiff LEBLANC's heart condition.

19.   Plaintiff LEBLANC continued to seek a position closer to his home as well as a position that did not entail him working at night.

20.   In or about February 2010, Plaintiff LEBLANC again submitted the letter from his cardiologist to Roberta Ellis, an HR supervisor, and phoned her multiple times after regarding the requested medical accommodation.

21.   Plaintiff LEBLANC's request for an accommodation due to his medical condition was continuously denied.

22.   Plaintiff LEBLANC was subjected to a high level of stress because of his lengthy commute every morning, and because he had to work long hours at night.  This undue stress caused Plaintiff LEBLANC to be hospitalized for chest pains two (2)

4

additional times, both of which resulted in Plaintiff LEBLANC having to stay in the hospital for three (3) consecutive days.

23. In or about February 2011, Plaintiff LEBLANC again asked Rita Tureios about the transfer, at which point she told Plaintiff LEBLANC again that she was "looking into it."

24. In or about February 2011, Plaintiff LEBLANC also asked Pat Shepard, the Division Manager, about his request for a medical accommodation, to which Mr. Shepard responded that he was "working on it."

25. Upon information and belief, Ruth Herring, another UPS employee requested a move to Atlanta, Georgia for personal reasons not motivated by any medical issues. This request was granted shortly after it was made.

26. Plaintiff LEBLANC was never provided with <u>any</u> medical accommodation whatsoever, in spite of his repeat submission of medical documentation and repeated follow-up requests.

## Plaintiff LEBLANC'S Illegal Termination

27. In or around mid March 2011, seven (7) employees under the direct supervision of Plaintiff LEBLANC participated in hazmat training.

28. After the training for which Plaintiff LEBLANC was present, all seven (7) employees signed the roster, vouching that they had been present for the hazmat training.

29. As per the protocol and practice of UPS, Plaintiff LEBLANC handed the signed roster to the Safety Supervisors, who in the past had frequently lost various important documents, including signed rosters.

30. The morning that Keter, a company that was hired to do inspections of safety

was scheduled to do an audit of UPS, the same Safety Supervisors who previously had in their possession the signed roster approached Plaintiff LEBLANC and requested that all seven (7) employees repeat the hazmat training because they had misplaced the signed roster.

31. Upon information and belief, at least two (2) other supervisors, John Argiento and Donna Manuza, were asked that their employees re-complete the hazmat or other trainings because the signed rosters had been lost.

32. Because the Safety Supervisors approached these three (3) supervisors at 10am when the employees had left at 8am, and because the hazmat training had to be completed before the Keter Audit that day, Plaintiff LEBLANC, along with the two (2) other supervisors, re-created the same safety roster which had been lost by the Safety Supervisors and previously signed by the seven (7) employees.

33. In or about mid April 2011, Plaintiff LEBLANC was approached about the safety roster, which was submitted as part of the Keter Audit, by a Security Manager.

34. Plaintiff LEBLANC never denied re-creating the safety roster, which had been lost by the Safety Supervisors – in fact he had been present for the hazmat training of all seven (7) employees and was able to confirm that they had all been present.

35. Despite never having previously received a negative performance evaluation in his twenty-one (21) years of employment at UPS and having received a salary increase three (3) weeks prior based on positive performance reviews, Plaintiff LEBLANC was summarily terminated. The reason alleged was dishonesty with regard to the list.

36. In addition to his exemplarily performance, Plaintiff LEBLANC in the past few years had not had any injuries among the ninety-four (94) people he supervised as a

Safety Supervisor. This excellent result is extremely rare and potentially unprecedented in the country.

37. However, based on Plaintiff LEBLANC's continuous requests for medical accommodation, which were always denied and the commendation he received immediately prior to his termination, Defendant UPS clearly terminated Plaintiff LEBLANC in retaliation for him continuously requesting medical accommodations.

38. Upon information and belief, both other Supervisors who were accused by Defendant UPS of the same actions in regard to the safety roster were not terminated. John Argiento and Donna Manuza both received nominal disciplinary action for one year only and were otherwise not subjected to any other adverse employment action.

39. Furthermore, at a UPS Peer Review, the peer review board unanimously voted to reinstate Plaintiff LEBLANC's job, however, Plaintiff LEBLANC's job was ultimately not reinstated by Defendant UPS.

40. Upon information and belief, it is extremely uncommon, if it happens at all, for employees to not have their jobs reinstated when the peer review board unanimously votes to reinstate that employee.

41. However, despite the official Peer Review Recommendation, Defendant UPS chose to summarily terminate Plaintiff LEBLANC, in direct retaliation for continuously requesting medical accommodation.

42. Furthermore, Plaintiff LEBLANC was hospitalized four (4) weeks before his termination and due to that hospitalization was out of work for three (3) days.

43. Moreover, Division Manager Mike Michalak vocalized at least three (3) times his frustrations with scheduling Plaintiff LEBLANC because Plaintiff LEBLANC no

longer had a DOT card, as a direct result of his medication and medical condition. Accordingly, Plaintiff LEBLANC was limited in his position as a PDS Dispatch Supervisor.

44.   Plaintiff LEBLANC previously had a DOT card but was not eligible for the DOT card after he began taking medication for his heart condition.  Plaintiff LEBLANC could perform all of his job duties at UPS except driving trucks.

45.   As a result of this termination, Plaintiff LEBLANC suffered from a stress-creating strain on his family life.


## FIRST CAUSE OF ACTION

46.   Plaintiff LEBLANC repeats and realleges each and every allegation contained in paragraphs "1" though "45" with the same force and effect as if separately alleged and reiterated herein.

47.   Defendant UPS subjected Plaintiff LEBLANC to disability discrimination, disparate treatment, a hostile work environment, and retaliation in violation of the New York City Human Administrative Code § 8-101, *et seq*.

48.   As a result, Plaintiff LEBLANC suffered damages for past and future earnings, other employment benefits, and emotional injuries in an amount to be determined at trial.


**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

(i)   On the First Cause of Action, actual damages to be determined at trial, but in no event less than $2,000,000;

(ii)    A bridge to Plaintiff's pension, inclusive of continued health insurance, which

pension would have accrued with thirty (30) years of full-time employment;

(iii)   Disbursements and other costs; and

(iv)   For such other and further relief which the Court deems just and proper.


Dated:      New York, New York
            October 5, 2011


                            _____/s/_____
                            Walker G. Harman, Jr.
                            THE HARMAN FIRM, PC
                            *Attorneys for Plaintiff*
                            200 West 57th Street, Suite 900
                            New York, New York 10019
                            (212) 425-2600

9

# EXHIBIT B

Walker G. Harman, Jr. [WH-8044]
THE HARMAN FIRM, P.C.
*Attorneys for Plaintiff*
200 West 57th Street, Suite 900
New York, New York 10019
212-425-2600

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X

RICHARD LEBLANC,                                  11-CV-6983  (JPO)

                       *Plaintiff,*                **AMENDED**
                                                                              **COMPLAINT**
    -against-

UNITED PARCEL SERVICE,                            **PLAINTIFF**
                                                                              **HEREBY DEMANDS**
                   *Defendant.*              **A TRIAL BY JURY**

------------------------------------------------------------------------X

Plaintiff, RICHARD LEBLANC, by his attorneys, THE HARMAN FIRM, P.C., as and

for his Amended Complaint for employment discrimination against Defendant alleges as

follows:

## JURISDICTION AND VENUE

1.    Jurisdiction of this Court is proper under 28 USC § 1332 in that diversity of

citizenship exists between all parties.

2.    Venue is properly laid in the Southern District of New York under U.S.C. §

1391(a)(2), in that a substantial part of the events or omissions giving rise to the claims

occurred in the Southern District of New York.

## PARTIES

3.    Plaintiff, RICHARD LEBLANC (hereinafter "LEBLANC"), is a resident of Newtown, Connecticut.

4.    Defendant, UNITED PARCEL SERVICE, (hereinafter "UPS") is an Ohio corporation, which maintains a principal place of business in Atlanta, Georgia. Defendant UPS at all times relevant and hereinafter mentioned is the company that employed Plaintiff LEBLANC.

## DEMAND FOR TRIAL BY JURY

5.    Plaintiff demands a trial by jury.

## FACTUAL BACKGROUND

6.    On or about April 15, 1991, Plaintiff LEBLANC was hired by UPS as a "Driver," earning  fifteen ($15) dollars an hour with benefits at the Manhattan South Location.

7.    Up until April 20, 2011, Plaintiff LEBLANC worked at UPS, receiving promotions, positive performance evaluations, and salary increases yearly until 2011, going from Driver to On Car supervisor to a "PDS" (Dispatch Supervisor).

8.    Plaintiff LEBLANC, through his tenure with UPS, never once received a negative performance review.

9.    Before June 2008, Plaintiff LEBLANC had never had a serious medical condition.  However, in or about June 2008, Plaintiff LEBLANC was admitted to the hospital and diagnosed as having had a heart attack.

10.   Plaintiff LEBLANC, as a result of this heart attack, was out of work on

medical leave for six (6) weeks.   As a result of his medical condition, Plaintiff LEBLANC was not able to renew his DOT Card, which would have enabled him to drive for UPS.

11.   Due to his medical condition, Plaintiff LEBLANC's cardiologist wrote a letter to UPS requesting an accommodation for Plaintiff LEBLANC, specifically that Plaintiff LEBLANC be transferred to a location closer to where he lived.   A transfer closer to Plaintiff LEBLANC's home would have reduced his commute by two (2) hours per day, thus alleviating a extremely stressful commute that exacerbated his medical condition.

12.   Upon information and belief, Plaintiff LEBLANC could have been transferred to Watertown, a UPS location situated 4 miles away from Plaintiff LEBLANC's home, or to Brookfield, another UPS location situated 10 miles away from Plaintiff LEBLANC's home.

13.   On or about February 15, 2008, Plaintiff LEBLANC submitted the letter from his cardiologist to HR Manager Yvonne Quiones.

14.   When Plaintiff LEBLANC submitted the letter from his cardiologist to HR, the HR managers were not responsive and did not take his request seriously.   Plaintiff LEBLANC followed up on his request for a medical accommodation multiple times by phoning HR and discussing the request with his supervisors; however, no accommodation was ever provided.   The only answer Plaintiff LEBLANC was ever given was by Rita Tureios, an HR Manager, who said she was "looking into it."   HR failed to provide Plaintiff LEBLANC with any accommodation whatsoever.

15.   In or about March 2009, Plaintiff LEBLANC submitted this same letter again

to Rita Tureios.

16. Although upon information and belief, there were open positions in both Watertown and Brookfield, two UPS locations closer to where Plaintiff LEBLANC lived, Plaintiff LEBLANC's request for this necessary and legitimate medical accommodation was repeatedly denied without reason.

17. In fact, not only was Plaintiff LEBLANC's request for medical accommodation denied without justification, but in January 2008, Plaintiff LEBLANC was also moved to night shifts as a PDS Supervisor. The only reason given to Plaintiff LEBLANC was that he was unable to obtain a DOT card, a fact about which Plaintiff LEBLANC's supervisor, Division Manager Mike Michalak, complained frequently. This change of schedule happened subsequent to Plaintiff LEBLANC submitting a request for medical accommodation.

18. As a PDS Supervisor, Plaintiff LEBLANC was made to work night shifts with arduous hours, which exacerbated Plaintiff LEBLANC's medical condition and created undue stress. Plaintiff LEBLANC was having insomnia and had trouble sleeping; he worked twelve (12) to thirteen (13) hours a day. This created a serious strain on his family, which further exacerbated Plaintiff LEBLANC's heart condition.

19. Plaintiff LEBLANC continued to seek a position closer to his home as well as a position that did not entail him working at night.

20. In or about February 2010, Plaintiff LEBLANC again submitted the letter from his cardiologist to Roberta Ellis, an HR supervisor, and phoned her multiple times after regarding the requested medical accommodation.

21. Plaintiff LEBLANC's request for an accommodation due to his medical

condition was continuously denied.

22. Plaintiff LEBLANC was subjected to a high level of stress because of his lengthy commute every morning, and because he had to work long hours at night. This undue stress caused Plaintiff LEBLANC to be hospitalized for chest pains two (2) additional times, both of which resulted in Plaintiff LEBLANC having to stay in the hospital for three (3) consecutive days.

23. In or about February 2011, Plaintiff LEBLANC again asked Rita Tureios about the transfer, at which point she told Plaintiff LEBLANC again that she was "looking into it."

24. In or about February 2011, Plaintiff LEBLANC also asked Pat Shepard, the Division Manager, about his request for a medical accommodation, to which Mr. Shepard responded that he was "working on it."

25. Upon information and belief, Ruth Herring, another UPS employee requested a move to Atlanta, Georgia for personal reasons not motivated by any medical issues. This request was granted shortly after it was made.

26. Plaintiff LEBLANC was never provided with any medical accommodation whatsoever, in spite of his repeat submission of medical documentation and repeated follow-up requests.

### Plaintiff LEBLANC'S Illegal Termination

27. In or around mid March 2011, seven (7) employees under the direct supervision of Plaintiff LEBLANC participated in hazmat training.

28. After the training for which Plaintiff LEBLANC was present, all seven (7) employees signed the roster, vouching that they had been present for the hazmat training.

29. As per the protocol and practice of UPS, Plaintiff LEBLANC handed the signed roster to the Safety Supervisors, who in the past had frequently lost various important documents, including signed rosters.

30. The morning that Keter, a company that was hired to do inspections of safety was scheduled to do an audit of UPS, the same Safety Supervisors who previously had in their possession the signed roster approached Plaintiff LEBLANC and requested that all seven (7) employees repeat the hazmat training because they had misplaced the signed roster.

31. Upon information and belief, at least two (2) other supervisors, John Argiento and Donna Manuza, were asked that their employees re-complete the hazmat or other trainings because the signed rosters had been lost.

32. Because the Safety Supervisors approached these three (3) supervisors at 10am when the employees had left at 8am, and because the hazmat training had to be completed before the Keter Audit that day, Plaintiff LEBLANC, along with the two (2) other supervisors, re-created the same safety roster which had been lost by the Safety Supervisors and previously signed by the seven (7) employees.

33. In or about mid April 2011, Plaintiff LEBLANC was approached about the safety roster, which was submitted as part of the Keter Audit, by a Security Manager.

34. Plaintiff LEBLANC never denied re-creating the safety roster, which had been lost by the Safety Supervisors – in fact he had been present for the hazmat training of all seven (7) employees and was able to confirm that they had all been present.

35. Despite never having previously received a negative performance evaluation in his twenty-one (21) years of employment at UPS and having received a salary increase

three (3) weeks prior based on positive performance reviews, Plaintiff LEBLANC was summarily terminated.  The reason alleged was dishonesty with regard to the list.

36.  In addition to his exemplarily performance, Plaintiff LEBLANC in the past few years had not had any injuries among the ninety-four (94) people he supervised as a Safety Supervisor.  This excellent result is extremely rare and potentially unprecedented in the country.

37.  However, based on Plaintiff LEBLANC's continuous requests for medical accommodation, which were always denied and the commendation he received immediately prior to his termination, Defendant UPS clearly terminated Plaintiff LEBLANC in retaliation for him continuously requesting medical accommodations.

38.  Upon information and belief, both other Supervisors who were accused by Defendant UPS of the same actions in regard to the safety roster were not terminated. John Argiento and Donna Manuza both received nominal disciplinary action for one year only and were otherwise not subjected to any other adverse employment action.

39.  Furthermore, at a UPS Peer Review, the peer review board unanimously voted to reinstate Plaintiff LEBLANC's job, however, Plaintiff LEBLANC's job was ultimately not reinstated by Defendant UPS.

40.  Upon information and belief, it is extremely uncommon, if it happens at all, for employees to not have their jobs reinstated when the peer review board unanimously votes to reinstate that employee.

41.  However, despite the official Peer Review Recommendation, Defendant UPS chose to summarily terminate Plaintiff LEBLANC, in direct retaliation for continuously requesting medical accommodation.

42. Furthermore, Plaintiff LEBLANC was hospitalized four (4) weeks before his termination and due to that hospitalization was out of work for three (3) days.

43. Moreover, Division Manager Mike Michalak vocalized at least three (3) times his frustrations with scheduling Plaintiff LEBLANC because Plaintiff LEBLANC no longer had a DOT card, as a direct result of his medication and medical condition. Accordingly, Plaintiff LEBLANC was limited in his position as a PDS Dispatch Supervisor.

44. Plaintiff LEBLANC previously had a DOT card but was not eligible for the DOT card after he began taking medication for his heart condition. Plaintiff LEBLANC could perform all of his job duties at UPS except driving trucks.

45. As a result of this termination, Plaintiff LEBLANC suffered from a stress-creating strain on his family life.

## FIRST CAUSE OF ACTION

46. Plaintiff LEBLANC repeats and realleges each and every allegation contained in paragraphs "1" though "45" with the same force and effect as if separately alleged and reiterated herein.

47. Defendant UPS subjected Plaintiff LEBLANC to disability discrimination, disparate treatment, a hostile work environment, and retaliation in violation of the New York City Human Administrative Code § 8-101, *et seq.*

48. As a result, Plaintiff LEBLANC suffered damages for past and future earnings, other employment benefits, and emotional injuries in an amount to be determined at trial.

8

**WHEREFORE,** Plaintiff demands judgment against Defendants as follows:

(i)    On the First Cause of Action, actual damages to be determined at trial, but in no event less than $2,000,000;

(ii)    A bridge to Plaintiff's pension, inclusive of continued health insurance, which pension would have accrued with thirty (30) years of full-time employment;

(iii)   Disbursements and other costs; and

(iv)   For such other and further relief which the Court deems just and proper.


Dated:    New York, New York
           November 4, 2011


Walker G. Harman, Jr.
THE HARMAN FIRM, PC
*Attorneys for Plaintiff*
200 West 57th Street, Suite 900
New York, New York 10019
(212) 425-2600

# EXHIBIT C

DAY PITNEY LLP
SEVEN TIMES SQUARE
NEW YORK, NY 10036-7311
(212) 297-5800
Attorneys For Defendant
United Parcel Service, Inc.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RICHARD LEBLANC, | : Case No. 11-CV-6983 (JPO) |
| Plaintiff, : | |
| | **ANSWER TO THE AMENDED** |
| -against- : | **COMPLAINT ON BEHALF OF** |
| | **DEFENDANT UNITED PARCEL** |
| : | **SERVICE, INC.** |
| UNITED PARCEL SERVICE, | |
| : | |
| Defendant. | |
| : | |

    Defendant United Parcel Service, Inc. (improperly named as "United Parcel Service" and referred to hereinafter as "Defendant" or the "Company"), having its principal place of business at 55 Glenlake Parkway, N.E., Atlanta, Georgia 30328, provides the following Answer to the Amended Complaint (the "Complaint") of Plaintiff Richard LeBlanc:

83742875.3

## JURISDICTION AND VENUE

1.   Defendant admits that this Court has jurisdiction on the basis of diversity jurisdiction but denies that there is any basis in law or in fact for the claims asserted in the Complaint.

2.   Defendant admits that venue properly lies in this judicial district but denies the factual allegations contained in paragraph 2 of the Complaint and further denies that there is any basis in law or in fact for the claims asserted in the Complaint.

## PARTIES

3.   Defendant admits that its business records indicate that Plaintiff resides in Newtown, Connecticut.

4.   Defendant denies the allegations contained in paragraph 4 of the Complaint, except to admit that it is an Ohio Corporation with principal place of business in Atlanta, Georgia, and that its business records demonstrate that it employed Plaintiff from April 7, 1992 to April 21, 2011.

## DEMAND FOR TRIAL BY JURY

5.   Defendant admits that Plaintiff demands a trial by jury but denies that there is any basis in law or in fact for that demand or for any of the relief requested in the Complaint.

83742875.3                                    2

## **FACTUAL BACKGROUND**

6.  Defendant denies the allegations contained in paragraph 6 of the Complaint, except to admit that its business records indicate that it employed Plaintiff beginning on or about April 7, 1992 as a package driver in the Central New York District.

7.  Defendant denies the allegations contained in paragraph 7 of the Complaint, except to state that its business records indicate that Plaintiff worked as an On Road Supervisor and, later, a Preload and Dispatch Supervisor prior to his termination on or about April 21, 2011.

8.  Defendant denies the allegations contained in paragraph 8 of the Complaint.

9.  Defendant is without sufficient knowledge or information to form a reasonable belief as to the truth of the allegations contained in paragraph 9 of the Complaint.

10. Defendant is without sufficient knowledge or information to form a reasonable belief as to the truth of the allegations contained in paragraph 10 of the Complaint, except to state that its business records indicate that Plaintiff took a medical leave of absence on or around May 21, 2007 through August 14, 2007, and, on or about February 8, 2009, his DOT card

expired and was not renewed.

11. Defendant is without sufficient knowledge or information to form a reasonable belief as to the truth of the allegations contained in the paragraph 11 of the Complaint, except to state that Defendant has no record of an accommodation request by Plaintiff.

12. Defendant denies the allegations contained in paragraph 12 of the Complaint.

13. Defendant is without sufficient knowledge or information to form a reasonable belief as to the truth of the allegations contained in the paragraph 13 of the Complaint, except to state that Defendant has no record of an accommodation request by Plaintiff.

14. Defendant denies the allegations contained in paragraph 14 of the Complaint, except to state that Plaintiff did inquire as to available positions in Connecticut but that Defendant has no record of an accommodation request by Plaintiff.

15. Defendant denies the allegations contained in paragraph 15 of the Complaint.

16. Defendant denies the allegations contained in

paragraph 16 of the Complaint.

17. Defendant denies the allegations contained in paragraph 17 of the Complaint, except to state that on or around May 7, 2008, Defendant transferred Plaintiff to the position of Preload and Dispatch Supervisor, which involved night hours and did not require a DOT card.

18. Defendant denies the allegations contained in paragraph 18 of the Complaint, except to state that it is without sufficient knowledge or information to form a reasonable belief as to the truth of the allegations regarding Plaintiff's medical condition contained in paragraph 18 of the Complaint.

19. Defendant denies the allegations contained in paragraph 19 of the Complaint, except to state that Plaintiff did inquire as to available positions in Connecticut but that Defendant has no record of an accommodation request by Plaintiff.

20. Defendant denies the allegations contained in paragraph 20 of the Complaint.

21. Defendant denies the allegations contained in paragraph 21 of the Complaint.

22. Defendant is without sufficient knowledge or

information to form a reasonable belief as to the truth of the allegations contained in paragraph 22 of the Complaint.

23. Defendant denies the allegations contained in paragraph 23 of the Complaint.

24. Defendant denies the allegations contained in paragraph 24 of the Complaint.

25. Defendant denies the allegations contained in paragraph 25 of the Complaint.

26. Defendant denies the allegations contained in paragraph 26 of the Complaint.

27. Defendant is without sufficient knowledge or information to form a reasonable belief as to the truth of the allegations contained in paragraph 27 of the Complaint, except to state that, on or about March 30, 2011, Plaintiff informed Defendant that he had not conducted the hazmat training class.

28. Defendant is without sufficient knowledge or information to form a reasonable belief as to the truth of the allegations contained in paragraph 28 of the Complaint, except to state that, on or about March 30, 2011, Plaintiff informed Defendant that he had not conducted the hazmat training class.

29. Defendant denies the allegations contained in

paragraph 29 of the Complaint.

30. Defendant denies the allegations contained in paragraph 30 of the Complaint, except to state that, on the morning of the Keter audit, the safety department requested records regarding the training which Plaintiff was required to have completed with his employees.

31. Defendant denies the allegations contained in paragraph 31 of the Complaint, except to state that, on the morning of the Keter audit, the safety department also requested records of other supervisors, including John Argiento and Donna Mannuza.

32. Defendant denies the allegations contained in paragraph 32 of the Complaint, except to state that Plaintiff falsified attendance records and tests in the names of his employees for a training class.

33. Defendant admits the allegations contained in paragraph 33 of the Complaint.

34. Defendant denies the allegations contained in paragraph 34 of the Complaint, except to state that Plaintiff admitted to falsifying attendance records and tests in the names of his employees for a training class.

35. Defendant denies the allegations contained in paragraph 35 of the Complaint, except to state that on April 21, 2011, Defendant terminated Plaintiff's employment for dishonesty and that, prior to his termination, Plaintiff had received a salary increase.

36. Defendant denies the allegations contained in paragraph 36 of the Complaint.

37. Defendant denies the allegations contained in paragraph 37 of the Complaint.

38. Defendant denies the allegations contained in paragraph 38 of the Complaint, except to state that Mannuza and Argiento were not terminated in April 2011.

39. Defendant denies the allegations contained in paragraph 39 of the Complaint, except to state that, on or about August 17, 2011, Plaintiff's termination was reviewed by a Peer Review panel pursuant to Defendant's Employee Dispute Resolution Program, the Peer Review panel's non-binding recommendation was reinstatement without back pay, merit pay, or salary increase and with a final warning, and Defendant rejected the panel's recommendation.

40. Defendant denies the allegations contained in paragraph 40 of the Complaint.

41.  Defendant denies the allegations contained in paragraph 41 of the Complaint.

42.  Defendant is without sufficient knowledge or information to form a reasonable belief as to the truth of the allegations contained in paragraph 42 of the Complaint, except to state that, in or around March 2011, Plaintiff was absent from work for three days.

43.  Defendant denies the allegations contained in paragraph 43 of the Complaint.

44.  Defendant is without sufficient knowledge or information to form a reasonable belief as to the truth of the allegations contained in paragraph 44 of the Complaint, except to state that, on or about February 8, 2009, his DOT card expired and was not renewed.

45.  Defendant is without sufficient knowledge or information to form a reasonable belief as to the truth of the allegations contained in paragraph 45 of the Complaint.

## FIRST CAUSE OF ACTION

46.  Defendant repeats its answers to each and every allegation contained in all preceding paragraphs of the Complaint as if fully set forth at length herein.

47. Defendant denies the allegations contained in paragraph 47 of the Complaint.

48. Defendant denies the allegations contained in paragraph 48 of the Complaint, and further denies that Plaintiff is entitled to any of the relief requested therein or as otherwise requested in the Complaint.

Defendant further denies that Plaintiff is entitled to any of the relief requested in the Wherefore clause that immediately follows paragraph 48 of the Complaint, including, but not limited to, subparagraphs (i) through (iv).

## AFFIRMATIVE DEFENSES

As and for its Affirmative Defenses, Defendant states as follows:

## FIRST AFFIRMATIVE DEFENSE

The Complaint, in whole or in part, fails to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

Any loss sustained by Plaintiff was due to the actions of Plaintiff over whom Defendant exercised no control as to the issues in dispute.

## THIRD AFFIRMATIVE DEFENSE

The damages alleged by Plaintiff were not proximately caused by the actions of Defendant.

## FOURTH AFFIRMATIVE DEFENSE

Defendant owed no duty to Plaintiff that is in dispute in this case.

## FIFTH AFFIRMATIVE DEFENSE

The Complaint is barred in whole or in part by the doctrine of waiver and/or estoppel.

## SIXTH AFFIRMATIVE DEFENSE

On the facts alleged, Plaintiff is not entitled to an award of compensatory damages as alleged in the Complaint.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff is not entitled to any of the damages available under the New York City Human Rights Law.

## EIGHTH AFFIRMATIVE DEFENSE

On the facts alleged, Plaintiff is not entitled to an award of attorneys' fees or costs of suit on some or all of his claims.

### NINTH AFFIRMATIVE DEFENSE

On the facts alleged, Plaintiff is not entitled to the recovery of back pay, front pay or alleged lost benefits.

### TENTH AFFIRMATIVE DEFENSE

The Complaint is barred in whole or in part by the relevant statute of limitations.

### ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff has failed to make reasonable efforts to mitigate his alleged damages.

### TWELFTH AFFIRMATIVE DEFENSE

Plaintiff was an at-will employee who was subject to termination at any time for any reason.

### THIRTEENTH AFFIRMATIVE DEFENSE

Without prejudice to any other defense, any employment action taken with respect to Plaintiff was for legitimate, non-discriminatory and non-retaliatory reasons.

### FOURTEENTH AFFIRMATIVE DEFENSE

Without prejudice to any other defense, Plaintiff never requested an accommodation of Defendant.

### FIFTEENTH AFFIRMATIVE DEFENSE

Without prejudice to any other defense, Plaintiff cannot perform the essential functions of his position with or without a reasonable accommodation.

### SIXTEENTH AFFIRMATIVE DEFENSE

Without prejudice to any other defense, Plaintiff was not and is not disabled within the meaning of the New York City Human Rights Law.

### SEVENTEENTH AFFIRMATIVE DEFENSE

Defendant exercised reasonable care to prevent and correct any alleged discrimination or retaliation, and Plaintiff unreasonably failed to avail himself of the Company's preventive and corrective policies and procedures and failed to otherwise avoid harm.

WHEREFORE, Defendant United Parcel Service, Inc. demands judgment in its favor and against Plaintiff Richard LeBlanc, dismissing the Complaint with prejudice, together with costs, attorneys' fees and such other relief as the Court may deem appropriate.

Respectfully submitted,

Dated: January 20, 2012

**DAY PITNEY LLP**
*Attorneys for Defendant*
*United Parcel Service, Inc.*

By:  \_/s/ Heather Weine Brochin\_\_\_\_
Daniel L. Schwartz
Heather Weine Brochin
Joseph C. Nuzzo, Jr.

7 Times Square
New York, NY 10036
Phone:  (212) 297-5800

## CERTIFICATE OF SERVICE

I hereby certify that on this date a copy of the within Answer of Defendant United Parcel Service, Inc. was served via the court's electronic case filing system and U.S. First Class Mail upon the following counsel for Plaintiff.

Walker G. Harman, Esq.
The Harman Firm, P.C.
Attorneys for Plaintiff
200 West 57th St., Ste. 900
New York, NY 10019

/s/ Heather Weine Brochin
HEATHER WEINE BROCHIN

DATED: January 20, 2012.

# EXHIBIT D

Page 1

1
2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
3  11-CV-6983(JPO)
   - - - - - - - - - - - - - - - - -x
4  RICHARD LEBLANC,                    :
                                       :
5                       Plaintiff,     :
                                       :
6           - against -                :
                                       :
7  UNITED PARCEL SERVICE,              :
                                       :
8                       Defendant.     :
                                       :
9  - - - - - - - - - - - - - - - - -x
10
11                              April 19, 2012
                                9:30 a.m.
12                              7 Times Square
                                New York, New York
13
14
15
16
17
18
19
20          DEPOSITION OF RICHARD LEBLANC, held at
21  the above-mentioned time and place, before Randi
22  Friedman, a Registered Professional Reporter and
23  Notary Public within and for the State of New
24  York.
25

1                    R. Leblanc

2       Q.    Prior to living in Tennessee, where

3  did you live?

4       A.    11 Apple Blossom Lane, Newtown,

5  Connecticut.

6       Q.    How long did you live there?

7       A.    21 years.

8       Q.    Did you live with the same people

9  there, your three children and your wife?

10      A.    Yes.

11      Q.    Why did you move to Tennessee?

12      A.    I couldn't afford Connecticut anymore.

13      Q.    I just want to turn to your employment

14  at UPS and start by asking you if you recall when

15  you were hired by UPS.

16      A.    I guess April 15th, '90.  Somewhere

17  around there.

18      Q.    Does April 7th, 1992 sound about

19  right?

20      A.    No.  Could be.

21      Q.    And what position did you start in

22  when you commenced employment with UPS?

23      A.    Helper.

24      Q.    You were a helper, okay.  How long

25  were you in the role as helper?

<div align="center">R. Leblanc</div>

1

2     A.     Two months, three months.

3     Q.     And after that, what position?

4     A.     Driver.

5     Q.     And about how long were you a driver?

6     A.     Ten years.

7     Q.     Okay.  Approximately ten years?

8     A.     Yes.

9     Q.     And what facility were you working out

10 of when you were a helper?

11    A.     Elmsford.

12    Q.     What facility were you working out of

13 when you were a driver?

14    A.     Elmsford.

15    Q.     Where is Elmsford located?

16    A.     New York, near the Tappan Zee Bridge.

17    Q.     Where were you residing at the time

18 when you started your job working in Elmsford for

19 UPS?

20    A.     Newtown.

21    Q.     And about how far is it from Newtown

22 to Elmsford?

23    A.     Approximately 40 miles.

24    Q.     Did you ever consider moving closer to

25 your work location?

VERITEXT REPORTING COMPANY
www.veritext.com
212-279-9424                    212-490-3430

1                       R. Leblanc

2                  MR. HARMAN:  Is the question now

3       or --

4       Q.    Do you understand that during your

5   employment that this guided how you should be

6   acting as an employee?

7       A.    Yes.

8       Q.    Okay.  Can you just turn to page --

9   the one that's UPS 0011.

10      A.    (Witness complies.)

11      Q.    There's another section on integrity

12  there.  It's on the page that looks like part of

13  the book that's page 16.  "We insist upon

14  integrity in our people."  Just take a look and

15  read that.  I just want to make sure that you

16  also agree that that's during your employment, to

17  guide your actions as a UPS employee.

18      A.    Yes.

19      Q.    If you can hand me back that document.

20            So was there a time that your position

21  at UPS changed from a driver?

22      A.    Yes.

23      Q.    Okay.  And was that about February of

24  2001?

25      A.    Yes.

1                    R. Leblanc

2       Q.    And what position did you move into in

3  February of 2001?

4       A.    On car supervisor.

5       Q.    Whose decision was it to move you to

6  on car supervisor?

7       A.    Mike Feroni.

8       Q.    And who is Mike Feroni?

9       A.    He was the division manager.

10      Q.    The division manager of the Elmsford

11 location?

12      A.    Yes.

13      Q.    For approximately what time period was

14 he the division manager where you were working?

15      A.    I don't recall.

16      Q.    But it was during part of the time you

17 were a driver at Elmsford?

18      A.    Yes.

19      Q.    And it was at the time that you were

20 moved to a new position?

21      A.    Yes.

22      Q.    And that position was on road

23 supervisor; is that correct?

24      A.    Yes.

25      Q.    So you believe Mike Feroni made the

1                    R. Leblanc

2   decision to move you to on car supervision?

3        A.    Yes.

4        Q.    Sorry, I apologize, on road

5   supervisor; is that correct?

6        A.    Yes.

7        Q.    Was that a promotion?

8        A.    Yes.

9        Q.    And you were still based at the

10  Elmsford center?

11       A.    Yes.

12       Q.    And did your hours change at all from

13  the time you were a driver to the time you became

14  an on road supervisor?

15       A.    Yes.

16       Q.    And what were your approximate hours

17  as a driver?

18       A.    Approximately nine hours a day, ten

19  hours a day.

20       Q.    How about when you became an on road

21  supervisor?

22       A.    Approximately 13 to 14 hours.

23       Q.    So you worked 13 to 14 hours a day as

24  an on road supervisor?

25       A.    Yes.

Page 17

R. Leblanc

1

2      Q.      About what time did you need to arrive

3   at work when you were an on road supervisor?

4      A.      Six o'clock in the morning,

5   approximately.

6      Q.      And about how long did it take you to

7   get to the Elmsford facility from your home in

8   Newtown as an on road supervisor at 6:00 a.m., to

9   arrive at 6:00 a.m.?

10     A.      Approximately 30 minutes.

11     Q.      Did you ever work as an on road

12  supervisor at a different UPS location?

13     A.      Yes.

14     Q.      Where was that?

15     A.      The Bronx.

16     Q.      Did you ever work out of the Elmira

17  facility?

18     A.      No.

19     Q.      So you were an on road supervisor at

20  the Elmsford facility for what time period?

21     A.      I don't remember.

22     Q.      So we talked before that you moved

23  into the role in February 2001; is that correct?

24     A.      Yes.

25     Q.      Do you know approximately when you

```
 1                      R. Leblanc
 2   who it was at the time.
 3        Q.    It was no longer Mike Feroni?
 4        A.    No.
 5        Q.    Were your hours similar at Brush
 6   Avenue as an on road supervisor as they were at
 7   Elmsford?
 8        A.    Yes.
 9        Q.    So it was about 13, 14-hour days?
10        A.    Approximately.
11        Q.    And about how long did it take you to
12   get to the Elmsford facility after you moved
13   there in about 2003?
14        A.    To the Bronx, you mean?
15        Q.    Strike that.  Let me start again.
16              Approximately how long did it take you
17   to get from Newton, your home --
18        A.    Newtown.
19        Q.    -- Newtown to the Brush Avenue
20   facility once you started working there as an on
21   road supervisor?
22        A.    Approximately an hour and ten minutes.
23        Q.    And you were commuting there in the
24   morning to arrive at approximately 6:00 a.m.; is
25   that correct?
```

Page 22

1                         R. Leblanc

2         Q.    And was there more than one on road

3    supervisor at Brush Avenue at the time you were

4    an on road supervisor?

5         A.    Yes.

6         Q.    About how many?

7         A.    At times, three.  At times, four.

8         Q.    Okay.  If employees that you

9    supervised made inquiries about requests for time

10   off or leaves, would they come to you?

11        A.    Yes.

12        Q.    And what would you do?

13        A.    Try and get them whatever they needed.

14   Time off or...

15        Q.    And if they were making a request for

16   a medical accommodation, change their schedule or

17   some other medical accommodation, who would you

18   refer that to?

19        A.    HR.

20        Q.    Do you ever work with or receive

21   training from UPS's occupational health

22   representatives?

23        A.    Not that I can remember.

24        Q.    In your on road supervisor job, did

25   you drive the UPS package car from time to time?

1                      R. Leblanc

2        line?

3                 MS. BROCHIN:   I think I said

4        hotline, but you're right, it does say "UPS

5        help line."

6        Q.    I assume your answer doesn't change

7   regardless of whether I call it a hotline or help

8   line?

9        A.    No, it doesn't.

10       Q.    You were aware of it; correct?

11       A.    Yes.

12       Q.    Did you ever have occasion to send

13  employees on your team to -- you said human

14  resources, because they were requesting some sort

15  of medical accommodation?

16       A.    Not that I can recall.

17       Q.    Was there a point in time that you

18  went out on a leave of absence when you were an

19  on road supervisor?

20       A.    Yes.

21       Q.    Approximately when was that?

22       A.    2008.

23       Q.    Does May 2007 sound about right?

24       A.    Yeah.   Yes.

25       Q.    Okay.   And why did you go out on that

1                        R.  Leblanc

2    leave?

3         A.     From a heart attack.

4         Q.     And did you have a prior heart

5    condition?

6         A.     No.

7         Q.     So it was a sudden heart attack?

8         A.     Yes.

9         Q.     And did it occur while you were at

10   home or work?

11        A.     In a doctor's office.

12        Q.     It occurred in the doctor's office?

13        A.     Yes.

14        Q.     Were you hospitalized?

15        A.     Yes.

16        Q.     For about how long?

17        A.     One week.

18        Q.     And about how long were you out of

19   work?

20        A.     Approximately two months.

21        Q.     And would you say you returned around

22   August 2007?

23        A.     Yes.

24        Q.     Who did you speak to at UPS when you

25   went out on that leave?

```
 1                    R. Leblanc
 2   the hospital and was admitted.
 3        Q.    Okay.  And this was in what year?
 4        A.    2011.
 5        Q.    Was the woman you spoke to in 2007
 6   named Valerie, by any chance?
 7        A.    I'm not sure.
 8        Q.    So when you returned back from your
 9   leave of absence in or about August 2007, did you
10   return back to your on road supervisor job at
11   Brush Avenue?
12        A.    For -- yeah, for a couple weeks, I
13   think.
14        Q.    Did you stay in that on road
15   supervisor job until about May of 2008?
16        A.    Maybe.
17        Q.    Okay.  And so you came back.  Were you
18   working the same hours when you returned back to
19   work in August 2007?
20        A.    Yes.
21        Q.    So between that August 2007 period and
22   May 2008, you continued in the on road supervisor
23   role at Brush Avenue?
24        A.    Yes.  Yes.
25        Q.    Just any chance the woman you spoke to
```

1                         R. Leblanc

2     in 2007 was Quinn Wang?

3          A.    I don't recognize that name.

4          Q.    Okay.  Did your role at UPS ever

5     change at any point in 2008?

6          A.    Yes.

7          Q.    And what happened?

8          A.    I was put on the night shift.

9          Q.    And were you transferred to a

10    different operation supervisor role?

11         A.    PDS.

12         Q.    And what does that stand for?

13         A.    Package --

14         Q.    Does it stand for preload and dispatch

15    supervisor?

16         A.    Yes, yes.

17         Q.    Okay.  We'll call it a PDS.

18         A.    I had a moment.

19         Q.    And why were you moved to the preload

20    and dispatch supervisor job?

21         A.    That's where they put me.

22         Q.    At any point in time in 2007, did you

23    lose your DOT card?

24         A.    Yes, when it expired.

25         Q.    I'm sorry?

Page 41

                              R. Leblanc

1

2     as on road supervisor?

3          A.    No.

4          Q.    Before you were transferred?

5          A.    No.

6          Q.    Okay.  So you were lightheaded.  You

7     were feeling lightheaded when you were in the

8     role of preload and dispatch supervisor?

9          A.    Yes.

10         Q.    That is why you could not renew your

11    DOT card?

12         A.    Right.

13         Q.    Okay.  And you don't know what this

14    medicine was for?

15         A.    Could have been my platelets.  I'm not

16    sure.

17         Q.    Okay.  Who did you tell that you lost

18    your DOT card?

19         A.    No one.

20         Q.    No one?  You didn't need to give the

21    renewal to UPS?

22         A.    No, not for that job.

23         Q.    Not for what job?

24         A.    PDS.  It's in the building.

25         Q.    But you needed a DOT card for the on

Page 42

1                        R. Leblanc

2    road supervisor job?

3         A.    Yes.

4         Q.    So while you were on that medication

5    you couldn't be an on road supervisor; is that

6    correct?

7         A.    Yes.

8         Q.    And when you didn't have the DOT card

9    you couldn't be an on road supervisor; right?

10        A.    Right.

11        Q.    Do you know who made the decision to

12   transfer you to the PDS position?

13        A.    Mike Feroni.

14        Q.    Now is that the same individual who

15   was the division manager when you were at

16   Elmsford?

17        A.    Yes.

18        Q.    Was he also division manager at Brush

19   Avenue?

20        A.    Yes.

21        Q.    Do you know what time period?

22        A.    I do not.

23        Q.    Was it the whole time that you were at

24   Brush Avenue, he was the division manager?

25        A.    No.

1                    R. Leblanc

2   job?

3        A.    Yes.

4        Q.    What were those?

5        A.    Local sort supervisor.

6        Q.    Isn't that a part-time job?

7        A.    No.

8        Q.    It was full time?  Same number of

9   hours, approximately, as your position?

10       A.    Yes.

11       Q.    Okay.  Anything else?

12       A.    All the different safety, HR.

13       Q.    But operations.  So different -- HR,

14  different from the job that you were in?

15       A.    Yes.

16             MR. HARMAN:  Objection.

17       A.    Yes.

18       Q.    And so what were your hours as a PDS

19  at the Brush Avenue facility?

20       A.    Approximately 1:00 to 1:00.  1:00 a.m.

21  to 1:00 p.m.

22       Q.    And about what time did you leave from

23  your home to get there at the 1:00 a.m. start?

24       A.    Approximately 11:45 p.m.

25       Q.    Was the commute on the way in slightly

Page 47

                         R. Leblanc

2  better than it was in the morning when you were

3  working as an on road supervisor?

4                MR. HARMAN:   Objection.

5      A.     More drunks.

6      Q.     I'm sorry?

7      A.     More drunks on the road.

8      Q.     And how about on the way home; what

9  time did you arrive home?

10     A.     2:30 p.m.

11     Q.     And how about the commute home, was

12 that any different than your commute home when

13 you were an on road supervisor?

14     A.     Longer.

15     Q.     Why was it longer?

16     A.     Traffic.

17     Q.     About how much longer?

18     A.     Approximately 15 minutes.

19     Q.     So about how long was your commute?

20 You're saying it was 15 minutes longer.   About

21 how long was it?

22     A.     Approximately an hour and a half.

23     Q.     And as a preload and dispatch

24 supervisor, what was your job --

25 responsibilities?

1                    R. Leblanc

2        A.    To run the unload and to dispatch the

3    drivers.  Packages in the vehicles.

4        Q.    About how many employees did you

5    supervise?

6        A.    85.

7        Q.    And were there other PDS supervisors

8    at the time?

9        A.    One.

10       Q.    And did this change in your position

11   at UPS have any effect on your personal life?

12                MR. HARMAN:  Objection.

13       A.    Lack of sleep.  Not seeing my wife.

14       Q.    Was your compensation the same?

15       A.    Yes.

16       Q.    And you worked approximately the same

17   number of hours as you did when you were an on

18   road supervisor; correct?

19       A.    A little less.  Twelve.

20       Q.    You worked 12 hours as a PDS, whereas

21   you worked 13 hours as an on road supervisor?

22                MR. HARMAN:  13, 14 hours was the

23       testimony.

24       A.    Yes.

25       Q.    Let me ask the question again so it's

Page 49

1                    R. Leblanc

2    clear on the record.

3              As a PDS, you worked approximately 12

4    hours a day; is that correct?

5         A.    Yes.

6         Q.    And as an on road supervisor, you

7    worked between 13 and 14 hours a day; is that

8    correct?

9         A.    Yes.

10        Q.    Thank you.

11              Did you ever ask to move back to an on

12   road supervisor job at the Brush Avenue facility?

13        A.    No.

14        Q.    Why not?

15        A.    I don't know.

16        Q.    You were happy working the PDS

17   position?

18              MR. HARMAN:   Objection.

19        A.    Yes.

20        Q.    Did you ever look to transfer to any

21   of those other operations supervisor jobs that

22   you mentioned before at the Brush Avenue

23   facility?

24        A.    No.

25        Q.    Did you enjoy your job as a PDS

                          R. Leblanc

1

2     Q.     That would be G-u-i-n-e-y.

3            All right.  So was one of your jobs as

4     a preload dis -- I'm sorry, was one of your

5     responsibilities as a PDS to deal with United

6     States Postal Service packages that wound up in

7     the UPS facility at Brush Avenue?

8     A.     Yes.

9     Q.     Do you know why those packages wound

10    up at Brush Avenue from time to time?

11           MR. HARMAN:  Objection.

12    A.     By mistake.

13    Q.     And how often was it that you needed

14    to address United States Postal Service packages

15    at your facility?

16    A.     Approximately once a week.

17    Q.     Is it because they were held over

18    until one time per week that you had to deal with

19    them?

20           MR. HARMAN:  Objection.

21    Q.     Let me ask that a different way.

22           Did these packages come in daily that

23    should have been going to the United States

24    Postal Service?

25           MR. HARMAN:  Objection.

1                          R. Leblanc

2          A.    Yes.

3          Q.    Did you only address them once a week

4    and decide how to deal with them?

5                     MR. HARMAN:   Objection.

6          A.    Yes.

7          Q.    And what was supposed to happen to

8    these packages?

9          A.    Brought to the post office.

10         Q.    And was this your responsibility

11   during the entire time you were at PDS?

12         A.    No.

13         Q.    When did you have this responsibility?

14         A.    When Dennis Quinn left.

15         Q.    Okay.  So starting around May 2010, it

16   became your responsibility to deal with the

17   United States Postal Service packages at the

18   Brush Avenue facility?

19         A.    Yes.

20         Q.    And was it your responsibility until

21   the end of your employment?

22         A.    Yes.

23         Q.    So once a week you were supposed to

24   bring these packages to the United States Post

25   Office; is that correct?

1                          R. Leblanc

2          A.     Yes.

3          Q.     And did you do this once a week?

4          A.     Yes.

5          Q.     About how many packages were there,

6     approximately, each week?

7          A.     Different every week.

8          Q.     Can you give me a range?

9          A.     Could have been ten, it could have

10    been 100, from week to week.

11         Q.     Where were you bringing them when you

12    say the post office?

13         A.     The post office on East Tremont.

14         Q.     Is that a sorting center or is that an

15    East Tremont center?

16                    MR. HARMAN:   Objection.

17         A.     East Tremont center.

18         Q.     Why were you bringing it to that

19    particular post office?

20         A.     It's the closest one.

21         Q.     Were you ever told that you weren't

22    supposed to bring it to this particular post

23    office anymore?

24         A.     Yes.

25         Q.     And when was that?

Page 62

1                          R. Leblanc

2     took a group of packages that were in the

3     facility and left them at a mailbox?

4          A.    Yes.

5          Q.    About how many packages?

6          A.    I don't recall.

7          Q.    Was it between 75 and 100 packages?

8          A.    Yes, probably, approximately.

9          Q.    And was this at a mailbox on the

10    corner of Quincy and Bruckner Boulevard?

11         A.    Yes.

12         Q.    And did anyone know you did that?

13         A.    Anyone?

14         Q.    At the time.

15         A.    Not that I know of.

16         Q.    Did you take anyone with you to

17    deliver those 75 to 100 packages?

18         A.    Yes.

19         Q.    Who?

20         A.    A part-time driver.

21         Q.    What's his name?

22         A.    Billy Connect.

23         Q.    Did you tell him what you were doing?

24         A.    Yes.

25         Q.    Did he assist you unloading the

R. Leblanc

1

2      Q.      Who's LP?

3      A.      Loss prevention.

4      Q.      Okay.   But can you answer my question?

5              MS. BROCHIN:   Can you read back

6      the question, please.

7              (Whereupon the reporter read back

8      the requested portion of the record.)

9      A.      No.

10     Q.      Did you see the article that was

11  written about the packages that were left?

12     A.      Yes.

13     Q.      Did somebody show it to you?

14     A.      Yes.

15     Q.      Who showed it to you?

16     A.      Billy Connect.

17     Q.      Billy Connect?   Okay.

18              (Newspaper article marked Exhibit

19     D-4 for identification.)

20              Does that look like the article that

21  was in the newspaper?

22     A.      Yes.

23     Q.      Is that a local newspaper?

24     A.      Yes.

25     Q.      And who is Billy Connect?

1                      R.  Leblanc

2        A.      The driver that went with me.

3        Q.      Did anyone in management show you

4  this?

5        A.      No.

6        Q.      And so the document marked D-4 is the

7  article that we were referencing; is that

8  correct?

9        A.      Yes.

10        Q.      When you were questioned by loss

11  prevention, do you remember who the person was

12  who questioned you?

13        A.      No.

14        Q.      Could it be Ralph Fargardo?

15        A.      Could be.

16        Q.      Did you sign a statement regarding

17  this?

18        A.      Yes.

19        Q.      What did you tell Mr. Fargardo?

20        A.      I don't recall.

21        Q.      Did you admit that you left the

22  packages?

23        A.      Yes.

24                      (Statement by Mr. Leblanc marked

25        Exhibit D-5 for identification.)

1                      R. Leblanc

2         Q.    Can you look at the document that's

3    been marked D-5.

4               Do you recognize that?

5         A.    Yes.

6         Q.    And what is it?

7         A.    Saying that I left the packages with

8    Billy Connect on the Bruckner.

9         Q.    This is your handwriting?

10        A.    Yes.

11        Q.    This is a statement you made

12   voluntarily?

13        A.    Yes.

14        Q.    Turn to the second page, please.  It

15   says that you read it -- you read it yourself and

16   you agree to the truth and accuracy of the facts

17   in that statement; is that correct?

18        A.    As much as I can recall.

19        Q.    At the time it was true and accurate?

20        A.    I don't know.

21        Q.    You signed that statement; correct?

22        A.    I guess.

23        Q.    And were you -- you said before that

24   you told the security person who was interviewing

25   you -- could it be Ralph Fargardo, because he

1                          R. Leblanc

2        Q.      Where was the actual sheet?

3        A.      Lost.

4        Q.      So --

5        A.      I handed it to Tanya.  And it was

6   gone.

7        Q.      Are you suggesting that these

8   employees actually took that class?

9        A.      Absolutely.

10        Q.      And who were these employees?  What

11   are their names?

12        A.      I don't remember.

13        Q.      Do you remember any of their names?

14        A.      No.

15        Q.      Not one of the names that you wrote?

16   You don't remember?

17        A.      No.  That was almost a year ago.

18        Q.      And how about the tests?

19        A.      Yes.

20        Q.      Did you have their tests?

21        A.      No.

22        Q.      Did you also hand in tests for them?

23        A.      Yes.

24        Q.      So when you handed in the tests for

25   them, did they take the tests or did you complete

1              R. Leblanc

2  the tests for them?

3      A.    The ones that they did were lost.   I

4  recreated them.

5      Q.    So in other words, you took

6  approximately eight to ten tests, filled out the

7  multiple choice and signed an employee name?

8      A.    Yes.

9      Q.    Did you put the same answers for all

10 of them?

11     A.    They have to be 100 percent.

12     Q.    So you put the correct answers down?

13     A.    They have to be.

14     Q.    Did you have the answer sheet?

15     A.    Yes.

16     Q.    So you filled out the tests for your

17 employees to make sure that they were all right?

18     A.    Yes.

19     Q.    And you signed their names?

20     A.    Yes.

21     Q.    Did you sign them differently so it

22 looked like each of them signing it?

23     A.    Yes.

24     Q.    Was that honest?

25     A.    No.

1                       R.  Leblanc

2         Q.    Was that consistent with UPS's

3    integrity policy?

4         A.    I'm sorry, can you say it again?

5         Q.    Was that consistent with UPS's

6    integrity policy?

7         A.    No.

8         Q.    So it was inconsistent with UPS's

9    policy book and code of conduct?

10        A.    Yes.

11        Q.    And how did UPS management figure out

12   that you had fabricated these tests and sign-in

13   sheets?

14        A.    No idea.

15        Q.    Who confronted you?

16        A.    Loss prevention.

17        Q.    And why did you fabricate the tests

18   and the sign-in sheets?

19        A.    The team, inspection team was coming.

20        Q.    Was this inspection a Keter Audit?

21        A.    Yes.

22        Q.    And what's your understanding of what

23   a Keter Audit is?

24        A.    It's a company that UPS pays to come

25   and audit the buildings.

1                       R. Leblanc

2       Q.    Is that to make sure that UPS is

3   complying with its safety obligations under the

4   law, such as OSHA?

5       A.    Yes.

6       Q.    So this outside entity comes in to

7   check to make sure UPS is doing what it needs to?

8       A.    Yes.

9       Q.    And UPS needs to comply with a whole

10  host of laws including OSHA, right, in terms of

11  safety?

12      A.    Yes.

13      Q.    Is that why you were conducting these

14  hazmat trainings?

15      A.    Yes.

16      Q.    And were these sign-in sheets going to

17  be part of a submission to OSHA?

18      A.    No.

19      Q.    OSHA requires that all employees be

20  trained --

21      A.    Yes.

22      Q.    -- on hazmat?

23      A.    Yes.

24      Q.    And UPS is required to keep records

25  that every employee has been trained; correct?

1                          R. Leblanc

2        A.     Yes.

3        Q.     So part of these records were to

4   include the fabricated records you created;

5   correct?

6        A.     They were done.  So they weren't

7   fabricated.

8        Q.     That's not my question.

9               The sheets that were going to be part

10  of UPS's hazmat training records were going to

11  have forged signatures; correct?

12       A.     Yes.

13       Q.     And that's because you forged them;

14  correct?

15       A.     I recreated them.

16       Q.     You recreated them by trying to make

17  handwriting look different and signing employees'

18  names?

19       A.     Yes.

20       Q.     You wouldn't call that forging?

21       A.     No.

22       Q.     Okay.  What would you call it?

23       A.     Forging I think would be if I had done

24  the tests for them and then they weren't trained.

25       Q.     But --

1                     R. Leblanc

2    I try hiding it?

3          Q.     Can anyone corroborate that you

4    actually gave these employees a class?

5          A.     All of them.

6          Q.     But you don't know who they are?

7          A.     No.

8          Q.     Do you remember signing a statement

9    about this?

10         A.     I would say yes.

11                    (Statement by Mr. Leblanc was

12         marked Exhibit D-6 for identification.)

13         Q.     Mr. Leblanc, please take a look at

14   what's been marked D-6.  Do you recognize that?

15         A.     Yes.

16         Q.     Is that your handwriting?

17         A.     Yes.

18         Q.     What is it?

19         A.     Stating that I did the hazmat and the

20   test.  Signed their names.

21         Q.     If you turn to the second page which

22   has UPS 0753 at the bottom, is that your

23   signature?

24         A.     Yes.

25         Q.     That's the date you signed it?

```
 1                      R. Leblanc

 2        A.     Yes.

 3        Q.     And you're agreeing that it's truthful

 4   and accurate; correct?

 5        A.     Yes.

 6        Q.     Nobody forced you to give this

 7   statement, did they?

 8        A.     No.  They told me.

 9        Q.     They asked you what happened; right?

10        A.     They told me to go downstairs and

11   write a write-up.

12        Q.     Okay.  And you were willing to do

13   that?

14        A.     I had no choice.

15        Q.     Why did you have no choice?

16        A.     That's one of my superiors.  I had to

17   do what he told me.

18        Q.     Okay.  They didn't tell you what to

19   write, did they?

20        A.     No.

21        Q.     But they told you to tell the truth?

22        A.     Right.

23        Q.     Can you read the first sentence that

24   you wrote?

25        A.     "I, Rich Leblanc, falsified the hazmat
```

Page 98

```
  1                     R.  Leblanc
  2    sign-off sheet and test because Keter was
  3    coming."
  4         Q.    Keep reading.
  5         A.    "And they were overdue."
  6         Q.    You said they were overdue.
  7         A.    Yeah.
  8         Q.    What does that mean?
  9         A.    On the sheet that comes out every
 10    month, if she didn't get the names, it didn't
 11    come off on the computer.  Their names don't come
 12    off.
 13         Q.    So overdue meaning your sheets were
 14    late; right?
 15         A.    'Cause she lost them.
 16         Q.    It doesn't say that, though.
 17         A.    Okay.  This is after 12 hours of work
 18    again.
 19         Q.    But again, does it say the sheets were
 20    lost anywhere?
 21         A.    No, it doesn't.
 22         Q.    But it shows that your sheets had not
 23    been turned in because they were overdue;
 24    correct?
 25                     MR.  HARMAN:  Objection.
```

1                    R. Leblanc

2       Q.    You were stunned that you were fired

3   after recreating signature pages?

4       A.    Yes.

5       Q.    How come?

6       A.    I don't know.

7       Q.    Okay.  We talked before about some UPS

8   policies; correct?

9       A.    Yes.

10      Q.    And that there are policies that are

11  available on the intranet, right, the internal

12  system where UPS employees can access; correct?

13      A.    Yes.

14      Q.    And you know how to access them;

15  right?

16      A.    Yes.

17      Q.    Have you ever seen the policy about

18  transfers and how to transfer within UPS?

19      A.    No.

20      Q.    Did you ever request to transfer at

21  UPS?

22      A.    Yes.

23      Q.    Never went online to look and see what

24  the policy was about transfers?

25      A.    No.

Page 111

R. Leblanc

1

2      Q.     How come?

3      A.     I thought it was enough to hand in a

4  doctor's note that I had given to HR.  They said

5  they were looking at it.

6      Q.     But you never thought to look at the

7  policies?

8      A.     No.

9      Q.     Even as a supervisor, you're aware the

10  policies guide the people's employment; correct?

11      A.     Yes.

12      Q.     Did you ever think to look at the

13  policy to see where you were supposed to bring

14  transfer requests to?

15      A.     No.

16      Q.     Did you ever look to see where you

17  were supposed to bring notes of a medical nature?

18      A.     No.

19      Q.     Did you ever fill out paperwork for an

20  ADA accommodation under UPS's policy?

21      A.     No.

22      Q.     Can I just show you a document.

23             (Document headed Workplace

24      Flexibility marked Exhibit D-7 for

25      identification.)

Page 115

1                        R. Leblanc

2    reviewed by the region HR manager and the

3    corporate workforce request committee.

4              Did you ever approach somebody who was

5    regional HR manager?

6                   MR. HARMAN:   Objection.

7         Q.    To talk about a transfer request?

8         A.    No.

9         Q.    Or somebody at corporate workforce

10   request?

11        A.    No.

12        Q.    So did you ever request to move jobs

13   by any other means, since you said you didn't use

14   this policy?

15        A.    Yes.

16        Q.    And what did you do?

17        A.    I gave a doctor's note for the HR

18   manager.

19        Q.    And who was that?

20        A.    Yvonne Quinones.

21        Q.    And when was that?

22        A.    I'm not sure.  Had to be sometime in

23   '08 or '09.

24        Q.    Okay.  Was it right after you got back

25   from your leave?

Page 116

1                        R. Leblanc

2        A.     No.  A little while after.

3        Q.     How much after?

4        A.     Couple months.

5        Q.     Was it before you were moved from on

6   road supervisor to PDS?

7        A.     No, after.

8        Q.     After what?

9        A.     When I was at PDS.

10        Q.     So you didn't give a doctor's note to

11   anyone until you were a PDS?

12        A.     Right.

13        Q.     Why did you give a doctor's note to

14   somebody?

15        A.     'Cause I was nights and the sleep

16   patterns was a lot less.  So it was affecting my

17   health.

18        Q.     So the sleep patterns of nighttime

19   were affecting your health; is that your

20   testimony?

21        A.     Yes.

22        Q.     And this lack of sleep or the change

23   in your sleep pattern occurred in or around

24   May 2008, when you transferred to PDS; correct?

25        A.     Yes.

Page 117

R. Leblanc

1

2     Q.     Did you go to a doctor to talk about

3  this?

4     A.     Yes.

5     Q.     So you spoke to your doctor to tell

6  him that you were working nights and you were

7  having sleeping issues?

8     A.     Yes.

9     Q.     Who was that doctor?

10    A.     Dr. Herman -- Harvey Kramer.

11    Q.     And what did he do?

12    A.     He wrote a note to UPS saying to try

13 and get me closer for the hours.  Closer to home

14 so -- the two extra hours I'm driving back and

15 forth.  The stress from driving in New York

16 traffic.

17    Q.     So he was trying to alleviate the

18 stress of New York traffic?

19    A.     And the two extra hours of driving.

20 Two and a half hours.

21    Q.     Okay.  And what was the purpose of

22 this note?

23    A.     What was the purpose?

24    Q.     Uh-huh.

25    A.     To try to get me closer.

Page 120

1                          R.  Leblanc

2        Q.     At this point in time you're working

3    13 or 14 hours; right?

4        A.     Yes.

5        Q.     And you have a commute that's over an

6    hour each way; right?

7        A.     Yes.

8        Q.     So you were trying to shorten your day

9    by a little bit; right?

10       A.     Yes.

11       Q.     By about two hours, you thought, if

12   you could get closer to home?

13       A.     (The witness nods head.)

14       Q.     But you testified before that your day

15   was about two hours shorter when you moved to the

16   night job.

17       A.     Yes.

18       Q.     Didn't that alleviate the problem?

19                  MR. HARMAN:  Objection.

20       A.     No.

21       Q.     No?  You were working two hours less.

22                  MR. HARMAN:  He's testified to

23       stress.  I mean, I think you need to clarify

24       what the problem is.  You're bouncing all

25       around.  He's testified to stress.  He's

Page 121

1                    R.  Leblanc

2         testified to long hours and sleep problems.

3         It's not one thing.

4         Q.    Okay.  So if you look at the note, it

5    talks about your cholesterol not being controlled

6    and a weight problem; is that correct?

7         A.    Yes.

8         Q.    So it looks like that's part of the

9    doctor's concern, at least; right?

10        A.    Yes.

11        Q.    And it says that the doctor --

12   "Because of his long commute to work in the

13   Bronx, he does not have time to exercise."

14             If you read down, then it says, "If he

15   could move closer to home, basically near Newton,

16   Connecticut, he would be able to exercise, if he

17   saved some time on his commute to work"; right?

18        A.    Yes.

19        Q.    So the doctor in February was trying

20   to save you some time so you could exercise;

21   correct?

22             You have to answer verbally.

23        A.    Yes.

24        Q.    But in fact, after this doctor's note

25   was written, you were saving time because you had

Page 122

1                    R. Leblanc

2    a shorter shift, isn't that true, when you became

3    a PDS?

4         A.    Yes.

5         Q.    So the doctor is focusing on exercise.

6    Did you try to exercise?

7         A.    No, not with night work.

8         Q.    But in February 2008 were you trying

9    to exercise?

10        A.    Yes.

11        Q.    What were you doing?

12        A.    Biking.

13        Q.    Okay.   Why didn't you bike later on?

14        A.    In the middle of the night?

15        Q.    You got home at one o'clock in the

16   afternoon.

17        A.    You're talking preload, PDS.

18        Q.    Yeah.

19        A.    I went to sleep.

20        Q.    So let me ask that question again.

21              When you worked as an on road

22   supervisor you're saying you couldn't bike

23   because you got home too late.

24        A.    Right.

25        Q.    So when were you biking, when you

Page 123

                          R. Leblanc

1    switched to nights?

2        A.    On weekends.  Probably Saturday and

3    Sunday.

4        Q.    But when you switched to nights you

5    could have biked in the afternoon?

6        A.    No.  I have children to bring to games

7    and sleep.

8        Q.    You could have brought them to the

9    game and rode your bike; right?

10       A.    Not watch their game?  Not be a dad?

11       Q.    But your doctor is telling you to

12   exercise.

13       A.    Yeah.

14       Q.    The only thing I see in this letter is

15   suggesting that he wants you to exercise and to

16   facilitate your ability to exercise; is that

17   correct?

18                    MR. HARMAN:  Objection.

19                    Can you read the question back,

20       Miss?

21                    (Whereupon the reporter read back

22       the requested portion of the record.)

23                    MR. HARMAN:  I renew my objection.

24       A.    Yes.

                            R. Leblanc

1     surprised to know."

2                     MR. HARMAN:   Are you surprised

3     that -- about the content of doctor's notes

4     that you haven't seen?

5          A.    Yes.

6          Q.    How often did you talk to him about

7     this commuting issue or your inability to

8     exercise?

9          A.    Once.  Twice.

10         Q.    Twice?

11         A.    Yes.

12         Q.    Okay.  And what did he say?

13         A.    That he asked if I had given the

14    letter to UPS and I said yes.

15         Q.    So the note is dated February 2008.

16         A.    Yes.

17         Q.    You didn't give it to anyone until you

18    moved to the overnights; correct?

19         A.    No.  I gave this the next day that I

20    worked.  Whatever it was.

21         Q.    I thought -- you testified before that

22    you gave the note to somebody once you were

23    working the overnight.

24         A.    No.  I thought I was working the

1                    R. Leblanc

2    overnight but I was still doing -- during the

3    daytime.

4         Q.    So let's walk through who you gave the

5    note to.

6         A.    Yvonne Quinones was in HR at the time.

7         Q.    Was she located at your facility?

8         A.    Yes.

9         Q.    So you think you gave her the note

10   around February or March 2008 time period?

11                    MR. HARMAN:  He testified the next

12        day.

13        A.    I know I did.

14        Q.    Did you hand in the original note?

15        A.    Yes.

16        Q.    Do you have just a copy of the note?

17        A.    No.

18        Q.    So this note was produced by your

19   lawyers as part of this lawsuit.

20        A.    Yes.

21        Q.    Where did you have this copy that you

22   gave to your lawyer?

23        A.    I got it from the doctor.

24        Q.    When?

25        A.    I don't know.  Maybe four months ago,

Page 129

1                          R. Leblanc

2          A.     No.

3          Q.     Did you ever fill out any other

4    paperwork or write anything else to anyone at UPS

5    requesting that you wanted to transfer?

6          A.     No.  Told people.

7          Q.     So you didn't fill out a transfer

8    request form or any other paperwork along with

9    this doctor's note?

10         A.     No.

11         Q.     What did you do after you handed her

12   the note?

13         A.     Went to work.

14         Q.     Okay.  Did you ever speak to her again

15   about the note?

16         A.     Yes.

17         Q.     When?

18         A.     Maybe a week later.

19         Q.     Okay.  What did you say?

20         A.     She said she was working on it.

21         Q.     And what did you say?

22         A.     "Okay."

23         Q.     Were you specific about what you

24   wanted to do?

25         A.     Move closer to home.

1                      R.  Leblanc

2    Then I went and got another copy and I gave it

3    to -- I'm trying to remember her name.  She's

4    still in HR now.  A manager.  I don't remember

5    her name.

6         Q.    Is it -- in your complaint you allege

7    that you handed it to Rita Turcios.

8         A.    Rita.

9         Q.    Before we get to talking about that,

10   so you said you gave it to Ms. Quinones.  You

11   followed up with her a week later.  You followed

12   up with her three or four weeks later.  What was

13   that conversation --

14        A.    Nothing was --

15        Q.    Let me finish my question so it's

16   clear on the record.

17              You gave it to her in February.  You

18   followed up with her about a week later and then

19   followed up with her three to four weeks later.

20   Can you explain what you talked about in that

21   last conversation?

22        A.    She talked to her boss and there was

23   nothing right now.  There was a freeze.

24        Q.    What did you say?

25        A.    There's nothing I could say.  "Thank

Page 132

R. Leblanc

1

2    you."

3         Q.    So it sounded like she was looking

4    into it and trying to help you, but there were no

5    open positions?

6              MR. HARMAN:   Objection.

7         A.    Yes.

8         Q.    Sorry, did you answer?

9         A.    Yes.

10        Q.    Did you talk to her again after that

11   meeting?

12        A.    No.

13        Q.    Were these in person or on the phone?

14        A.    Person.

15        Q.    So you said you also gave the note to

16   Rita Turcios.

17        A.    Yes.

18        Q.    So you went back to the doctor's

19   office to get another copy of this note?

20        A.    Yes.

21        Q.    And did you keep a copy at that point?

22        A.    Don't remember.

23        Q.    You allege that you then spoke to

24   Rita.  Did you give Rita the note?

25        A.    Yes.

Page 133

1                        R.  Leblanc

2        Q.     And when was that?

3        A.     I'm not sure.  It probably would have

4   been about a year or so after.  After Rita.

5        Q.     So around March 2009; does that sound

6   right?

7        A.     Could have been.

8        Q.     In March 2009 you gave Rita Turcios a

9   doctor's note that was dated February 2008?

10       A.     Yes.

11       Q.     You didn't get a new one from the

12   doctor?

13       A.     No.

14       Q.     You didn't talk to the doctor about

15   this issue again?

16       A.     Because I told her that it was in my

17   file already with Yvonne.

18       Q.     But your job had changed since this

19   letter had been written.

20       A.     Yeah, same building.

21       Q.     But overnights, shorter shift; right?

22       A.     Yes.

23       Q.     Okay.  You didn't think it was

24   important to go to the doctor and explain your

25   new circumstance and get a new note?

Page 134

1                        R. Leblanc
2         A.      No.
3         Q.      And what did Rita say?
4         A.      Rita said she would check on it, see
5    if there was anything open.
6         Q.      Were you in her office when you gave
7    her this note or spoke to her, or on the phone?
8         A.      No.  She was in our building.
9         Q.      She's not normally located in your
10   building?
11        A.      No.  I think she was covering a few.
12   She was the HR manager, though.
13        Q.      But you're testifying that you gave
14   her a note?
15        A.      Yes.
16        Q.      Was anyone there --
17        A.      Dennis Quinn.
18        Q.      Can I finish my question?
19        A.      Sorry.
20        Q.      That's okay.
21                Was anyone there when you gave Rita
22   Turcios this note?
23        A.      Dennis Quinn.
24        Q.      Was he part of the conversation?
25        A.      Yes.

1                    R. Leblanc

2        Q.     What did he say?

3        A.     He just said, "See what you can do.

4    Get him a little closer."

5        Q.     Did he see the note?

6        A.     Yes.

7        Q.     How many times did you talk to

8    Ms. Turcios?

9        A.     Three or four times.

10       Q.     Was Dennis there for all of them?

11       A.     No.

12       Q.     Just the first one?

13       A.     Yes.

14       Q.     And why were you talking to

15   Ms. Turcios and not Ms. Quinones?

16       A.     She wasn't there anymore.  She was in

17   43rd now.

18       Q.     At this point in time did you fill out

19   any transfer request paperwork?

20       A.     I did not.

21       Q.     Did you fill out any ADA paperwork?

22       A.     No, I did not.  They didn't tell me to

23   do any of that.

24       Q.     But you were a manager so you were

25   aware that there was ADA paperwork available?

Page 138

```
 1                    R. Leblanc
 2   office, just in passing?
 3        A.    In passing.  She wasn't always in that
 4   building.  She had three or four buildings.
 5        Q.    Did you take notes or write down the
 6   occasions that you met with her?
 7        A.    No.
 8        Q.    How long or short were these
 9   conversations?
10        A.    Two minutes.
11        Q.    Did you hand her anything to remind
12   her who you were, what your request was?
13        A.    No.  She knew who I was.
14        Q.    Send any emails to anybody about this?
15        A.    No.
16        Q.    Write any letters about this?
17        A.    No.
18        Q.    Speak to anybody else other than
19   Ms. Quinones and Ms. Turcios about your request
20   to transfer?
21        A.    Mike Feroni.  Pat Sheppard.  Our
22   region guy who came in.  I'm not sure what his
23   name was.  He worked in Connecticut.
24        Q.    So you said the names Feroni, Sheppard
25   and somebody from the region?
```

1                          R. Leblanc

2        Q.    Could it have been 2010?

3        A.    No.

4        Q.    Okay.  In February 2011 or around that

5   time, you spoke to Ms. Turcios about a request

6   for a transfer.  At that point you had a doctor's

7   note that was two years old; right?

8        A.    Yes.

9        Q.    You didn't think it was important to

10  get another doctor's note?

11       A.    I don't know.  I just talked to her

12  about it.

13       Q.    When you talked to her about it, did

14  you mention at all the reason why you wanted to

15  move?

16       A.    'Cause of my heart attack.

17       Q.    You said it was 'cause of your heart

18  attack?

19       A.    Yes.

20       Q.    You didn't say it was because you just

21  wanted to be closer to home?

22       A.    No.

23       Q.    Every time you spoke to Ms. Turcios

24  did you mention your heart attack?

25       A.    Yes, she knew about that.

Page 151

1                    R. Leblanc

2        Q.    You allege in your Complaint that you

3    could have transferred to Watertown or

4    Brookfield; is that correct?

5        A.    Yes.

6        Q.    How far are those locations from your

7    house?

8        A.    Brookfield is four, maybe three miles.

9    And Watertown is maybe nine.

10        Q.    Do you have any knowledge that there

11    were any open operations supervisor jobs at these

12    facilities in 2010 or 2011?

13        A.    No.

14        Q.    So what's the basis for your

15    suggesting that you could have transferred there?

16        A.    That they were closer.

17        Q.    Did you ever check online to see if

18    there were open positions in advertisements?

19        A.    No.

20        Q.    You said there was a region guy you

21    spoke to.

22        A.    Yes.

23        Q.    You don't know his name?

24        A.    I don't know.  He was there for some

25    kind of inspection.  I'm not quite sure what it

Page 167

1                      R. Leblanc

2        Q.    If you look at paragraph 20 of your

3   complaint, which is D-9, it says February 2010 is

4   when you spoke to Ms. Ellis.

5              Does that refresh your memory?

6        A.    Must be.

7        Q.    So that was two years after you had a

8   doctor's note; right?

9        A.    Yes.

10       Q.    You suggest here you gave her the

11  letter but you said you didn't have a copy.

12                  MR. HARMAN:   He testified --

13       A.    I went to the doctor's to get a copy.

14       Q.    How many times did you go back to the

15  doctor's to request copies of this letter?

16       A.    I don't know, maybe three or four

17  times.

18       Q.    You did?

19       A.    Yes, absolutely.   I have to see him

20  twice a year.

21       Q.    And you kept getting the same letter,

22  not asking for a new updated version?

23       A.    Right.

24       Q.    Your conversation with Roberta Ellis,

25  what do you remember about it?

Page 253

1                      R. Leblanc

2      Q.     Did that upset her?

3      A.     Yes.

4      Q.     Is she disappointed in you?

5      A.     No.

6      Q.     She wasn't angry about that?

7      A.     Disappointed but, no, not angry.

8      Q.     Disappointed, yes, did you say?

9      A.     Disappointed but not angry.

10     Q.     Did that potentially cause you to

11   argue at all?

12     A.     Not really.

13     Q.     You allege in your lawsuit that you've

14   been treated differently than other people; is

15   that correct?

16     A.     Yes.

17     Q.     Who are those people?

18     A.     Everybody that was in that same

19   building for that same inspection by Keter.

20     Q.     Who was that?

21     A.     John Argiento, Donna Manuzza, Dave

22   Colantonio.

23            I'm trying to remember Fordham's

24   manager.

25     Q.     The manager?

1                          R. Leblanc

2          A.      The manager at the Fordham center.

3          Q.      Anyone else?

4          A.      Keith Russell.

5                  That's about it that I can remember

6      right now.

7          Q.      And let's take these one by one.

8                  So how is John Argiento treated

9      differently than you?

10         A.      He did a safety -- CPT -- the habit

11     video.  The guy didn't watch the video so he had

12     him sign it off that he did it.

13         Q.      The same video that you showed your

14     employees?

15         A.      Yes.

16         Q.      Did you mean hazmat?

17         A.      Yes, sorry.

18         Q.      So he had one -- can you explain that

19     again, now using the word "hazmat" so we know

20     what we're talking about?

21         A.      The hazmat video wasn't working but he

22     had to get it done 'cause it was due for Keter.

23     So he signed it off that they had watched it.

24     And he lost his stock for it.

25         Q.      Did he forge that employee's signature

1                        R. Leblanc

2    on a paper?

3         A.    No.  No.

4         Q.    Did he take the test for that

5    employee?

6         A.    No.

7         Q.    The employee signed himself and took

8    that test?

9         A.    Yes.

10        Q.    Did he leave packages by a mailbox?

11        A.    No.

12        Q.    So he didn't do exactly the same thing

13   as you?

14        A.    No.  He did something wrong.

15        Q.    How about Donna Manuzza?

16        A.    Same thing.  With an employee, she

17   signed off on an employee.

18        Q.    So one employee?

19        A.    One employee.

20        Q.    One employee.

21              When you say she signed off, what do

22   you mean?

23        A.    She signed the name.

24        Q.    She forged an employee name?

25        A.    Yes.

Page 256

1                     R. Leblanc
2        Q.    Did she take a test for the employee
3   and put that employee's name down?
4        A.    Yes.
5        Q.    And how do you know that?
6        A.    I was told by John.
7        Q.    John Argiento?
8        A.    Yes.
9        Q.    How do you know what John did?
10       A.    John told me.
11       Q.    Did you ask Donna?
12       A.    No.
13       Q.    So you heard it secondhand from John?
14       A.    Yeah.
15       Q.    Did you ever see those sheets that
16   Donna supposedly -- the sheet Donna supposedly
17   signed for one employee?
18       A.    No, I did not.
19       Q.    Did Donna forge signatures or take
20   tests for more than one employee?
21       A.    No.
22       Q.    Did Donna leave packages by a mailbox?
23       A.    Not that I know of.
24       Q.    So Donna did something different than
25   you; right?

Page 257

1                          R. Leblanc

2        A.     Yes.

3        Q.     And you said Dave?

4        A.     Colantonio.

5        Q.     Do you know how to spell that?

6        A.     (Witness shakes head.)

7        Q.     Okay.  What did Dave do?

8        A.     For Keter he made -- told the drivers

9   to punch out outside.  Leave the cars outside so

10  they wouldn't be questioned by Keter.  That's

11  what the other three did.

12       Q.     Dave Colantonio, the Fordham center

13  manager and Keith Russell did the same thing?

14       A.     Not Keith, sorry.  Dave -- oh, what's

15  his name?  There's three of them in the Fordham

16  center.  Two supes and a manager.

17       Q.     Dave Colantonio is a supervisor at

18  Fordham?

19       A.     Yes.

20       Q.     So him and another Fordham supervisor?

21       A.     Yes.  Louie Santana.

22       Q.     And a Fordham center manager?

23       A.     Yes.

24       Q.     Did what?

25       A.     Told all the drivers to punch out on

Page 258

1                    R. Leblanc

2    the road and leave the cars parked outside so

3    that they wouldn't get asked questions by Keter.

4         Q.    What kind of questions?

5         A.    Safety questions.  And they would

6    fail.

7         Q.    Why would they fail?

8         A.    Because the drivers wouldn't know it.

9         Q.    Why wouldn't they know it?

10        A.    I don't know.

11        Q.    How do you know that they would or

12   wouldn't know it?

13        A.    It's what happens every year, every

14   time Keter comes.  You know the people that know

15   the stuff and you know the people that don't know

16   the stuff.

17        Q.    About how many drivers did this

18   involve?

19        A.    78.

20        Q.    So basically they didn't want their

21   drivers to come into the facility that day?

22        A.    Yes.

23        Q.    When Keter was there?

24        A.    Right.

25        Q.    Did they sign sheets representing that

Page 259

1                    R. Leblanc

2    their employees took a hazmat training?

3        A.    No.

4        Q.    Do you know if their employees took

5    the hazmat training?

6        A.    I do not know.

7        Q.    Do you know if their employees took

8    the test following the hazmat training?

9        A.    I do not know.

10        Q.    Did any of these people leave packages

11    by a mailbox in the middle of the Bronx?

12        A.    I don't know.

13        Q.    As far as you know?

14        A.    As far as I know, I don't know.

15        Q.    As far as you know, you don't have any

16    examples?

17        A.    I don't know.

18        Q.    Do you have any examples of that type

19    of conduct by them?

20        A.    No.

21        Q.    So what they did was different than

22    what you did?

23              MR. HARMAN:   Objection.

24        A.    Still wrong.

25        Q.    I'm asking if it was different.

1                       R. Leblanc

2          A.     Yes, different.

3          Q.     Anybody else?

4                 Oh, you said Keith Russell.  I'm

5     sorry.  So we talked about John Argiento, Donna

6     Manuzza, Dave Colantonio, Louie Santana, a

7     Fordham center manager, and you said Keith

8     Russell.

9          A.     Keith Russell scanned packages future,

10    a whole bag of packages future, but they were

11    supposed to be left in building.

12         Q.     What does that mean?

13         A.     When the packages come in the

14    building, if -- they should have been scanned

15    missed if they don't go on the road so that the

16    customer can get the money back for the packages.

17    But he put future.

18         Q.     How many packages?

19         A.     I think there were 30.

20         Q.     Did you talk to Keith Russell?

21         A.     Yes.

22         Q.     And he told you he did this?

23         A.     Yes, I was there.

24         Q.     And was this around the same time of

25    the audit?

Page 263

R. Leblanc

1

2      Q.    Do you know if any of the people you

3  just talked about have any medical conditions?

4      A.    No, not that I know of.

5      Q.    Not that you know of.  But do you talk

6  to them regularly about that kind of thing?

7      A.    No.

8      Q.    So you don't necessarily know if they

9  have a medical condition?

10     A.    No.

11                 (Plaintiff's response to

12         defendant's interrogatories marked Exhibit

13         D-16 for identification.)

14     Q.    Mr. Leblanc, do you recognize that

15  document that's marked D-16?

16     A.    Yes.

17     Q.    What is it?

18     A.    The response to the defense.

19     Q.    Did you prepare this response?

20     A.    Yes.

21     Q.    Did you ever certify this response?

22  Did you sign any sort of statement certifying

23  that this was accurate?

24     A.    No.  Oh, yeah, I did, on the end.  I'm

25  sorry.  I did.

Page 290

```
  1                     R. Leblanc
  2    asking to be moved.
  3         Q.    Did you ever -- you said before you
  4    didn't complain about discrimination to anybody.
  5         A.    No.
  6         Q.    It also says in here you suffered a
  7    hostile work environment.  I understand your
  8    lawyer's objection but I'm asking you from a lay
  9    perspective, what do you feel was hostile about
 10    your work environment?
 11         A.    I don't know what you're asking.
 12         Q.    Did you experience any conduct that
 13    you felt was unwelcome?
 14         A.    No.
 15         Q.    Did you ever have any comments that
 16    were made to you that you felt were inappropriate
 17    while at UPS?
 18         A.    No.
 19         Q.    Did you feel that anything about your
 20    work environment was intolerable?
 21         A.    It wasn't intolerable.
 22         Q.    I'm sorry?
 23         A.    It was not intolerable.
 24         Q.    Do you think that during the course of
 25    your UPS employment, leaving your termination
```

```
 1                        R. Leblanc

 2        A.    No.

 3        Q.    Were you curious?

 4        A.    She was just gone.

 5        Q.    Were you curious how she was able to

 6   get her job transferred?

 7        A.    Yes.

 8        Q.    Did you ask anybody at UPS how she was

 9   able to get a transfer?

10        A.    Roberta.

11        Q.    What did Roberta tell you?

12        A.    That she put in for it and got it.

13        Q.    And she put in for a transfer?

14        A.    Yes.

15        Q.    Did you think to put in for a transfer

16   through the transfer paperwork?

17        A.    No.

18              MS. BROCHIN:  I think I need five

19        minutes to figure out I'm done, but I think

20        I'm just about done.

21              MR. HARMAN:  Okay.

22              (Whereupon there was a brief

23        recess from 4:07 p.m. until 4:11 p.m.)

24   BY MS. BROCHIN:

25        Q.    Just take D-17 for a minute.  If you
```

# EXHIBIT E



# Danbury Office of Physician Services, P.C.

# Southbury Cardiology

Harvey M. Kramer, M.D., F.A.C.C., F.A.C.P.
Medical Director, Southbury Cardiology
Director of Cardiovascular Disease Prevention, Danbury Hospital
Assistant Clinical Professor of Medicine, Yale University School of Medicine

February 12, 2008

Re: Mr. Richard J. LeBlanc
Date of birth 7/5/63

To whom it may concern:

This 44-year-old gentleman had a myocardial infarction (heart attack) in May 2007. He is having some chest pain at this point. His cholesterol is not adequately controlled and his weight remains a problem. Because of his long commute to work in the Bronx, he does not have time to exercise.

I have strongly recommended that he be transferred to a job with your company closer to his home here in Newtown, Connecticut. This would help him better maintain his health and be a long-term better employee for UPS with fewer days of absenteeism due to health problems. He would be able to exercise if he saved some time on his commute to work.

I hope you will consider this recommendation. Please feel free to call in with any questions or concerns.

Sincerely,

Harvey M. Kramer M.D.

EXHIBIT
D-8
4-19-12 RF
PENGAD 800-631-6989

# EXHIBIT F



**WESTERN CONNECTICUT MEDICAL GROUP**

DANBURY HOSPITAL • NEW MILFORD HOSPITAL

# CERTIFICATION

The undersigned being duly sworn does depose and say:

1.  That the undersigned is an authorized assistant to the person in charge of the Record Room at the Western Connecticut Medical Group (formerly known as Danbury Office of Physician Services, P.C.), Southbury Cardiology Office.

2.  That the attached records are true copies of the original correspondence from Harvey M. Kramer, M.D. on behalf of Richard J. LeBlanc "To whom it may concern" dated February 12, 2008 and the electronic screen shot of the "Document History/Tracking" system corresponding to when the aforestated letter was printed.

3.  That said records were made in the regular course of the business of the aforestated Office and that it was the regular course of such business to make such records at the time of the transactions, occurrences or events recorded therein or within a reasonable time thereafter.

Print name: _Debra Wirag_
(Keeper of Records)

(State of Connecticut)
City: ~~Danbury~~ Southbury
(County of ~~Fairfield~~) New Haven/MM 9/28/12

Subscribed and sworn to this 28th day of September 2012 , before me.

_Melinda M. Monson, Esq._
~~Notary Public~~
Commissioner of the Superior Court
~~My Commission expires on~~

UPS1407



## Danbury Office of Physician Services, P.C.

# Southbury Cardiology

Harvey M. Kramer, M.D., F.A.C.C., F.A.C.P.
Medical Director, Southbury Cardiology
Director of Cardiovascular Disease Prevention, Danbury Hospital
Assistant Clinical Professor of Medicine, Yale University School of Medicine

February 12, 2008

Re: Mr. Richard J. LeBlanc
Date of birth 7/5/63

To whom it may concern:

This 44-year-old gentleman had a myocardial infarction (heart attack) in May 2007. He
is having some chest pain at this point. His cholesterol is not adequately controlled and
his weight remains a problem. Because of his long commute to work in the Bronx, he
does not have time to exercise.

I have strongly recommended that he be transferred to a job with your company closer to
his home here in Newtown, Connecticut. This would help him better maintain his health
and be a long-term better employee for UPS with fewer days of absenteeism due to health
problems. He would be able to exercise if he saved some time on his commute to work.

I hope you will consider this recommendation. Please feel free to call in with any
questions or concerns.

Sincerely,

Harvey M. Kramer M.D.



**Document History / Tracking:**

Ext DocumentId:
Ext SequenceId:
InterfaceId:

Author: KRAMER, HARVEY

Accession: ALC176407
Priority:
Site: (Danbury Health System
Transcriptionist:

| Audit Date | Action | Other | Transcription | Med | QueID | Resource |
|---|---|---|---|---|---|---|
| 09-13-2012 | Viewed | Wrap,Debra | 1 | 317028 | |
| 09-13-2012 | Viewed | Wrap,Debra | 1 | 317028 | |
| 09-13-2012 | Faxed | Wrap,Debra | 1 | 317028 | Ark Print Center |
| 09-08-2012 | Viewed | Wrap,Debra | 1 | 317028 | |
| 09-08-2012 | Viewed | Wrap,Debra | 1 | 317028 | |
| 04-27-2011 | Viewed | Colravacson,Carol | 1 | 317028 | |
| 04-27-2011 | Viewed | Wrap,Debra | 1 | 317028 | |
| 04-27-2011 | Printed | Wrap,Debra | 1 | 317028 | PRINT SERVER |
| 04-27-2011 | Viewed | Wrap,Debra | 1 | 317028 | |
| 02-12-2008 | Created | Orten,Gene | 1 | 317028 | |
| 02-12-2008 | Image | Orten,Gene | 1 | 317028 | |

February 12, 2008

Re: Mr. Richard J. LeBlanc
Date of birth 7/5/63

To whom it may concern:

This 44-year-old gentleman had a myocardial infarction (heart attack) in 2000 ...

Harvey M. Kramer
Medical Director
Director of Cardio...
Assistant Clinical ...

UPS1409

# EXHIBIT G

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -x

RICHARD LEBLANC,

      Plaintiff,

      -against-          11-CV-6983
                            (JPO)

UNITED PARCEL SERVICE,

      Defendant.

- - - - - - - - - - - - - - - - - - - -x

      DEPOSITION of DANIEL MINESINGER, taken
by the Plaintiff, pursuant to Court order, held
at the offices of The Harman Firm, 200 West 57th
Street, New York, New York 10019, on Thursday,
August 8, 2013, commencing at 12:00 noon, before
Margaret M. Harris, a Shorthand (Stenotype)
Reporter and Notary Public within and for the
State of New York.

44

1                         Minesinger

2           Q        Do you recall how you became

3     aware of this concern?

4           A        No, I don't.

5           Q        Do you recall who spoke to you

6     about the concern?

7           A        I don't remember.

8           Q        Would someone have spoken with

9     you about the concern?

10          A        Yes, I believe they did.

11          Q        But you don't remember who that

12    person was?

13          A        No.

14          Q        Was it one person initially?

15          A        I believe so.

16          Q        And even though you can't recall

17    who that person was, do you recall what was the

18    concern that was expressed by that individual?

19          A        That some of the training rosters

20    that were produced looked too much the same, as

21    in it looked like the same person completed some

22    of the rosters.

23          Q        And this concern was expressed to

24    you within one to two weeks after the audit

25    itself?

48

                        Minesinger

1

2   with me.

3           Q       Do you recall him reviewing the

4   results of his investigation with you?

5           A       I believe so, yes.

6           Q       And was this in an in-person

7   meeting?

8           A       I don't remember.

9           Q       Do you recall what he told you?

10          A       Not specifically.  It would have

11  referenced the rosters or other things that were

12  found during the audit.

13          Q       Do you recall in general what he

14  told you?

15          A       It would be that they found

16  several issues during the audit that they

17  uncovered.

18          Q       Do you recall what those issues

19  were?

20          A       I believe one of the issues that

21  they uncovered was that one of the center

22  managers was contacting his drivers and asking

23  them if they didn't want to speak to the

24  auditor, they could stop outside the building,

25  punch out and go home.

49

1                          Minesinger

2              I believe they found that one or

3      two of the rosters, I would have to look at it,

4      were falsified by one of the management team.   I

5      believe they found out that some training wasn't

6      properly done, didn't follow procedures.

7              And I think another part was they

8      found out that another manager didn't follow

9      procedure to verify whether or not an employee

10     went through some training and just took their

11     word for it.   I think they found that out.

12             And then I think in the course

13     that they found out that a supervisor within,

14     the night before or something, had dropped off

15     some packages at a post office box in the middle

16     of a neighborhood or something or on the side of

17     the road.

18             I think those were like the four

19     or five things that I remember.

20       Q       Okay.   That's a lot.

21             Did Mr. Fitzgerald prepare a

22     written report for you?

23       A       I don't remember.

24       Q       Would it have been a standard

25     practice for Mr. Fitzgerald to prepare a written

Miñesinger

Q      Were Mr. LeBlanc and Mr. Argiento
reporting to either Ms. Manuzza or Mr. Meher?

A      Yes, or I don't remember if Mr.
Quinn that you talked about was a preload
manager.  I don't know what his status is.

And if there was a preload
manager there, then the preload sups would
report to the preload manager.  I don't remember
what the structure in the building was.

Q      And Mr. LeBlanc was the preload
supervisor and Mr. Argiento was the on road
supervisor?

A      I believe.  I mean, one of them
could have been a DPS supervisor, which is
dispatch.  The preload on filling up the cars,
it just depends on what their classification was
in the system.  But they are classified as
supervisors.

Q      And when Mr. Fitzgerald reported
to you after the result of his investigation,
let's take them one by one.

With respect to Ms. Manuzza, what
were Mr. Fitzgerald's investigation's results?

A      I believe he found out that Donna

1                          Minesinger

2    Manuzza, during the audit, had talked to one of

3    her supervisors about some training that was

4    missing on a driver, so they placed a phone call

5    to that driver to verify that he did the

6    training or not did it.

7                      And when he said he did, so she

8    sent the supervisor out to the area, I believe,

9    to have the driver sign the training that he

10   did, which was, I mean, the driver, in my

11   opinion, it wasn't following procedure because

12   if the driver didn't do it, he just told you he

13   did it, then how would you know that he did, so

14   she probably should have tested him.

15        Q      So the concern was that there was

16   a driver who may or may not have received

17   certain training?

18        A      She didn't follow procedure to

19   make sure he had the training.  She just took

20   his word for it that he said he did it.

21        Q      So the issue was that there was

22   documentation lacking as to whether the driver

23   had received the training or not?

24                      MR. NUZZO:  Objection to

25             form.

64

Minesinger

1  supposed to have been trained on?

2

3       A       No.

4       Q       Was it a Hazmat type of training

5  issue?

6       A       It could have been one of the

7  Hazmat trainings, safety, or it could have been

8  one of the space invisibility trainings.  It

9  could have been one of those things.

10      Q       So Mr. Fitzgerald's report or

11  investigation revealed that she sent someone out

12  to where he was and got him to sign a roster?

13      A       I believe so, yes.

14      Q       Do you recall how Mr. Fitzgerald

15  or why Mr. Fitzgerald had reached a conclusion

16  that these events had happened?

17      A       I believe it was through his

18  interviews with the management team.

19      Q       Anything else with respect to Ms.

20  Manuzza at that time?

21      A       Not that I remember.

22      Q       Larry Meher, what was the concern

23  that Mr. Fitzgerald reached with respect to Mr.

24  Meher?

25      A       I believe his concern with Larry

65

Minesinger

2  Meher was that through his investigation and

3  interviewing, that he was telling drivers that

4  if they wanted to just stop outside the

5  building, punch out and go home, they could,

6  which our procedure is you pull inside the

7  building, you punch out, put your board up, park

8  your car.

9           So it looked like the attempt was

10  to avoid the auditors from being questioned on

11  safety elements, and that's not procedure.

12          Q     And do you recall how Mr.

13  Fitzgerald reached that conclusion?

14          A     I believe it was through his

15  interviews.

16          Q     All right.  And with Mr.

17  Argiento, what concern did Mr. Fitzgerald

18  identify?

19          A     I believe Mr. Argiento completed

20  some training on some folks, I don't remember

21  how many, I don't remember if it was two or

22  three or four, and he completed the training

23  that day, but he wasn't certified to do the

24  training, so it questioned the validity, did

25  they actually get the training.

MCM REPORTING SERVICE
(516) 775-5209

66

Minesinger

So, again, he wasn't certified to
do it, so he didn't follow the procedures of
making sure they were trained by a trained,
certified trainer.

    Q    So he trained people even though
he may not have been himself qualified to do the
training?

    A    I believe that was it.

    Q    Do you recall what type of
training that he allegedly did or said he did?

    A    It was some of the safety
training.

    Q    Do you recall how many other
people had been trained by him?

    A    No.  It was just at that time,
during the audit.

    Q    And the concern was that the very
validity of this training was questionable?

            MR. NUZZO:  Objection to
        form.

            You can answer.

    A    It was that he wasn't a certified
trainer to do the training.

    Q    Which would have rendered the

67

Minesinger

1    training invalid?

2

3         A        Correct.

4         Q        And, finally, with respect to Mr.

5    LeBlanc, do you recall what Mr. Fitzgerald's

6    concern was?

7         A        Yes.  That I believe, and I

8    believe in the statements with Mr. LeBlanc was

9    that he admitted to completing a training roster

10   on some of his preloaders, and when I asked, I

11   believe it was what do you mean completed, he

12   actually put the employee ID numbers down, wrote

13   their names down and signed their names down.

14                 And I believe he admitted to

15   falsifying the entire document, because it

16   wasn't done.

17        Q        During this period of time,

18   March, April, May 2011, spring of 2011, do you

19   recall that UPS had an integrity policy?

20        A        Yes.

21        Q        Do you recall that policy?

22        A        Yes.  Not word for word, but,

23   yes.

24        Q        Was it a written document?

25        A        Yes, I believe it's in our policy

68

                    Minesinger

 1
 2    book.
 3         Q        Would these concerns that you
 4    have just identified with respect to Ms.
 5    Manuzza, Mr. Meher, Mr. LeBlanc and Mr. Argiento
 6    have constituted possible violations of the
 7    integrity policy?
 8                        MR. NUZZO:   Objection to
 9                   form.
10                        You can answer.
11         A        I think when we looked at it,
12    some of them were failure to follow policy and
13    then some I know for a fact was integrity, when
14    the person tells me that I falsified this
15    information.
16                   And then there was one other
17    point on LeBlanc which I didn't finish with that
18    came out of the investigation, that he admitted
19    that on one, if not two times during the night
20    he got someone to drive him to a post box and
21    drop off some packages that you were not UPS
22    packages and he put them just outside the box,
23    which is a concern, just with where we are at in
24    the country with packages sitting on the side of
25    the road would be a concern, so that was a

69

Minesinger

2      concern that was also brought up.

3           Q      Why would Mr. LeBlanc have had

4      packages that were not UPS packages?

5           A      Well, with the number of millions

6      of packages that travel across the country

7      between the post office, Federal Express and

8      UPS, people get it mixed up all the time.  And

9      it happens at post offices, Federal Express and

10     UPS, that it looked like a UPS label and they

11     put it in a UPS truck or the Fed Ex truck or the

12     post office truck and it didn't belong there.

13          Q      And when that happens, what is

14     supposed to happen?

15          A      You usually give them to the post

16     office.

17          Q      So you physically take them to

18     the post office, I'm sorry, not you, a driver is

19     supposed to physically take them to the post

20     office?

21          A      Correct.

22          Q      And say these were mistakenly

23     brought to UPS?

24          A      They mistakenly got into our

25     system, it happens all over the country where we

96

                          Minesinger

1

2          Q       And would you have considered

3    what Mr. Meher did to be an integrity violation?

4          A       Policy, poor judgment again.

5          Q       Would you consider what Mr.

6    Argiento did to be an integrity violation?

7          A       No, poor judgment.

8          Q       You testified that you were

9    present when the meeting took place with Mr.

10   LeBlanc to advise him of the company's decision

11   to terminate his employment?

12         A       Yes, sir.

13         Q       Who was present at that meeting?

14         A       Mike Michalak, Richard LeBlanc,

15   myself, I'm not sure if Doug Trandiak was in the

16   room or not, but I know the three of us were.

17         Q       I'm sorry, Doug?

18         A       Trandiak.

19         Q       And who is Mr. Trandiak?

20         A       He's one of my area HR managers.

21         Q       Do you specifically recall the

22   meeting?

23         A       Yes.

24         Q       Did you speak to Mr. LeBlanc at

25   the meeting?

97

Minesinger

A        I believe I asked him if he had

any questions or concerns after Mike terminated

him, and he didn't have any questions, comments,

didn't say anything.

Q        Did Mr. Michalak explain why Mr.

LeBlanc was being terminated?

A        I believe so, yes.

Q        Do you recall what Mr. Michalak

told Mr. LeBlanc?

A        I believe it was violation of

company policy and integrity.

Q        Once that meeting took place,

were there any subsequent procedures or meetings

that took place to your knowledge with respect

to Mr. LeBlanc's employment?

                    MR. NUZZO:  Objection to

                    form, but you can answer.

A        I believe he went through the EDR

process.

Q        What is the EDR process?

A        Employee dispute resolution.

It's where our nonmanagement -- I mean, where

our management folks have an opportunity to go

through a dispute resolution to see if they can

119

                          Minesinger

2  recommendation regarding Mr. LeBlanc?

3          A      I believe from talking with Mr.

4  Soumis and Mr. Fitzgerald, and I'm not sure

5  about Mike Michalak, that when we talked about

6  the termination, because it's very serious, the

7  concern was writing and signing somebody else's

8  name, their ID numbers, you know, it's close,

9  it's like identity theft.

10             I mean, you're writing and

11  signing somebody else's name, so we took that

12  pretty seriously and I think that was a lot of

13  the conversation that we had around that.

14          Q      Now, since the time that Mr.

15  LeBlanc was advised that you had rejected the

16  peer review panel's recommendation, do you know

17  what has happened with Mr. LeBlanc's situation?

18                  MR. NUZZO:  Objection.

19                  You can answer.

20          A      Define "situation."

21                  I know he's suing us.

22          Q      When did you find out that he was

23  suing you?

24          A      I'm not sure.  When the attorneys

25  told me.

120

Minesinger

2    Q     I don't want you tell me anything

3  that you have discussed with your attorneys, and

4  I'm sure your attorney has told you not to tell

5  me anything that you've discussed with him, but

6  do you recall when you found out that Mr.

7  LeBlanc was suing the company?

8    A     No.

9    Q     Do you understand why Mr. LeBlanc

10 is suing the company?

11           MR. NUZZO:  Objection.

12           You can answer if you can.

13    A     Yes.

14    Q     Do you understand what he has

15 alleged?

16           MR. NUZZO:  Objection.

17    A     I believe so.

18    Q     What is your understanding of Mr.

19 LeBlanc's allegations?

20    A     I believe he is suing us because

21 he feels he was terminated for failing to -- he

22 wanted us to accommodate him or he's got a

23 disability, and we failed to accommodate him

24 based on his disability, which -- my termination

25 recommendation wasn't based on that, because I

121

                    Minesinger

1

2   didn't know anything about anything.  I was

3   never aware of it prior to his lawsuit to UPS.

4           Q       Have you reviewed Mr. LeBlanc's

5   complaint in this action?

6                   MR. NUZZO:  Objection.

7                   I would just caution the

8                   witness not to reveal any reviews

9                   that may have taken place with

10                  counsel.

11                  If you reviewed it on your

12                  own, you're free to answer as to

13                  that.

14          A       I don't recall.

15          Q       Now, you testified a few moments

16  ago that you believed what Mr. LeBlanc did was

17  tantamount to identity theft?

18          A       Well, when you sign somebody's

19  name, that's a term that can pop into it.  It's

20  you're signing somebody's name without their

21  permission.

22          Q       So the concern was signing

23  somebody else's name?

24                  MR. NUZZO:  Objection.

25          A       The concern was integrity.


                    MCM REPORTING SERVICE
                    (516) 775-5209

# EXHIBIT H

Page _1_ of _2_

Statement of _Richard LeBlanc_     Employee ID _0360440_

Date _3 / 30 / 2011_     Time _11:12_     Phone number _____

I, _Richard LeBlanc_ , voluntarily make the following statement to

_Security_ , knowing that no threats or promises have been made to me.

I Richard LeBlanc falseatied the hazmate sign ot sheets and test because Ketter was comeing and they were over due I signed there names and did the test. This was the first time that I had done this. I planed on doing them over this week but have been on the belt because we been really crazy. Know one knew I did this I took it upon my self to do it.

Writer's Initials _RL_



EXHIBIT

D-6

4-19-1288

UPS 0752

Page 2 of 2

I have had this statement consisting of ___ page(s), each of which I have initialed, read to me and I have read myself.  I agree to the truth and accuracy of the facts contained in the statement.

This statement was completed at _11 - 15_, on the _30_ day of _03_, _2011_
                              (time)            (day)      (month)    (year)

_____

Signature of person giving voluntary statement

_____       _3/30/11_      _11:40 AM_

Witness                              Date              Time

_____       _3/30/201_  Writer's Initials _RC_

Witness

# EXHIBIT I

Page 1 of 2

Statement of Richard LeBlanc          Employee ID 036 3440

Date 03/30/2011     Time 1116     Phone number _____

I, Richard LeBlanc voluntarily make the following statement to
Security, knowing that no threats or promises have been made to me.

I Richard LeBlanc took about 30 USPS
and Fedex packages and drop them
off at the mail box on the
bruckner. I asked Billy Knuet
to drive me because I do not
have a DOT. I did not tell anyone
or get check out by Security gaurd.
I tried to bring them to the post
Office and they told me I had
to bring them to each of the zip
code the one on brush ave told
they would not take them. I brought
the package at 200 AM. I have done
this twice.

_____

_____

Writer's Initials R/L

EXHIBIT
D-8
4-19-12 PP
PENGAD 800-631-6989

UPS 0754

Page 2 of 2

I have had this statement consisting of ___1___ page(s), each of which I have initialed, read to me and I have read myself.  I agree to the truth and accuracy of the facts contained in the statement.

This statement was completed at _1626_ , on the _30_ day of _03_ , _2011_
                                           (time)             (day)      (month)    (year)

_____
Signature of person giving voluntary statement

_____        _3-30-11_        _10:40 AM_
Witness                          Date               Time

_____            Writer's Initials _RL_
_3/30/11_

UPS 0755

# EXHIBIT J

Mar. 24-30, 2011                              Your Neighborhood



# Mysterious mail left on street

**BY PATRICK ROCCHIO**

Dozens of parcels left unattended generally doesn't fare well, but someone has been leaving 60-100 packages at a time next to a mail box on Bruckner Boulevard during the night.

Postal police are now investigating the anomaly that has occurred at least twice, most recently on Wednesday, March 16 when about 60 to 70 packages were neatly

*Continued on page 37*



EXHIBIT

D-4

4-19-12

UPS 0748







... drops that she does not have with her. If she goes for an extended period without using the drops, she can lose her vision.

If anyone has any information on Angela's whereabouts, contact Detective Conner at the 45th Precinct at (718) 822-5414, or contact Nick Mayleas at (347) 851-5606.





TINA ADOVASIO



Photo by Patrick Rocchio

Friends and relatives erected a memorial to Tina Adovasio on the lawn of her apartment building.

# Mysterious parcels left unattended on curb

*From page 1*

stacked next to a mailbox on Quincy Avenue and Bruckner Boulevard, and also on Wednesday, February 23 when 75 to 100 packages were also left next to the same mailbox, according to neighbor Tom Ziegler.

Ziegler contacted the Throggs Neck Post Office when passerbys would stop and pick-up the packages, including what Ziegler said was someone in a city-owned vehicle, who came to pick up what remained of the packages on March 16.

"This has been happening in the middle of the night, and when we wake up in the morning, there are all these packages left next to the collection box at the curb," Ziegler said. "These are just regular packages going to locations all over the city, and are from companies like Direct TV and Amazon.com."

The packages are sealed and nothing seems suspicious about them, but nevertheless, Ziegler called the postal police.

Ziegler said, "The vast majority of the stuff is USPS, with some UPS and Federal Express packages mixed in as well.'"

"There was a homeless man who was opening the packages and pilfering the contents," Ziegler said. "I called the police and they nabbed him, but later had to release him."

An investigation by the postal inspector was brought on because Ziegler and others heavily pursued the issue.

"The Postal Inspection Service's mission is to ensure public trust in the mail," a source from the U.S. Postal Inspection Service New York stated. "We are responding to the information provided by Bronx residents regarding this incident. Postal inspectors are actively working behind the scenes to resolve this matter. Tips can be called in to (212) 330-2400."

The sight of unattended mail left on the street is almost unthinkable for Ziegler.

"If you leave sealed parcels on the street they are probably going to disappear," Ziegler said.

A call was placed to the New York City Department of Transportation about a worker who Ziegler said picked up about a dozen of the packages, but no comment was available at press time.



Photo courtesy of Tom Ziegler

Mail has been found next to a postal receptacle, left out in the open, on Bruckner Boulevard and Quincy Avenue, on at least two occasions.

# EXHIBIT K

# THE HARMAN FIRM, PC

ATTORNEYS & COUNSELORS AT LAW

200 WEST 57th STREET, SUITE 900, NEW YORK, NEW YORK 10019
TELEPHONE 212 425 2600   FAX 212 202 3926
WWW.THEHARMANFIRM.COM

April 17, 2013

<u>VIA FACSIMILE (212) 805-7991</u>
Hon. J. Paul Oetken
United States District Court for the
   Southern District of New York
40 Foley Square, Room 2101
New York, New York 10007

Re:   *LeBlanc v. UPS*, 11 CV 6983 (JPO) (S.D.N.Y.)

Dear Judge Oetken:

The Clerk of Court is Directed to:
___ Term motion (doc. #_____)
✓ Doc. and File As: Letter

We represent Plaintiff Rich LeBlanc, in the above-referenced employment discrimination matter wherein our client was terminated from UPS for something that his younger colleagues without disability, and who did not request reasonable accommodation, were not. Mr. LeBlanc was forced to leave his home in Newtown, Conn. and move to Appalachia, where he resides today.

As the Court has not responded to Plaintiff's requests for its guidance regarding Defendants' wholly deficient and uncooperative discovery, which requests Plaintiff submitted while discovery was reopened, we are certain that the grounds upon which we may oppose Defendants' intended motion for summary judgment are manifold.[1] The parties agree on very little and the truth should be determined by a jury; we believe that the parties' stance on the issues is simply too far apart to be solved by summary judgment. Nevertheless and pursuant to the Court's *Individual Practices in Civil Cases*, ¶ 4(F) at 3, Plaintiff herein opposes Defendant's intended motion.

First, although the majority of UPS's letter is patently lacking in supporting testimony and fact, Plaintiff, having reviewed their April 12, 2013 letter at 3, wherein it is asserted that Mr. LeBlanc's hostile work environment claim should not stand, Plaintiff agrees to withdraw the claim. We respectfully request that such withdrawal underscore the reasonableness and sobriety with which Plaintiff opposes the rest of UPS's letter.

Even the "Factual Background" section of Defendant's letter contains inaccuracies. For example, following his heart attack, Mr. LeBlanc submitted to his supervisors, a doctor's letter, to seek reasonable accommodation from UPS. Defendant claims that they never received such a letter. Defendant was not however able to provide evidence or testimony that the proper parties who would have searched for such a document had even commenced such a search. UPS never registered that Mr. LeBlanc had requested accommodation. Plaintiff, however, is in custody of

---

[1] Should UPS be permitted to file their intended motion, Plaintiff shall rely heavily on FED. R. CIV. P. 56(d) to oppose it.

Hon. J. Paul Oetken, U.S.D.J.
April 17, 2013
Page 2 of 3

an affidavit and a note, which emphasize that on numerous occasions, Mr. LeBlanc had indeed requested accommodation through his direct supervisor, who informed him on numerous occasions that his request was being processed, where in fact, it was not.

Mr. LeBlanc was one of a myriad of other UPS employees who were also accused of falsifying records. Plaintiff strongly asserts that there is overwhelming pretext in Mr. LeBlanc being the only UPS employee terminated for such accusations while being the eldest against whom such accusations were directed and the only one who requested reasonable accommodation.

Part of UPS's responsibility was—and continues to be—a mandate that they support a legitimate nondiscriminatory reason for terminating Mr. LeBlanc. *See, e.g., McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973). Because Mr. LeBlanc was terminated for something in which many of his younger, but similarly situated, former colleagues had participated, UPS's assertions are undermined and baseless. We strongly rebut UPS's contentions, because, again, UPS never even searched for notes or evidence of Mr. LeBlanc's multiple requests for accommodation.

If UPS had even had a legitimate nondiscriminatory reason for Mr. LeBlanc's termination—which they did not—even that would not mean that he was not illegally denied accommodation. This in no way supports UPS's intended summary judgment.

Mr. LeBlanc has testified and submitted briefing in support of his assertion that in addition to circulating his doctor's note to request accommodation, he made numerous requests to several people on multiple occasions for such accommodation. UPS never complied.

What we find disingenuous, glib, and litigiously abusive is UPS's assertion that even after they purportedly never received any notice, request, or information regarding Mr. LeBlanc's multiple and perpetual requests for accommodation, that UPS nevertheless "provided [him] with a *de facto* accommodation . . . three months after the date of his doctor's note."

Further, the case to which UPS cites to purport that Mr. LeBlanc's conduct was not protected when he sought accommodation is affirmative only; it does not exclude as protected activity Mr. LeBlanc's having circulated his doctor's note to various UPS employees and having requested from many UPS employees a reasonable accommodation. *See Mayers v. Emigrant Bancorp*, 796 F. Supp. 2d 434, 448 (S.D.N.Y. 2011). The conclusions that UPS somehow drew, were its own.

Finally, Plaintiff is concerned that UPS's intended motion would by necessity, be largely frivolous and wasteful. To the extent that such a motion is filed and is frivolous, Plaintiff respectfully requests reservation of his right to object and to seek costs associated with opposing it.

Hon. J. Paul Oetken, U.S.D.J.
April 17, 2013
Page 3 of 3

We thank the Court for its time and attention to these matters.

Respectfully submitted,
THE HARMAN FIRM, PC


_____ s/ _____
Walker G. Harman, Jr.


cc:    Joseph Nuzzo, Esq. (*via email*, jnuzzo@daypitney.com)
       Heather Weine Brochin, Esq. (*via email*, hbrochin@daypitney.com)
       Peter J. Andrews (*via email*, pandrews@theharmanfirm.com)

# EXHIBIT L



CHARLES K. AKA, Plaintiff, - against - JACOB K. JAVITS CONVENTION
CENTER OF NEW YORK, Defendant.

09 Civ. 8195 (FM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2011 U.S. Dist. LEXIS 114002*

September 30, 2011, Decided
September 30, 2011, Filed

**COUNSEL:** [*1] For Jacob K. Javits Convention Center of New York, Defendant: Raymond T. Mak, LEAD ATTORNEY, Epstein, Becker & Green, P.C. (New York), New York, NY; Kevin Richard Brady, Epstein Becker & Green, P.C.(NY), New York, NY.

**JUDGES:** FRANK MAAS, United States Magistrate Judge.

**OPINION BY:** FRANK MAAS

**OPINION**

**MEMORANDUM DECISION AND ORDER**

    **FRANK MAAS**, United States Magistrate Judge.

I. Introduction

    Plaintiff Charles K. Aka ("Aka"), a former carpenter at the Jacob K. Javits Convention Center of New York ("Javits Center"), brings this pro se action against the Javits Center,[1] alleging that it discriminated against him on the basis of his age, race, and disability, and later retaliated against him. Aka seeks relief for these alleged wrongs under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e, et seq.* ("Title VII"), the Age Discrimination in Employment Act of 1967, *29 U.S.C. § 621, et seq.* ("ADEA"), the Americans with Disabilities Act, *42 U.S.C. § 12101, et seq.* ("ADA"), the New York State Human Rights Law, *N.Y. Exec. Law § 296* ("NYSHRL"), and the New York City Human Rights Law, *N.Y. City Admin. Code § 8-107* ("NYCHRL").

1  The defendant notes that the entity that operates the Javits Center is the New York Convention Center [*2] Operating Corporation ("NYCCOC"). (See ECF No. 27 ("Def.'s 56.1 Stmt.") ¶ 2). Inasmuch as this appears to be correct, see *Cokely v. N.Y. Convention Ctr. Operating Corp., No. 00 Civ. 4637 (CBM), 2004 U.S. Dist. LEXIS 9264, 2004 WL 1152531, at * 1 (S.D.N.Y. May 21, 2004)*, the defendant is hereinafter referred to as NYCCOC.

    Following the close of discovery, NYCCOC has moved for summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure.* (ECF No. 25). For the reasons set forth below, that motion is granted.

II. Relevant Facts and Procedural History

    Unless otherwise noted, the following facts are either undisputed or set forth in the light most favorable to Aka.

A. NYCCOC and the Javits Center

    NYCCOC is a public benefit corporation established by *New York Public Authorities Law § 2562* which operates the Javits Center in Manhattan. (See "Def.'s 56.1 Stmt. ¶¶ 1-2).[2] "The Javits Center hosts many of the leading international and national trade shows, exhibitions and conventions," as well as other functions, such as banquets, corporate meetings, seminars, and examinations. (Id. ¶ 3).

    2  When only NYCCOC's Rule 56.1 statement is cited, Aka either has not disputed the fact referenced or has failed to reference [*3] admissi-

ble evidence giving rise to a material factual issue.

Outside contractors, known as "General Decorating Contractors" or "Exhibit Appointed Contractors," oversee most of the work involved in planning, building, and dismantling exhibits at the Javits Center. (Id. ¶¶ 4-5). The contractors provide their own supervisors to manage the on-site work but hire laborers employed by NYCCOC to perform exhibit building work. (Id. ¶¶ 4-6). NYCCOC's laborers, also known as carpenters or journeyman carpenters, perform such tasks as crating and recrating freight; erecting and dismantling exhibits, displays, backgrounds, and booths; hanging or nailing flags, banners, and signs; laying rugs; delivering furniture; and installing draperies. (Id. ¶ 6). Although the carpenters are employed by NYCCOC, they work under the direction and supervision of the contractors. The contractors also "organize[] and determine[]" the carpenters' shifts. (Id. ¶ 7).

B. Collective Bargaining Agreement

The carpenters employed by NYCCOC are members of the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America, AFL-CIO ("District Council" or "Union"). (Id.). The Union [*4] and NYCCOC have entered into a collective bargaining agreement ("CBA") that sets forth the terms and conditions governing the employment of the carpenters and journeyman carpenters who work at the Javits Center. (Id. ¶ 8; Decl. of Anne Tassone, dated Jan. 7, 2011 ("Tassone Decl."), Ex. A at D003-D004). Pursuant to the CBA, NYCCOC has "the sole and unfettered right to manage every aspect of the operation of the Javits Center." (Tassone Decl. Ex. A at D005). These rights include the right to (1) determine the "qualifications of all employees referred for employment at the Javits Center," (2) "refuse to employ any individual[] in [its] absolute and sole discretion," and (3) "terminate employees for violation of duly promulgated work rules." (Id. at D005-D006). The CBA further provides that NYCCOC "may, in its discretion, contract with other individuals or Employers to provide, among other things, supervision of the employees covered by [the CBA]" and that those other individuals or employers shall not be considered joint employers. (Id. at D007).

C. NYCCOC's Work Rules for Carpenters

NYCCOC sets forth its work rules for carpenters in the Show Labor Handbook for Exhibit Builders ("Handbook"). [*5] (Def.'s 56.1 Stmt. ¶ 11). The Handbook describes the two ways in which carpenters receive work assignments at the Javits Center. (See Suppl. Decl. of Kevin R. Brady, Esq., dated Apr. 1, 2011 ("Brady Suppl. Decl."), Ex. A at D042-D044). Under the first method,

prior to installing exhibits, contractors at the Javits Center inform NYCCOC of their labor needs; NYCCOC's manager of exhibit carpenters (also known as the "Carpenter Manager") then assigns specific carpenters to work with the contractors. (See id. at D042; Def.'s 56.1 Stmt. ¶ 14). Assignment decisions are based on the carpenter's "past reliability" and the opinions of the contractor, exhibitor, and Javits Center foreman concerning that carpenter's work. (Brady Suppl. Decl. Ex. A at D040).

Carpenters also may be selected as "stand-by" labor to replace carpenters who are absent or to meet a contractor's unanticipated needs. (Id. at D044; Def.'s 56.1 Stmt. ¶ 12). Stand-by labor assignments are made by lottery at the beginning of a scheduled shift. (Brady Suppl. Decl. Ex. A at D044). The carpenter foreman conducts the lottery by writing each of the carpenters' names and badge numbers on separate pieces of paper, inserting them in [*6] a box, mixing the papers, and randomly selecting as many carpenters as are necessary for that work shift. (Id.; see also Def.'s 56.1 Stmt. ¶ 12).[3] The lottery process is also known as "shaping"; the box, perhaps not surprisingly, is referred to as the "shaping box." (Def.'s 56.1 Stmt. ¶ 12).

> 3   In the Handbook, the person conducting the lottery is referred to as the "sign in desk administrator." (Brady Suppl. Decl. Ex. A at D044).

According to Aka, if a contractor refuses to work with a particular carpenter selected during shaping, the contractor must provide an "instant explanation or report" to NYCCOC, and submit an evaluation to the carpenter's general foreman that same day. (ECF No. 36 ("Pl.'s Opp'n") at 4). Aka further alleges that such reports and evaluations must be submitted with the rejected employee's "clear knowledge" and that "overdue" evaluations are "unacceptable." (Id. at 4-5). The Handbook annexed to NYCCOC's papers, however, does not contain any language imposing such requirements. (See ECF No. 38 ("Def.'s Reply Mem.") at 1 n.1; Brady Suppl. Decl. Ex. A). The Handbook does state that a carpenter's work performance is subject to evaluation "[f]rom time to time" by the Javits [*7] Center general foreman or management. (Brady Suppl. Decl. Ex. A at D052). Additionally, the written evaluations are "normally . . . recorded and filed in the General Foreman's office." (Id.).

D. Aka's Work as a Carpenter

Aka is a sixty-five year old African-American man who began working at the Javits Center as a part-time apprentice carpenter in 1998. (Def.'s 56.1 Stmt. ¶ 13; see ECF No. 1, Ex. A ("Compl." or "Complaint")). As an apprentice carpenter, Aka was required to join the Union and attend a four-year apprentice training program con-

ducted by the District Council. (Def.'s 56.1 Stmt. ¶ 13). In 2003, after completing the apprenticeship program, Aka earned the title of "Journeyman" carpenter. (Id. ¶ 17). When Aka worked at the Javits Center, Anne Tassone ("Tassone") was the Carpenter Manager; she "was personally responsible for assigning work" to him. (Id. ¶ 14).

Aka contends that he was a "good" journeyman carpenter, but concedes that his professional development was ongoing and that he continued to learn new skills from senior carpenters. (Pl.'s Opp'n Ex. Q2 ("Dep.") at 101 ("[W]hen you become a journeyman, the profession continues, it doesn't end there. Because you learn from your [*8] seniors . . . .")). The contractors' written evaluations, however, characterize Aka's work quite differently. In 2004 and 2005, several contractors with whom Aka worked submitted negative evaluations to NYCCOC, criticizing his attitude, judgment, carpentry skills, and punctuality. (Tassone Decl. Exs. G-K). Aka describes these evaluations as "bogus," "deceptive," "fake," "fabricated," "ludicrous," and "malicious." (Pl.'s Opp'n at 9-10, 12-13, 18-19). In any event, Aka continued working with several of the contractors that submitted negative evaluations. (Id. at 16).

E. Aka's Complaints to NYCCOC in 2004 and 2006

Over time, Aka lodged several complaints with NYCCOC's management about his work schedule and certain of the contractors with whom he worked. One such complaint related to a contractor named Manny Stone Decorators, which did not permit Aka and another African-American carpenter to work on its crew on January 13, 2004. (Id. at 11). After Manny Stone Decorators failed to provide a contemporaneous explanation of its decision, Aka reported the incident to NYCCOC's labor department. (Id.). Tassone, the Carpenter Manager, then informed Aka that Manny Stone Decorators had submitted a [*9] negative evaluation of his work. (Id.; see Tassone Decl. Ex. G (employee evaluation of Aka by Manny Stone Decorators, dated Jan. 13, 2004 (describing Aka as a "terrible" worker))). A few days later, Aka sent NYCCOC's human resources director a letter regarding "[d]iscrimination and [h]arassment." (Pl.'s Opp'n Ex. O). That letter discussed Manny Stone Decorators and challenged at least one other negative contractor evaluation. (Id.). Aka also noted that one contractor had submitted a positive evaluation but that he had not received a copy. (Id.).

On January 30, 2004, Aka filed a complaint with the Union because Tassone had not assigned him work for seventy-four days. (See Pl.'s Opp'n at 34). In response, NYCCOC claimed that Aka could not read blueprints. (Id.). Aka insisted that he in fact possessed adequate blueprint reading skills, as demonstrated by his receipt of an "excellent" evaluation in a blueprint class at the District Council Technical College. (Id. at 35). In his complaint, Aka further contended that he had been subject to harassment and discrimination by managers at the Javits Center. (Id.). A manager from NYCCOC's labor office and a representative of the Union both intervened [*10] to assure Aka that he would obtain work and that the alleged harassment and discrimination would cease. (Id. at 35-36 & Ex. M2; see also Dep. 120-21).

In 2006, Aka made several complaints to NYCCOC managers about the shaping process. On one such occasion in October 2006, after the lottery had been conducted, Aka discovered that his name was missing from the shaping box, causing him not to be selected for work. (Pl.'s Opp'n at 38-39). Similarly, in November 2006, a carpenter from Barbados, who was not selected from the lottery, discovered that the paper containing his name was not in the shaping box at the conclusion of the lottery, but had instead been thrown in the trash. (Id. at 39-40). Aka and other carpenters complained to NYCCOC's human resources department about this incident, which the assistant to NYCCOC's CEO promised to investigate. (Id. at 40-41).

F. Events of January 11, 2007

During his employment with NYCCOC, Aka worked several times with a contractor named Exhibit Installation Specialists, Inc. ("EIS"), which never completed a written evaluation of Aka's work. (Dep. 125; see also Pl.'s Opp'n at 19-20).

On January 11, 2007, there was a lottery to select stand-by carpenters [*11] to work with EIS. (See Def.'s 56.1 Stmt. ¶ 22). Although Aka's name was pulled from the shaping box, EIS refused to accept him as a member of its work crew. (Id.). According to Aka, EIS did so without providing an explanation. (Pl.'s Opp'n at 20). NYCCOC contends that EIS "asked that [Aka] not be assigned to future work because it was dissatisfied with his prior work performance and ability." (Def.'s 56.1 Stmt. ¶ 22). Aka claims to have been "astonished" that he was rejected after having worked with EIS on several prior occasions. (Dep. 125). Aka complained to his shop steward and foreman, but they did not know why EIS had rejected him. (Id. at 125-26).

Aka also complained about the EIS rejection to Edward Bielen ("Bielen"), who was his immediate supervisor. (Id. at 126). Aka told Bielen that he had been "harassed" and did not understand why EIS had refused him. (Id.). Because Bielen was" busy at that moment, he made an appointment with Aka to discuss the matter further on January 16, 2007. (Id.).

After EIS rejected Aka on January 11, 2007, his name was reinserted into the shaping box, and he was

selected to work with another contractor for the remainder of the day. (Id. at 126-27).   **[\*12]** While on a break, Aka fell and fractured his ankle. (Id. at 127). Aka then took an extended leave of absence related to his injury. (See Def.'s 56.1 Stmt. ¶ 25). He consequently did not meet with Bielen on January 16 as previously planned. (See Decl. of Kevin R. Brady, Esq., dated Jan. 10, 2011 ("Brady Decl."), Ex. 5).

G. Aka's Complaints to NYCCOC in 2007

On January 23, 2007, during his leave of absence, Aka wrote to Deborah Richardson de Cuevas ("Richardson de Cuevas"), NYCCOC's equal employment opportunity compliance manager, regarding the incident with EIS. (Def.'s 56.1 Stmt. ¶ 26; Brady Decl. Ex. 5). Aka complained that EIS had refused to employ him on January 11, 2007, "without giving an explanation," and that this had caused him to be "emotionally hurt." (Brady Decl. Ex. 5). Aka further stated that he was unable to keep his appointment with Bielen because of his injury. (Id.). Although Aka noted that he "still [did] not know the reason" that EIS had rejected him, he did not suggest that EIS's action was discriminatory. (Id.).

Having received no response from NYCCOC, Aka took a taxi to the Javits Center on August 9, 2007, to speak to Richardson de Cuevas and other managers.[4] (Dep.  **[\*13]** 141-42). At that time, Aka was still using crutches because of his ankle fracture. (See id.). During his visit, Aka met with Michelle Green ("Green"), who assisted Aka with his workers' compensation paperwork. Aka told Green about his "case" and asked to see Paul Hiler ("Hiler"), NYCCOC's human resources director.[5] (Id. at 142; Pl.'s Opp'n at 21). After Aka informed Hiler about his "case," Hiler brought him to Richardson de Cuevas's office and asked her to investigate Aka's case. (Dep. 142-43). Richardson de Cuevas, in turn, asked Aka several questions about the incident with EIS. (Id. at 144-45). Aka told her that he did not know the race of the EIS supervisor who rejected him, but that he likely was white because all of the EIS supervisors were white. (Id. at 145). At the conclusion of their meeting, Richardson de Cuevas told Aka that she had "writ[ten] down" and "investigated everything." (Id. at 146). She also told Aka, "[a]nywhere you want to take your case, you can take your case." (Id.).

> 4    Aka initially testified that he went to the Javits Center in April 2007, but subsequently said the visit occurred in August 2007. (Dep. 140, 142).
> 5    The Aka deposition transcript refers to this  **[\*14]** individual as "John Hiller." (Dep. 142).

According to Aka, Richardson de Cuevas's investigation of his complaint involved speaking with Bielen

and John Dillon, who worked in NYCCOC's labor department. (See id. at 145-46). Bielen allegedly told Richardson de Cuevas that EIS had said that Aka was a poor worker. (Id. at 146). Aka suggests that Richardson de Cuevas concluded, based on her investigation, that EIS's refusal to work with Aka was discriminatory. (See id. at 145 ("Discrimination will come after the investigation of de Cuevas."); see also id. at 146 (after Richardson de Cuevas told Aka that he could take his case "anywhere," Aka concluded that "they [had] discriminated against" him)), 147 (at some unspecified time, Richardson de Cuevas told Aka that he "ha[d] a case.")

H. Aka's Termination

After injuring himself on January 11, 2007, Aka took a leave of absence which extended into early 2008. (See Def.'s 56.1 Stmt. ¶ 28). On January 8, 2008, nearly one year after Aka's fall, Hiler informed Aka, in writing, that NYCCOC expected him to return to work "on or before January 15, 2008." (Tassone Decl. Ex. M). Hiler further indicated that before Aka could return, NYCCOC would need "a certification  **[\*15]** of [his] fitness to return to work." (Id.). Hiler stated that Aka's employment would be "terminated effective January 15, 2008," if he did not comply. (Id.). As Hiler explained, NYCCOC was "taking this action for the purpose of maintaining a steady, reliable and adequate workforce." (Id.).

By January 2008, Aka had retained Pamela A. Elisofon, Esq. ("Elisofon"), as his counsel. (See Pl.'s Opp'n Ex. B). On Aka's behalf, Elisofon wrote to Hiler on January 14, 2008, stating that Aka would "not be able to obtain [medical] clearance [to return to work] on or before January 15, 2008." (Id.). At that time, Aka's medical provider apparently had indicated that he had a "'total temporary disability' with a guarded prognosis." (Id.). Elisofon stated that Aka was expected to follow up with his doctor "in one month (from 12/31/07) at which time his ability to return to work will be determined." (Id.). She explained that Aka needed an MRI and was awaiting approval for this test from his insurance carrier. (Id.). Elisofon requested that Aka remain a Javits Center employee "until he [could] obtain medical clearance and return to work." (Id.).

By letter dated January 18, 2008, despite Elisofon's request,  **[\*16]** Hiler informed Aka that, because he had not returned to work, NYCCOC had to "terminate [his] employment effective January 15, 2008." (Tassone Decl. Ex. N). Hiler again explained that NYCCOC was "taking this action for the purpose of maintaining a steady, reliable and adequate workforce." (Id.).

I. EEOC Charge and the Instant Action

On March 17, 2008, approximately two months after his termination, Aka filed a charge of discrimination with the federal Equal Employment Opportunity Commission ("EEOC"). (See Brady Decl. Ex. 6 ("EEOC Charge")). Aka alleged in his charge, which was prepared by Elisofon, that NYCCOC had discriminated against him based on his race, color, national origin, age, and disability, and also had retaliated against him. (Id. at 4). Aka indicated that NYCCOC's discriminatory actions against him were "continuing," and that the earliest incident had taken place on May 1, 2007, with the most recent occurring on January 15, 2008. (Id.). Aka requested that the 300-day statute of limitations for filing a charge be tolled because of the physical injury he had sustained as a result of his on-the-job fall on January 11, 2007. (Id. at 4-6).

In an affidavit annexed to the EEOC charge, [*17] Aka claimed that several incidents constituted unlawful discrimination and retaliation against him. These included: (a) EIS's refusal to work with him on January 11, 2007; (b) NYCCOC's termination of Aka's employment in January 2008; (c) the negative evaluations of Aka's work submitted by certain contractors at the Javits Center; and (d) NYCCOC's accusation that Aka could not read blueprints. (Id. at 6-9). Aka also contended that his termination constituted unlawful retaliation for his "reporting [of] racial bias to his supervisors" and the disability arising out of his accident on January 11, 2007.[6] (Id. at 7). Finally, Aka's affidavit intimated that he had suffered retaliation due to his participation in a prior discrimination class-action lawsuit against NYCCOC. (Id. (citing *Cokely v. N.Y. Convention Ctr. Operating Corp., No. 00 Civ. 4637 (CBM), 2004 U.S. Dist. LEXIS 9264, 2004 WL 1152531 (S.D.N.Y. May 21, 2004)*)). In that action, Aka received a payment of $12,500. (Id.).

> 6   In addition to the injury suffered on January 11, 2007, Aka suggested that he had a medical disability related to an accident in 2000 that had injured his shoulder, knee, ribs and elbow. (EEOC Charge at 7).

In his EEOC charge, Aka further [*18] contended that EIS and NYCCOC had violated certain internal policies, thereby further evidencing NYCCOC's discriminatory animus. (Id. at 7-8). For example, according to Aka, contractors that rejected a carpenter were required to explain their decision in writing within hours of that rejection. EIS, however, allegedly failed to comply with this practice when it refused to work with him in January 2007. (Id. at 7). Aka also alleged that NYCCOC violated "Javits' policies and procedures" by failing to provide him with copies of the contractors' evaluations of his work. (Id. at 8). Aka first received those evaluations three years after he submitted a request for them. (Id.).

On May 22, 2009, the EEOC issued Aka a right-to-sue letter. (See Brady Decl. Ex. 7). Subsequently, on August 20, 2009, proceeding pro se, Aka commenced an action against the Javits Center in Supreme Court, Bronx County. (See ECF No. 1 (Notice of Removal)). In his complaint, Aka alleged that the Javits Center had violated Title VII, and the ADEA, ADA, NYSHRL, and NYCHRL by terminating him and "enter[ing] into a complicit relationship with its vendor EIS by not upholding" federal law. (Compl. ¶ 10). Aka also alleged that [*19] EIS had "rejected him for discriminatory reasons." (Id.) ¶ 6).

On September 25, 2009, NYCCOC removed Aka's action to this Court pursuant to *28 U.S.C. §§ 1441, 1446.* (See Notice of Removal). Thereafter, in January 2011, pursuant to *28 U.S.C. § 636(c),* the parties consented to my exercise of jurisdiction over the matter for the purpose of deciding NYCCOC's motion for summary judgment. (ECF No. 23). NYCCOC subsequently filed that motion on January 10, 2011. (ECF Nos. 25-31). Aka filed opposition papers on March 17, 2011, (ECF Nos. 35-36), and NYCCOC filed reply papers on April 1, 2011, (ECF Nos. 37-39). NYCCOC's motion therefore is fully submitted.

## III. Applicable Law

### A. Standard of Review

Under *Rule 56 of the Federal Rules of Civil Procedure,* summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact" based on supporting materials in the record. *Fed. R. Civ. P. 56.* In deciding a motion for summary judgment, the Court must "view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences" in favor of that party. *Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 78 (2d Cir. 2002)* [*20] (quoting *Gummo v. Vill. of Depew, N.Y., 75 F.3d 98, 107 (2d Cir. 1996); Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997).* The Court also must accept as true the non-moving party's evidence, if supported by affidavits or other evidentiary material. See *Beyer v. Cnty. of Nassau, 524 F.3d 160. 164 (2d Cir. 2008).* Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the Court. *Fischl, 128 F.3d at 55.* Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried." *Id. at 55.*

To defeat a motion for summary judgment, however, the non-moving party cannot simply rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* Rather, the non-moving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

Although the same summary judgment rules apply to a party proceeding **[*21]** pro se, special latitude is appropriate to ensure that a meritorious claim is not foreclosed simply because the papers submitted in opposition to the motion are inartfully worded. See *Milano v. Astrue, No. 05 Civ. 6527 (KMW) (DCF), 2009 U.S. Dist. LEXIS 36207, 2009 WL 1150186, at * 1 n. 1 (S.D.N.Y. Apr. 29, 2009)*; see also *Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)* (pro se complaint should be held to less stringent standard than formal pleadings drafted by counsel); *McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999)* (pleadings should be read liberally and interpreted to "raise the strongest arguments that they suggest") (quoting *Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)).* By the same token, however, a pro se party's "bald assertion, completely unsupported by evidence," is not sufficient to overcome a motion for summary judgment. *Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).*

## B. Title VII, ADEA and ADA

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, **[*22]** sex, or national origin." *42 U.S.C. § 2000e-2(a)(1).*

Under the ADEA, it is unlawful for "an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *29 U.S.C. § 623(a)(1).* The protections of the ADEA, however, extend only to persons who are "at least 40 years of age." Id. *§ 631(a).*

The ADA prohibits discrimination by an employer covered by the ADA against a "qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *42 U.S.C. § 12112(a).*

## C. McDonnell Douglas Framework

To overcome a motion for summary judgment with respect to claims under Title VII, the ADEA, and the ADA, "a discrimination plaintiff must withstand the

three-part burden-shifting laid out by McDonnell Douglas Corp. v. Green," *411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). McPherson v. N.Y. City Dep't of Educ., 457 F.3d 211, 215 (2d Cir. 2006)* (ADEA); see *Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005)* (Title **[*23]** VII); *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc., 198 F.3d 68, 72 (2d Cir. 1999)* (ADA). Under that rubric, the plaintiff must satisfy an initial burden of "proving by the preponderance of the evidence a prima facie case of discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).* To establish a prima facie case under Title VII and the ADEA, an employee must show that: (1) he was within the protected class; (2) his job performance was satisfactory; (3) he was subjected to an adverse employment decision or discharge; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. See *Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006); Stratton v. Dep't for the Aging, 132 F.3d 869, 879 (2d Cir. 1997).* A prima facie case under the ADA requires a plaintiff to establish that: (1) his employer is subject to the ADA; (2) he had a disability within the meaning of the ADA; (3) he could perform the essential functions of his job with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. *Capobianco v. City of N.Y., 422 F.3d 47, 56 (2d Cir. 2005).*

"A **[*24]** plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)* (internal quotation marks omitted). Among the actions that qualify as materially adverse are "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." Id.

Once the plaintiff makes out a prima facie case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision." *Sharpe v. MCI Commc'ns Servs., Inc., 684 F. Supp. 2d 394, 401 (S.D.N.Y. 2010)* (quoting *Stratton, 132 F.3d at 871*; see *Heyman, 198 F.3d at 72* (citing *Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 38 (2d Cir. 1994)); Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998).* The purpose of this step is "to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the **[*25]** difficulty of proving discriminatory intent." *Felder v. Securiticus Sec. Serv., No. 04 Civ. 9501 (LAK), 2006 WL 2627969, at *7*

(S.D.N.Y. Sept. 12, 2006) (quoting *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1335-36 (2d Cir. 1997) (en banc)).

Finally, if the defendant provides a nondiscriminatory rationale for its conduct, the rebuttable presumption drops out of the case. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). The burden then rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual, but also that the defendant discriminated against the plaintiff. *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 93-94 (2d Cir. 2001); *Fleming v. Verizon N.Y., Inc.*, No. 03 Civ. 5639 (WHP), 2006 U.S. Dist. LEXIS 68632, 2006 WL 2709766, at *15 (S.D.N.Y. Sept. 22, 2006) (citing *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 153-54 (2d Cir. 2000)). In other words, "the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

### D. Retaliation

Title VII, the ADEA, and the ADA each make it unlawful for an employer to retaliate against an employee who has exercised his statutory [*26] right to complain about conduct that he considers discriminatory. *29 U.S.C. § 623(d)*; *42 U.S.C. §§ 2000e-3(a), 12203(a)*. A retaliation claim is "not dependent on the merits of the underlying discrimination complaint." *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 642 (2d Cir. 1986). Thus, to establish a prima facie case of retaliation, an employee need only show that: (1) he engaged in a protected activity; (2) the employer knew of this activity; (3) the employer took adverse action against the employee; and (4) there was a causal relation between the adverse action and the employee's protected activity. *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001); *Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996).

Mere temporal proximity between a plaintiff's protected activity and an adverse employment action is sufficient to create an inference of retaliation for purposes of proving a prima facie case. *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 932-33 (2d Cir. 2010); *Simpson v. N.Y. State Dep't of Civil Servs.*, 166 Fed. Appx. 499, 502 (2d Cir. 2006). However, temporal proximity, without more, "is insufficient to satisfy [the plaintiff's] burden to bring forward some evidence [*27] of pretext" at the third stage of the McDonnell Douglas inquiry. *El Sayed*, 627 F.3d at 933; *Simpson*, 166 Fed. Appx. at 5021.

### E. State and City Law

The NYSHRL and NYCHRL prohibit an employer from discriminating against an employee in the terms, conditions, or privileges of employment on the basis of age, gender, or race. Both statutes also prohibit retalia-

tion against an employee who has opposed unlawful discrimination or participated in a proceeding arising under those laws. See *N.Y. Exec. Law § 296(1)(a), (7)*; *N.Y. City Admin. Code § 8-107(1)(a), (7)*. The framework for analyzing NYSHRL and NYCHRL discrimination claims is essentially the same as under federal anti-discrimination statutes. See, e.g., *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) ("[A] plaintiff's discrimination claims under both the NYSHRL and the NYCHRL are subject to the burden-shifting analysis applied to discrimination claims under Title VII."); *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 n.1 (2d Cir. 2009) (applying Title VII analysis to state and municipal claims in New York); *Rosenblatt v. Bivona & Cohen, P.C.*, 946 F. Supp. 298, 300 (S.D.N.Y. 1996) (stating that the NYSHRL "is applied in a fashion consistent [*28] with the federal civil rights laws"). The New York City Council has enacted legislation, however, which requires that claims under the NYCHRL be construed more liberally than claims under its state and federal counterparts. See Local Civil Rights Restoration Act, N.Y.C. Local Law No. 85 (2005); see also *Fowler v. Scores Holding Co.*, 677 F. Supp. 2d 673, 682 (S.D.N.Y. 2009) (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)) (pursuant to Restoration Act, "all provisions of the [NYCHRL] require[] independent construction to accomplish the law's uniquely broad purposes").

### IV. Application of Law to Facts

#### A. Notice of Claim and Statute of Limitations

##### 1. State and City Law Claims

NYCCOC contends that Aka's NYSHRL and NYCHRL claims are barred because he failed to serve a notice of claim on NYCCOC pursuant to *New York Public Authorities Law § 2570*.[7] (ECF No. 30 ("Def.'s Mem.") at 9). Aka concedes he did not serve a notice of claim, (see Dep. 226-27), but suggests that one was not required because: (a) NYCCOC "kn[e]w the rules better than [he did];" (b) the Javits Center's "unprofessional attitude . . . prevented" him from serving the notice of claim; and (c) [*29] he had filed a charge with the EEOC prior to bringing the instant lawsuit. (Pl.'s Opp'n at 28). Aka has not requested leave to file a late notice of claim.

7   Federal courts must "apply state notice of claim provisions to causes of action brought under state and local law, but not to causes of action brought under federal law." *Aguilar v. N.Y. Convention Ctr. Operating Corp.*, 174 F. Supp. 2d 49, 53 n.3 (S.D.N.Y. 2001) (citing *Felder v. Ca-*

*sey, 487 U.S. 131, 141, 151, 108 S. Ct. 2302, 101 L. Ed. 2d 123 (1988)).*

*Section 2570* of the *New York Public Authorities Law § 2570* provides that

> [a] notice of claim; served in accordance with the provisions of section fifty-e of the general municipal law, shall be a condition precedent to the commencement of an action against [NYCCOC], its directors, officers, employees or agents. No such action shall be commenced more than one year after it has accrued, except that an action against [NYCCOC] for wrongful death shall be commenced in accordance with the notice of claim and time limitation provisions of title eleven of article nine of this chapter.

*N.Y. Pub. Auth. Law § 2570* (emphasis added). *Section 50-e* of the *New York General Municipal Law*, in turn, requires that, "[i]n any case founded **[*30]** upon tort where a notice of claim is required by law as a condition precedent to the commencement of an action or special proceeding against a public corporation, . . . the notice of claim shall . . . be served . . . within ninety days after the claim arises." *N.Y. Gen. Mun. Law § 50-e(1)(a).* Although *Section 50-e* on its face appears to apply to tort actions only, courts in this District have found that its procedural requirements apply to NYSHRL and NYCHRL claims brought against the NYCCOC. See *Aguilar, 174 F. Supp. 2d at 54-55* (concluding that "*[S]ection 2570* incorporates *[S]ection 50-e* only with respect to the procedure required for serving a notice of claim") (emphasis in original). Before commencing suit, Aka therefore was required to serve a notice of claim on NYCCOC within ninety days of the allegedly discriminatory or retaliatory act upon which his suit is based.

Aka clearly has not complied with the notice of claim requirement. Moreover, the reasons that he proffers for failing to do so are insufficient to save his NYSHRL and NYCHRL claims. Despite Aka's allegation that NYCCOC had an "unprofessional attitude," he has offered no evidence indicating that NYCCOC intentionally **[*31]** or negligently prevented him from timely serving a notice of claim. Cf. *Bethel v. N.Y. City Transit Auth., 215 A.D.2d 206, 626 N.Y.S.2d 185, 186 (1st Dep't 1995)* (equitably estopping defendants from asserting lack of proper notice because "their conduct was calculated to, or negligently did, mislead or discourage the plaintiff from serving a timely notice of claim"). Aka's contention that his fractured ankle excuses his failure to serve timely notice also is meritless. See *Montanez v.*

*City of N.Y., 156 A.D.2d 185, 548 N.Y.S.2d 441, 441 (1st Dep't 1989)* (plaintiff's broken leg "was not an incapacitation preventing the filing of a [notice of] claim" during the ninety-day period). Finally, Aka's ignorance of the notice requirement also does not save his state and city law claims. See *Landa v. City of N.Y., 252 A.D.2d 525, 675 N.Y.S.2d 377, 378 (2d Dep't 1998)* (plaintiff's "ignorance of the filing requirement constituted an inadequate explanation" for the delay in filing his notice of claim).

Aka appears to contend that a notice of claim was, in any event, unnecessary because NYCCOC had learned of his discrimination claims through his filing of the EEOC charge in March 2008, only two months after his termination. In deciding whether **[*32]** to grant a plaintiff's application to file a late notice of claim, New York courts consider whether the defendant "acquired actual knowledge of the essential facts constituting the claim within 90 days of its accrual or a reasonable time thereafter." *DiBella v. City of N.Y., 234 A.D.2d 366, 650 N.Y.S.2d 311, 312 (2d Dep't 1996)*, lv denied, *90 N.Y.2d 804, 684 N.E.2d 281, 661 N.Y.S.2d 831 (1997)*. In this case, Aka has not sought leave to file a late notice of claim. Even more importantly, this Court lacks jurisdiction to entertain such a request. See *N.Y. Gen. Mun. Law § 50-e(7)* ("[a]ll applications [for leave to file a late notice of claim] should be made to the [state] supreme court or to the county court"). Although NYCCOC's actual knowledge of Aka's claims could weigh in favor of permitting him to file a late notice of claim had his suit remained in state court, it does not avoid the fact that Aka never served a notice of claim on NYCCOC. Inasmuch as this Court cannot cure this defect, Aka's NYSHRL and NYCHRL claims must be dismissed.[8]

> 8   Aka also suggests that he failed to file a notice of claim because he was represented by counsel at the time service was required. (*See* Dep. 226 ("Q. Okay. You did not file a notice? A. My lawyer **[*33]** was speaking for me.")). Even if an error on the part of Aka's former counsel contributed to his noncompliance, that would not save his NYSHRL and NYCHRL claims. See *Deegan v. City of N.Y., 227 A.D.2d 620, 643 N.Y.S.2d 596, 597 (2d Dep't 1996)* (plaintiff's former attorney's "law office failure" did not justify granting leave to file late notice).

### 2. Statute of Limitations for Title VII, ADEA, and ADA Claims

"Title VII, the ADA and the ADEA require claimants to file a charge of discrimination with the EEOC (or with the similar state agency, here, the New York State Division of Human Rights) within 300 days of the alleged discriminatory employment action; claims for acts

that occurred more than 300 days before the filing are time-barred in federal court." *Adams v. N.Y. State Educ. Dep't, 752 F. Supp. 2d 420, 465 n.52 (S.D.N.Y. 2010)* (citing *29 U.S.C. § 626(d)(1)(B); 42 U.S.C. §§ 12117(a), 2000e-5(e)(1)).* There are four possible ways, however, to overcome the limitations period. First, the Second Circuit has held that the 300-day limitations period is "subject to waiver, estoppel, and equitable tolling." *Downey v. Runyon, 160 F.3d 139, 145-46 (2d Cir. 1998)* (quoting *Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393, 102 S. Ct. 1127, 71 L. Ed. 2d 234 (1982)).* [*34] Additionally, a plaintiff may rely on the "continuing violation exception." See *Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 220 (2d Cir. 2004).* Under this exception, if a plaintiff "files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Nghiem v. U.S. Dep't of Veterans Affairs, 323 F. App'x 16, 17 (2d Cir. 2009)* (quoting *Patterson. 375 F.3d at 220).* "[D]iscrete discriminatory acts," however, such as termination, failure to promote, or refusal to hire, "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113-14, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).* Thus, each "discrete act" of discrimination or retaliation "constitutes a separate actionable 'unlawful employment practice.'" *Id. at 114.*

In this case, Aka filed a charge of discrimination with the EEOC on March 17, 2008. (See EEOC Charge). Any employment actions that occurred more than 300 days before March 17, 2008 -- i.e., before May 22, 2007 -- therefore are time-barred. [*35] Aka's termination effective January 15, 2008, two months before he filed the EEOC charge, is certainly well within the limitations period. However, each of the additional employment actions about which Aka complains -- EIS's refusal to work with him in January 2007, the other incidents relating to work assignments and shaping in 2004 and 2006, and the allegedly discriminatory evaluations submitted by contractors in 2004 and 2005 -- fall outside the limitations period.[9] Accordingly, unless Aka is able to overcome this hurdle in one of the four ways set forth above, the only claim that he has asserted in a timely manner are those related to his termination.

---

9  Aka also alleges that NYCCOC "aided and abetted" EIS's allegedly discriminatory rejection of Aka in January 2007. (Dep. 219). Assuming that such an aiding and abetting claim may be asserted under Title VII and the ADEA, it nevertheless plainly falls outside the statute of limitations.

Although Aka does not present his arguments in an organized fashion, it appears that he seeks to invoke the continuing violation exception and to toll the statute of limitations because of the injury he sustained on January 11, 2007. (See Pl.'s Opp'n at [*36] 13 (alleging that this case is "another example" of how contractors at the Javits Cernter "contrive to discriminate"); EEOC Charge at 4-6 (requesting equitable tolling)). Aka's showing is insufficient under either theory to overcome the limitations period.

Turning first to the continuing violation exception, Aka has failed to proffer any evidence suggesting that his termination constituted an "incident of discrimination in furtherance of an ongoing policy of discrimination." *Lu v. Chase Inv. Servs. Corp., 412 F. App'x 413, 416 (2d Cir. 2011)* (quoting *Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993).* Although many of Aka's complaints concerning NYCCOC involve Tassone, (see, e.g., Pl.'s Opp'n at 12 (alleging that Tassone subjected Aka to "harassment, discriminatory practices, and disingenuous behaviors . . . over a notable period of time")), he has failed to show that his termination and any other alleged discriminatory acts were part of a specific discriminatory policy, mechanism, or program. In particular, Aka's conclusory statements that contractors at the Javits Center have engaged in several instances of discrimination and favoritism do not suffice to establish that NYCCOC [*37] had a policy of discrimination. Moreover, Aka's termination -- a discrete employment act that falls within the limitations period -- cannot be used to "pull in the time-barred discriminatory act[s]." See *Morgan, 536 U.S. at 113* (citing *Del. State Coll. v. Ricks, 449 U.S. 250, 257, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980)).* Aka therefore cannot avail himself of the continuing violation exception to the statute of limitations.

Aka seeks equitable tolling of the limitations period after January 11, 2007 -- the date that EIS refused to work with him -- because of his ankle fracture. (See EEOC Charge at 4-6 (requesting equitable tolling due to a "disability" that rendered him "immobile")). Equitable tolling of the statute of limitations in discrimination cases "is permissible, but only 'in rare and exceptional circumstances, in which a party is prevented in some extraordinary way from exercising his rights.'" *Haghpassand v. Reuters Am. Inc., 120 F. App'x 859, 862 (2d Cir. 2005)* (quoting *Zerilli-Edelglass v. N.Y. City Transit Auth., 333 F.3d 74, 80 (2d Cir. 2003)).* The plaintiff bears the burden of showing both extraordinary circumstances and that he pursued his rights diligently during the time period that he seeks to toll. *Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000);* [*38] *Boos v. Runyon, 201 F.3d 178, 185 (2d Cir. 2000).* Tolling consequently may be appropriate when a plaintiff's medical condition or mental impairment prevented him from initiating suit

in a timely manner. *Zerilli-Edelglass, 333 F.3d at 80.* The plaintiff, however, must proffer a "particularized description of how h[is] condition adversely affected h[is] capacity to function generally or in relationship to the pursuit of h[is] rights." *Boos, 201 F.3d at 185.*

The ankle fracture that Aka suffered as a result of his on-the-job accident on January 11, 2007, does not satisfy the high bar that courts have required for equitable tolling. Compare *Thon v. Marshall, No. 08 Civ. 292 (RWS), 2011 U.S. Dist. LEXIS 14531, 2011 WL 519454, at *1 (S.D.N.Y. Feb. 11, 2011)* (habeas petitioner's back pain, herniated disk, and related surgery insufficient to justify tolling), with *Harper v. Ercole, 648 F.3d 132, 137 (2d Cir. 2011)* (extraordinary circumstances established because habeas petitioner was hospitalized, underwent six surgeries, and was heavily medicated during limitations period). Aka has not provided any medical documentation of his injury, and thus has failed to describe with the requisite particularity his medical condition [*39] and its effect on his capacity to press his claims. Moreover, Aka was able to travel by taxi to the Javits Center on one occasion during the 300-day period following his injury. At the time of that visit in August 2007, Aka walked with the assistance of crutches, but obviously had the ability to move about and to converse with NYCCOC officials. (See Dep. 141-42). It follows that Aka's argument that the limitations period should be tolled because he was "immobile" is unpersuasive.

Aka also has not shown that he diligently pursued his rights during the 300-day period following the EIS incident. Indeed, aside from his visit to the Javits Center, he did not make any efforts to pursue his discrimination claims. Although Aka contends that he decided that EIS's action was discriminatory in August 2007, after he met with Richardson de Cuevas at the Javits Center, (see id. at 145-46), even then he did not file his EEOC charge until March 17, 2008 -- approximately seven months after he concluded that he had been subject to discrimination and fourteen months after the alleged discriminatory action.

In these circumstances, Aka has failed to adduce evidence of the sort of extraordinary circumstances [*40] that would justify tolling of the statute of limitations.

B. Discrimination

As a consequence, the only allegedly discriminatory employment action that this Court can address is Aka's termination in January 2008.[10] Aka claims that his termination was unlawfully based on his age, race, color, national origin, and disability. (See EEOC Charge at 4). NYCCOC disputes that claim, arguing that Aka has failed to establish a prima facie case of discrimination,

and that its decision to terminate his employment was based on legitimate, nondiscriminatory reasons. (Def.'s Mem. at 11-16).

10   Aka also complained during his deposition that NYCCOC did not "do anything about" the EIS incident. (Dep. 158: see also id. at 148 (Aka's testimony that he sued the Javits Center for "[t]otal negligence to [his] case")). To the extent that Aka asserts a discrimination claim against NYCCOC for its failure to adequately investigate his complaints about EIS, his claim is without merit. Aka has not shown that NYCCOC's alleged failure to investigate his complaint about EIS constituted an adverse employment action. See *Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 721-22 (2d Cir. 2010)* (in context of retaliation [*41] claim, employer's failure to investigate employee's discrimination complaint does not constitute adverse employment action).

1. Title VII and ADEA Prima Facie Case

It seems clear that Aka can satisfy three of the four required elements of his prima facie case under Title VII and the ADEA.. Indeed, Aka is a member of at least two protected classes since he was over forty years old when he was terminated and is an African-American. Aka's termination also plainly constituted an adverse employment action. Furthermore, despite evidence that certain contractors disapproved of Aka's work, NYCCOC does not challenge Aka's qualifications as a journeyman carpenter as part of its present motion. Accordingly, the sole remaining issue with respect to Aka's prima facie case under these statutes is whether he can show that the circumstances surrounding his termination give rise to an inference of discrimination based on his age, race, national origin, or color.

Aka has not proffered any admissible evidence that gives rise to an inference that NYCCOC terminated him based on any of these factors. Insofar as he seeks relief under the ADEA, Aka's papers and testimony do not contain so much as a scintilla [*42] of evidence that he was singled out because of his age or that NYCCOC treated younger carpenters differently than older carpenters. The mere fact that Aka was sixty-two years old when he was terminated, (see EEOC Charge at 5), is not enough to create a triable issue of material fact with respect to his claim that NYCCOC acted out of an ageist animus when it terminated his employment. See *Sklar v. N.Y. Life Ins. Co., No. 00 Civ. 2254 (WHP), 2001 U.S. Dist. LEXIS 12890, 2001 WL 984724, at *5 (S.D.N.Y. Aug. 27, 2001)* ("mere fact" that plaintiff was fifty-two years old does not raise inference of age discrimination).

NYCCOC therefore is entitled to summary judgment as to Aka's age discrimination claim.

Aka claims that he was discriminated against based on his color, national origin, and race necessarily meet the same fate. Aka has failed to proffer any admissible evidence that suggests that NYCCOC terminated him because of his membership in those protected classes. To support his claim that his termination in 2008 was discriminatory, Aka points to certain prior acts occurring between 2004 and 2006. In particular, he alleges that: (a) a contractor refused to work with him and another African-American carpenter after [*43] they were selected through shaping; (b) he was denied work for seventy-four days on discriminatory grounds; (c) he and a carpenter from Barbados were excluded from shaping for unexplained reasons; and (d) the contractors' evaluations of his work were false and therefore evidence NYCCOC's discriminatory bias. (See Pl.'s Opp'n at 11, 18-19, 34-36, 38-41; Dep. 120-21; EEOC Charge at 7-9). Aka's conclusory statements that these incidents amounted to discrimination, however, are insufficient to show that NYCCOC acted out of a discriminatory animus several years later. See *Bickerstaff v. Vassar Coll., 196 F.3d 435, 456 (2d Cir. 1999)* ("[feelings and perceptions] of being discriminated against [are] not evidence of discrimination") (internal quotation marks omitted; brackets in original); *Butler v. N.Y. Health & Racquet Club, 768 F. Supp. 2d 516, 532 (S.D.N.Y. 2011)* ("conclusory assertions" that supervisor acted out of racial bias are insufficient to establish inference of discrimination). Importantly, each of the prior acts on which Aka relies occurred between two and four years before he was terminated. Absent any evidence that NYCCOC engaged in a longstanding practice or pattern of discrimination, [*44] even if these prior incidents involved unlawful discrimination, this would not suggest that the circumstances surrounding his termination in January 2008 were discriminatory.

Finally, Aka seems to suggest that Richardson de Cuevas's conclusion that EIS had discriminated against him in January 2007 raises an inference that his termination in 2008 also was discriminatory. Aka, however, has offered no admissible evidence to support his assertion that Richardson de Cuevas, in fact, reached that conclusion.[11] Moreover, even if Aka could establish that EIS's action was discriminatory, he has not shown that EIS had any decisionmaking power with respect to his termination. Pursuant to the CBA, contractors such as EIS were not joint employers of the carpenters working for NYCCOC. (Tassone Decl. Ex. A at D007). Rather, the CBA gave NYCCOC the sole right to determine the qualifications of all employees at the Javits Center and to terminate those employees. (Id. at D005-D006). In the absence of any showing that Aka's termination arose out

of EIS's complaints, rather than Aka's inability to return to work, Aka has failed to establish a prima facie case that his termination constituted discrimination [*45] on the basis of his race, color, or national origin. NYCCOC consequently is entitled to summary judgment on Aka's Title VII claim.

> 11   Aka has annexed to his opposition papers an unauthenticated three-page document that appears to be Richardson de Cuevas's handwritten notes regarding Aka's complaints about EIS's refusal to work with him. (See Pl.'s Opp'n Ex. V). It is by no means clear from this exhibit that Richardson de Cuevas reached any conclusions as to the merits of Aka's claim. In any event, it is well-settled that "exhibits submitted in connection with a summary judgment motion must be authenticated and non-hearsay in order to be considered." *Young v. Daughters of Jacob Nursing Home, No. 09 Civ. 7475 (CS), 2011 U.S. Dist. LEXIS 74694, 2011 WL 2714208, at *1, n.1 (S.D.N.Y. July 12, 2011)*. Here, Aka's exhibit is neither.

## 2. ADA Prima Facie Case

Turning to the ADA, the parties do not dispute that Aka was on a leave of absence at the time of his termination. (See EEOC Charge at 5; Def.'s 56.1 Stmt. ¶ 25). NYCCOC's argument is grounded on its assertion that the record "is bereft of any admissible evidence from which an inference of [disability] discrimination can be made." (Def.'s Mem. at 11). For purposes of its [*46] motion, NYCCOC thus does not challenge Aka's showing regarding the first two elements of a prima facie disability discrimination claim. (See id. at 11-14). I therefore have assumed that (a) NYCCOC is subject to the ADA, and (b) Aka was disabled within the meaning of the ADA on the date of his termination.[12] See *Capobianco, 422 F.3d at 56*. The remaining issues are whether Aka has shown that (a) he could perform the essential functions of his job with or without reasonable accommodation, and (b) the circumstances of his termination raise an inference of discrimination based on his disability. See id.

> 12   This second assumption may not be warranted. Aka's physician indicated in January 2008 that Aka had a "total temporary disability." (Pl.'s Opp'n Ex. B) (emphasis added). "Courts within this circuit and the vast majority of courts elsewhere [that] have considered the question have held that temporary disabilities do not trigger the protection of the ADA because individuals with temporary disabilities are not disabled persons within the meaning of the act." *Huskins v. Pepsi*

2011 U.S. Dist. LEXIS 114002, *

*Cola of Odgensburg Bottlers, Inc., 180 F. Supp. 2d 347, 351 (N.D.N.Y. 2001)* (quoting *Graaf v. N. Shore Univ. Hosp., 1 F. Supp. 2d 318, 321 (S.D.N.Y. 1998).* **[*47]** The Second Circuit, however, has yet to address this issue. See *Adams v. Citizens Advice Bureau, 187 F.3d 315, 316 (2d Cir. 1999)* ("The question is open in this circuit and we intimate no opinion on it.") (per curiam); see also *Toyota Motor Mfg. v. Williams, 534 U.S. 184, 198, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002)* ("impairment's impact must . . . be permanent or long term").

Aka also suggests that he is disabled due to an injury in 2000. (See EEOC Charge at 7 (noting that Aka's ADA claim was based, in part, on his "medical disability" in connection with "an earlier accident in 2000 wherein he hurt his shoulder, knee, ribs, and elbow")). Aka has failed to provide any evidence to support an alleged disability dating to 2000. Moreover, it appears that Aka performed his work responsibilities without any accommodation throughout his tenure at NYC-COC. Aka therefore cannot show that he is disabled based on this earlier alleged disability.

"In general, a leave of absence is a reasonable accommodation." *Starr v. Time Warner, Inc., No. 07 Civ. 5871 (DC), 2007 U.S. Dist. LEXIS 88219, 2007 WL 4144627, at * 4 (S.D.N.Y. Nov. 21, 2007).* "The ADA, however, 'does not require an employer to grant an employee an indefinite leave of absence.'" Id. (quoting *Stamey v. NYP Holdings, Inc., 358 F. Supp. 2d 317, 324 (S.D.N.Y.2005)).* **[*48]** As Judge Conner noted in *Powers v. Polygram Holding, Inc., 40 F. Supp. 2d 195, 200-01 (S.D.N.Y. 1999),* courts have thus far often concluded, as a matter of law, that a request for leave is unreasonable when it exceeds one year, although it does not appear that "any exact number is the 'red line' that demarcates the reasonable from the unreasonable."

In this case, NYCCOC advised Aka that it expected him to return to work by January 15, 2008, which was slightly more than one year after he went on sick leave. (See Tassone Decl. Ex. M). Aka, however, neither returned to work nor furnished NYCCOC with a certification that he was fit to do so. Instead, because he had yet to obtain approval for an MRI from his insurance carrier, Aka took the position that it was too early to announce his ability to return to work. (See Pl.'s Opp'n Ex. B).

As Aka's counsel's letter to Hiler forthrightly explained, the accommodation that Aka sought was that Aka "remain as a Javits employee until he can obtain medical clearance and return to work." (Pl.'s Opp'n Ex. B). Nonetheless, an employer is "not require[d] . **[*49]** . . to maintain an employee's position while [he] unilater-

ally takes an indefinite leave of absence." See *Vazquez v. Southside United Hous. Dev., No. 06 Civ. 5997 (NGG) (LB), 2009 U.S. Dist. LEXIS 74480, 2009 WL 2596490, at *11 (E.D.N.Y. Aug. 21, 2009)* (citing *Parker v. Columbia Pictures Indus., 204 F.3d 326, 338 (2d Cir. 2000)).* Accordingly, because Aka was unable to perform the essential functions of his job and had not sought a "reasonable accommodation" which would permit him to do so, he has failed to establish the third required element of his ADA claim.

More importantly, even if Aka's request to continue his open-ended leave of absence were deemed reasonable, Aka has failed to adduce any evidence that NYC-COC terminated him because of his disability. In particular, Aka has not shown that NYCCOC treated disabled employees less favorably than able-bodied employees in response to requests for extended leave. Aka also has not shown that NYCCOC's decision to terminate his employment was based on anything other than Aka's inability to come to work. Aka therefore has not established a prima facie ADA claim.

3. NYCCOC's Legitimate, Nondiscriminatory Reason

Even if Aka had established a prima facie claim under any of **[*50]** the anti-discrimination statutes upon which he relies, NYCCOC has proffered a legitimate, nondiscriminatory reason for his termination, which is that it needed to "maintain[] a steady, reliable and adequate workforce." (See Tassone Decl. Exs. M, N). By the time NYCCOC terminated Aka, he had taken a leave of absence for over a year as a result of his on-the-job injury, and had not complied with NYCCOC's request that he provide a certification of his fitness to return to work. Both an employee's failure to provide such a certification and an employer's need to maintain a staff that is capable of working have been recognized as legitimate, nondiscriminatory reasons for an adverse employment action. *Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 447 (2d Cir. 1999)* (plaintiff's termination proper because she failed to provide documentation for her leave of absence pursuant to employer's demand), abrogated on other grounds, *Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006); Beachum v. AWISCO N.Y., 785 F. Supp. 2d 84, 2011 U.S. Dist. LEXIS 28856, 2011 WL 1045082, at *8 (S.D.N.Y. Mar. 16, 2011)* ("An employee's failure to provide medical clearance to return to work is a legitimate, non-discriminatory **[*51]** reason for an adverse job action."); *Jackanin v. Mt. Sinai Hosp., No. 98 Civ. 5752 (KTD), 2003 U.S. Dist. LEXIS 2475, 2003 WL 402443, at *4-5 (S.D.N.Y. Feb. 20, 2003)* (granting summary judgment where plaintiff failed to show that the "official reason" for his termination -- his failure to

return to work from an extended medical leave -- was pretextual).

To rebut NYCCOC's legitimate, nondiscriminatory reason for its decision to terminate him, Aka must show that the proffered reason was false and that discrimination based on his age, national origin, race, color, or disability was the "real reason" for his termination. See *Beachum, 785 F. Supp. 2d 84, 2011 U.S. Dist. LEXIS 28856, 2011 WL 1045082, at *9* (citing *St. Mary's Honor Ctr., 509 U.S. at 515*). Here, however, there is no evidence even remotely suggesting that NYCCOC's proffered reason for terminating Aka's employment was false.

In sum, Aka has failed to adduce sufficient evidence to support his claim that NYCCOC unlawfully terminated his employment based on his age, race, color, national origin, or disability. NYCCOC's motion for summary judgment is therefore granted with respect to Aka's Title VII, ADEA, and ADA discrimination claims.

C. Retaliation

Aka's final claim is that his termination constituted unlawful [*52] retaliation. To prevail on this claim, Aka first must establish that he engaged in a protected activity prior to his termination. Aka does not clearly identify the events that he contends were protected activities. Rather, he has interspersed throughout his papers and testimony references to several events that he apparently considers protected activities. These include: (1) Aka's participation in *Cokely*, a race and national origin discrimination class-action lawsuit, in which Aka received $12,500 as his share of NYCCOC's settlement with certain persons it employed between the mid-1990s and 2004 (EEOC Charge at 7); (2) Aka's complaint in 2004 to NYCCOC that Manny Stone Decorators refused to work with him and another African-American carpenter (Pl.'s Opp'n at 11); (3) his complaint in 2004 to the Union and NYCCOC that Tassone failed to assign him work for seventy-four days, under circumstances that he believed constituted harassment and discrimination (id. at 34-36); (4) his complaints in 2006 to NYCCOC concerning the exclusion of his and another carpenter's names from the shaping box (id. at 38-41); (5) his letter to Richardson de Cuevas, dated January 23, 2007, regarding EIS's refusal [*53] to work with him earlier that month (see Brady Decl. Ex. 5); and (6) his oral complaints to Richardson de Cuevas in August 2007 about the EIS incident (see Dep. 142-46).

Aka's participation in the prior class-action discrimination suit against NYCCOC clearly constituted protected activity. Assuming, without deciding, that each of his complaints in 2004 and 2006 to NYCCOC also constituted protected activity, Aka still has failed to establish

any causal link between any of these activities and his termination. Indeed, each of these prior activities is too remote in time from his termination to be considered causally related simply because it occurred. See *Morisseau v. DLA Piper, 532 F. Supp. 2d 595, 616 (S.D.N.Y. 2008)* (citing *Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001))* (to infer a causal connection based on timing alone, the protected activity and adverse employment action must be "very close" in time); *Lynk v. Henderson, No. 98 Civ. 2086 (MGC), 2000 U.S. Dist. LEXIS 1496, 2000 WL 178859, at *4 (S.D.N.Y. Feb. 15, 2000)* (unreasonable to infer that retaliation occurred when three years elapsed between protected activity and adverse employment action). Absent any additional evidence of NYCCOC's allegedly [*54] retaliatory motive, Aka therefore has failed to establish a prima facie case of retaliation arising out of anything occurring before 2007.

Aka's contention that he was terminated based on his complaints about EIS in 2007 requires closer examination. In late January 2007, Aka wrote to Richardson de Cuevas about the EIS incident. (See Brady Decl. Ex. 5). In that letter, Aka noted that he did not understand why EIS had refused to work with him, observing further that the rejection made him feel "emotionally hurt." (Id.). Aka's letter, however, did not suggest that EIS had rejected him for any discriminatory reason, nor did Aka use the word "discrimination" or make reference to any anti-discrimination statutes. (See id.). Aka's submission of the letter therefore was not a protected activity because he neither opposed unlawful discrimination nor participated in a proceeding arising out of those statutes as a consequence of sending the letter.[13] See *42 U.S.C. § 2000e-3(a)* (protecting employees who oppose any unlawful employment practice or participate "in any manner in an investigation, proceeding, or hearing under" Title VII).

13    The fact that Aka sent his letter to NYCCOC's equal employment [*55] opportunity compliance manager does not make his letter an informal charge of discrimination since it is completely devoid of any language that would have alerted Richardson de Cuevas that Aka believed EIS's refusal to work with him was discriminatory.

Later, in August 2007, Aka made an oral complaint to Richardson de Cuevas about the EIS incident. Aka concedes that he did not allege at his meeting with Richardson de Cuevas that EIS's action was discriminatory, but maintains that she nevertheless concluded, based on her own investigation, that discrimination had occurred. (Dep. 144-46). Assuming that Aka's discussion with Richardson de Cuevas constituted protected activity, Aka

at best has shown a degree of temporal proximity between his complaint and his subsequent termination. This proximity is sufficient to establish a rebuttable presumption of retaliation at the first stage of the McDonnell Douglas analysis. *El Sayed, 627 F.3d at 932-33*. As noted previously, however, NYCCOC has proffered a legitimate, nondiscriminatory reason for Aka's termination. The burden therefore shifts to Aka to show that NYCCOC's alleged nondiscriminatory reason for terminating Aka is pretextual. In that **[*56]** regard, the mere fact that only five months elapsed between Aka's oral complaint and his termination is insufficient for Aka to meet his burden. See *Simpson, 166 Fed. Appx. at 502*: see also *Beachum, 785 F. Supp. 2d 84, 2011 U.S. Dist. LEXIS 28856, 2011 WL 1045082, at *11* ("mere temporal proximity . . . [is] insufficient to support a claim of retaliation at the summary judgment stage, at least where the defendant proffers a legitimate reason for the plaintiff's discharge with evidentiary support therefor") (internal quotation marks omitted). Because Aka has not proffered any additional evidence showing that NYCCOC's proffered reason for his termination is pretextual, his retaliation claim fails as a matter of law.

NYCCOC's motion for summary judgment with respect to Aka's retaliation claims pursuant to Title VII, the ADEA, and the ADA therefore must be granted.

## V. Conclusion

For the reasons set forth above, NYCCOC's motion for summary judgment, (ECF No. 25), is granted. The Clerk of the Court is therefore requested to close this case.

The Court certifies, pursuant to *28 U.S.C. § 1915(a)(3)*, that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See **[*57]** *Coppedge v. United States, 369 U.S. 438,444-45, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962)*.

SO ORDERED.

Dated: New York, New York

September 30, 2011

/s/ Frank Maas

FRANK MAAS

United States Magistrate Judge

# EXHIBIT M



ALICE BRESLOFF-HERNANDEZ, Plaintiff, -against- MARTIN F. HORN, as Commissioner of the NYC Department of Correction, Defendant.

05 Civ. 0384 (JGK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2007 U.S. Dist. LEXIS 71257; 19 Am. Disabilities Cas. (BNA) 1477*

September 21, 2007, Decided
September 25, 2007, Filed

**COUNSEL:** **[*1]** For Alice Bresloff-Hernandez, Plaintiff: Paul E. Kerson, LEAD ATTORNEY, Leavitt, Kerson & Duane, New York, NY.

For Martin F. Horn, as Commissioner of the NYC Department of Correction, Defendant: Andrez Shumree Carberry, LEAD ATTORNEY, Jonathan Michael Bardavid, LEAD ATTORNEY, New York City Law Department, New York, NY.

**JUDGES:** JOHN G. KOELTL, United States District Judge.

**OPINION BY:** JOHN G. KOELTL

**OPINION**

*OPINION AND ORDER*

    **JOHN G. KOELTL, District Judge:**

    The plaintiff, Alice Bresloff-Hernandez, brings this action against Martin F. Horn, in his capacity as Commissioner of the New York City Department of Correction ("DOC"). The plaintiff alleges that the defendant discriminated against her in violation of the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12101 et seq.;* New York State Human Rights Law ("NYHRL"), *N.Y. Exec. Law § 296;* and New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code *§ 8-107(1)(b).* The plaintiff, a retired Correction Officer, alleges that her medical separation from employment in July 2003 was discriminatory and that the DOC failed to accommodate her disability when she was reinstated in March 2004. The plaintiff also alleges that the defendant

violated the terms of a court-endorsed **[*2]** stipulation of settlement dated March 27, 1991, in *Aversa v. City of New York,* 90 Civ. 0138 (PKL).

    The DOC now moves for summary judgment pursuant to *Federal Rule of Civil Procedure 56,* arguing that the plaintiff cannot establish a prima facie case of disability discrimination because at the time she was medically separated from her position she could not perform the essential functions of the job, and further, that the defendant had a legitimate non-discriminatory reason for medically separating the plaintiff. The defendant also argues that the plaintiff's failure to accommodate claim must be dismissed because the plaintiff did not exhaust her administrative remedies by presenting this claim to the Equal Employment Opportunity Commission ("EEOC"). Further, the defendant argues that the plaintiff cannot establish a prima facie case of failure to accommodate because (1) she was not disabled at the time she made the request; (2) she did not provide notice that she was seeking an accommodation for an alleged disability; and (3) she requested an accommodation that was neither reasonable nor related to her alleged disability. Finally, the defendant argues that the plaintiff cannot establish **[*3]** that the defendant violated the stipulation of settlement in *Aversa.*

**I.**

    The following facts, unless otherwise noted, are undisputed. The plaintiff was employed by the DOC from 1986 until January 2007 as a Correction Officer. (Transcript of Nov. 16, 2006 Deposition of Alice Bresloff-Hernandez ("Dep. Tr."), at 14.) On or about January 25, 2000 the plaintiff was injured in an on-duty bus ac-

Case 1:11-cv-06983-KPF   Document 45   Filed 09/13/13   Page 162 of 253

Page 2

2007 U.S. Dist. LEXIS 71257, *; 19 Am. Disabilities Cas. (BNA) 1477

cident. (Def.'s *Rule 56.1* St. P2; Pl.'s Resp. *Rule 56.1* St. P1.) [1] Due to her injuries, the plaintiff's duty status alternated between light duty and paid sick leave until April 2002, when she went out permanently on paid sick leave. (Def.'s *Rule 56.1* St. P3; Pl.'s Resp. *Rule 56.1* St. P1.) On May 20, 2003, one year after the plaintiff went out on paid sick leave, the plaintiff submitted a treating physician's report from Dr. Jeffrey Spivak, which indicated that the plaintiff should continue her sick leave. (Def.'s *Rule 56.1* St. P6; Treating Physician's Summary Report dated May 20, 2003, attached as Ex. C to the Declaration of Jonathan Bardavid dated Feb. 15, 2007 ("Bardavid Decl.").) The plaintiff remained on paid sick leave until July 25, 2003, when she was medically separated from the DOC pursuant to [*4] New York Civil Service Law § 71. [2] (Def.'s *Rule 56.1* St. P4; Pl.'s Resp. *Rule 56.1* St. P1.) More than one month prior to her medical separation, the defendant notified the plaintiff that she could contest the separation by submitting medical documentation indicating her ability to perform all of the functions of a Correction Officer. (Def.'s *Rule 56.1* St. PP12-13; Letter from DOC Assistant Commissioner Robert M. O'Leary dated May 20, 2003, attached as Ex. E to Bardavid Decl.) The plaintiff did not submit any such documentation. (Def.'s *Rule 56.1* St. P15; Dep. Tr. 90, 93, 95.)

1   The defendant's Statement Pursuant to *Local Rule 56.1* includes relevant citations to the evidence supporting each of the factual allegations. The plaintiff's response generally denies the defendant's entire *Rule 56.1* Statement but does not explain why the statements in it are false or contested and cites no evidence to support a denial. (Pl.'s Resp. *Rule 56.1* St. PP1-2.) Unsubstantiated denials are insufficient to raise contested issues of fact or to support the denial of a motion for summary judgment. *See Indus. Bank of Japan Trust Co. v. Haseotes, 92 Civ. 6074, 1993 U.S. Dist. LEXIS 11568, 1993 WL 322775, at *6 n.1 (S.D.N.Y. Aug. 19, 1993);* [*5] *Logan v. St. Luke's-Roosevelt Hosp. Ctr., 636 F. Supp. 226, 232 (S.D.N.Y. 1986).*

2   *New York Civil Service Law § 71* provides in pertinent part:

Where an employee has been separated from the service by reason of a disability resulting from occupational injury . . . he or she shall be entitled to a leave of absence for at least one year . . . . Such employee may, within one year after the termination of such disability, make application . . . for

a medical examination to be conducted by a medical officer selected for that purpose by such department or commission. If, upon such medical examination, such medical officer shall certify that such person is physically and mentally fit to perform the duties of his or her former position, he or she shall be reinstated to his or her former position . . . .

In March 2003, while the plaintiff was out on paid sick leave, the plaintiff applied for an accident disability pension from the New York City Employees' Retirement System ("NYCERS"). (Def.'s *Rule 56.1* St. P8; Dep. Tr. 87.) In support of her application, the plaintiff stated that she could not perform the functions of a Correction Officer. (Def.'s *Rule 56.1* St. P9; Dep. Tr. 88.) On July 25, 2003, [*6] NYCERS found the plaintiff disabled but denied the accident disability application because the plaintiff's on-duty injury was not an accident within the meaning of the NYCERS rules. (Def.'s *Rule 56.1* St. PP10-11; Letter from I.J. Stephen, Deputy Director of NYCERS, dated July 25, 2003, attached as Ex. D to Bardavid Decl.)

On October 21, 2003 the plaintiff filed a charge of discrimination with the EEOC alleging that her medical separation from the DOC violated the ADA and was in retaliation for a prior complaint, and that she was not offered a reasonable accommodation to return to work. (Def.'s *Rule 56.1* St. PP40-41; Pl.'s Letter to the EEOC dated October 21, 2003, attached as Ex. M to Bardavid Decl.) The EEOC subsequently found no evidence from which to infer that the defendant had discriminated against the plaintiff based on sex, age, race, or disability, or had retaliated against the plaintiff for engaging in a protected activity; the EEOC also found that the plaintiff did not request a reasonable accommodation and therefore the employer could not have denied such an accommodation. (Def.'s *Rule 56.1* St. P43; Letter from EEOC to Pl. dated Oct. 21, 2004, attached as Ex. N to Bardavid [*7] Decl.)

In August 2003, during the time that the plaintiff was medically separated from employment from the DOC, she obtained full-time employment as an interviewer for Michael Vincent Michael Corporation ("MVM"). (Def.'s *Rule 56.1* St. P31; Dep. Tr. 14.)

In or about August 2003, the plaintiff applied for reinstatement pursuant to *New York Civil Service Law § 71.* (Def.'s *Rule 56.1* St. PP17-18; Pl.'s Resp. *Rule 56.1* St. P1.) On February 9, 2004 a doctor from the New

Case 1:11-cv-06983-KPF   Document 45   Filed 09/13/13   Page 163 of 253

Page 3

2007 U.S. Dist. LEXIS 71257, *; 19 Am. Disabilities Cas. (BNA) 1477

York City Department of Citywide Administrative Services ("DCAS") evaluated the plaintiff and determined that she was medically fit to return to her former position as a Correction Officer. (Def.'s *Rule 56.1* St. PP19-20; Letter from Dr. Joseph A. De Marco dated February 9, 2004, attached as Ex. G to Bardavid Decl.) On March 15, 2004 the plaintiff was reinstated to her position as a Correction Officer with the DOC and assigned to rotating shifts at the Eric M. Taylor Center. (Def.'s *Rule 56.1* St. P21; Pl.'s Resp. *Rule 56.1* St. P1.) On March 20, 2004 the plaintiff submitted a request to the Warden of the Eric M. Taylor Center for a steady 5:00 a.m. to 1:31 p.m. tour or a 6 a.m. to 2:30 p.m. tour. (Def.'s *Rule 56.1* St. P23; Mem. [*8] from Pl. to Warden Squillante dated March 20, 2004, attached as Ex. I to Bardavid Decl.) The plaintiff explained: "The reason for this request is that I must maintain a strict exercise program and routine to keep my health at its top performance due to the past surgeries" as the reason for the request. (*Id.* The request was denied "at this time." (*Id.*

Despite her reinstatement, the plaintiff remained employed with MVM full-time. (Def.'s *Rule 56.1* St. P34; Pl's Resp. *Rule 56.1* St. P1; Dep. Tr. 16-17.) DOC Directive # 2250R requires that a DOC employee seek and receive departmental approval before commencing off-duty employment and that any approved off-duty employment not exceed twenty hours per week. (Def.'s *Rule 56.1* St. P33; Pl's Resp. *Rule 56.1* St. P1; DOC Directive # 2250R, attached as Ex. K to Bardavid Decl.) On August 22, 2006 the plaintiff agreed to retire, effective January 31, 2007, to avoid being disciplined for unauthorized off-duty employment. (Def.'s *Rule 56.1* St. PP38-39; Pl's Resp. *Rule 56.1* St. P1; Dep. Tr. 31-32.)

On March 27, 1991 the plaintiff entered into a stipulation of settlement in the case entitled *Aversa v. City of New York*, 90 Civ. 0138 (PKL). [3] The stipulation [*9] provides in pertinent part: "[t]he DOC agrees that any personnel action or discipline contemplated with respect to plaintiff shall first be approved by the Deputy Commissioner for Human Resources or, if he is not available, the Commissioner of the DOC." (Stipulation and Order of Settlement and Discontinuance in *Aversa v. City of New York* dated March 27, 1991, attached as Ex. P to Bardavid Decl., at P6) The plaintiff's medical termination from employment was signed by the Assistant Commissioner for Personnel, not the Deputy Commissioner for Human Resources or the Commissioner of the DOC. (*See* Ex. F to Bardavid Decl.) At the time the plaintiff's medical termination was signed the position of Deputy Commissioner for Human Resources no longer existed and had been subsumed by the Assistant Commissioner for Personnel. (Dep. Tr. 133-34.)

3    The plaintiff was a class member in *Aversa v. City of New York*, 90 Civ. 0138 (PKL), in which she and twenty of her co-workers, through their union, filed suit against the DOC for wrongful sex discrimination in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e-2*, alleging discriminatory treatment of pregnant employees. The plaintiff [*10] settled with the DOC for $ 55,000, and the DOC admitted no liability. (*See* Dep. Tr. 50-52; Ex. P to Bardavid Decl., at PP3, 12.)

## II.

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).* "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo, 22 F.3d at 1224.* The moving party bears the initial burden of informing the district court of the basis for its motion and identifying those portions of the record which it believes demonstrates the absence of a genuine issue [*11] of material fact. *Celotex, 477 U.S. at 323.* The substantive law governing the case will identify those facts that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (citing *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962)); Gallo, 22 F.3d at 1223.* Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party. *See Chambers v. T.R.M. Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).* If the moving party meets its initial burden of showing a lack of a material issue of fact, the burden shifts to the nonmoving party to come

2007 U.S. Dist. LEXIS 71257, *; 19 Am. Disabilities Cas. (BNA) 1477

forward with "specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*. The nonmoving party must produce evidence in the record and [*12] "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998)*.

An employment discrimination claim brought pursuant to the ADA is governed at the summary judgment stage by the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc., 198 F.3d 68, 72 (2d Cir. 1999)* (applying *McDonnell Douglas* test to ADA claim). Under the *McDonnell Douglas* test, the plaintiff carries the initial burden of establishing a prima facie case of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 113 S. Ct 2742, 125 L. Ed. 2d 407 (1993); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)* (citing *McDonnell Douglas*); *Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997).* [4]

> 4   In general, disability claims under the NY-HRL and NYCHRL are subject to the same analytical framework as claims under the ADA. *Parker v. Columbia Pictures Indus., 204 F.3d 326, 332 n.1 (2d Cir. 2000)* [*13] (NYHRL); *Mohamed v. Marriott Int'l Inc., 905 F. Supp. 141, 156-57 (S.D.N.Y. 1995)* (NYHRL and NY-CHRL). The sole exception appears to be the more expansive definition of "disability" in the NYHRL and NYCHRL. *See, e.g., Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001)* (noting the discrete, and more expansive, definitions of "disability" under the NYHRL and NYCHRL).

When a plaintiff has successfully demonstrated the elements of a prima facie case, the burden of production shifts to the defendant to put forth a legitimate, nondiscriminatory reason for the employer's challenged action. *See Burdine, 450 U.S. at 252-53*. After the defendant articulates a legitimate reason for the action, the presumption of discrimination raised by the prima facie case drops out, and the plaintiff has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision and that the plaintiff's membership in a protected class was. *Id. at 254-56; Fisher, 114 F.3d at 1336*. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine, 450 U.S. at 253;* [*14] *see also Reeves, 530 U.S. at 143; Fisher, 114 F.3d at 1336*. The Court of Appeals for the Second Circuit has instructed that in determining whether the plaintiff has met this burden, a court is to use a "case by case" approach that evaluates "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." *James v. N.Y. Racing Ass'n, 233 F.3d 149, 156 (2d Cir. 2000)* (quoting *Reeves, 530 U.S. at 148-49)*. Although summary judgment must be granted with caution in employment discrimination actions "where intent is genuinely in issue, . . . summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers, 43 F.3d at 40; Slatky v. Healthfirst, Inc., 02 Civ. 5182, 2003 U.S. Dist. LEXIS 20608, 2003 WL 22705123, at *4 (S.D.N.Y. Nov. 17, 2003)*.

### III.

The defendant contends that the plaintiff has failed to make out a prima facie case for discrimination because at the time of the plaintiff's termination in July 2003 she could not perform the essential functions of her job. To make out a prima facie case of discrimination based on a [*15] disability, the plaintiff must establish that (1) her employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she could perform the essential functions of her job with or without a reasonable accommodation; and (4) she was discriminated against because of her disability. *Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 149-50 (2d Cir. 1998); see 42 U.S.C. § 12112(a); Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869-70 (2d Cir. 1998); Siederbaum v. City of New York, 309 F. Supp. 2d 618, 623 (S.D.N.Y. 2004); Hawana v. City of New York, 230 F. Supp. 2d 518, 530-31 (S.D.N.Y. 2002); Usala v. Consol. Edison Co., 141 F. Supp. 2d 373, 380 (S.D.N.Y. 2001)*.

The DOC argues that the plaintiff is not a qualified individual with a disability because she could not perform the essential functions of her job at the time of her discharge in July 2003. A "qualified individual with a disability" is a person with a disability "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *42 U.S.C. § 12111(8)*. EEOC regulations define "essential functions" as the "'fundamental' [*16] duties to be performed in the position in question, but not functions that are merely 'marginal.'" *Stone v. City of Mount Vernon, 118 F.3d 92, 97 (2d Cir. 1997)* (quoting *29 C.F.R. § 1630.2(n)(1)*). The NYCHRL standard is similar. It states that "it shall be an

Case 1:11-cv-06983-KPF  Document 45  Filed 09/13/13  Page 165 of 253

Page 5

2007 U.S. Dist. LEXIS 71257, *; 19 Am. Disabilities Cas. (BNA) 1477

affirmative defense that the person aggrieved by the alleged discriminatory practice could not, with reasonable accommodation, satisfy the essential requisites of the job . . . ." *N.Y. City Admin. Code § 8-107(15)(b).* The NY-HRL limits disability to those impairments which "upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held." *N.Y. Exec. Law § 292(21).*

The plaintiff has failed to make a prima facie showing that she could perform the essential functions of her job when she was terminated in July 2003. For over a year prior to her medical separation, the plaintiff was out on paid sick leave and was unable to report for work. (Dep. Tr. 81.) The plaintiff notes in her complaint that her inability to report to work began in April 2002 due to complications from a back injury. (Compl. P9.) She testified that **[*17]** she felt she could not function at the level the DOC required. (Dep. Tr. 88.) In May 2003, the plaintiff's physician stated that the plaintiff could not return to work in any capacity, full or light, and should remain out sick. (Treating Physician's Summary Report dated May 12, 2003, attached as Ex. C to Bardavid Decl.) New York Civil Service Law allows an employee a one-year leave of absence following an occupational injury that leads to disability. *See N.Y. Civ. Serv. Law § 71.* On May 20, 2003, over a year after the plaintiff went out on paid sick leave, the defendant informed the plaintiff that she was being medically separated, but had one month to submit papers to contest this determination. (Ex. E to Bardavid Decl.) The plaintiff points to no such submissions. (Dep. Tr. 95.) Further, the plaintiff admits that when she applied for an accident disability pension from NYCERS in March 2003 she was unable to perform the essential functions of her job. (Dep. Tr. 88.) The plaintiff has made it plain that at the time of her medical separation, she was unable to perform the essential requirements of her job. The plaintiff contends only that she was wrongfully terminated, but provides **[*18]** no evidence that she was qualified to meet the requirements of her job at the time she was separated. Thus, because the plaintiff was unable to perform the essential functions of her job, she cannot make out a prima facie case for discrimination under the ADA, NYHRL, or NYCHRL.

Moreover, the defendant argues that it is also entitled to summary judgment because it articulated a legitimate non-discriminatory reason for terminating the plaintiff and the plaintiff has failed to present any evidence that the non-discriminatory reason was pretextual. *New York Civil Service Law § 71* provides an employee up to one year of leave due to a work-related injury. After one year, the agency, in this case the DOC, is permitted to separate an employee from employment for medi-cal reasons. *See N.Y. Civ. Serv. Law § 71.* Here, it is undisputed that the plaintiff went out on paid sick leave in April 2002 due to a work-related injury. On May 20, 2003 the plaintiff was informed, in writing, that the DOC was seeking to separate her medically from employment pursuant to *New York Civil Service Law § 71.* (Ex. E to Bardavid Decl.) The plaintiff was further notified that she had until June 20, 2003 to submit medical **[*19]** documentation indicating her ability to perform the full duty functions of a Correction Officer, and that if she submitted such documentation, the DOC would schedule a medical examination to determine if she was capable of resuming her position with the DOC in a full duty capacity. (*Id.* The plaintiff concedes that she received the notice and she points to no documentation that she submitted in response to the notification. (Dep. Tr. 90, 92-93, 95.)

Given that the plaintiff was out on sick leave for one year and that the plaintiff failed to contest her medical separation within the time provided, and that the defendant's actions were in accordance with *New York Civil Service Law § 71,* the defendant has presented a non-discriminatory reason for the plaintiff's termination. *See Hatter v. Fulton, 92 Civ. 6065, 1997 U.S. Dist. LEXIS 10429, 1997 WL 411623, at *7 (S.D.N.Y. July 21, 1997), aff'd sub nom. Hatter v. New York City Housing Authority, 165 F.3d 14 (2d Cir. 1998)* (finding termination pursuant to *N.Y. Civ. Serv. Law § 71* to be a valid non-discriminatory reason for termination because the plaintiff had not attended work in over a year and had failed to provide any documentation that she was able to return to work). **[*20]** No presumption of discrimination arises when an employer makes a decision explicitly provided for by the Civil Service Law. *See Syken v. New York, 02 Civ. 4673, 2006 U.S. Dist. LEXIS 92264, 2006 WL 3771095, at *9 (S.D.N.Y. Dec. 21, 2006).*

Under the burden-shifting framework of *McDonnell Douglas,* the burden shifts back to the plaintiff to show that the DOC's proffered reason for termination is pretextual. *411 U.S. at 802-05; Fisher, 114 F.3d at 1336.* The plaintiff has not responded to the defendant's argument or presented any evidence that the defendant's proffered reason was pretextual. Thus, for this reason also the defendant is entitled to summary judgment.

The defendant's motion for summary judgment dismissing the plaintiff's claims of discrimination under the ADA, NYHRL, and NYCHRL based on her medical separation in July 2003 is **granted**.

**IV.**

In response to the plaintiff's claim of failure to make a reasonable accommodation when she returned to work in March 2004, the defendant argues that the plaintiff's

Case 1:11-cv-06983-KPF   Document 45   Filed 09/13/13   Page 166 of 253

Page 6

2007 U.S. Dist. LEXIS 71257, *; 19 Am. Disabilities Cas. (BNA) 1477

claim is barred because the plaintiff failed to include the claim in her charge of discrimination filed with the EEOC.

The Court has jurisdiction only over those claims included in an EEOC charge or those based [*21] on conduct subsequent to an EEOC charge which are "reasonably related" to those alleged in the EEOC charge. *Butts v. City of N.Y. Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993), superseded by statute on other grounds as stated in Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684 (2d Cir. 1998); see Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 686 (2d Cir. 2001); Katz v. Beth Israel Med. Ctr., 95 Civ. 7183, 2001 U.S. Dist. LEXIS 29, 2001 WL 11064, at *6-7 (S.D.N.Y. Jan. 4, 2001).* Exhaustion of administrative remedies through the EEOC is a precondition for bringing these claims in federal court. *See Legnani, 274 F.3d at 686; Butts, 990 F.2d at 1401.* A claim raised for the first time in the district court is "reasonably related" to allegations in an EEOC charge "where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Butts, 990 F.2d at 1402* (internal quotation marks and citation omitted). In this inquiry, the focus should be "on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Deravin v. Kerik, 335 F.3d 195, 201 (2d Cir. 2003)* [*22] (internal quotation marks and citation omitted). The central question is whether the complaint filed with the EEOC gave that agency "adequate notice to investigate discrimination on both bases." *Id. at 202.* This "is essentially an allowance of loose pleading" and is based on the recognition that "EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims she is suffering." *Butts, 990 F.2d at 1402.*

The Court of Appeals for the Second Circuit has also recognized that two other types of claims are "reasonably related" to a complaint before the EEOC: complaints alleging retaliation by an employer against an employee for filing an EEOC charge, and complaints alleging further incidents of discrimination carried out in precisely the same manner or using the same method alleged in the EEOC charge. *Id. at 1402-03.*

The defendant alleges that the plaintiff failed to exhaust her remedies before the EEOC and that none of the exceptions to the exhaustion rule apply in this case. The defendant urges that the Court therefore lacks jurisdiction to hear the plaintiff's claim that [*23] the defendant's failure to grant her requested shift change in March 2004 was a failure to provide her a reasonable accommodation for her alleged disability.

The plaintiff simply ignored this argument and has not explained how the charge of failure to accommodate was presented to the EEOC or is reasonably related to the EEOC charge under one of the *Butts* exceptions. An examination of the EEOC charge and the current complaint of failure to accommodate indicates that they are not reasonably related.

The plaintiff filed a charge of discrimination with the EEOC on October 21, 2003, in which she claimed that that the DOC failed to offer her a return to work with a reasonable accommodation and instead wrongfully terminated her in July 2003. (*See* Ex. M to Bardavid Decl.) The plaintiff did not claim that she sought a reasonable accommodation at that time, but she did note that the DOC had positions where officers could work with a disability. (*Id.* The EEOC decision concluded that because the plaintiff did not ask for an accommodation, she could not have been denied one, and thus found this claim unavailing. (Ex. N to Bardavid Decl., at 2.)

The failure to accommodate claim that the plaintiff [*24] currently brings relates to her request for a shift change in March 2004, after she had been reinstated to full duty at the DOC, not to any behavior by the DOC before the plaintiff's medical separation. It is a different charge of discrimination which would not have reasonably been investigated by the EEOC in its initial investigation. Furthermore, it is not an instance of alleged discrimination which could be considered to have been carried out in precisely the same manner as the alleged earlier failure to accommodate. The claim included in the EEOC charge refers to a failure to offer the plaintiff a different position at the EEOC to accommodate her disability between April 2002 and July 2003 when she was on medical leave, whereas the current claim is based on the denial of a request for a shift change made by the plaintiff several months after she was reinstated to her previous position as a Corrections Officer in March 2004. Therefore, the plaintiff's ADA claim for failure to accommodate is barred. [5]

5   Unlike the ADA, the NYHRL and NYCHRL do not require exhaustion of administrative remedies. These acts provide an election of forums, either administrative or judicial, such that a plaintiff [*25] who files a complaint with the State Human Rights Division or the City Human Rights Commission may not then bring suit in court. *See N.Y. Exec. Law § 297(9); N.Y.C. Admin. Code § 8-502(a); Hernandez v. N.Y. City Law Dept. Corp. Counsel, 94 Civ. 9042, 1997 U.S. Dist. LEXIS 620, 1997 WL 27047, at *10 (S.D.N.Y. Jan. 23, 1997).* Because the plaintiff did not file her failure to accommodate claim with either the State or City administrative agen-

Case 1:11-cv-06983-KPF    Document 45    Filed 09/13/13    Page 167 of 253

Page 7

2007 U.S. Dist. LEXIS 71257, *; 19 Am. Disabilities Cas. (BNA) 1477

cy, she can pursue that claim under the State and City statutes in this Court. *See 1997 U.S. Dist. LEXIS 620 [WL] * 11.*

In any event, the claim under the ADA, as well as under the NYHRL and the NYCHRL, fails on its merits. To state a claim for discrimination based on a failure to accommodate, the plaintiff must allege that: (1) she is an individual with a disability; (2) an employer covered by the statute had notice of this disability; (3) with reasonable accommodation, she could perform the essential functions of the position; and (4) the employer had refused to make such accommodations. *Rodal v. Anesthesia Group of Onondaga, P.C.,* 369 F.3d 113, 118 (2d Cir. 2004); *Kendricks v. Westhab, Inc.,* 163 F. Supp. 2d 263, 269 (S.D.N.Y. 2001).

The defendant argues that the plaintiff was not disabled under the **[*26]** meaning of the applicable statutes at the time she made her request for a shift change. The term "disability" is defined under the ADA as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). The EEOC regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). The regulations define "substantially limit[ed]" as "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity." *Id. § 1630.2(j)(1).* "Disability" is defined more broadly under the NYHRL and NYCHRL. The NYHRL defines "disability" as "(a) a physical, mental or medical impairment **[*27]** resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment...." N.Y. Exec. Law § 292.21. The NYCHRL defines "disability" as "any physical, medical, mental or psychological impairment, or a history or record of such impairment," which includes "an impairment of any system of the body." *N.Y.C. Admin. Code § 8-102(16).* Neither the NYHRL nor the NYCHRL requires proof of an impairment that substantially limits a major life activity.

The plaintiff has not shown that she had a substantial limitation of a major life activity, and therefore has not presented evidence that she was disabled under the meaning of the ADA. The plaintiff testified that she can walk up to three miles a day, can sit for over an hour, and does not require assistance getting dressed. (*See* Dep. Tr. 109-10.) In August 2003 the plaintiff applied for reinstatement to the DOC pursuant to *New York Civil Service Law § 71* and alleged that she was able to perform the full **[*28]** duties of a Correction Officer. The plaintiff underwent a medical examination on or about December 15, 2003, at which time she was diagnosed as medically fit to perform the duties of her position as a Correction Officer. (*See* Letter from DCAS dated February 9, 2004, attached as Ex. G to Bardavid Decl.) The plaintiff then returned to full duty. An employee is only eligible for reinstatement pursuant to *New York Civil Service Law § 71* if a medical officer certifies that the person is physically and mentally fit to perform the duties of the person's prior position. *See N.Y. Civ. Serv. Law § 71.* Therefore, the plaintiff has failed to present evidence that she was disabled under the meaning of the ADA at the time of her request for a reasonable accommodation.

However, there are issues of material fact as to whether the plaintiff was disabled under the NYHRL's and the NYCHRL's broader definition of disability. The plaintiff testified that she suffered from physical impairments resulting from anatomical and physiological conditions that are demonstrable by medically accepted techniques. The plaintiff testified that she has had a spinal disc replaced with an implant which limits her ability **[*29]** to stand and sit for long periods of time. (Dep. Tr. 108-10.) She also stated that she has difficulty dressing in the morning, and cannot bend down to pick up objects off the floor. (*Id.* at 110.) The plaintiff also has a limited range of motion in her left shoulder and elbow and is unable to pick up heavy objects due to an earlier injury. (*Id.* at 109.) There are thus issues of material fact as to whether the plaintiff was disabled under the NYHRL or the NYCHRL.

The failure to accommodate claim fails in any event, however, because the DOC did not refuse to make a reasonable accommodation for a disability for which it had notice. The initial burden of requesting an accommodation is "on the employee, and it is only after such a request has been made that the employer must engage in the 'interactive process' of finding a suitable accommodation." *Felix v. N.Y. City Transit Auth.,* 154 F. Supp. 2d 640, 656-57 (S.D.N.Y. 2001) (citing *Stola v. Joint Indus. Bd.,* 889 F. Supp. 133, 135 (S.D.N.Y. 1995) (An "employer is obliged to accommodate only those disabilities that are obvious or called to its attention by the employee.")). Proper notice is important because the ADA "envisions an 'interactive **[*30]** process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated."

2007 U.S. Dist. LEXIS 71257, *; 19 Am. Disabilities Cas. (BNA) 1477

*Felix*, 154 F. Supp. 2d at 658 (internal citations omitted). An employer "who acts or fails to act without knowledge of a disability cannot be said to have discriminated based on that disability." *Id. at 657.*

At the time the plaintiff made the request for a tour change she was on full duty status and did not indicate that she was disabled in any way. The plaintiff cited "maintain[ing] a strict exercise program and routine to keep [her] health at its top performance due to the past surgeries" as the reason for her request. (Ex. I to Barda-vid Decl.) The plaintiff did not refer to this request as an accommodation for a disability. Moreover, she had just been reinstated to the DOC pursuant to *N.Y. Civil Service Law § 71*, which permits reinstatement when a previously disabling condition has ended. As such, the DOC had no reason to believe that the plaintiff was then disabled. *See N.Y. Civ. Serv. Law § 71.*

Moreover, the plaintiff did not follow the DOC's formal procedure for requesting a disability accommodation. DOC Directive # 2232R requires that all applicants **[*31]** complete a Reasonable Accommodation Request Form and submit reasonable supporting documentation to the Disability Rights Coordinator. (*See* DOC Directive # 2232R(V)(I)(a), attached as Ex. J to Bardavid Decl.) The plaintiff conceded that she followed none of these protocols, but instead submitted a brief typed memorandum without any supporting papers to the Personnel Department, addressed to her Warden. (*See* Dep. Tr. 119, 122-23; Ex. I to Bardavid Decl.) The plaintiff's request appeared to be nothing more than a request to accommodate a personal preference. Without more definite notice from the plaintiff, namely, some indication of a disability and how the disability relates to the request for an accommodation, the defendant was unable to participate in the interactive process that the ADA envisions. Therefore, the plaintiff never notified the DOC properly of the plaintiff's request for a reasonable accommodation for an alleged disability.

Finally, the plaintiff's request for an accommodation was not reasonably related to any disability; there is no nexus or causal connection between the plaintiff's requested accommodation and any alleged disability such that the change in job condition **[*32]** could be considered as reasonably related to her alleged disability. *See Pimentel v. City of New York, 2001 U.S. Dist. LEXIS 20426, 2001 WL 1579553, at *15 (S.D.N.Y. Dec. 11, 2001); Felix, 154 F. Supp. 2d at 659.* The plaintiff testified that her request for a tour change was to enable her to maintain a "strict exercise program . . . to keep my health at its top performance due to past surgeries" by working out on a treadmill at her home. (*See* Ex. I to Bardavid Decl.; Dep. Tr. 123-24, 130.) The plaintiff further testified that on average it took her three hours to get home from the DOC, leaving little time to exercise,

whereas her proposed shift change would result in reduced travel time, better facilitating her exercise regime. (Dep. Tr. 124, 130.) However, there is no connection between reduced commuting time and the plaintiff's ability to work out. The plaintiff admitted that there was a gym at the DOC that she could use before or after her shifts, and the hour she gets off work is immaterial to her ability to work out. (Dep. Tr. 129.) Furthermore, the defendant contends that the request for a tour change was in fact to accommodate the work schedule for the plaintiff's second job, as an interviewer for MVM. **[*33]** The plaintiff does not respond to this contention. Thus, her shift change request appears to be no more than a personal preference for getting home at one time as opposed to another, possibly to accommodate a second job, and the ADA imposes no obligation on employers to accommodate personal preferences. *Pimentel, 2001 U.S. Dist. LEXIS 20426, 2001 WL 1579553 at *15* (rejecting failure to accommodate claim that requested a transfer to reduce commuting time). The plaintiff similarly does not show why the change in tour is a reasonable accommodation for her alleged disability, her back pain; she simply asked for the same hours at a different time of day. This is not a sufficient causal connection.

Because the plaintiff's claim for a shift change was not a reasonable accommodation claim, was not filed with the EEOC or reasonably related to the claim that was filed, and because there is no evidence from which a reasonable jury could conclude that the plaintiff provided the DOC with adequate notice of her request, or that she made a request that was causally connected to her alleged disability, the defendant's motion for summary judgment on this claim is **granted**.

**V.**

Finally, the plaintiff alleges that the defendant violated **[*34]** a stipulation of settlement dated March 27, 1991 in the case of *Aversa v. City of New York*, 90 Civ. 0138 (PKL). The stipulation provides in pertinent part: "[t]he DOC agrees that any personnel action or discipline contemplated with respect to plaintiff shall first be approved by the Deputy Commissioner for Human Resources, or, if he is not available, the Commissioner of the DOC." (Ex. P to Bardavid Decl., at P6) The plaintiff alleges that because her medical termination from employment was signed by the Assistant Commissioner for Personnel instead of the Deputy Commissioner of Human Resources or the Commissioner of the DOC, the terms of her settlement agreement were violated. However, the position of Deputy Commissioner for Human Resources was eliminated by the DOC and had been subsumed by the Assistant Commissioner for Personnel at the time the plaintiff's medical termination was signed.

Case 1:11-cv-06983-KPF   Document 45   Filed 09/13/13   Page 169 of 253

Page 9

2007 U.S. Dist. LEXIS 71257, *; 19 Am. Disabilities Cas. (BNA) 1477

(Reply Mem., at 9-10; Dep. Tr. 133-34.) The plaintiff testified that she was aware of this. (Dep. Tr. 133-34.)

In any event, stipulations of settlement are contracts and therefore are governed by general principles of contract law. *See Red Ball Interior Demolition Corp. v. Palmadessa, 173 F.3d 481, 484 (2d Cir. 1999).* [*35] A claim for breach of contract requires a material breach. *In re Stock Exch. Options Trading Antitrust Litig., 2005 WL 1635158, 99 Civ. 0962, 2005 U.S. Dist. LEXIS 13734, at *14 (S.D.N.Y. July 8, 2005)* (citing *41-41 51st Street Realty Assocs v. Tura Assocs., 207 A.D.2d 524, 616 N.Y.S.2d 73, 75 (App. Div. 1994).* Materiality "goes to the essence of the contract. . . . [A] breach is material if it defeats the object of the parties in making the contract and 'deprive[s] the injured party of the benefit that it justifiably expected.'" *ESPN, Inc. v. Office of the Commissioner of Baseball, 76 F. Supp. 2d 416, 421 (S.D.N.Y. 1999)* (quoting E. Allen Farnsworth, *Farnsworth on Contracts* § 8.16 (3d ed. 1999). When one party has committed a material breach, the non-breaching party may either elect to terminate the contract and sue for damages, or continue performance under the contract and sue for partial damages. *City of New York v. N.Y. Pizzeria Delicatessen, Inc., 05 Civ. 2754, 2006 U.S. Dist. LEXIS 71414, 2006 WL 2850237, at *7 (S.D.N.Y. Sept. 29, 2006).* Here, the plaintiff has chosen the latter. [6]

6 The parties have not disputed that these basic principles of contract law should be applied to the stipulation.

The plaintiff has failed to offer any evidence of a material [*36] breach of the settlement agreement. The essence or object of the settlement with the plaintiff was to release the DOC and its employees from any liability arising from the allegations in the complaint in exchange for a payment of $ 55,000 and the implementation of a Pregnancy Disability Policy. (*See* Ex. P to Bardavid Decl., at PP1-3, 8.) The plaintiff testified that she received the money and released the DOC from liability. (Dep. Tr. 52.) The Pregnancy Disability Policy was included in the stipulation of settlement. (*See* Classification # 2262, attached to Ex. P to Bardavid Decl.) The plaintiff acknowledged that the terms of her employment remained subject to the rules and regulations of the DOC, including disciplinary procedures. (*See* Ex. P to Bardavid Decl., at P5.) While the stipulation provided that a personnel action with respect to the plaintiff was to be approved by the Deputy Commissioner of Human Resources or, if he is not available, by the DOC Commissioner, when the personnel action with respect to the plaintiff was approved by a senior official of the DOC who assumed the duties of the Deputy Commissioner of Human Resources, that approval process could not be construed as [*37] a material breach of the stipulation, one that defeated the object of the parties. Therefore, the plaintiff retained the benefit of her bargain, and there was no material breach of the stipulation of settlement.

Because the plaintiff provides no evidence from which a reasonable jury could conclude that the stipulation of settlement in *Aversa* was violated, the defendant's motion for summary judgment as to this claim is **granted.** [7]

7 There is a substantial question whether the Stipulation in the *Aversa* action can form the basis for an independent claim in this case. The Stipulation specifically provided: "This stipulation shall not be admissible in nor is it related to any other litigation or settlement negotiations." (Ex. P. to Bardavid Decl., at P12.) Neither of the parties has raised this issue. However, the dismissal of the claim in this case is without prejudice to any motions the parties may make in the *Aversa* action.

## CONCLUSION

For the reasons stated above, the defendant's motion for summary judgment is **granted.** The Clerk is directed to enter judgment dismissing the complaint and closing this case.

**SO ORDERED.**

**Dated: New York, New York**

September 21, 2007

John G. Koeltl

United States District [*38] Judge

# EXHIBIT N



**LARRY FITZPATRICK, Plaintiff, -v.-THE NEW YORK CORNELL HOSPITAL, Defendant.**

**00 Civ. 8594 (LAP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2002 U.S. Dist. LEXIS 25166*

**December 13, 2002, Decided
January 9, 2003, Filed**

**DISPOSITION:**     [*1]   Defendant's motion for summary judgment granted.

**COUNSEL:** Larry Fitzpatrick, PLAINTIFF, Pro se, Brooklyn, NY USA.

For The New York Cornell Hospital, DEFENDANT: David E Prager, Phillips, Nizer, Benjamin, Krim & Ballon, LLP, New York, NY USA.

**JUDGES:** LORETTA A. PRESKA, United States District Judge.

**OPINION BY:** LORETTA A. PRESKA

**OPINION**

MEMORANDUM AND ORDER

LORETTA A. PRESKA, United States District Judge:

The New York and Presbyterian Hospital, Weill Cornell Medical Center ("Hospital") moves for an order granting summary judgement pursuant to *Rule 56 of the Federal Rules of Civil Procedure* to dismiss the complaint of Larry Fitzpatrick in its entirety based on the lack of any genuine issue of material fact. Defendant argues that plaintiff's disability and race discrimination claims should be dismissed because he has failed to present any evidence of discrimination or to rebut defendant's legitimate reasons for its business decisions. For the reasons stated below, the motion for summary judgment is granted.

*BACKGROUND*

Plaintiff commenced employment with the Hospital in the Laundry Department on June 2, 1997. (Def. Ex. 3; Tr. 35). [1] The Hospital's Attendance Control Policy allows three incidents [*2] of unplanned absence in any six-month period and five incidents in any twelve-month period before any disciplinary sanctions are imposed. (Def. Ex. 6). Plaintiff was orally cautioned about excessive absenteeism on June 2, 1998 and received his first written warning on July 22, 1998 which recited eight incidents of absence during the preceding months. (Def. Exs. 7, 9A). On December 24, 1998, plaintiff received a second written warning for excessive absenteeism which recited ten incidents of absence in less than a year, and a three-day suspension was imposed. (Def. Exs. 8, 9A). Plaintiff's 1998 record shows he was absent on ten separate occasions totaling in excess of 30 days, plus an additional two incidents relating to an injured back. (Def. Exs. 9A, 10; Tr. 251-253). He was also late on eight occasions (five of them one hour or more). (Def. Ex. 9A). The Hospital records cite a variety of reasons for plaintiff's absenteeism, including "called in sick," "problems in his brother's house," "unplanned dentist appointment," and because plaintiff "went to a party the night before." (Def. Ex. 9A).

> 1    References are to the transcript of plaintiff's deposition and to the exhibits thereto.

[*3]   In February 1999, plaintiff injured his back and commenced a leave of absence during which he had back surgery. (Tr. 260, 262-63). Plaintiff returned to work in the fall of 1999. *(Id.)*. Like other employees in the Laundry Department, the plaintiff was evaluated in

mid-year 1999, covering the preceding twelve-month period. (Myers Aff. P 6; [2] Def. Ex. 15). Plaintiff's overall performance was rated as "NI" (Needs Improvement), which falls below "Meets Standards." *(Id.)* The principal reason for plaintiff's poor rating was his recurrent absenteeism during the evaluation period. (Def. Exs. 7, 8, 9A, 10).

> 2   Reference is to the Affidavit of Ronni Myers sworn to on July 24, 2002.

In late 1999, the effects of the 1997 Balanced Budget Act and other national health care reimbursement cutbacks created a $ 45 million budget gap for the year 2000 which caused the Hospital to institute a job freeze and to reduce staff in numerous areas Hospital-wide. (Myers Aff. P 3; Def. Ex. 2). Accordingly, on or about December 17, 1999, Fitzpatrick [*4] was laid off by the Hospital along with nine other non-supervisory Laundry Department employees. (Myers Aff. P 11). The first seven laid off were selected strictly on a lowest seniority basis (less than one year of service). (Myers Aff. P 4). The next three employees were selected based on a combination of seniority and performance -- those with the lowest seniority who fell below standards on the performance evaluation. *(Id.)*.

The Hospital has a Reinstatement/ Reemployment Policy that states:

> "Regular employees who terminate employment with the Hospital, reapply and are accepted for reemployment in a full-time or part-time position for which they are qualified, will be eligible for reinstatement provided they ... possess a satisfactory record of performance and were in compliance with the Hospital Policy No.212, Attendance Control."

(Def. Ex. 6). Pursuant to this policy, plaintiff and the other two employees who were laid off for performance deficiencies were ineligible for rehiring. (Myers Aff. P 6). Plaintiff received and signed for the Hospital's Employee Handbook that explains the Hospital's grievance policy. (Def. Exs. 25, 26; Tr. 212-213). After being laid off, [*5] plaintiff spoke with the Hospital's Human Resources Department concerning his benefit entitlements but did not question the layoff decision or ask for any review. (Myers Aff. P 15; Tr. 199-206). By contrast, Mr. Luis Saco, who was also laid off because of his attendance record, filed an internal grievance through the Hospital's Human Resources Department. (Myers Aff. P 6; Def. Ex. 23). The Hospital granted Mr. Saco's grievance in part, determining that his layoff would remain in

effect but made him eligible for rehire should a suitable opening become available. (Def. Ex. 24). Mr. Saco reapplied and was rehired in March 2000. (Myers Aff. P 14).

Shortly after being laid off, plaintiff applied for Social Security disability benefits and on June 27, 2002 was determined to be totally disabled "since February 20, 1999." (Pltff. Resp. Mem., SSA Decision, Findings PP 6, 11, 12). [3]

> 3   Reference is to plaintiff's "Affirmation: Notice of Opposing a Motion for Summary Judgment" received August 23, 2002 and the Social Security Administration Notice of Decision dated June 27, 2002 ("Decision") attached thereto.

[*6]   In his complaint, plaintiff asserts a single claim under the Americans with Disabilities Act, *42 U.S.C. §§ 12112 et seq.* ("ADA"), claiming discrimination because the Hospital laid him off due to a back injury suffered on the job. (Def. Ex. 17). In his deposition testimony, plaintiff rests his complaint on a comparison to the treatment of Mr. Saco and alleges discrimination due to the fact that Mr. Saco was rehired by the Hospital while the plaintiff was not. (Tr. 107, 121, 142, 205, 208). Although not specifically alleged in the complaint, plaintiff argues in his deposition testimony that he was also discriminated against on the basis of his race (African American). [4] *(Id.)*. For the purposes of this motion, I treat the complaint as amended to include an allegation of discrimination based on the Hospital's failure to rehire the plaintiff and to include an allegation of race discrimination.

> 4   Plaintiff did add the words "and/ or race" in the space next "Other Acts" when describing the alleged discriminatory conduct in the complaint. (Def. Ex. 17).

[*7] *DISCUSSION*

Under *Rule 56(c)*, "[a] motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 36 (2d Cir. 1994)*; *see Fed. R. Civ. P. 56(c)*. *See generally Celotex Corp. v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome of the particular litigation if the

substantive law at issue so renders them. *Anderson, 477 U.S. at 248.*

The burden of establishing that no genuine factual dispute exists rests on the party seeking summary judgment. *Chambers, 43 F.3d at 36.* "In moving for summary judgment [*8] against a party who will bear the ultimate burden of proof at trial," however, "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); accord Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223-24 (2d Cir. 1994)* ("The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The moving party, in other words, does not bear the burden of disproving an essential element of the nonmoving party's claim.

If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e); accord Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994).* The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita, 475 U.S. at 586.* Instead, the non-movant must "come forward [*9] with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely ... on the basis of conjecture or surmise.'" *Trans Sport v. Starter Sportswear, 964 F.2d 186, 188 (2d Cir. 1992).*

In assessing materials such as affidavits, exhibits, interrogatory answers, and depositions to determine whether the moving party has satisfied its burden, the court must view the record "in the light most favorable to the party opposing the motion" by resolving "all ambiguities and drawing all factual inferences in favor of the party against whom summary judgment is sought." *Chambers, 43 F.3d at 36.* "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Id. at 37.*

Under Title VII, which I have assumed is implicated because of plaintiff's race claim, it is unlawful "for an employer ... to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual ... because of such individual's race, color, religion, sex, [*10] or national origin." *42 U.S.C. § 2000e-2(a)(1).* Under this statute, the Court of Appeals continues to adhere to the allocation of the burden of production articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L.*

Ed. 2d 668, 93 S. Ct. 1817 (1973). See *Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1998).* Under *McDonnell Douglas,* to establish a prima facie Title VII claim, plaintiff must show (1) membership in a protected class; (2) qualification for the position sought; (3) an adverse employment action; and (4) the filling of a position by a person not a member of the protected class. *Fisher, 114 F.3d at 1335 (citing McDonnell Douglas, 411 U.S. at 802; Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-253, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)).*

To establish a prima facie case of discriminatory discharge under the ADA, a plaintiff must demonstrate that (1) his employer is subject to the [disability acts]; (2) he suffers from a disability within the meaning of the [disability acts]; (3) he is "otherwise [*11] qualified," *i.e.,* he could "perform the essential functions of his job with or without reasonable accommodation; and (4) he was fired because of his disability. See *Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, (2d Cir. 1998).* In order to satisfy the fourth element under Title VII and the ADA, the plaintiff must show that similarly situated employees outside of his protected class engaged in the same type of conduct and were treated more favorably. See *Cheek v. Peabody Coal Co., 97 F.3d 200, 204 (7th Cir. 1996); Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993); Binford v. RJR Nabisco Brands, Inc., (4th Cir. 1995).*

It often is difficult to apply summary judgment analysis in employment discrimination cases because they necessarily turn on the intent of the alleged discriminator, and plaintiffs will rarely uncover direct evidence of discriminatory intent. *Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 464-65 (2d Cir. 1989).* Nonetheless, a plaintiff must produce some evidence from which a reasonable inference of discrimination can be drawn. *McLee v. Chrysler Corp., 109 F.3d 130, 134-35 (2d Cir. 1997).* [*12] For a discrimination plaintiff to survive a motion for summary judgment he must do more than present "'conclusory allegations of discrimination;'" *Duprey v. Prudential Insur. Co. of America, 910 F. Supp. 879, 883 (N.D.N.Y. 1996) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985));* "he must offer 'concrete particulars' to substantiate [his] claim." *Id.*

To address these concerns, courts in discrimination cases under the ADA apply the same three-part test announced in *McDonnell Douglas* and its progeny. *Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 721-22 (2d Cir. 1994)(applying the McDonnell Douglas standard to handicap discrimination claim brought under the Rehabilitation Act); Duprey v. Prudential Insur. Co. of America, 910 F. Supp 879, 883 (N.D.N.Y.)(applying this test to an ADA claim).* Under this standard, a plaintiff bears

the initial burden, albeit minimal, of establishing a prima facie case of discrimination. *See Fisher, 114 F.3d at 1340 & n.7; Wernick v. Federal Reserve Bank of New York, 91 F.3d 379, 383 (2d Cir. 1996).*

If plaintiff establishes his prima facie [*13] case, the burden of production shifts to the defendant to produce "an explanation to rebut the prima facie case -- i.e., the burden of producing evidence that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *Fisher, 114 F.3d at 1335 (quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-07, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)(quoting Burdine, 450 U.S. 248, 254, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)).* As the Court of Appeals noted in *Fisher,* "any legitimate, nondiscriminatory reason will rebut the presumption triggered by the prima facie case." *114 F.3d at 1336.* Accordingly, "the defendant need not persuade the court that it was actually motivated by the proffered reasons in order to nullify the presumption and obligate the plaintiff to satisfy the burden of proof." *Id. (quoting Burdine, 450 U.S. at 254).*

Once a defendant has met its burden, "the presumption that triggered the defendant's burden of production ... 'drops out of the picture'" *Id. (quoting Cabrera v. Jakabovitz, 24 F.3d 372, 382 (2d Cir. 1994)(quoting St. Mary's, 509 U.S. at 509).* [*14] The "factual inquiry proceeds to a new level of specificity," *St. Mary's, 509 U.S. at 516; Fisher, 114 F.3d at 1336,* and the burden shifts back to plaintiff to put forth adequate evidence to support a rational finding that the "legitimate nondiscriminatory reasons proffered by the employer were false, and that more likely than not the employee's [race, national origin, or disability] was the reason for [the adverse decision.]" *Holt v. KMI-Continental, Inc., 95 F.3d 123, 129 (2d Cir. 1996), cert. denied, 520 U.S. 1228, 137 L. Ed. 2d 1027, 117 S. Ct. 1819 (1997).* Plaintiff need not show that this was the only factor in the employer's decision. *See Charrette v. Flickinger, 806 F. Supp. 1045, 1060 (N.D.N.Y. 1992)(citing Montana v. First Federal, 869 F.2d 100, 105 (2d Cir. 1989)(citations omitted)).* Nor must plaintiff demonstrate that defendant's "'proffered reason is false, but only that its stated reason was not the only reason and that [race, national origin, or disability] did make a difference.'" *See Charrette, 806 F. Supp. at 1060 (quoting Montana, 869 F.2d at 105* [*15] *(citation omitted)).* If, however, in the last analysis, plaintiff is "'unable to show evidence from which a jury could infer discrimination ..., then summary judgment may be granted.'" *See Charrette, 806 F. Supp. at 1061 (quoting Diamantopulos v. Brookside Corp., 683 F. Supp. 322, 328 (D. Conn. 1988) (citations omitted)).* In all cases, the plaintiff always "retains that ultimate burden of persuading the [trier of fact] that [he] has been the victim of intentional discrimination." *Fisher, 114*

*F.3d at 1336 (quoting St. Mary's, 509 U.S. at 508 (quoting Burdine, 450 U.S at 256 (alteration in St. Mary's)).*

Further, because Fitzpatrick is proceeding pro se in this action, I must judge his pleadings by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner, 404 U.S. 519, 520, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972); accord Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)("We read [the pro se party's] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest."); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988)* [*16] *(referring to the "special solicitude" afforded pro se litigants when confronted with motions for summary judgment); Hanlin v. Mitchelson, 794 F.2d 834, 838-839 (2d Cir. 1986)(citing Haines to support the principle that pro se pleadings are given a liberal construction).*

Nevertheless, proceeding pro se does not otherwise relieve Fitzpatrick from the usual requirements of summary judgment. *See Lee v. Coughlin, 902 F. Supp. 424, 429 (S.D.N.Y. 1995)(holding that a "pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment" (citing Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991)), reh'g granted on other grounds, 914 F. Supp. 1004 (S.D.N.Y. 1996); Kadosh v. TRW Inc., 1994 U.S. Dist. LEXIS 17390, *16, No. 91 Civ. 5080(PKL)(S.D.N.Y. 1994)("The work product of pro se litigants should be generously and liberally construed, but [the pro se's] failure to allege either specific facts or particular laws that have been submitted in an attempt to oppose defendants' motion ineffectual."); Stinson v. Sheriff's Dep't of Sullivan County, 499 F. Supp. 259, 262 (S.D.N.Y. 1980)* [*17] *(holding that the liberal standard accorded to pro se pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").*

Plaintiff's primary argument is that he was laid off from his position in the Laundry Department and was denied reemployment because of alleged discriminatory intent. Before addressing each argument individually, I note the Court's summary of certain applicable law in *Coleman v. Prudential Relocation, 975 F. Supp. 234, 239 (N.D.N.Y. 1997):* The laws prohibiting discrimination in employment were "not intended to transform the courts into personnel managers." The Court of Appeals has reminded district courts that they do not have a "roving commission to review business judgments" and that they "must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process." *Id. at 239-40 (citations omitted).* Plaintiff's objections to the decisions made by the Hospital amount to a difference of opinion as to the means and

policies the Hospital employs when determining who will be laid off and the qualifications of those it will employ or reemploy, and these are [*18] business decisions which I am instructed not to second-guess. *See also Scaria v. Rubin, 117 F.3d 652, 655 (2d Cir. 1997); Dister v. Continental Group, Inc., 859 F.2d 1108, 1116-17 (2d Cir. 1988); Lieberman v. Gant, 630 F.2d 60, 67 (2d Cir. 1980)*("When a decision to hire, promote, or grant tenure to one person rather than another is reasonably attributable to an honest even though potentially subjective evaluation of their qualifications, no inference of discrimination can be drawn"). I now address plaintiff's two arguments in turn.

## I. *Plaintiff's Prima Facie Case*

Plaintiff asserts that he was discharged and/ or not rehired as the result of racial and/ or disability discrimination. Plaintiff must first make a prima facie showing of discrimination. It is undisputed that plaintiff, an African-American, belongs to a protected class, and I assume for this motion that he suffers from a disability. Here, however, plaintiff has failed to establish the qualification prong of his prima facie case -- that he was qualified for the position or, in the case of his disability claim, that he could perform the essential functions of his job [*19] with or without accommodation. Indeed, plaintiff himself has demonstrated that he "is unable to perform his past relevant work as ... a laundry worker (hospital linens), either as it was specifically performed by [plaintiff] ... or as it is generally performed in the national economy." (Decision at 7). In his deposition plaintiff testified that he cannot perform any of the elements of the Laundry and Linen Worker job set forth in the job description, work in any capacity, and could not conceive of any help or accommodation that would enable him to do so. (Def. Ex. 5; Tr. 14-20, 27).

Plaintiff also has failed to establish the fourth prong of his prima facie case. Plaintiff fails to offer any evidence from which a jury could conclude that employees outside of his protected group engaged in similar behavior yet were treated more favorably. The record is undisputed that plaintiff was continually absent and late for work in excess of the Hospital's policies and that management had warned Fitzpatrick that further incidents could lead to his termination. Indeed, after several warnings by management, plaintiff showed no improvement and was subsequently discharged. The record also discloses [*20] that another Laundry Department worker, Luis Saco (who I will assume is not an African-American or disabled), was discharged due to excessive absenteeism and was rehired after he filed an internal grievance with the Hospital. In Saco's case a favorable determination of his grievance was based on "significant improvement" in his attendance records and "con-

tinuous compliance with the Hospital's Policy" since his previous evaluations. (Def. Exs. 23, 24). By contrast, Fitzpatrick never filed an internal grievance with the Hospital or asked for any review of his discharge. The Hospital claims plaintiff's continued absences and warnings formed the basis of plaintiff's low performance rating and were the reasons plaintiff was discharged and not rehired. Therefore, plaintiff has failed to establish a prima facie showing of race discrimination in his discharge or in the failure to rehire him because he has not met the fourth requirement of showing that a similarly situated employee received more favorable treatment from the Hospital. Thus, plaintiff has failed to make a prima facie case on either race or disability.

## II. *Defendant's Legitimate Non-Discriminatory Reasons*

If the plaintiff [*21] were able to establish a prima facie case (which he cannot), the burden would then shift to the defendant to offer a non-discriminatory justification for the termination. As the Court of Appeals has noted, "any legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case." *Fisher, 114 F.3d at 1336.* The Court of Appeals has held that a plaintiff's prima facie case of discrimination is rebutted by evidence that "at the time it discharged [plaintiff a] company was in a business downturn and that a reduction-in-force was necessary to meet its budgetary goals." *Gallo, 22 F.3d at 1226; Viola v. Philips Med. Sys. of N.A., 42 F.3d 712, 717 (2d Cir. 1994)*(employer's "evidence that it implemented a business-justified, company-wide reduction in its work force in response to changes in business emphasis and economic necessities, and it relied upon non-discriminatory guidelines in selecting employees to be fired," rebutted plaintiff's prima facie case); *Woroski v. Nashua Corp., 31 F.3d 105, 109* (defendant rebutted plaintiff's prima facie case where it "presented evidence to demonstrate that it discharged [plaintiffs] [*22] as part of a business-justified company reduction-in-force, conducted on an unbiased basis"). As noted above, courts are not to interfere with the employer's business judgment so long as that judgment is not exercised for discriminatory reasons. E.g., *Montana v. First Federal Savings and Loan Assn. of Rochester, 869 F.2d 100, 106 (2d Cir. 1989)*("Certainly the court could not merely substitute its judgment for that of a business judgment, nor could it determine that [the employer] should more properly have released another instead of [plaintiff]."); *Parcinski v. Outlet Co., 673 F.2d 34, 37 (2d Cir. 1982)* ("The [ADA] does not authorize the courts to judge the wisdom of a corporation's business decisions"); *Coleman v. Prudential Relocation, 975 F. Supp. at 239; see Lieberman v. Gant, 630 F.2d 60, 67 (2d Cir. 1980)*("When a decision to hire, promote, or grant tenure to one person rather than another is reasonably attributable to an honest even

though potentially subjective evaluation of their qualifications, no inference of discrimination can be drawn"); *Pisana v. Merrill Lynch & Co., Inc., 1995 U.S. Dist. LEXIS 10296 (S.D.N.Y. 1995)* [*23] ("Employers are free to terminate employees for subjective business judgments so long as their actions are not taken for discriminatory reasons").

As set out above, the Hospital has offered a number of legitimate, non-discriminatory reasons for Fitzpatrick's discharge. Assuming plaintiff had established his prima facie case, the Hospital has clearly met its burden in rebutting plaintiff's prima facie case by offering affidavits and depositions demonstrating the non-discriminatory basis for its decision to discharge plaintiff. Defendant details without contradiction the financial impact that the 1997 Balanced Budget Act along with additional national healthcare reimbursement cutbacks had on the Hospital. In response to these changes that produced a $ 45 million budget gap for the year 2000, the Hospital sought to reduce its staff and impose a job freeze. As described above, the elimination of certain positions and employees was handled through an objective process. The selection process for the staff reduction relied primarily on a review of all employees' performances and lengths of service.

The defendant has also clearly met its burden in rebutting plaintiff's prima facie case by [*24] offering affidavits and depositions demonstrating the non-discriminatory reason why plaintiff did not qualify for reemployment (besides the fact that plaintiff did not apply for reemployment). Plaintiff did not possess a satisfactory record of performance and was not in compliance with the Hospital Policy on Attendance Control. Plaintiff could have taken advantage of the internal grievance policy and reapplied for a position in the Laundry Department like Luis Saco and others did; however, he chose not to do so and brought this discrimination action instead.

Accordingly, defendant has met its slight burden to rebut plaintiff's inference of discrimination -- it has articulated legitimate, non-discriminatory reasons for its conduct, which is required in order to "prevent employers simply from remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." *Fisher, 114 F.3d at 1335.*

III. *Pretext for Discrimination*

Even if plaintiff had established a prima facie case of discriminatory discharge and non-reinstatement, the Hospital asserts legitimate, non-discriminatory reasons for his discharge and non-reinstatement -- excessive [*25] absenteeism and economic downturn. The plaintiff must offer evidence from which a jury could conclude that the Hospital's reasons were mere pretext for a discriminatory motive.

Fitzpatrick argues that he was discharged and/ or not rehired due to his race and/ or disability. Plaintiff, however, submits no evidence of discriminatory discharge, that he reapplied for the position in the Laundry Room after his discharge, was denied reemployment, that there were circumstances that could give rise to an inference of racial and/ or disability discrimination, or that the reasons given for his discharge were pretextual. Once again plaintiff can only point to the fact that Luis Saco, who is not similarly situated as explained above, was rehired. As noted above, that evidence is undisputed and insufficient to raise an issue as to pretext. In addition, all of plaintiff's undisputed absences and warnings occurred in 1998, prior to the February 20, 1999, "onset" date of his disability. Accordingly, there is no issue of fact as to pretext.

In short, Fitzpatrick has failed to provide any evidence beyond his own belief that the Hospital discharged him and did not reinstate him because of his disability [*26] and/ or race. A plaintiff may not defeat summary judgment "through reliance on unsupported assertions" or "conclusory statements." *See Goenaga, 51 F.3d at 18.* Thus, Fitzpatrick's conclusory allegations fail to raise a genuine issue of material fact either as to whether the Hospital's stated reasons for discharging and failing to reinstate him were false or whether the real reasons were discriminatory.

*CONCLUSION*

For the reasons stated above, defendant's motion for Summary Judgment is granted. The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED:

December *13,* 2002

LORETTA A. PRESKA, U.S.D.J.

# EXHIBIT O



**WILLIAM HART, JR., Plaintiff, -against- NEW YORK UNIVERSITY HOSPI-TALS CENTER, Defendant.**

**09 Civ. 5159**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2011 U.S. Dist. LEXIS 116538*

**October 7, 2011, Decided**
**October 7, 2011, Filed**

**SUBSEQUENT HISTORY:** Affirmed by *Hart v. New York Univ. Hosp. Ctr., 2013 U.S. App. LEXIS 2151 (2d Cir. N.Y., Jan. 31, 2013)*

**PRIOR HISTORY:** *Hart v. New York Univ. Hosps. Ctr., 2010 U.S. Dist. LEXIS 12054 (S.D.N.Y., Feb. 9, 2010)*

**COUNSEL:** [*1] William Hart, Jr., Plaintiff, Pro se, New York, NY.

Attorneys for Defendant: By Daniel T. Driensen, Esq., NYU LANGONE MEDICAL CENTER, OFFICE OF LEGAL COUNSEL, New York, NY.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINION BY:** ROBERT W. SWEET

**OPINION**

**OPINION**

Sweet, D.J.

Defendant, NYU Hospitals Center ("NYUHC" or the "Defendant") (s/h/a New York University Hospitals Center), has moved pursuant to *Rule 56 of the Federal Rules of Civil Procedure* for a summary judgment motion to dismiss the complaint brought by plaintiff pro se, William Hart ("Hart" or the "Plaintiff"). Upon the findings and conclusions set forth below, the motion is granted, and the complaint is dismissed.

**Prior Proceedings**

Hart filed his complaint on June 3, 2009 alleging discrimination, retaliation and denial of reasonable accommodation.

NYUHC moved to dismiss Hart's claims previously adjudicated by the New York State Division of Human Rights ("NYSDHR") which motion was granted in an opinion of February 9, 2010 (the "February 9 Opinion"), leaving as Hart's surviving claim that he was denied a reasonable accommodation and terminated on or about April 22, 2008 in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. §§ 12112, et seq.,* [*2] New York State Human Rights Law ("NYSHRL") N.Y. Exec. L *§ 296, et seq.,* and New York City Human Rights Law ("NYCHRL"), *N.Y.C. Admin. Code §§ 8-107 et seq.*

The instant motion was marked fully submitted on June 15, 2011.

**The Facts**

The facts are set forth in Defendant's Statement of Material Facts pursuant to *Rule 56.1 of Local Rules* of Civil Procedure, the various affidavits sworn to May 18, 2011 and May 19, 2011 that Plaintiff submitted in support of his Opposition, the Plaintiff's Statement of Material Fact and Plaintiff's Opposition of Motion for Summary Motion. The facts are not in dispute except as noted below.

Hart began his employment with NYUHC on December 23, 1989 as a Building Service Attendant. Over the course of his employment, Hart was subjected to disciplinary actions on more than forty occasions which

Hart has asserted were harassment and the result of bogus disciplinary write-ups. These disciplinary actions included five suspensions, two of which were for insubordination and one for threatening a supervisor which Hart has asserted were unjustified and the result of false accusations. Hart's performance evaluations frequently found him to be a sub standard employee. In the [*3] last evaluation of his performance, issued March 2006, Plaintiff was given a "l," the lowest rating, which signified that his performance failed to meet normal expectations and job requirements. Hart has asserted that the evaluator was not part of management.

As an incident of his employment, Hart was part of a collective bargaining unit represented by Local 1199, SEIU United Healthcare Workers East. In addition to the Defendant's policies, the terms and conditions of Plaintiff's position are governed by the collective bargaining agreement in place between the Defendant and the Local 1199, SEIU. Pursuant to the collective bargaining agreement, vacant positions must be posted and made available to qualified employees in the bargaining unit. To be qualified for a lateral transfer to a non-promotional position, an employee must have a satisfactory work record. Similarly, the Defendant's policy requires that, to be eligible, an employee applying for a vacant position must have "a satisfactory record of performance, attendance and punctuality. "

In early 2007, plaintiff applied for three job postings within the Building Services Department that would have been lateral transfers from his Building [*4] Service Attendant position. Two of the positions for which Plaintiff applied in January 2007 were runner positions on the day shift. Hart chose to withdraw his application for both of these positions. During the posting period from February 13, 2007 to February 20, 2007, Plaintiff also applied for a Temporary Elevator Operator position on the night shift. Hart has asserted the position was labeled a full time position at the time of his application. Due to his suspension on February 5, 2007, Hart was passed over for consideration of this position. Hart has asserted the suspension was unjustified because he was under a doctor's care as a result of a job-related injury from July 19, 2001. After rejecting Hart's application, the Department ultimately decided not to utilize the temporary position that was posted and instead covered the work using extra hours from other employees.

On February 21, 2007, Hart left work on an approved medical leave of absence due to a preexisting injury that was covered by Workers' Compensation and was continuously out of work from February 21, 2007, until his termination on April 22, 2008. On September 5, 2007, while still out on Workers' Compensation leave, [*5] Plaintiff filed a complaint against the Defendant (named therein as New York University Medical Center)

with the NYSDHR alleging employment discrimination based on disability, race and retaliation, alleging, inter alia, unfair work assignments, job positions, vacations and personal days. Id. On February 19, 2008, the NYSDHR issued a Determination and Order after Investigation dismissing the NYSDHR complaint and dually-filed EEOC Charge and dismissed Plaintiff's discrimination and retaliation claims, finding that there was no probable cause to believe that Defendant had engaged in or was engaging in the alleged unlawful discriminatory processes. On April 15, 2008, the EEOC issued a Dismissal and Notice of Rights wherein it adopted the findings of the NYSDHR.

While out on his Workers' Compensation Medical Leave, Hart participated in a basketball referee training program at the Kips' Bay Boys Club in the Bronx. Peter Aguilar, Senior Administrative Director of the Hospital's Building Services Department ("Aguilar") was assisting in the running of the program. In early April 2008, Aguilar observed Hart at the tryouts sprinting laterally with sudden stops and starts, repeatedly thrusting [*6] his arms in the air, and performing other strenuous physical actions that are required of basketball officials. Hart has asserted that at the Kips' Bay Boys Club, while in the stands, he observed Aguilar. Aguilar has asserted that he approached Hart after the session and noted to Hart that he appeared to be feeling better and that Hart responded that he had to make sure his family eats and that this was not the place, but one day they would talk about it. Hart has asserted that there was nothing stated about his health or his family.

On April 22, 2008, Hart appeared at the administrative office of the Building Services Department and sought to meet with Aguilar. At the meeting, Hart requested to be returned to work and be given the evator Operator position on the night shift. Hart admitted that his inquiry was for the position that he previously applied for and was denied in February 2007 and that he did not know whether or not the position he inquired about was vacant on April 22, 2008. Aguilar informed Plaintiff that there were no vacant night escort positions, adding that even if a vacant position existed, Plaintiff was not eligible for a transfer given his performance and disciplinary [*7] history prior to going on medical leave. According to Aguilar, Hart so said he did not have medical clearance to return to work from his leave. Hart states that the NYUHC never asked for medical clearance. According to Aguilar, Hart became loud and belligerent, and Aguilar and other witnesses have stated that Hart threatened Aguilar, warning "you better not come to Harlem," and shouting, "I know where you be at in Harlem and where you live in Mount Vernon!" According to Aguilar, when asked what Hart meant, Hart responded "you'll see." Hart states that he told Aguilar he would see

Aguilar in Mt. Vernon because his first referee training session was scheduled to be held in Mt. Vernon that Saturday. Hart also alleges that, in this conversation, it was Aguilar who responded with anger and profanity, prompting Hart to ask if he was being treated in such a manner because he was black. According to Hart, Aguilar was threatening and directed Hart to leave.

According to Aguilar, while leaving, Hart continued to curse and threaten Aguilar. Hart testified that he, not Aguilar, raised the issue of race in the meeting and that Aguilar never said anything about Plaintiff being black. Hart also testified [*8] that Aguilar never discussed Plaintiff's disability, nor could Hart recall if he said anything about his disability and that he, not Aguilar, spoke of his prior complaint to the NYSDHR. Hart speculated that he believed Aguilar was offended both because Plaintiff was taking the same referee asses and because Hart told Aguilar about the night elevator position and the NYSDHR claim. Hart testified that at this meeting, Aguilar stated that "your job is here if you want it." On April 22, 2008, Aguilar terminated Plaintiff's employment based on his conduct at the meeting. Hart has asserted this to be untrue.

Hart was not the first employee Aguilar terminated at the hospital, and others he has discharged have been disabled and not disabled, male and female, and were a variety of races and ethnicities. Aguilar currently employs people who are disabled; people who have returned from medical and workers' compensation leaves; and people who have made allegations of discrimination and retaliation against the Medical Center to the NYSDHR.

On or about August 12t 2008, Plaintiff filed a new charge of discrimination with the EEOC. In addition to allegations that had been raised in his previously dismissed [*9] EEOC and NYSDHR charges, Hart alleged that he was unlawfully discharged based on his disability and retaliation. Hart's EEOC charge does not allege that his race was a cause of discrimination. According to Hart, the charge, by claiming disability and retaliation, included discrimination. On March 31, 2009, the EEOC issued a dismissal and notice of rights finding that it was unable to conclude that the statutes had been violated and notified Plaintiff of his right to file suit in federal court within 90 days.

After his termination, Hart alleges that he looked for other employment. However, Hart could not identify any jobs that he did not pursue because of alleged limitations caused by his purported disability. According to Hart, his college eligibility was rejected as a result of his termination.

**The Discrimination Claim Is Dismissed**

This Court has previously held that, "[a]s a general rule, Title VII claims may only be maintained in federal court if they are raised in, or reasonably related to, the allegations brought before the EEOC or equivalent state agency." *Buckvar v. City of New York, No. 98 CIV. 3106(RWS), 2000 U.S. Dist. LEXIS 2889, 2000 WL 274195, at *5 (S.D.N.Y. Mar. 13, 2000).* If a claim is omitted from [*10] an EEOC charge and does not involve the same type of discrimination as that which was submitted for investigation, the omitted claim must be dismissed. See id.; *White v. N.Y.C. Dept. of Educ., No. 05-CV-2064 (RRM) (LB), 2008 U.S. Dist. LEXIS 79002, 2008 WL 4507614, at *3 (E.D.N.Y. Sept. 30, 2008)* (granting summary judgment on claims of gender discrimination where only race discrimination was raised in the EEOC complaint); *Scott v. N.Y.C. Dept. of Corr., No. 04 Civ. 9638(SHS) (GWG), 2007 U.S. Dist. LEXIS 86533, 2007 WL 4178405, at *7 (S.D.N.Y. Nov. 26, 2007)* Such an omission, when not reasonably related to the specific allegation actually included in the charge, will be the basis for dismissal for failure to exhaust. *Bethea v. Potter, No. 08 Civ. 2789, 2010 U.S. Dist. LEXIS 10191, 2010 WL 423105, at *7 (S.D.N.Y. Feb. 5, 2010).*

On the face of his EEOC charge, Hart only checked the boxes for "retaliation" and "disability" in the section labeled "Cause of Discrimination Based on." Plaintiff's type-written attachment to the charge only references claims arising under the ADA regarding retaliation, reasonable accommodation and disability. Despite acknowledging that the motion to dismiss successfully eliminated all claims other than those arising from the April 2008 meeting [*11] with Aguilar, Hart devoted much of his Opposition to challenging his numerous suspensions and previously adjudicated claims. Where Hart addressed the issues of the April 2008 meeting, he fails to proffer evidence from which a jury could conclude that the stated reason for termination was pretextual and the real reason was discrimination or retaliation. See *Fitzpatrick v. The New York Cornell Hosp., No. 00 Civ. 8594 LAP, 2002 U.S. Dist. LEXIS 25166, 2003 WL 102853, at *8 (S.D.N.Y. Jan. 9, 2003).* He concludes simply that the meeting itself establishes discrimination. Although Hart states in ¶ 50 of his affidavit that his EEOC charge "does claim race as one of the possible causes of discrimination," he provided no factual evidence to support this claim. The charge was an exhibit to the Driesen Affidavit, see Ex. 6, and, on its face, the charge and attachment signed by Hart bears no mention of race as a basis for the alleged discriminatory conduct. Plaintiff cannot avoid summary judgment with mere conjecture and surmise, *Del Franco v. N.Y.C. Off-Track Betting Corp., 245 Fed. Appx. 42, 43 (2d Cir. 2007).* See also *White, 2008 U.S. Dist. LEXIS 79002, 2008 WL 4507614, at *2.* The discrimination claim is dismissed.

### The Accommodation Claim Is Dismissed

To [*12] make a prima facie case for denial of a reasonable accommodation, a plaintiff must show that he was disabled, qualified for his position, and that the accommodation requested was reasonable. *McBride v. BIC Consumer Prods. Mfg. Co., Inc., 583 F.3d 92, 97-98 (2d Cir. 2009).*

In order to prove disability, a plaintiff must show that he possessed a physical or mental impairment that substantially limited one or more major life activities. *42 U.S.C. § 12102(1) (A).* Merely having an impairment, however, does not necessarily make one disabled for purpose of the ADA. *Wega v. Ctr. for Disability Rts., 395 Fed. Appx. 782, 784 (2d Cir. 2010)* (quoting *Toyota Motor Mfg. v. Williams, 534 U.S. 184, 195, 122 S. Ct. 681, 151 L. Ed.2d 615 (2002)).* In this case, Hart was out on a workers' compensation leave when he met with Aguilar on April 22, 2008. Shortly before that date, however, Aguilar observed Hart engaged in physical activity while participating in a referee training program, undermining any claim that Hart was, in fact, disabled. Moreover, Hart provided no evidence attesting to his being disabled at the time of his termination. Plaintiff provided a doctor's note from one year before the termination [*13] and a social security application from two years after. These documents do not satisfy Hart's burden of demonstrating that was disabled at the time of his termination.

If a plaintiff demonstrated that he was disabled under the applicable statutes, he must so establish that the request for a transfer as accommodation was reasonable and that a suitable vacancy existed at the time the request was made. *Jackan v. New York State Dep't of Lab., 205 F.3d 562, 567 (2d Cir. 2000); Batlidze v. Harris Beach L.L.P., No. 05 Civ. 86(DLC), 2008 U.S. Dist. LEXIS 37512, 2008 WL 2009385, at *4 (S.D.N.Y. May 8, 2008).* The burden of production and persuasion both lie with the Plaintiff for this element of the claim. *Jackan, 205 F.3d at 567-68.* Here, Hart testified that the position he sought as a reasonable accommodation, night elevator operator, was not posted at the time he met with Aguilar on April 22, 2008 but was the position for which he applied and was denied 14 months earlier. Hart asserted in his Opposition to Summary Judgment that the position was not labeled "temporary" and that Defendant's exhibit was "doctored." This assertion is not supported by relevant evidence, or more importantly, is this contention relevant to the [*14] issue of whether the position was vacant when requested in April 2008. See *Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11-12 (2d. 1986)* (the existence of disputed facts that are immaterial to the issues at hand is not an impediment to summary judgment).

Finally, Hart must demonstrate that the position sought must be one for which he was qualified. *McBride, 583 F.3d at 98.* Qualifications include "the requisite skill, experience and other job-related requirements of the employment pos ion." Id., quoting *29 C.F.R. § 1630.2(m).* Both the applicable collective bargaining agreement and hospital policy require that a prospective applicant for a vacant position have a satisfactory record in order to be considered. Hart conceded that possessing a satisfactory work record is a prerequisite for transfer under the union contract and hospital policies, but he conclusorily states that Defendant would falsify accusations to prevent him from transfer. Such conjecture, however, cannot be relied upon deciding this motion. See *Bickerstaff v. Vassar College, 196 F.3d 435, 439 (2d Cir. 1999)* ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported [*15] motion for summary judgment"). Thus, even if the position sought by Hart was vacant (which it was not), his history of disciplinary problems and performance deficits immediately prior to his medical leave in February 2007 would render him ineligible for transfer. Accordingly, Plaintiff cannot satisfy the requirements for a reasonable accommodation under the ADA. See *Jackan, 205 F.3d at 567-68* (plaintiff must show that he was qualified for the vacant position sought as a reasonable accommodation).

For these reasons, summary judgment is granted dismissing the causes of action concerning the alleged failure to provide a reasonable accommodation.

### The Claim Of Discrimination And Retaliation Is Dismissed

Title VII and the ADA prohibit discriminatory employment practices based on race and disability, respectively. *42 U.S.C. §§ 2000e, et seq.; 42 U.S.C. §§ 12112, et seq.* In the absence of direct evidence, courts apply the three-tier burden-shifting framework established in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973),* and *Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981),* to determine if a plaintiff [*16] has met his burden of proving employment discrimination. See *Brown v. Pension Boards, United Church of Christ, 488 F. Supp. 2d 395, 405 (S.D.N.Y. 2007).* In this framework, the plaintiff has the initial burden to establish a prima facie case of discrimination and, if the defendant articulates a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to prove that defendant's reason is in fact a pretext for discrimination. Id. "The question for the court on summary judgment is whether the plaintiff's evidence, taken as a whole, establishes a substantial likelihood that the employer inten-

tionally discriminated against the plaintiff." *Id. at 405.* Likewise, federal retaliation claims and claims for discrimination and retaliation under the Human Rights Laws of New York City and New York State are evaluated using the same analytical framework. *Auguste v. N.Y. Presbyterian Medical Ctr., 593 F. Supp. 2d 659, 665-6 (S.D.N.Y. 2009); Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001).*

The first step of the three-part burden shifting analysis is that a plaintiff must satisfy his prima facie burden of proving discrimination by [*17] a preponderance of the evidence. *McDonnell Douglas, 411 U.S. at 802-04.* With respect to the claims of discriminatory discharge based on disability, a plaintiff must demonstrate with evidence in the record that he was: (1) disabled under the statute; (2) performing his job satisfactorily; (3) was discharged; and (4) the discharge took place under circumstances that give rise to an inference of discrimination. Id.; *Auguste, 593 F. Supp. 2d at 663-64.*

Hart has failed to submit evidence that NYUHC's decision to terminate his employment for insubordination and threatening the senior administrative director was in any way related to his disability or race. To establish a prima facie case of discriminatory discharge, a plaintiff must show that he was terminated "under circumstances giving rise to an inference of discrimination." *Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998).* To do so, a plaintiff must "produce direct or circumstantial evidence that would lead a 'reasonable fact-finder to conclude either . . . that [the Hospital terminated his employment] because of his [race and/or disability], or [that the Hospital considered his race and/or disability] as a negative factor [*18] in such consideration." *Passonno v. State Univ. of N.Y. at Albany, 889 F. Supp. 602, 607 (N.D.N.Y. 1995)* (citations omitted); see also *Memnon v. Clifford Chance US, LLP, 667 F. Supp. 2d 334, 340 (S.D.N.Y. 2009)* ("To survive summary judgment under this analysis, a plaintiff must adduce sufficient evidence for a reasonable fact finder to conclude that she established her prima facie claim of either discrimination or retaliation."). Hart testified that Aguilar never spoke of his race or disability at the April 22, 2008 meeting, but rather it was Hart who raised these issues:

Q. Did he say anything to you about being black?

A. No. In so many ways I was puzzled why I was getting this way. And I said, "Why am I getting treated this way?" I might have said black. "Is it because I'm black?"

Q. But he didn't say it's because you're black?

A. No, I asked him.

Q. Did he say anything to you about your disability?

A. No.

Driesen Aff. Ex. 1 (Dep. of Pl. Tr.), p. 72:13-25.

Plaintiff further speculated that Aguilar was offended because Hart was taking the same referee classes. Although Aguilar was not actually taking the class, Hart believed that Aguilar was upset because Hart was trying to be a basketball [*19] official. Such speculation is wholly insufficient to withstand summary judgment. *Quarles v. Gen. Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985)* (plaintiff may not depend on "mere conjecture or speculation" to overcome a motion for summary judgment); *Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)* (conclusory allegations of discrimination are not enough to evade summary judgment).

Further, Hart has not demonstrated that non-blacks or non-disabled persons were treated in a more favorable manner. See *Baguer v. Spanish Broadcasting Sys., Inc., No. 04 Civ. 8393(RJS), 2010 U.S. Dist. LEXIS 69212, 2010 WL 2813632, *12 (S.D.N.Y. July 12, 2010)* (court granted summary judgment dismissing discriminatory discharge claims where plaintiff did "not offer any specific evidence of employees outside his protected class being treated more favorably than him on account of his [protected class]"). Aguilar's unrebutted affidavit states that both disabled and non-disabled employees and people of various races have been terminated.

Lastly, Hart's claim of discriminatory intent is undercut by his own testimony. Plaintiff testified that Aguilar told him at the meeting, "'Your job is here if you want it.' Something to that effect. 'Your [*20] job is here.'." Hart has failed to establish that the legitimate, non-discriminatory explanation proffered by Aguilar was pretextual and that he was motivated by discrimination or retaliation. See *Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000); Henwood v. Unisource Worldwide, Inc., 282 Fed. Appx. 26, 28 (2d Cir. 2008).* Plaintiff testified as follows:

o Hart, not Aguilar, raised the issue of race in the meeting. 56.2 Stmt. ¶ 39;

o Aguilar never said anything about Hart being black. Id. ¶ 39;

o Aguilar never discussed Hart's disability. Id. ¶ 40;

o Hart did not recall saying anything about disability either. Id. ¶ 40;

o Hart, not Aguilar spoke of his prior complaint to the NYSDHR. Id. ¶ 41;

o Hart's NYSDHR claim had already been dismissed for no probable cause at the time of the meeting. Id. ¶ 43;

o Aguilar stated to Hart that "your job is here if you want it." Id. ¶ 44.

In fact, Hart's testimony reflects that he had no idea as to why he was allegedly being treated hostilely -- "In so many ways I was puzzled why I was getting this way? And I said, 'Why am I getting treated this way?' I might have said black. 'Is it because I'm black?'" Driesen Aff. Ex. 1 (Dep. of Pl. Tr.), p. 72:16-19. [*21] In *Cameron v. Community Aid for Retarded Children, Inc.*, the Second Circuit held that where a decision-maker's remarks or conduct are facially neutral, the court should not infer discriminatory intent, because '[c]hoosing one explanation over another without more evidence is a matter of speculation." *335 F.3d 60, 65 (2d Cir. 2003)*.

Even if Hart had established a prima facie case of race or disability discrimination, the Defendant had a legitimate, non-discriminatory reason for his termination: Hart, who had an unsatisfactory disciplinary history, threatened and cursed at the Senior Administrative Director of the Department when he would not return Plaintiff to work in a position that was not vacant, for which Plaintiff was not qualified, and for which he had already been turned down. As this Court held in *Bethea v. Potter*, such insubordination and threatening behavior is a legitimate non-discriminatory reason for NYUHC's decision to terminate Plaintiff's employment. *2010 U.S. Dist. LEXIS 10191, 2010 WL 423105, at \*9-10*; see also, *Meiri, 759 F.2d at 997* (plaintiff's usurpation of authority, contravention of prescribed workplace policies and inability to get along with her co-workers provided a legitimate nondiscriminatory [*22] reason for her dismissal); *Volmar v. Cold Spring Hills Ctr. for Nursing & Rehabilitation, No. 07-CV-1418 (JS)(ARL), 2009 U.S. Dist. LEXIS 84434, 2009 WL 2984194, at \*4 (E.D.N.Y. Sept. 14, 2009)* (granting summary judgment on discrimination claims noting plaintiff's insubordination as a legitimate nondiscriminatory reason for termination); *Dorrilus v. St. Rose's Home, 234 F. Supp. 2d 326, 333 (S.D.N.Y. 2002)* (granting defendant's motion for summary judgment finding that plaintiff's insubordination along with verbal threats and abusive language to supervisors was a legitimate nondiscriminatory reason for the adverse employment action). Plaintiff has not created a genuine issue of material fact by putting forth allegations that are contradicted by the overwhelming weight of the evidence. See *Forde v. Beth Israel Med. Ctr., 546 F. Supp. 2d 142, 146-47 (S.D.N.Y. 2008)*; *Ghirardelli v. McAvey Sales & Serv., Inc., 287 F. Supp. 2d 379, 391 (S.D.N.Y. 2003)* (plaintiff's self-serving account that disputes the clear and unequivocal documentary and testimonial evidence presented by an employer are insufficient to create genuine issues of material fact to avoid summary judgment). In *Forde*, the court disregarded the allegation [*23] by plaintiff that a meeting did not occur when sworn deposition testimony and seven affidavits proved that the meeting took place. *546 F. Supp.2d at 146-47*. Similarly, in this case, the evidence provides strong support for the fact that Hart was terminated for legitimate reasons.

Finally, Hart fails to establish that the explanations Defendant has provided for terminating Hart are a pretext for discrimination. As described above, it was Hart, not Aguilar, who raised the issues of race and disability in their discussions. Hart has sought to show pretext by alleging that he was not insubordinate or threatening. However, as a matter of law, his interpretation of his conduct is immaterial. See *Saenger v. Montefiore Med. Ctr., 706 F. Supp. 2d 494, 509 (S.D.N.Y. 2010)* (granting summary judgment dismissing discriminatory discharge claims, stating "whether the complaints against Plaintiff were truthful, and whether, if true, they justify termination, are immaterial disputes"); *Duviella v. Jet Blue Airways, 353 Fed. Appx. 476, 477 (2d Cir. 2009)* ("In a discrimination case, however, we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what 'motivated [*24] the employer.'"); *Graham v. Long Island R.R., 230 F.3d 34, 44 (2d Cir. 2000)* (even if plaintiff could demonstrate that the grounds for his discharge were error, that showing would not demonstrate that reliance on those grounds was pretextual). Courts should not interfere with or second-guess valid corporate termination decisions. *Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2001)* ("federal courts are not in the business of adjudicating whether employment decisions are prudent or fair.") (internal citations omitted); *Baguer, 2010 U.S. Dist. LEXIS 69212, 2010 WL 2813632, at \*6* ("a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable"). Here, even if Hart were somehow able to reach the final step in the burden shifting-analysis, he has not satisfied his ultimate burden of proving that discrimination was the real reason for his termination.

With respect to retaliation, a plaintiff is obligated to show that (1) he engaged in protected activity; (2) NYUHC was aware of the protected activity; (3) NYUHC took adverse action against him; and (4) a causal connection exists between his protected activity and the adverse action -- i.e., that a retaliatory motive [*25] played a part in the termination decision. *Cooney v. Consol. Edison, 220 F. Supp. 2d 241, 248 (S.D.N.Y. 2002)*. Hart has not satisfied the second and the fourth criteria--that NYUHC knew he was engaged in protected

activity and that his termination was motivated by retaliation.

Hart filed a NYSDHR claim over seven and a half months before his termination. This claim was dismissed for no probable cause more than two months before he was fired. Plaintiff's filing, in and of itself, is too far attenuated in time to be evidence of retaliatory discharge on April 22, 2008. This Court found in *Bethea*, that pro se plaintiff's EEO filing four months prior to termination was too long to suggest causal relationship. *2010 U.S. Dist. LEXIS 10191, 2010 WL 423105, at \*12*; see also *Cunningham v. Consol. Edison, Inc., No. 03 Civ. 3522 (CPS), 2006 U.S. Dist. LEXIS 22482, 2006 WL 842914, at \*19 (E.D.N.Y. Mar. 28, 2006)* ("a passage of two months between the protected activity and the adverse employment action seems to be the dividing line"). Further, as set forth more fully above, Hart's request to be transferred to a non-vacant position for which he was not qualified and which he was denied 14 months earlier was not a request for a reasonable accommodation and **[\*26]** therefore should not be considered protected activity. See *Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1328 (11th Cir. 1998)* (to be protected activity plaintiff must demonstrate that "he had a good faith, objectively reasonable belief" that he was entitled to the accommodations requested.) Moreover, Hart has not established that his inquiry about the night elevator position was presented as an accommodation request for his alleged disability:

> Q. . . . in the conversation that you may have had with him, did you or he say anything about you being disabled? A. I don't recall, Maybe I said something. I don't recall all the way . . . .").

Driesen Aff. Ex. 1 (Dep. of Pl. Tr.), pp. 73:21-74:2.

Accordingly, absent Plaintiff proving that the inquiry about the prior job was known to Defendant as being a reasonable accommodation request, his prima facie burden cannot be met. See *Jones v. United Parcel Serv., Inc., 502 F.3d 1176, 1194-95 (10th Cir. 2007)* (granting summary judgment where the record contained no evidence that the employer believed the request for reassignment was presented as a request for a reasonable accommodation).

Even if Hart's NYSDHR complaint and request to Aguilar could **[\*27]** be deemed protected activity, his retaliation claim still must fail because he cannot demonstrate a causal connection between the complaints and his termination. See, e.g., *Meder v. City of New York, No. 05 CV 919(JG), 2007 U.S. Dist. LEXIS 30874, 2007 WL 1231626, at \*6 (E.D.N.Y. Apr. 27, 2007)* (prima facie retaliation case failed because plaintiff "proffers no admissible evidence linking the offending actions to any retaliatory animus"); see also *Hollander v. American Cyanamid Co., 895 F.2d 80, 85-86* (retaliation claim fails because there is no evidence "which would fulfill the final requirement of a casual nexus between [plaintiff's] filing of the agency complaint . . . [and the adverse action]"). As noted above, Hart's allegations regarding Aguilar's motivations were purely speculative. On the one hand, Hart alleged that Aguilar reaffirmed to Plaintiff that his job was there if he wanted it. On the other hand, he alleged that Aguilar was the one who got upset and started cursing, but testified that he did not "know for what reason." Plaintiff baldly speculated that Aguilar was allegedly upset, "because maybe when 1 said the Division of Human Rights part he got offended." Driesen Aff. Ex. 1 (Dep. of Pl. Tr.), **[\*28]** p. 74:12-15. He also speculated that Aguilar was upset that Plaintiff was trying out to be a basketball referee. Id. at 43:14-45:22. Moreover, Aguilar's undisputed affidavit testimony indicates that other employees have complained to the NYSDHR and continued to be employed in his department. Accordingly, Plaintiff's unsupported assertions are insufficient to establish pretext and overcome Defendant's legitimate non-retaliatory business reasons for the discharge. See *Auguste, 593 F. Supp. 2d at 665-66*; *Bethea, 2010 U.S. Dist. LEXIS 10191, 2010 WL 423105 at \*10*. The retaliation claim is dismissed.

## Conclusion

Based upon the facts and conclusions set forth above, the motion of NYUHC for summary judgment dismissing the complaint is granted.

It is so ordered.

New York, NY
October 7, 2011

/s/ Robert W. Sweet

**ROBERT W. SWEET**

U.S.D.J.

# EXHIBIT P



**PATRICIA MILNE, Plaintiff, -v- NAVIGANT CONSULTING, INC., Defendant.**

**08 Civ. 8964 (PAE)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2012 U.S. Dist. LEXIS 114005*

**August 13, 2012, Decided**
**August 13, 2012, Filed**

**PRIOR HISTORY:** *Milne v. Navigant Consulting, 2010 U.S. Dist. LEXIS 115650 (S.D.N.Y., Oct. 27, 2010)*

**COUNSEL:** [*1] Patricia Milne, Plaintiff, Pro se.

For Navigant Consulting, Inc., Defendant: Amy Marie Culver, John S. Ho, Bond, Schoeneck & King, PLLC (NYC), New York, NY; Garry Wills, PRO HAC VICE, Freeborn & Peters LLP, Chicago, IL; Jessica Christine Satriano, Bond, Schoeneck & King, PLLC (GdnCity), Garden City, NY.

**JUDGES:** Paul A. Engelmayer, United States District Judge.

**OPINION BY:** Paul A. Engelmayer

**OPINION**

OPINION & ORDER

 PAUL A. ENGELMAYER, District Judge:

 Plaintiff Patricia Milne, proceeding *pro se*, and defendant Navigant Consulting, Inc. ("Navigant") cross-move for summary judgment on Milne's claim for retaliatory termination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. § 2000e et seq.*, the New York State Human Rights Law ("NYSHRL"), *N.Y. Exec. Law § 290 et seq.*, and the New York City Human Rights Law ("NYCHRL"), *N.Y. City Admin. Code § 8-101 et seq.* For the following reasons, Milne's motion is denied and Navigant's motion is granted.

**I. Background**[1]

1   The facts that form the basis of this Opinion are primarily drawn from: (1) Defendant's Local Civil Rule 56.1 Statement ("Def.'s 56.1") (Dkt. 65); (2) Plaintiff's Local Civil Rule 56.1 Counterstatement ("Pl.'s Counter.") (Dkt. 72); (3) Defendant's [*2] Response to Plaintiff's Counterstatement ("Def.'s Resp.") (Dkt. 86); (4) Plaintiff's Local Civil Rule 56.1 Statement ("Pl.'s 56.1") (Dkt. 75); and (5) Defendant's Response to Plaintiff's Statement and Local Civil Rule 56.1 Counterstatement ("Def.'s Counter.") (Dkt. 77). Facts in dispute are noted.

 Despite the Court's repeated admonishments to Milne that her sole surviving claim at this stage of the litigation is for retaliatory termination, her 56.1 Statement and her Counterstatement recite numerous facts relevant only to claims previously dismissed. Additionally, Milne's Rule 56.1 Statement and Counterstatement are almost entirely without reference to the record and are, as such, of limited evidentiary value on a motion for summary judgment.

**A. Milne's Employment with Navigant**

 On September 5, 2006, Milne was hired by Navigant, a consulting firm, as an administrative specialist. Def.'s 56.1 ¶ 2; Pl.'s Counter. ¶ 4. Milne's last day with Navigant was June 30, 2008. Def.'s 56.1 ¶ 2; Pl.'s Counter. ¶ 4. The parties dispute whether Milne left Navigant willingly, or was forced to resign. Milne claims that Jessica Le, a Navigant employee, told her that Mary Stafford, then-Senior Manager of [*3] Operations for Navigant's New York office and Milne's supervisor, was

planning to force her to resign. Pl.'s 56.1 ¶ nnn. Navigant denies this, and, in an affidavit, Le attests that no such conversation took place, and that she was out of the office on vacation during the time Milne claims the conversation occurred. Def.'s Counter ¶ nnn; Affidavit of Jessica Le in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("Le Aff.") (Dkt. 80) ¶ 9. The parties do agree that, on May 29, 2008, Milne sent an email to Debra Ombrello, then-Director of Office Operations, with copies sent to four other Navigant employees, which stated, in relevant part:

> I am writing to let you know that I am planning to move back to Toronto at the end of June. If you are able to facilitate a transfer to our Toronto office, it would be greatly appreciated.

Affidavit of Mary Stafford in Support of Defendant's Motion for Summary Judgment ("Stafford Aff.") (Dkt. 67) Ex. A; *see also* Def.'s 56.1 ¶ 7; Pl.'s Counter. ¶ 42.

On or about May 29, 2008, Stafford met with Milne about the email, which Stafford understood to be Milne's voluntary resignation. Def.'s 56.1 ¶¶ 11-12; Pl.'s Counter. ¶ 44. Milne,  [*4] on the other hand, attests that she believed she was going to be forced to resign, and decided to seek what she characterizes as a preemptive transfer to Navigant's Toronto office. Pl.'s 56.1 ¶ ooo; Pl.'s Counter ¶ 41. At the meeting, Milne told Stafford that she intended to move to Toronto even if Navigant did not have an open position for her there, and did not clarify that she had no intention to voluntarily resign her position. Def.'s 56.1 ¶¶ 13-14, 18; *see also* Affidavit of Garry L. Wills in Support of Defendant's Motion for Summary Judgment Ex. C (Deposition of Patricia Milne) ("Milne Dep.") (Dkt. 68) 115-16. When Stafford asked Milne when her last day at Navigant would be, Milne refused to provide that information. Def.'s 56.1 ¶ 16; Pl.'s Counter ¶¶ 45-46.

On June 2, 2008, Milne stopped coming to work. Def.'s 56.1 ¶ 20; Pl.'s Counter ¶ 52. Because Milne failed to inform Navigant when her last day of work would be, Navigant determined that her last day would be June 12, 2008, two weeks after she had sent the email about moving to Toronto. Def.'s 56.1 ¶¶ 21, 23. On June 11, 2008, a Navigant human resources employee drafted a letter to Milne--which was never sent--informing her that  [*5] her voluntary resignation would be effective the following day, June 12. *Id.* ¶ 24. On June 11, 2008, before that letter was sent, Milne emailed a different human resources employee at Navigant, requesting time off pursuant to the Family and Medical Leave Act ("FMLA"). *Id.* ¶ 25; Pl.'s 56.1 ¶¶ bbbb-cccc. On June 12, Navigant sent a letter to Milne (1) enclosing FMLA

forms for her to complete and return and (2) informing her that her voluntary resignation would be effective June 30, 2008. Def.'s 56.1 ¶ 27; Pl.'s 56.1 ¶ dddd. On June 16, 2008, Milne sent an email to Navigant, stating that there had been a "miscommunication," and that she had never provided Stafford or anyone else at Navigant with any "time and date" on which Milne would leave her position. Stafford Aff. Ex. C; *see also* Def.'s 56.1 ¶ 30; Pl.'s 56.1 ¶ eeee. Milne neither completed the FMLA forms nor returned to work at Navigant during the month of June, or thereafter. Def.'s 56.1 ¶¶ 20, 28; Pl.'s 56.1 ¶ dddd.

## B. Internal and EEOC Harassment Complaints

Milne alleges that, in 2007, Paul Braithwaite, a Managing Director at Navigant, made harassing and discriminatory remarks to her. Pl.'s 56.1 ¶¶ f-h. However, it is undisputed  [*6] that Milne did not make any internal complaint about these harassing remarks, nor did she file a complaint with the Equal Employment Opportunity Commission ("EEOC"). Milne Dep. 160; Def.'s Counter. ¶ k. Milne also claims that, on November 16, 2007, Mark Springer, an Associate Director at Navigant, sexually harassed her: She alleges that he said to her, "I would like to see you drunk and do you," and, "Because of the way you are, no man wants you." Milne also alleges that, when she attempted to leave Springer's office after he made these comments, he grabbed her arm in an attempt to physically restrain her. Pl.'s 56.1 ¶ p-r; Def.'s 56.1 ¶¶ 31-32. Milne told Braithwaite, Brett Goldman (an analyst), Tracy Stewart (Stafford's assistant), and Stafford about the November 16, 2007 incident with Springer; Stafford informed Joe Blalock, Springer's supervisor; and the incident was reported to Navigant's human resources department. Pl.'s 56.1 ¶¶ v-x; Def.'s 56.1 ¶¶ 33-35; Milne Dep. 94-95, 160-61. In late November 2007 (the parties dispute the precise date), Julie Baker, a Navigant human resources employee, interviewed Milne about the November 16, 2007 incident. Pl.'s 56.1 ¶ gg; Def.'s 56.1  [*7] ¶ 36. Based on its investigation of the incident, Navigant decided to terminate Springer; on November 30, 2007, Springer resigned in anticipation of his termination. Def.'s 56.1 ¶¶ 37-38.

In or about April 2008, Milne told Karen Zerbo, an administrative assistant at Navigant, that she intended to file an EEOC charge relating to the November 16, 2007 incident with Springer. *Id.* ¶ 39; Pl.'s 56.1 ¶¶ lll-mmm. Milne told only Zerbo that she planned to file an EEOC charge; Zerbo did not tell anyone else at Navigant because she did not believe that Milne was truly going to file any such charge. Pl.'s Counter. ¶ 47; Def.'s 56.1 ¶¶ 39-42; Milne Dep. 66. On June 12, 2008, the EEOC received Milne's complaint. Stafford Aff. Ex. D; Pl.'s Counter. ¶ 55; Def.'s 56.1 ¶ 44. It is undisputed that

Milne never told Stafford, or anyone else at Navigant other than Zerbo, about her intention to file an EEOC complaint. Def.'s 56.1 ¶¶ 46-49; Milne Dep. 63. On July 3, 2008, Navigant received a copy of Milne's EEOC charge in its New York office; upon viewing it, Stafford forwarded it to Navigant's human resources department. Def.'s 56.1 ¶¶ 50-51.

Separate from the filing of the EEOC charge, Milne claims Navigant **[*8]** terminated her in retaliation for internal complaints she made (1) to Braithwaite, Goldman, Stewart, and Stafford stemming from the November 16, 2007 incident with Springer and (2) to Braithwaite about Stafford's treatment of her. Milne Dep. 94-95. Milne alleges that, after reporting the Springer incident to Stafford, Stafford treated Milne in a biased manner, scrutinized her work more closely than that of others, micromanaged her time off, and, ultimately, terminated her. Milne Dep. 58-60, 86-92, 117-18.

## C. Procedural History

On October 20, 2008, Milne filed her original complaint in this action (Dkt. 2). She complained of sexual harassment, discrimination, failure to promote, unequal treatment, a hostile work environment, constructive discharge, and retaliation. On November 30, 2009, the Hon. Naomi Reice Buchwald, to whom this case was previously assigned, dismissed the case in its entirety for failure to state a claim, but gave Milne leave to replead her retaliation claim, and to bring new claims under the FMLA (Dkts. 21 & 25). On February 4, 2010, Milne filed a second amended complaint (Dkt. 24), and, on April 13, 2010, a third amended complaint (Dkt. 28).[2] On October 27, 2010, Judge **[*9]** Buchwald dismissed Milne's FMLA claims, but denied Navigant's motion to dismiss Milne's claim that she was terminated in retaliation for her intention to file a complaint with the EEOC and/or her internal complaints, in violation of Title VII, the NYSHRL, and the NYCHRL (Dkt. 42).

> 2   Although the docket does not reflect the filing of a first amended complaint, the record indicates that one was filed sometime between October 20, 2008, and November 30, 2009.

On December 22, 2011, discovery in this case closed (Dkt. 61). On January 20, 2012, Navigant moved for summary judgment (Dkt. 64); Milne filed a cross-motion for summary judgment on January 25, 2012 (Dkt. 75). On March 6, 2012, Milne filed her opposition papers (Dkt. 71); on March 12, 2012, Navigant filed its opposition papers (Dkt. 76). On March 27, 2012, Navigant filed its reply (Dkt. 83); on April 2, 2012, Milne filed her reply papers (Dkt. 87).

## II. Applicable Legal Standards

Summary judgment may be granted only where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The movant bears the burden of demonstrating the absence of **[*10]** a material factual question, and in making this determination, the court must view all facts "in the light most favorable" to the non-movant. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); see also Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008)*.

Once the moving party has adduced facts demonstrating that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings *Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009)*. "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010)* (citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

In cases involving allegations of discriminatory retaliation, **[*11]** courts must use "an extra measure of caution" before granting summary judgment in favor of the defense, "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006)* (citation omitted). However, "the salutary purposes of summary judgment--avoiding protracted, expensive and harassing trials--apply no less to discrimination cases." *Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)*. Even in such cases, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb, 521 F.3d at 137*.

In considering the cross-motions for summary judgment, the Court is, further, mindful that Milne is a *pro se* litigant whose submissions must be construed to "raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006)* (per curiam) (citation and emphasis omitted). However, this forgiving standard "does not relieve plaintiff of [her] duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003)* **[*12]** (citation omitted).

## III. Analysis

### A. Retaliation Under Title VII

Under Title VII, it is unlawful for an employer to discriminate against an employee because that employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *42 U.S.C. § 2000e-3(a)*. The statute thus "prohibits an employer from taking materially adverse action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity." *Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 567 (2d Cir. 2011)*. Title VII is violated when "a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause." *Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993)*.

Title VII retaliation claims are evaluated under the three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. *See, e.g., Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010)*. To establish **[*13]** a prima facie case of retaliation, a plaintiff must show:

> (1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Chin-McKenzie v. Continuum Health Partners, No. 10-cv-3658, 2012 U.S. Dist. LEXIS 91020, 2012 WL 2512942, at *11 (S.D.N.Y. June 29, 2012)* (quoting *Kaytor v. Elec. Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010))*. "A plaintiff cannot establish a *prima facie* case of discrimination under Title VII based on 'purely conclusory allegations of discrimination, absent any concrete particulars.'" *Tanvir v. N.Y. City Health & Hosps. Corp., No. 11-143-cv, 480 Fed. Appx. 620, 2012 U.S. App. LEXIS 9813, 2012 WL 1700846, at *1 (2d Cir. May 16, 2012)* (slip op.) (quoting *Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985))*.

Once a plaintiff has made out a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate reason for the adverse action. *Rojas v. Roman-Catholic Diocese of Rochester, 660 F.3d 98, 107*

*(2d Cir. 2011)*. If defendant does so, a plaintiff must then "come forward **[*14]** with evidence establishing that it is more likely than not the employer's decision was motivated, at least in part, by an intent to retaliate." *El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 932-33 (2d Cir. 2010)*.

### 1. EEOC Complaint

Filing an EEOC charge is a protected activity under Title VII. *See Williams v. Metro-North Commuter R.R. Co., No. 11-cv-7835, 2012 U.S. Dist. LEXIS 86631, 2012 WL 2367049, at *8 (S.D.N.Y. June 20, 2012)*. Milne, however, cannot establish a prima facie case of retaliation, because she cannot point to anything in the record that shows that Navigant knew about the filing of her EEOC charge before it made its decision that her employment would terminate in June 2008. At some point after the November 16 incident with Springer, but before June 2008, Milne told Zerbo, the administrative assistant, that she was planning to file an EEOC charge. Def.'s 56.1 ¶ 39; Pl.'s Counter. ¶ 77; Milne Dep. 55; Affidavit of Karen Zerbo in Support of Defendant's Motion for Summary Judgment ("Zerbo Aff.") (Dkt. 84) ¶ 3. Milne testified at her deposition that she did not tell anyone else at Navigant of her intent to file such a charge, Milne Dep. 54-56, and Zerbo has attested--and **[*15]** there is no evidence to the contrary--that she did not share what Milne told her with anyone else at Navigant, Zerbo Aff. ¶ 4. Milne's EEOC charge was dated June 10, 2008 and filed on June 12, 2008--14 days after Stafford asked Milne when her last day at Navigant would be. Milne Dep. 114; Stafford Aff. ¶ 10 & Ex. D. Milne's last day as a Navigant employee was June 30, 2008. Affidavit of Dorene Dressel in Support of Defendant's Motion for Summary Judgment ("Dressel Aff.") (Dkt. 66) ¶ 12. Navigant first learned that Milne had filed an EEOC charge on July 3, 2008, when it received a copy of the Notice of Charge of Discrimination from the EEOC, itself dated June 30, 2008. Stafford Aff. ¶ 20 & Ex. D.

Milne marshals no evidence tending to show that Navigant, before Milne's last day, or for that matter before July 3, 2008, knew that she had filed (or intended to file) an EEOC charge. To be sure, Milne need not show that the individual decisionmakers at Navigant had knowledge of her intent to file an EEOC charge; she must show only the existence of "general corporate knowledge" to that effect. *See Smiley v. Cassano, No. 10-cv-3866, 2012 U.S. Dist. LEXIS 39615, 2012 WL 967436, at *6 (S.D.N.Y. Mar. 21, 2012)*. However, for **[*16]** Milne to prove general corporate knowledge, there must be evidence in the summary judgment record that Navigant knew of her intent to file, or that she had filed, an EEOC charge. *See Adams v. City of N.Y., 837 F. Supp. 2d 108, 121 (E.D.N.Y. 2011)*. The record lacks

such evidence. Rather, the unrebutted evidence shows that: (1) Milne told only Zerbo, an administrative assistant at Navigant, that she planned to file an EEOC charge; (2) Zerbo did not believe Milne when she told her of her intention; (3) Zerbo did not tell anyone else at Navigant; and (4) no one at Navigant learned of the EEOC charge before July 3, 2008, three days after Milne's last day of employment. Milne Dep. 54-56; Zerbo Aff. ¶¶ 3-4; Stafford Aff. ¶ 20 & Ex. D. There is no evidence that Navigant, as a legal entity, had any knowledge prior to the end of the employment relationship of Milne's plans to engage in protected activity. *Cf. Kessler v. Westchester Cty. Dep't of Soc. Servs., 461 F.3d 199, 210 (2d Cir. 2006)* (general corporate knowledge found where non-decisionmaker had received copy of employee's complaint to the state human rights division, and made submissions in opposition); **[*17]** *Summa v. Hofstra Univ., No. 08-cv-361, 2011 U.S. Dist. LEXIS 37975, 2011 WL 1343058, at *21 (E.D.N.Y. Apr. 7, 2011)* (general corporate knowledge found where four officers and the legal department were aware of employee's protected activity). Milne has pointed the Court to no authority, and the Court is unaware of any, that the knowledge of only an administrative assistant of an employee's intent to file an EEOC charge, where there is no evidence that the administrative assistant shared that knowledge with anyone else, supports a finding of general corporate knowledge.

In her motion papers, Milne states that:

> Upon information and belief, EEOC sent its customary notice to Navigant's NYC and Chicago locations informing this defendant that Plaintiff had filed charges against defendant. Such notice was received between June 10, 2008 and June 30, 2008 and prior to the company's involuntary termination of Plaintiff which was part and parcel of the continuing retaliation she suffered.

Pl.'s 56.1 ¶ xxx. However, Milne does not point to any record evidence supporting this claim, and all such evidence is to the contrary. A plaintiff, even one proceeding *pro se*, must "provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb, 521 F.3d at 137.* **[*18]** Milne fails to do so.

Furthermore, because there is no dispute, based on the summary judgment record, that Navigant learned of the EEOC charge only *after* Milne's last day at Navigant, Milne cannot show the requisite causal connection between the protected activity and the termination of her employment. It is true that, under certain circumstances,

the occurrence of an adverse employment action closely following protected conduct may give rise to an inference of causation so as to make out a prima facie case of retaliation. *See, e.g., Kaytor, 609 F.3d at 552* ("Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action."). Here, however, the timeline simply does not support any such inference. On May 29, 2008, in response to Milne's email discussing a move to Toronto, Stafford asked Milne to provide Navigant with her last day of employment. Milne Dep. 114; Stafford Aff. ¶ 10. Although Milne has argued throughout this litigation that she never intended to leave her position at Navigant voluntarily, she did not inform **[*19]** Stafford of this when Stafford asked Milne to supply her date of departure. Milne Dep. 114-16; Stafford Aff. ¶¶ 11-12. On or around June 11, 2008, Navigant determined that, because Milne had failed to supply Navigant with a departure date, her last day would be June 12, 2008. Dressel Aff. ¶¶ 8-10 & Ex. A. When, on June 11, 2008, Milne informed Navigant's human resources department that she was requesting FMLA leave, Navigant revised Milne's day of departure to June 30, 2008. Dressel Aff. ¶¶ 11-12 & Ex. B. Milne's EEOC charge was filed on June 12, 2008. Stafford Aff. Ex. D. Thus, it is clear that, by the time Milne's charge reached the EEOC, Navigant had already decided that Milne's employment would cease at some point during the month of June; no causal connection therefore can reasonably be inferred. *See Stephan v. W. Irondequoit Cent. Sch. Dist., 450 F. App'x 77, 80 (2d Cir. 2011)* (because summary judgment record showed that termination decision had been made before filing of internal complaint, no causal connection can be inferred); *Witkowich v. Holder, No. 05-cv-7756, 2010 U.S. Dist. LEXIS 32548, 2010 WL 1328364, at *5 & n.6 (S.D.N.Y. Mar. 31, 2010)* (no sufficient causal connection between filing of EEOC charge **[*20]** and alleged retaliatory action when employer did not have notice of the charge until after undertaking action).

Because the Court holds that no reasonable juror could find that Navigant was aware of either Milne's intent to file an EEOC charge or the charge itself before Milne's last day at Navigant, it does not reach Navigant's alternative argument for summary judgment, that there was no adverse employment action because Milne voluntarily resigned from her position.

### 2. Internal Complaints

It is far from clear, on the basis of Milne's papers submitted at the summary judgment stage, whether she is also arguing that she was terminated in retaliation for internal complaints she lodged at Navigant. However,

given the obligation of this Court to "'construe . . . liberally' the submissions of a *pro se* litigant and to 'interpret them to raise the strongest arguments that they suggest,'" the Court construes Milne's papers to make such an argument. *Johnston v. Maha, 460 F. App'x 11, 15 n.5 (2d Cir. 2012)* (quoting *Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006))* (additional quotations marks and citation omitted).

Read liberally, Milne's papers allege retaliatory termination in response to two **[*21]** separate sets of internal complaints. First, Milne claims that her termination was in retaliation for internal complaints she made to Braithwaite, Goldman, Stewart, and Stafford stemming from the November 16, 2007 incident with Springer. Milne Dep. 94-95. Milne's internal complaints about that incident date from November 2007. Second, Milne claims that her termination was in retaliation for internal complaints she lodged against Stafford with Braithwaite, relating to Stafford's biased comments and micromanaging. Milne testified, at her deposition, that Braithwaite told her that he had informed Stafford of Milne's complaints. Milne's best estimate of when Braithwaite told Stafford about Milne's complaints is summer 2007. *Id.* 91-92.

Milne, however, fails to adduce sufficient evidence that these complaints caused her termination in June 2008.[3] Causation of an adverse employment action traceable to protected activity may be established through direct or indirect evidence. Direct evidence is "evidence of retaliatory animus directed against a plaintiff by the defendant." *DeCintio v. Westchester Cty. Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987).* Indirect evidence may consist of (1) evidence **[*22]** that the protected activity was followed closely by an adverse action, *see Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir. 2001),* or (2) other evidence, such as disparate treatment of fellow employees who engaged in similar conduct, *see DeCintio, 821 F.2d at 115.*

> 3 The Court assumes, *arguendo,* that Milne can establish the first three elements of a prima facie case of termination in retaliation for the lodging of internal complaints.

The evidence here (direct and indirect) fails to support an inference of causation. There is no direct evidence of retaliatory animus; nor indirect evidence sufficient to infer causation, whether in the form of the temporal proximity of Milne's complaints and her termination or evidence that other Navigant employees who lodged internal complaints were thereafter terminated. As noted above, "[c]lose temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected ac-

tivity and retaliatory action." *Kaytor, 609 F.3d at 552.* The Second Circuit "has not drawn a bright line to define the outer limits beyond which **[*23]** a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty., 252 F.3d 545, 554 (2d Cir. 2001).* However, in general within this Circuit, a two- or three-month lapse between the protected activity and the adverse employment action suffices to sever any inferred causal relationship. *See Thompson v. Morris Heights Health Ctr., No. 09-cv-7239, 2012 U.S. Dist. LEXIS 49165, 2012 WL 1145964, at *10 (S.D.N.Y. Apr. 6, 2012)* (collecting cases). On the evidence before the Court, at least 10 months, and perhaps more than a year, passed between Milne's complaints to Braithwaite about Stafford's treatment and Milne's termination; further, Milne's termination occurred seven months after her complaints to other employees relating to the incident with Springer. Absent other evidence of causation, these gaps in time (10 and seven months, respectively) are too substantial to allow an inference of causation based on temporal proximity alone. *See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)* ("The cases that accept mere temporal proximity between an **[*24]** employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'").

## B. Retaliation Under NYSHRL and NYCHRL

Milne also brings claims for retaliation under the NYSHRL and the NYCHRL.

*Section 296(7) of the NYSHRL* makes it illegal for:

> any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.

*N.Y. EXEC. LAW § 296(7).* "Courts apply the same standard used in Title VII cases in analyzing NYSHRL retaliation claims." *Caban v. Richline, No. 10-cv-559, 2012 U.S. Dist. LEXIS 98727, 2012 WL 2861377, at *14 (S.D.N.Y. July 10, 2012)* (citing *Patane v. Clark, 508 F.3d 106, 115-17 (2d Cir. 2007)).* Accordingly, no reasonable juror could find retaliatory termination in violation of the NYSHRL, for the same reasons set forth above relating to Title VII.

*Section 107(7) of the NYCHRL* makes it unlawful for:

> any person engaged in any activity to which this chapter applies **[\*25]** to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, or (v) provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8-115 of this chapter. The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment, housing or a public accommodation or in a materially adverse change in the terms and conditions of employment, housing, or a public accommodation, provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity.

*N.Y.C. ADMIN. CODE § 8-107(7).* Liability for retaliation under the NYCHRL is broader than under the companion federal and state statutes, **[\*26]** "in that there is no requirement that the employee suffer a materially adverse action." *Pilgrim v. McGraw-Hill Cos., 599 F. Supp. 2d 462, 469 (S.D.N.Y. 2009); see also Fincher, 604 F.3d at 723* ("New York State courts and district courts in this Circuit have concluded . . . that the retaliation inquiry under the CHRL is 'broader' than its federal counterpart."). However, a plaintiff claiming retaliation under the NYCHRL must still show, as part of her prima facie case of discrimination, that her employer was aware she engaged in a protected activity, and that there was a causal connection between the protected activity and the employer's subsequent action. *Pilgrim, 599 F. Supp. 2d at 469.* For the reasons discussed above, the summary judgment record does not support any such finding, and thus no reasonable juror could find that Navigant retaliated against Milne in violation of the NYCHRL.

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment is GRANTED, and plaintiff's motion for summary judgment is DENIED. Judgment is hereby entered in favor of defendant as to all counts. The Clerk of Court is directed to terminate the motions pending at docket entries 64 and 75, **[\*27]** and to close this case.

SO ORDERED.

/s/ Paul A. Engelmayer

Paul A. Engelmayer

United States District Judge

Dated: August 13, 2012

New York, New York

# EXHIBIT Q



BARBARA K. NIXON-TINKELMAN, Plaintiff-Appellant, -v.- NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE AND CITY OF NEW YORK, Defendants-Appellees.

10-3317-cv

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

*2011 U.S. App. LEXIS 16569; 14 Accom. Disabilities Dec. (CCH) 14-256; 25 Am. Disabilities Cas. (BNA) 578; 434 Fed. Appx. 17*

August 10, 2011, Decided

**NOTICE:**   PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**SUBSEQUENT HISTORY:** On remand at, Summary judgment granted, in part, summary judgment denied, in part by, Request denied by *Nixon-Tinkelman v. N.Y. City Dep't of Health & Mental Hygiene, 2012 U.S. Dist. LEXIS 91403 (S.D.N.Y., June 26, 2012)*

**PRIOR HISTORY:**   [*1]
   Appeal from the United States District Court for the Southern District of New York (Jones, J.).
*Nixon-Tinkelman v. N.Y. City Dep't of Health & Mental Hygiene, 2010 U.S. Dist. LEXIS 143573 (S.D.N.Y., July 26, 2010)*

**COUNSEL:**   FOR PLAINTIFF-APPELLANT: AR-NOLD H. PEDOWITZ, Pedowitz & Meister, LLP, New York, New York.

FOR DEFENDANTS-APPELLEES: ELIZABETH I. FREEDMAN, Assistant Corporation Counsel of the City of New York (Francis F. Caputo, Christopher A. Seacord, on the brief), for Michael A. Cardozo, Corporation Counsel of the City of New York, New York, New York.

**JUDGES:** PRESENT: BARRINGTON D. PARKER, DENNY CHIN, RAYMOND J. LOHIER, JR., Circuit Judges.

**OPINION**

[**18]  SUMMARY ORDER

   UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the district court is **AFFIRMED** in part and **VACATED AND REMANDED** in part.

   Plaintiff-appellant Barbara K. Nixon-Tinkelman ("Tinkelman") appeals from the district court's grant of summary judgment in favor of defendants-appellees New York City Department of Health and Mental Hygiene ("DOHMH") and the City of New York, on her claims that they discriminated against her on account of her disabilities under the Americans with Disabilities Act (the "ADA"), *42 U.S.C. §§ 12101 et seq.*, and Sections 501 and 504 of the Rehabilitation Act, *29 U.S.C. §§ 791 and 794*. Tinkelman, who is hearing  [*2] impaired and suffers from cancer, heart problems, and asthma, challenges the district court's determination that she was not denied reasonable accommodations on account of these disabilities.[1] We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

   1   The district court also dismissed Tinkelman's retaliation claims, including allegations that she was, for retaliatory reasons, (1) denied a reasonable accommodation; (2) "belittled"; and (3) given improper work assignments. Tinkelman fails to brief sufficiently these issues on appeal. Therefore, we consider them abandoned. *Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir.)*, cert. denied, *525 U.S. 1001, 119 S. Ct. 511, 142 L. Ed. 2d 424 (1998)* ("Issues not sufficiently argued in

the briefs are considered waived and normally will not be addressed on appeal.").

We review the grant of summary judgment de novo. See *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir.), cert. denied, 540 U.S. 823, 124 S. Ct. 153, 157 L. Ed. 2d 44 (2003). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*.

Section 504 of the [*3] Rehabilitation Act, which applies to defendants, provides that "'[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under' any covered program or activity." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004) (quoting *29 U.S.C. § 794(a)*). To establish a prima facie violation under Section 504, a plaintiff must demonstrate: (1) she is a "qualified individual" with a disability; (2) the defendants are subject to Section 504; and (3) she was "denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or [was] otherwise discriminated against by defendants, by reason of [her] disabilit[y]." Id. (alterations in original) (quoting *Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003))*.[2]

> 2   The defendants argue that Tinkelman is not a "qualified individual" within the meaning of Section 504 of the Rehabilitation Act. The district court, however, did not reach this issue and we thus do not consider its merits.

A plaintiff can base a discrimination claim on an employer's failure [*4] to make a [**19] reasonable accommodation. *Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009)* (citing *Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565, 573 (2d Cir. 2003))*. The Rehabilitation Act "prohibit[s] discrimination against qualified disabled individuals by requiring that they receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in . . . public accommodations." *Powell, 364 F.3d at 85* (citing *Henrietta D., 331 F.3d at 273; Felix v. N.Y.C. Transit Auth., 324 F.3d 102, 104 (2d Cir. 2003))*.

Two proposed accommodations are at issue here. First, Tinkelman contends that defendants should have provided her with a special telephone or device for the hearing impaired for the thirteen months while she was stationed in Manhattan. Second, after she was moved from Queens to Manhattan, she requested that defendants accommodate her with respect to her commute to work.

We agree with the district court that Tinkelman's claim based on her proposed accommodation, in the form

of a special telephone or device for the thirteen months in question, fails as a matter of law. First, it is undisputed that Tinkelman did not request a special telephone during the thirteen [*5] months in question. While the failure to make a request is not fatal to a claim for a reasonable accommodation, the failure to make a request is a consideration because it is "'[g]enerally . . . the responsibility of the individual with a disability to inform the employer that an accommodation is needed.'" *Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 135 (2d Cir. 2008)* (quoting *Graves v. Finch Pruyn & Co., 457 F.3d 181, 184 (2d Cir. 2006))*. Second, when Tinkelman had previously asked for an amplification device, she was given approval to purchase one and was subsequently reimbursed. On another occasion as well, DOHMH provided Tinkelman with a special telephone. Hence, when defendants had previously been made aware of her needs, she was either reimbursed for or furnished with a special telephone or device. Defendants' failure to spontaneously offer Tinkelman a special telephone in the circumstances here did not constitute discrimination. On this record, no reasonable jury could find discriminatory intent with respect to the thirteen months in question.

As for Tinkelman's second request, the district court erred in granting summary judgment on the grounds that "commuting falls outside [*6] the scope of [p]laintiff's job, and is thereby not within the province of an employer's obligations under the ADA and the Rehabilitation Act." *Nixon-Tinkelman v. N.Y.C. Dep't of Health & Mental Hygiene, No. 08-04509, 2010 U.S. Dist. LEXIS 143573, *30 (S.D.N.Y. July 26, 2010)*. Our case law establishes that in certain circumstances, an employer may have an obligation to assist in an employee's commute. Indeed, this Court has stated that "there is nothing inherently unreasonable . . . in requiring an employer to furnish an otherwise qualified disabled employee with assistance related to her ability to get to work." *Lyons v. Legal Aid Soc'y, 68 F.3d 1512, 1517 (2d Cir. 1995)*; accord *DeRosa v. Nat'l Envelope Corp., 595 F.3d 99, 104 (2d Cir. 2010)* (suggesting that employer had provided a reasonable accommodation by allowing employee to work from home, which was "necessary to maintaining his job").

Determining whether a particular commuting accommodation is reasonable normally involves a fact-specific inquiry. *Lyons, 68 F.3d at 1517* (citing *Borkowski v. Valley Cent. Sch. Dist. 63 F.3d 131, 138-40 (2d Cir. 1995)*). Here, the district court erred because it concluded that an employer had no obligation to assist [*7] in an employee's commute, when we have held that, in [**20] certain circumstances, such an obligation can exist. We therefore remand for the district court to reconsider, in light of the applicable law, whether it would have been reasonable for defendants to provide

2011 U.S. App. LEXIS 16569, *; ;
25 Am. Disabilities Cas. (BNA) 578; 434 Fed. Appx. 17, **

assistance related to Tinkelman's ability to get to work. Given that Tinkelman had worked for many years in a more suitable location, for example, the district court should have considered whether defendants could have reasonably accommodated her needs simply by transferring her back to Queens or another closer location, allowing her to work from home, or providing a car or parking permit.

On remand, the district court shall consider factors such as the number of employees employed by DOHMH, the number and location of its offices, whether other available positions existed for which Tinkelman showed that she was qualified, whether she could have been shifted to a more convenient office without unduly burdening DOHMH's operations, and the reasonableness of allowing her to work without on-site supervision. If the court determines that these issues may be resolved without deciding disputed issues of fact, it need not proceed to trial [*8] and may supplement the summary judgment decision here appealed.

We therefore **VACATE** the district court's judgment with respect to Tinkelman's request that defendants accommodate her commute and **REMAND** for proceedings consistent with this opinion. We **AFFIRM** the district court's judgment in all other respects.

# EXHIBIT R



NANCY O'CONNOR, Plaintiff, - against - SMITH & LAQUERCIA, LLP, & THOMAS LAQUERCIA, Defendants.

08-CV-4559 (ENV) (MDG)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

*2010 U.S. Dist. LEXIS 94088; 110 Fair Empl. Prac. Cas. (BNA) 528; 23 Am. Disabilities Cas. (BNA) 1148; 14 Accom. Disabilities Dec. (CCH) P14-141*

September 8, 2010, Decided
September 9, 2010, Filed

**COUNSEL:** [*1] For Nancy O'Connor, Plaintiff: David Abrams, LEAD ATTORNEY, David Abrams, LEAD ATTORNEY, Attorney at Law, New York, NY.

For Smith & Laquercia, LLP, Thomas Laquercia, Defendants, Counter Claimant: Thomas E. Chase, LEAD ATTORNEY, Rottenberg Lipman Rich, P.C., New York, NY.

For Nancy O'Connor, Counter Defendant: David Abrams, LEAD ATTORNEY, Attorney at Law, New York, NY.

For Nancy O'Connor, Counter Defendant: David Abrams, Attorney at Law, New York, NY.

**JUDGES:** ERIC N. VITALIANO, United States District Judge.

**OPINION BY:** ERIC N. VITALIANO

**OPINION**

## MEMORANDUM DECISION AND ORDER

### VITALIANO, D.J.

Plaintiff Nancy O'Connor brought this employment rights action against her former employer, Smith & Laquercia, LLP ("S&L"), naming one of its two principal partners, Thomas Laquercia ("Laquercia") as a co-defendant. O'Connor seeks to recover lost wages, liquidated and punitive damages, costs and attorneys' fees pursuant to the Age Discrimination in Employment Act, *29 U.S.C. § 621 et seq.* ("ADEA"), and the *New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq.* ("NYCHRL"). [1] Specifically, she asserts that the termination of her employment at S&L was the product of unlawful age and disability discrimination. Defendants counter [*2] that O'Connor was fired because she failed to maintain communication with the firm during a prolonged absence from work. A counterclaim for fraud has been interposed, alleging that O'Connor misrepresented her medical condition and intention to return to work to induce the firm to pay her full salary during her absence. O'Connor contends that this counterclaim was brought solely as improper retaliation for her initial lawsuit.

> 1   Plaintiff's amended complaint also included causes of action under Title VII, but these claims were not mentioned at trial or in the parties' joint pretrial order (Dkt # 27) and post-trial submissions (Dkt. # 30-31, 33-34). The Court considers these claims to have been abandoned.

Trial before the Court sitting without a jury began on March 29, 2010, and concluded the following day. Post-trial briefs were submitted by both sides. Having considered the testimony, the exhibits received in evidence, and the arguments of counsel, this Memorandum Decision and Order, pursuant to *Federal Rule of Civil Procedure 52*, constitutes the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

2010 U.S. Dist. LEXIS 94088, *; 110 Fair Empl. Prac. Cas. (BNA) 528;
23 Am. Disabilities Cas. (BNA) 1148;

Plaintiff began working at S&L, a 30 employee law firm located in downtown Manhattan, [*3] in 1990. In 2006, she was 59 years old and making an annual salary of $65,000 as a word processing supervisor. (Tr. at 8-9.) [2] Over the course of 16 years, O'Connor and Laquercia, the partner responsible for personnel decisions at the firm (Tr. at 206, 261-62), formed a strong working relationship; Laquercia considered O'Connor "critical for our office" and "like family." (Tr. at 269-70.) When O'Connor had medical concerns, Laquercia sought to accommodate her needs so she could regain her health and continue working. For example, in 2000-01, when O'Connor was suffering from foot and back problems, Laquercia offered to pay for a car service to take her to and from work, and ultimately covered the cost of a parking garage when O'Connor's friend and co-worker Renata Magnoni agreed to provide transportation. (Tr. at 133-34, 264-65.)

2    References to "Tr." denote the trial transcript.

O'Connor's last day in the S&L office was November 20, 2006. After taking two sick days and the Thanksgiving holiday weekend, on November 27, O'Connor left Laquercia a voicemail explaining that she needed to take an indeterminate amount of time off to seek medical attention for her back pain. (Tr. at 43.) As O'Connor [*4] testified, the back pain did not prevent her from working, but her "lifestyle had just deteriorated to coming home, taking Tylenol PM and going to bed and going back to work the next day." (Tr. at 10-11.) Laquercia arranged for O'Connor to see his orthopedist on November 29, who took x-rays and concluded that there might be a mass leaning against plaintiff's spine. (Tr. at 11.) A subsequent CT scan revealed a tumor, and O'Connor scheduled surgery for January 19, 2007, learning at some point in December that there would be a six to eight-week recovery period. (Tr. at 50-51.)

Communications between O'Connor and the firm prior to the surgery were infrequent. Both Laquercia and S&L's other principal partner, Edwin Smith, testified that they only learned of the surgery shortly before it happened. (Tr. at 207-08, 271.) There were no discussions regarding the length of O'Connor's absence or her salary, but she continued to be paid in full for a few months, as both Smith and Laquercia believed that it was the proper thing to do for their long-time employee. (Tr. at 207, 270.) O'Connor testified that she did not request or expect salary, and "was totally surprised and happy" when she realized [*5] that she was still getting paid; nonetheless, she testified, she was "too consumed with [her] illness to be really that concerned with money issues." (Tr. at 51.) Moreover, O'Connor testified repeatedly that she assumed that she would return to her position as soon as she was "better." (Tr. at 51, 64, 114).

The testimony at trial also revealed, though, that O'Connor was uncommunicative with S&L *following* her surgery. At the end of February 2007, she said she fell into an "overwhelming" depression that "got worse and worse" over the ensuing month, and caused her to "not care" about money, getting disability coverage, calling S&L, or much anything else. [3] (Tr. at 11-12, 69, 86.) She explained that "when I became depressed, I didn't . . . contact [S&L] as regularly. I really didn't want to tell anybody I was depressed . . . ." (Tr. at 20.) She considered her ability to communicate "severely impaired" (Tr. at 99), and acknowledged that she "should have been calling them like I had been in the beginning on a rather frequent basis. As I said, I was depressed and couldn't do it." (Tr. at 108-09.) Further, she admitted that she never requested any form of accommodation that would permit a return [*6] to work (Tr. at 99), and when Laquercia sent a laptop computer to O'Connor's home in early February unsolicited, with the apparent (but not explicitly stated) intention for her to start easing her way back by working remotely (Tr. at 272-73), she found it inappropriate and returned the laptop by mail without reaching out to S&L. (Tr. at 113.)

3    She did, however, have the wherewithal to meet with her accountant to do her taxes. (Tr. at 69-70.)

Aside from citing her own malaise and lack of communication, however, O'Connor was unable at trial to discuss with specificity her actions from February to April 2007. She attributed her inability to recall many facts, such as her communications with others and the improvement of her physical health, to the depression itself: "When I became depressed, time became out of focus." (Tr. at 55.) She was even unclear about her medical and psychological treatment, testifying that she was not sure whether she received the anti-depressant drug Lexapro as a prescription or just as a free sample from her general practitioner. (Tr. at 320.) O'Connor's testimony evolved and changed over the course of her direct and cross-examinations, and her recollections were [*7] often inconsistent with her prior statements at deposition. In short, although the Court does not doubt that O'Connor was in a troubled state of mind in 2007, [4] it finds her testimony as to her conduct during this period to be not credible.

4    The Court expresses no view on whether O'Connor was *clinically* depressed at that time, given the lack of expert testimony, but notes that she never visited with a psychiatrist or psychologist, and only received some informal "treatment" from her general practitioner, often "outside the formal reception area so I wouldn't have to pay the $140 fee." (Tr. at 63, 320.)

2010 U.S. Dist. LEXIS 94088, *; 110 Fair Empl. Prac. Cas. (BNA) 528;
23 Am. Disabilities Cas. (BNA) 1148;

Based on these findings, the Court further determines that O'Connor did not keep S&L informed of her condition or of any intention to return to work. O'Connor's only post-surgery communication with S&L, aside from social calls with Magnoni (Tr. at 93), occurred when she was phoned by Susan Saxe, S&L's bookkeeper, whose duties included managing S&L's employee benefits programs. Saxe was attempting in her contacts to get O'Connor to follow through on filling out disability insurance forms so S&L could continue to receive some reimbursement. Soon, she began to express to Laquercia and Smith [*8] her frustration with O'Connor's apparent failure to complete the forms and her lack of communication. (Tr. at 223, 237.) When Saxe learned that the short term insurance carrier was going to discontinue coverage, on March 19, 2007, she sent a memorandum to O'Connor explaining that it was her "responsibility" to complete disability forms and follow up with her doctors to ensure that reimbursement continued. (Defs.' Ex. 13.)

Throughout this period, Laquercia was growing irritated at the lack of reimbursement and O'Connor's failure to communicate, and he began doubting that O'Connor intended to return to work. (Tr. at 277, 283). Magnoni testified that in January 2007, Saxe told her that she (Saxe) overheard Laquercia say that O'Connor was "too sick, too old, and too fat" to work. [5] (Tr. at 176). Similarly, Doreena Davidson, one of O'Connor's colleagues at S&L, testified that she overheard Laquercia tell Smith a similar comment in April. (Tr. at 165.) Unsurprisingly, Smith testified that he never heard Laquercia make any comment of that nature. (Tr. at 215.)

5   Defendants challenge Magnoni's testimony as biased because she also had sued defendants for discrimination, and O'Connor testified [*9] on her behalf in that action. (Tr. at 181-82.) Despite this fact, the Court finds Magnoni's testimony on this score to be credible.

On March 30, Saxe called O'Connor and explained that S&L was not going to pay her any longer, and that it was imperative that she get in her disability papers. (Tr. at 238-39.) Based on this call, Saxe recognized that O'Connor was feeling down or depressed, but she had no information that it was particularly severe or merited taking anti-depressants. [6] (Tr. at 239-40.) On April 20, 2007, Laquercia sent O'Connor a letter explaining that S&L was terminating her employment, stating that "we have had no clue as to your medical condition or even if you ever intended to return to work" and that he could not "recall how long it has been since we spoke." (Pl.'s Ex. 9.) Laquercia further noted that O'Connor never responded to letters regarding disability claims and that he could "only assume that you do not intend to return" to the firm. (Id.)

6   Aside from the general credibility issues discussed above, O'Connor's testimony that she told Saxe that she was not returning to work due to severe depression is particularly incredible in light of her inability to recall  [*10] other calls or even estimate the number of times that she spoke with Saxe. (Tr. at 58, 89.)

Four days later, O'Connor's sister forwarded an email from O'Connor to Laquercia and Smith. The email claims that plaintiff "originally emailed" them on April 18, but that they "may not have received the original email" (Pl.'s Ex. 8.) O'Connor apologized for not calling, explaining that she was in physical pain and had "been in a state of deep depression," but was "taking anti-depressants and hopefully I will feel better soon." She further wrote that she was "sorry I haven't kept you posted after you were both so kind and generous" and that she wanted to return to work on April 30. (Id.) Laquercia responded by email two days later, explaining that the email was "too little too late," and pointing to "open" health issues: "There is nothing to indicate that Nancy is actually able to return to work, or whether her medical condition has improved sufficiently so that she can perform the duties of her job. Moreover, the email actually implies that she cannot stand for any length of time and we assume that she cannot work." Laquercia explained that due to her "failure to report to us on her health while  [*11] accepting her full salary without any indemnification for Long Term Disability, we assumed that she was not coming back to work for ou[r] firm.'" (Id.) On April 30, O'Connor left Laquercia a voicemail stating that she received his letter and requesting that he "rethink this position" since "after a major surgery I went into a major depression and I was not able to make a phone call." (Defs.' Ex. 28)

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over ADEA claims pursuant to 28 U.S.C. § 1331. The claims arising under NYCHRL are so obviously related to the ADEA claims that they form part of the same case or controversy, bringing them within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Venue is unquestioned and appropriate.

## I. Age Discrimination

Plaintiff claims that her termination violated the ADEA and NYCHRL, both of which prohibit age discrimination in employment decisions. The ADEA makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual. . . because of such individual's age." 29 U.S.C. § 623(a)(1). Similarly, NYCHRL makes it "an unlawful

discriminatory practice . . . [f]or an employer . **[*12]** . . because of the actual or perceived age, race, creed, color, national origin, gender, disability . . . of any person, to . . . discharge from employment such person " *N.Y.C. Admin. Code § 8-107(1)(a).*

As a general matter, "[a]ge discrimination claims brought pursuant to . . . NYCHRL are analyzed under the ADEA framework." *Leibowitz v. Cornell Univ., 584 F.3d 487, 498 n.1 (2d Cir. 2009)* (citing *Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 114 n.3 (2d Cir. 2007))*; *Weiss v. JPMorgan Chase & Co., 06-CV-4402, 2010 U.S. Dist. LEXIS 2505, at *5 (S.D.N.Y. Jan. 13, 2010)*. There is, however, potential for significant divergence. In *Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009)*, the Supreme Court recently clarified that the burden of persuasion for ADEA claims is more onerous than for other civil rights claims. Whereas Title VII permits plaintiffs to establish discrimination by showing that their inclusion in a protected class "was simply a motivating factor" in an employer's adverse employment action, *id. at 2349*, "under the plain language of the ADEA, an employee bringing a disparate treatment claim must prove by a preponderance of the evidence that age was the 'but-for' cause **[*13]** behind the employer's adverse decision, and not merely one of the motivating factors." *Hrisinko v. N.Y.C. Dep't of Educ., 369 Fed. Appx. 232, 234 (2d Cir. 2010)* (citing *Gross, 129 S. Ct. at 2350*). It is less clear whether the logic of Gross applies to analogous local laws, but one court directly confronted the issue recently and concluded that an age discrimination plaintiff under NYCHRL "need only prove by a preponderance of the evidence that his age was 'a motivating factor'" in a defendant's decision to terminate employment. [7] *Weiss, 2010 U.S. Dist. LEXIS 2505, at *12*.

[7]   As of this writing, there is no definitive state court decision interpreting NYCHRL's similar language in light of Gross.

In the case tried to the Court, it is unnecessary to determine whether the NYCHRL analysis tracks the restrictive ADEA one as a matter of law, because O'Connor would not succeed even under the less burdensome "mixed motive" standard. Simply put, the Court finds as a matter of fact that her age was not a motivating factor - much less the "but for" cause -- of defendants' decision to terminate her employment.

The age discrimination claims are premised entirely on Laquercia's comments to Smith -- overheard **[*14]** by Magnoni and Davidson -- that O'Connor was "too old" to work. Significantly, she presents no other evidence indicating that Laquercia or anyone else at S&L harbored any age-based animus or stereotypes against older employees like O'Connor, or that they made any

employment decisions based on such attitudes. In fact, the evidence is most compellingly to the contrary. The record reveals that Laquercia considered O'Connor an almost indispensible employee throughout her 16 year tenure, including during the period just prior to termination. Termination came not because of age but out of frustration with her lack of communication during a prolonged five month absence; S&L even continued to pay her full salary for a significant period of time as a gesture of good will. Given this context, notwithstanding their proximity to O'Connor's discharge, Laquercia's comments are best understood as "stray remarks," which "even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." *Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998)*; see *Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115 (2d Cir. 2007)* (noting that "[t]he more **[*15]** a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be"); *Bookman v. Lynch, 02-CV-l 108, 2009 U.S. Dist. LEXIS 40766, at *31-*32 (S.D.N.Y. May 14, 2009)* (explaining that a "stray comment may bear a more ominous significance when considered within the totality of the evidence") (internal quotation marks omitted).

While in no way approving of Laquercia's obnoxious outbursts, the Court does not find that his words reflected any actual age-based animus on his part. Defendants have amply supported -- and O'Connor has effectively admitted -- that there were legitimate, nondiscriminatory reasons for her termination, namely her failure to keep the firm updated as to her medical status, apprise defendants regarding her intention to return to work, and file forms necessary to secure long term disability benefits. Even given Laquercia's outbursts, the Court finds that O'Connor's age played no role whatsoever in defendants' employment decision, and, therefore, finds in favor of defendants on plaintiff's age discrimination claims under both ADEA and NYCHRL. [8]

[8]   The parties' post-trial briefs **[*16]** address the applicability of the familiar McDonnell Douglas burden-shifting framework applicable to Title VII and other such claims on summary judgment. Although the Second Circuit has concluded that, post-Gross, courts still "remain bound" by McDonnell Douglas in ADEA cases, *Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010)*, the Court here is not deciding a summary judgment motion. Pointedly, there is little utility to reciting that rubric's various shifts in the burdens of production after a full trial has taken place. The burden is on plaintiff to prove her claims by a preponderance of the evidence. Plaintiffs argument that she need not demonstrate

a "prima facie" case as set forth by McDonnell Douglas because Laquercia's "too old" comments constitute "direct," rather than circumstantial, evidence of discrimination," is therefore irrelevant. Cf. *Bookman, 2009 U.S. Dist. LEXIS 40766, at *31* ("Regardless of whether the Price Waterhouse or McDonnell Douglas framework is applied, the ultimate issue is: 'Whether the plaintiff has presented evidence from which a rational finder of fact could conclude that the defendant discriminated against [him] illegally.'") (quoting [*17] *Jalal v. Columbia Univ., 4 F. Supp. 2d 224, 234 (S.D.N.Y. 1998)*). The Court, as the finder of fact in this case, concludes that O'Connor has failed to carry her burden because her age did not motivate defendants' decision to terminate her employment in any way. Other than Laquercia's stray remarks, she offers no proof of age discrimination at all.

## II. Disability Discrimination

O'Connor also brings municipal claims pursuant to NYCHRL that her termination was based on perceived disability and that defendants failed to provide her with reasonable accommodation. *N.Y.C. Admin. Code § 8-107(1)(a).* "In general, disability claims under . . . NYCHRL are subject to the same analytical framework as claims under the [federal Americans with Disabilities Act ("ADA")]." [9] *Bresloff-Hernandez v. Horn, 05-CV-384, 2007 U.S. Dist. LEXIS 71257, at *12 n.4 (S.D.N.Y. Sept. 25, 2007).*

[9] There are, however, at least two differences between ADA and NYCHRL. First, the standards for what constitute a "disability" are broader under NYCHRL. See *Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001); Dellavolpe v. City of New York, 673 F. Supp. 2d 111, 120 (E.D.N.Y. 2009).* Second, as discussed infra, the municipal [*18] law employs a "more liberal standard" in construing "reasonable accommodation" claims. *Julius v. Dep't of Human Res. Admin., 08-CV-3091 2010 U.S. Dist. LEXIS 33259, at *12-*13 (S.D.N.Y. Mar. 24, 2010).* Plaintiff has made no claim under ADA.

To succeed on her claim of unlawful disability-based termination, O'Connor must prove by a preponderance of the evidence that: (1) defendants are subject to NYCHRL; (2) she was disabled or perceived to be disabled within the meaning of NYCHRL; (3) she was qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she was terminated because of her disability or perceived

disability. *Kendall v. Fisse, 149 Fed. Appx. 19,21 (2d Cir. 2005).*

Applying the analytical framework, the Court finds that O'Connor has failed to demonstrate that disability was a motivating factor in defendants' decision to terminate her employment. Defendants knew very little as to the specifics of plaintiff's condition post-surgery, particularly with respect to her psychological well-being. Indeed, there was no reason for defendants to know of it at the time, since O'Connor did little to provide them with an update on her status. [*19] Although O'Connor points to Laquercia's comments to third parties that she was "too sick" to work, the Court is not persuaded that these stray remarks reflect invidious discriminatory intent. On the contrary, the trial testimony made clear that O'Connor was considered a highly valued employee by Laquercia and S&L, who went out of their way to get O'Connor appropriate treatment and speed her return to work. To that end, Laquercia arranged for her to see his own doctor and get paid full salary for four months of sick leave. Critically, Laquercia, based on the information known to him, believed that O'Connor *could* work with reasonable accommodation, which is why he sent a laptop computer to O'Connor's home. These are not the actions of someone who is seeking to terminate an employee because he perceived her to be disabled and/or unable to work with reasonable accommodation. In fact, it is not clear that Laquercia considered her disabled at all (beyond simple post-surgical recuperation period) until he received her email *after* she had been terminated, which he believed "implie[d] that she cannot stand for any length of time." (Pl.'s Ex. 8.) But, that perception was no different from the [*20] perception defendants had of O'Connor's physical disability in February, which they sought to accommodate. Moreover, there was no hint that Laquercia perceived O'Connor psychologically disabled at any relevant time.

O'Connor's claim that defendants violated NYCHRL in not accommodating her medical and psychological conditions "by failing to excuse her absence from work from November 2006 through April of 2007", thus, fares no better. (Pl. Post-Trial Br. at 4.) NYCHRL requires employers to "make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job . . . provided that the disability is known or should have been known by the covered entity." *N.Y.C. Admin. Code § 8-107(15).* To make a claim of failure to accommodate under NYCHRL, O'Connor must prove that: (1) she has a disability as defined by the statute; (2) defendants knew or should have known about the disability; (3) with reasonable accommodation she could perform the essential functions of her job; and (4) defendants failed to make such accommodation. *Missick v. City of New York, 07-CV-1494, 707 F. Supp. 2d 336,*

*2010 U.S. Dist. LEXIS 48292, at \*40 (E.D.N.Y. Mar. 22, 2010)*; Roberts v. AIG Global Inv.   **[\*21]** *Corp., 06-CV-5966, 2008 U.S. Dist. LEXIS 76891, at \*22 (S.D.N.Y. Sept. 30, 2008)*. Although "[g]enerally it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed . . . an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious -- which is to say, if the employer knew or reasonably should have known that the employee was disabled." *Roberts, 2008 U.S. Dist. LEXIS 76891, at \*23* (internal quotation marks and citations omitted).

Here, other than post-surgical recuperation, the evidence at trial does not support the conclusion that defendants were aware of any perceived any disability under the ordinance due to plaintiffs lack of communication; they were informed that physical recovery from the surgery would take six to eight weeks, and they had no specific information regarding any clinical depression from which O'Connor may have been suffering. Certainly this lack of communication is at odds with any argument by plaintiff that her disability should have been known or "obvious" to defendants, particularly in light of the fact that O'Connor never requested *any* form of assistance or accommodation   **[\*22]** over the course of five months. [10] Notwithstanding, defendants made an effort to accommodate her in various ways recounted above that even O'Connor conceded were "generous." The sum of it is, the Court finds, that defendants did attempt to provide O'Connor with reasonable accommodation for the "disability" they perceived her to have, and provided her full pay, even though they were not obligated by statute, ordinance or contract to pay her salary.

> 10   Even at trial O'Connor failed to prove by a preponderance that she was disabled psychologically. All that she established was that she felt "depressed" and that in pursuit of medical help for her back, she had only an informal, unpaid chat or two with a doctor about her "depression." Bizarrely, she also relied on some gratuitous advice given her by her accountant to resume taking anti-depressants (Tr. at 59) at a time she claimed at trial she was psychologically unable to perform any work. None of this was known to defendants prior to termination.

Moreover, plaintiff's claim also fails because, assuming she was not capable of performing the essential functions of her job, she was also not capable of performing them even with reasonable accommodation. **[\*23]** [11] O'Connor testified repeatedly that, owing to her essentially self-diagnosed psychological condition, her communication with defendants lapsed and that she stopped caring about work or money. She not only had

no timetable for returning to work -- she had no interest in it either. She now argues that under NYCHRL, a five month leave of absence can constitute a "reasonable" accommodation, see *Phillips, 66 A.D.3d at 182, 884 N.Y.S.2d at 378*, but her factual premise that she was ready or willing to return to work at the end of April 2007 is not only self-serving, but irrelevant. At no point were defendants asked to accommodate O'Connor by granting her a five month leave of absence for recovery; nor is there any proof that, given the nature of her untreated psychological issues, that such an accommodation would be successful. Rather, O'Connor only informed defendants of an interest to return to work in an email that defendants received *after* she was terminated. In the meantime, defendants were under no obligation to "accommodate" O'Connor by leaving her position open indefinitely without any communication (direct or indirect) from her indicating her intended return date or general medical   **[\*24]** progress. See *Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 186 (2d Cir. 2006)* ("The duty to make reasonable accommodations does not . . . require an employer to hold an injured employee's position open indefinitely . . . .") (quoting *Parker v. Columbia Pictures Indus., 204 F.3d 326, 338 (2d Cir. 2000)*); *Vosburg v. Am. Nat'l Red Cross, 08-CV-653, 2009 U.S. Dist. LEXIS 99826, at \*25 (N.D.N.Y. Oct. 27, 2009)* (noting that "employers are not required to provide employees with indefinite periods of leave"); *McNamara v. Tourneau, Inc., 496 F. Supp. 2d 366, 376 (S.D.N.Y. 2007)*, affd, *326 Fed. Appx. 68 (2d Cir. 2009)* (explaining that "[i]ndefinite leave is not a reasonable accommodation") (quoting *Porter v. N.Y. Univ. Sch. of Law, 00-CV-4693, 2003 U.S. Dist. LEXIS 14674, at \*29 (S.D.N.Y. Aug. 25, 2003)*).

> 11   NYCHRL states that "[i]n any case where the need for reasonable accommodation is placed in issue, it shall be an *affirmative defense* that the person aggrieved by the alleged discriminatory practice could not, with reasonable accommodation, satisfy the essential requisites of the job . . .", *N.Y.C. Admin. Code § 8-107(15)(b)* (emphasis added), and at least one court has found that the burden   **[\*25]** rests on a defendant to prove that accommodation would not alleviate a plaintiffs inability to work. See *Phillips v. City of New York, 66 A.D.3d 170, 182, 884 N.Y.S.2d 369, 378 (1st Dep't 2009)*. Regardless of whether the burden of establishing ability to work rests on plaintiff in the prima facie case or defendants as an affirmative defense, the Court reaches the same determination, for the call is not close.

Whatever the ultimate cause of her nonfeasance, O'Connor admitted that she failed to remain in contact with S&L and did not inform them when she had hoped

Case 1:11-cv-06983-KPF   Document 45   Filed 09/13/13   Page 204 of 253

Page 7

2010 U.S. Dist. LEXIS 94088, *; 110 Fair Empl. Prac. Cas. (BNA) 528;
23 Am. Disabilities Cas. (BNA) 1148;

to return. It was for these reasons alone, and not disability crimination, that she was terminated by her long-time employer. Succinctly, O'Connor's termination did not violate any federal or local law barring employment discrimination based on an employee's actual or perceived disability.

### III. Retaliation Claim & Fraud Counterclaim

Following its receipt of the complaint in this action, defendants brought a counterclaim for common law fraud, alleging that plaintiff misrepresented her medical condition and the status of her disability insurance applications so that she could continue receiving salary without performing work. [12] [*26] (Defs.' Answer & Counterclaims, Dkt. #5, ¶¶ 35-48.) In her amended complaint, O'Connor claimed that the counterclaim was "baseless and frivolous," and was asserted purely as retaliation for the initial lawsuit. (Pl.'s Am. Compl., Dkt. #9, at 22.)

> 12   Defendants also brought a counterclaim for unjust enrichment, but it is not in the parties' joint pretrial order. It is deemed abandoned and is dismissed with prejudice on that basis.

As an initial matter, the Court finds in favor of plaintiff on defendants' counterclaim for fraud. "The elements of fraud under New York law are: (1) a misrepresentation or a material omission of fact which was false and known to be false by defendant, (2) made for the purpose of inducing the other party to rely upon it, (3) justifiable reliance of the other party on the misrepresentation or material omission, and (4) injury." *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (internal quotation marks omitted); see *State Farm Mut. Auto Ins. Co. v. Grafman*, 655 F. Supp. 2d 212, 220 (E.D.N.Y. 2009). Defendants argue that O'Connor's representations to Saxe -- and only to Saxe -- that she intended to return to work and was applying for benefits [*27] caused them to "detrimentally rel[y] . . . by continuing to pay [her] salary in expectation of at least partial refund from the disability carriers" for two pay periods. (Defs.' Br. at 19.) But defendants have failed to prove that O'Connor actually made any misrepresentations. The best they can muster is that "Ms. Saxe credibly testified that she *felt* that Plaintiff misrepresented her intentions and actions." (Id.; emphasis added). Defendants' claim that O'Connor intended to induce them into continuing to pay her salary is similarly without support, since it is undisputed that O'Connor never requested salary, and defendants continued paying her because they felt it fair, not because that payment was contingent on their receipt of disability benefits. That defendants assumed that O'Connor would eventually be returning to work does

not mean that they were defrauded by her when she did not.

At the same time, however, the Court also concludes that the fraud counterclaim did not constitute unlawful retaliation under NYCHRL. *N.Y.C. Admin. Code § 8-107(7)* ("It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate . . [*28] . because such person has . . . commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter . . . ."). "[A]n employer's lawsuit filed with a retaliatory motive rather than in good faith may constitute an adverse action and provide a basis for a retaliation claim." *Eng-Hatcher v. Sprint Nextel Corp.*, 07-CV-7350, 2008 U.S. Dist. LEXIS 92559, at *12 (S.D.N.Y. Oct. 31, 2008) (internal quotation marks omitted); *Fei v. WestLB AG*, 07-CV-8785, 2008 U.S. Dist. LEXIS 16338, at *7 (S.D.N.Y. Mar. 5, 2008) ("Lawsuits in response to a former employee's attempt to vindicate his rights can constitute retaliation."). Here, however, in light of O'Connor's nonfeasance throughout the duration of her absence, defendants believed at the time of pleading that she was lying about her medical condition and was intentionally stalling on disability applications in order to continue receiving salary without returning to work or providing the disability carrier proof of her disability.

As Laquercia implies in deposition testimony admitted into evidence (Laquercia Dep. at 58:2-58:7), defendants would likely not have sued O'Connor had she not brought [*29] the original lawsuit against them. But, O'Connor did commence an action and defendants did have a potential claim, which, while perhaps not strong enough to justify the costs of an independent lawsuit, could be practically justified as a counterclaim in the context of this suit. Although defendants were unable to adequately support their allegations at trial, plaintiff has not proven that their assertion of this compulsory counterclaim constituted a bad faith action brought purely to retaliate against O'Connor or that such a counterclaim interwoven in the very facts of plaintiff's claim might "deter a person from engaging in protected activity." *N.Y.C. Admin. Code § 8-107(7)*. Defendants thought that they had been taken by a confidante who had falsified her health status. The flimsiness of plaintiff's proof of disability at trial makes defendants' view that O'Connor's conduct was fraudulent most understandable, and supplies a good faith, nonretaliatory subtext. The retaliation claim is dismissed.

### CONCLUSION

The Court has determined after trial that: (1) plaintiff Nancy O'Connor is not entitled to recover against defendants Smith & Laquercia, LLP or Thomas Laquer-

2010 U.S. Dist. LEXIS 94088, *; 110 Fair Empl. Prac. Cas. (BNA) 528;
23 Am. Disabilities Cas. (BNA) 1148;

cia for her claims of discrimination [*30] and retaliation under ADEA or NYCHRL, and (2) defendants are not entitled to recover against plaintiff on their counterclaim for fraud. All other claims are dismissed as abandoned.

The Clerk of the Court is directed to enter judgment in accordance with this Memorandum Decision and Order, and to close this case.

**SO ORDERED.**

Dated: Brooklyn, New York

September 8, 2010

/s/ Eric N. Vitaliano

ERIC N. VITALIANO

United States District Judge

# EXHIBIT S



COLETTE RAGIN, Plaintiff, -v- EAST RAMAPO CENTRAL SCHOOL DIS-
TRICT, Defendant.

05 Civ. 6496 (PGG)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2010 U.S. Dist. LEXIS 32576*

March 31, 2010, Decided
March 31, 2010, Filed

**SUBSEQUENT HISTORY:** Affirmed by *Ragin v. East Ramapo Cent. Sch. Dist., 2011 U.S. App. LEXIS 6588 (2d Cir. N.Y., Mar. 31, 2011)*

**COUNSEL:** **[*1]** For Collette D. Ragin, Plaintiff: Michael Howard Sussman, LEAD ATTORNEY, Sussman & Watkins, Goshen, NY.

For East Ramapo Central School District, Defendant: Gregg Tyler Johnson, LEAD ATTORNEY, Lemire Johnson LLC, Malta, NY; Jacinda Hall Conboy, Girvin & Ferlazzo, P.C., Albany, NY.

**JUDGES:** Paul G. Gardephe, United States District Judge.

**OPINION BY:** Paul G. Gardephe

**OPINION**

*MEMORANDUM OPINION AND ORDER*

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff Colette Ragin claims that she was subjected to race discrimination, a hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.*, while employed as an assistant principal at the East Ramapo Central School District between August 2002 and December 2004. [1]

> 1   Plaintiff's Amended Complaint also asserts a gender discrimination claim. (Am. Cmplt. P 27) In her Rule 56.1 Statement and memorandum of

law opposing summary judgment, however, Plaintiff addresses only race discrimination, hostile work environment, and retaliation. Accordingly, to the extent that the Amended Complaint asserts a gender discrimination claim, that claim has been abandoned and will be dismissed. *See Grana v. Potter, No. 06 Civ. 1173 (JFB)(ARL), 2009 U.S. Dist. LEXIS 13159, 2009 WL 425913, at *15 (E.D.N.Y. Feb. 19, 2009)* **[*2]** (considering claim abandoned because plaintiff's summary judgment opposition "contained no factual or legal discussion" of the claim); *Bronx Chrysler Plymouth, Inc. v. Chrysler Corp., 212 F. Supp. 2d 233, 249 (S.D.N.Y. 2002)* (dismissing claim as abandoned because party opposing summary judgment "made no argument in support of th[e] claim at all" in its summary judgment opposition papers); *Douglas v. Victor Capital Group, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998)* (dismissing as abandoned claims that defendants addressed in motion for summary judgment but plaintiff failed to address in his opposition papers).

Defendant moves for summary judgment on all of Plaintiff's claims, arguing, *inter alia*, that Plaintiff's claims are time-barred, that its actions were justified by legitimate concerns about Plaintiff's job performance, that Plaintiff was never subjected to a hostile work environment, and that it did not retaliate against her for engaging in protected activity. For the reasons stated below, Defendant's motion for summary judgment (Docket No. 25) will be GRANTED.

*BACKGROUND*

In August 2002, the School District hired Ragin, an African-American female, to serve as the assistant principal [*3] of Lime Kiln Elementary School. (Def. Rule 56.1 Stat. P 5) [2] Neil Kaplicer, Lime Kiln's principal and a white male, recommended her for this position. (Id. P 6) Plaintiff was employed by the District for two and a half years until her termination in December 2004. (Id. P 7)

> 2   To the extent that this Court relies on facts drawn from Defendant's Rule 56.1 statement, it has done so because Ragin has not disputed those facts or has not done so with citations to admissible evidence. Where Ragin disagrees with Defendant's characterization of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on her characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

### A. Custodian's Alleged Sexual Harassment

Plaintiff alleges that in November 2003, when she was in a supply closet obtaining construction paper, and in January 2004, when she was in a storage room obtaining binders, custodian Robert Manion's hand "grazed" her buttocks. (Pltf. Rule 56.1 Counter-Stat. P 34; Johnson Aff., Ex. H.) Plaintiff alleges that she verbally [*4] complained to Principal Kaplicer after each incident. (Pltf. Rule 56.1 Resp. P 56; Ragin Aff. P 20) After the November 2003 incident, Kaplicer spoke with Manion, who explained that he had touched Ragin on the side "to try to get past her." Kaplicer told Manion to "be more careful" but was apparently satisfied that this contact was innocuous. (Pltf. Rule 56.1 Counter-Stat. PP 42-45; Sussman Aff. Ex. 1 at 9-11, 15) Manion retired from the District in January 2004 (Def. Rule 56.1 Stat. P 22; Johnson Aff., Ex. X at 15), and at about the same time, Kaplicer announced that he would retire at the end of the 2003-04 school year. (Def. Rule 56.1 Stat. P 18; Johnson Aff., Ex. Y at 107)

On June 4, 2004 - shortly before Kaplicer's June 30, 2004 retirement -- Ragin sent a letter to him recounting her accusations against Manion, who had since retired. She "formally request[ed] [Kaplicer's] . . . prompt attention to this matter." (Johnson Aff., Ex. H; Pltf. Rule 56.1 Counter-Stat. P 56; Def. Rule 56.1 Stat. P 61)

### B. January 2004 Performance Evaluation

During the 2002-03 school year, Ragin received two positive performance evaluations from Principal Kaplicer. (Pltf. Rule 56.1 Counter-Stat. PP 7, 14; [*5] Ragin Aff., Ex. 9, Ex. 10) Kaplicer's January 2004 mid-year review of Ragin continued to rate her as "satisfactory," but contained complaints about her scheduling and budgeting skills, and communications with the District's central administration. (Johnson Aff., Ex. W; see also Def. Rule 56.1 Stat. P 24; Pltf. Rule 56.1 Resp. P 24, Pltf. Rule 56.1 Counter-Stat. P 17) Ragin filed a rebuttal to the January 2004 evaluation on February 13, 2004, in which she stated that she "accept[ed] the evaluation" but argued that it did not acknowledge "the full range of [her] accomplishments/contributions." (Johnson Aff., Ex. C; Def. Rule 56.1 Stat. P 26; Pltf. Rule 56.1 Resp. P 19; Johnson Aff., Ex. K at 245-46; see Ragin Aff., Ex. 2)

Plaintiff and Kaplicer later met with Assistant Superintendent Linda Cruz. (Def. Rule 56.1 Stat. P 28; Pltf. Rule 56.1 Resp. P 28; Cruz Aff. P 7) The parties dispute what was discussed at this meeting. Defendant alleges that the "combative relationship" between Plaintiff and Kaplicer was discussed as well as Ragin's poor attendance, non-responsiveness to directives, and failure to notify the school about her absences (Def Rule 56.1 Stat PP 28-29; Cruz Aff. P 7), while [*6] Ragin asserts that the only issue that was discussed was her complaints about Kaplicer's alleged withdrawal of support for a Motown production she had organized at the school to celebrate Black History Month. (Def. Rule 56.1 Stat. P 30; Pltf. Rule 56.1 Resp. PP 28-30; Sussman Aff., Ex. 2 at 93-96; Cruz Aff. P 7; Ragin Aff. P 14)

### C. Application for Promotion

On February 12, 2004, Ragin applied for three vacant principal positions within the District for the 2004-05 school year. (Def. Rule 56.1 Stat. P 32) After proceeding through an initial screening process designed to narrow the applicant pool, Plaintiff was granted an interview on March 30, 2004 for the Lime Kiln principal vacancy only. (Id. PP 35 - 36; Sculnick Aff. P 13, Johnson Aff., Ex. E) She was one of thirteen candidates selected for a second-round interview, which took place on April 27, 2004. (Def. Rule 56.1 Stat. PP 41, 44) Plaintiff was not selected as a finalist by the interview committee, however, and the position was ultimately offered to another female African-American candidate, Lori Lowe-Stokes. (Id. PP 46, 49-50) On May 21, 2004, Plaintiff received formal notification that she had not been selected to fill the Lime [*7] Kiln principal vacancy. (Id. P 51)

### D. Continuing Difficulties with Kaplicer

On May 12, 2004, Ragin met with Assistant Superintendent Mitchell Schwartz and Director of Personnel Mary Sculnick to discuss her strained relationship with Kaplicer. (Id. P 55; Schwartz Aff. P 5; Sculnick Aff. P 5) At the meeting, Plaintiff told Sculnick and Schwartz that Manion had inappropriately touched her in November 2003 and January 2004. (Def. Rule 56.1 Stat. P 56; Schwartz Aff. P 5; Sculnick Aff. P 5) Schwartz sched-

uled a meeting for Ragin with Assistant Superintendent Cruz on June 1, 2003 to discuss these allegations. (Def. Rule 56.1 Stat. P 60) When Cruz came to Lime Kiln for the June 1 meeting, however, Plaintiff was not at the school. (Id.; Johnson Aff., Ex. K at 294-95) Cruz reprimanded Plaintiff for her absence. (Ragin Aff., Ex. 16) Plaintiff claims that she had obtained permission from Kaplicer to attend a wedding that day (Ragin Aff. P 22, Ex. 3), and that Kaplicer should have explained this to Cruz when Cruz asked where Plaintiff was. (Pltf. Rule 56.1 Counter-Stat. PP 94-96)

On June 22, 2004, a Lime Kiln teacher brought Kaplicer four pages of pornographic images that a Lime Kiln student had allegedly  [*8] printed out using a school computer. As Assistant Principal, Ragin was responsible for student discipline and for technology at Lime Kiln. (Def. Rule 56.1 Stat. P 78) Accordingly, Kaplicer gave these images to Ragin and asked her to investigate the incident. (Id. PP 80-81) In doing so, Kaplicer warned her that the images were "disgusting and graphic." (Id. PP 76-82) After seeing the images, Plaintiff objected to conducting the investigation. Kaplicer then offered to take the material back. (Id. P 85) Plaintiff refused to return the images, however, completed her investigation, and concluded that the incident had in fact involved student misconduct and misuse of school computers. (Id. PP 86-87)

### E. June 25, 2004 Sexual Harassment Complaint

On June 25, 2004, Plaintiff sent a letter to Director of Personnel Sculnick complaining that Kaplicer had sexually harassed her when he asked her to investigate the pornographic images. (Johnson Aff., Ex. J) In the letter, Ragin also accused Kaplicer of "never investigat[ing] or address[ing]" an "outstanding sexual harassment complaint" she had made - an apparent reference to the Manion incidents. (Id.) The District then conducted a formal investigation  [*9] into Plaintiff's allegations concerning both the Manion incidents and the pornographic images, and issued a report on December 17, 2004, concluding that no sexual harassment had taken place. (Johnson Aff., Ex. Q; Def. Rule 56.1 Stat. PP 92-93, 99)

In rejecting Plaintiff's allegations against Manion, the District noted that he had denied purposefully touching her in an inappropriate manner, that her June 4 memorandum had alleged that Manion's hand had merely "grazed" her buttocks -- and that Webster's New Collegiate Dictionary defines "graze" as "to touch lightly in passing" -- and that in any event Manion had retired from the school six months earlier and accordingly "the School District could not impose any penalty against him." (Johnson Aff., Ex. Q at 10) In rejecting Ragin's claims concerning the pornographic images, the District

noted that Ragin did not contest that she was responsible for student discipline and technology, and that, accordingly, Kaplicer did not commit sexual harassment in asking her to investigate an incident that involved potential misuse of a school computer by a student. (Id. at 11)

### F. June 2004 Performance Evaluation

On June 17, 2004, Kaplicer gave Ragin a year-end  [*10] evaluation that rated her performance as "unsatisfactory." (Def. Rule 56.1 Stat. P 66; Johnson Aff., Ex. I, Ex. K at 333-34; Pltf. Rule 56.1 Resp. P 66) In the evaluation, Kaplicer stated that Plaintiff had not completed her assigned work in a timely fashion, including certain teacher evaluations, had a record of poor attendance, had repeatedly failed to notify the District of her absences, interacted poorly with supervisors, and had failed to improve in the areas criticized in her January 2004 evaluation. (Def. Rule 56.1 Stat. PP 67-72; Johnson Aff. P 5, Ex. I)

On June 21, 2004, Plaintiff wrote a rebuttal to the review, stating: "Please be advised this evaluation is a form of retaliation and it's evidence of Neil Kaplicer punishing me for being sick; i.e., observations not performed in a timely fashion." [3] (Def. Rule 56.1 Stat. P 73; Johnson Aff., Ex. I, Ex. K at 333-34)

> 3   On June 8, 2004, Plaintiff requested and received an accommodation for a medical condition that made it difficult for her to type. Plaintiff alleges that this condition prevented her from completing the teacher evaluations on time. (Ragin Aff., Ex. 21)

### G. Transfer to Fleetwood Elementary School

In June 2004, the District  [*11] reassigned a number of assistant principals for the 2004-05 school year and decided to transfer Ragin to Fleetwood Elementary School (Def. Rule 56.1 Stat. PP 100-01; Schwartz Aff. P 7; Johnson Aff, Ex. Z at 44), allegedly to give her a fresh start at a new school. (Def. Rule 56.1 Stat. P 102; Friedman Aff. P 8; Simmons Aff. P 3; Cruz Aff. P 10) At Fleetwood, Ragin continued to serve as an assistant principal, but reported to Fleetwood Principal Patricia Simmons, an African-American woman. (Def. Rule 56.1 Stat. PP 103-05; Friedman Aff. P 8; Simmons Aff. PP 1, 3)

On September 9, 2004, Principal Simmons gave Ragin a list of her job responsibilities and Simmons' expectations for the coming school year. Plaintiff repeatedly refused to sign or acknowledge the list, however, citing advice from her union. (Def. Rule 56.1 Stat. PP 108-09, 111; Simmons Aff. PP 4, 6, Ex. M; Simmons Reply Aff. P 2; Johnson Aff, Ex. M; Pltf. Rule 56.1 Resp. PP 109-11; Ragin Aff. P 31) Ragin's attendance at

Fleetwood was -- in her words -- "inconsistent." (Johnson Aff., Ex. K at 259-60; Def. Rule 56.1 Stat. P 114; Pltf. Rule 56.1 Resp. P 114) During the three-and-a-half months between her September start date and [*12] mid-December, Ragin missed twenty-two days of work, her full yearly allotment of sick days under the union contract. (Def. Rule 56.1 Stat. P 113; Simmons Aff. P 5, Ex. N; Ragin Aff., Ex. 44) Ragin provided doctor's notes for many of these absences, however. (Pltf. Rule 56.1 Resp. P 113; Ragin Aff. P32)

**H.** *Ragin Accepts a Position with the Newburgh School District*

During her first semester at Fleetwood, Plaintiff began searching for a new job, and by October 2004, she had "made inquiry" about a principal position in the Newburgh School District. (Def. Rule 56.1 Stat. P 120; Pltf. Rule 56.1 Resp. P 120) At some point between Thanksgiving and November 30, 2004, Ragin learned that the Newburgh School District superintendent was going to recommend to Newburgh's Board of Education that Ragin be appointed to a principal position, the duties of which would commence in January 2005. (Def. Rule 56.1 Stat. P 122; Johnson Aff., Ex. A at 179)

On November 30, 2004, the Newburgh Board of Education officially appointed Ragin principal of the Horizons-on-Hudson elementary school. Ragin received formal written notice of this appointment in a December 1, 2004 letter from the Newburgh School District. (Def. [*13] Rule 56.1 Stat. PP 123, 125; Johnson Aff., Ex. A at 173-75, Ex. R) The appointment was for a three-year period, with salary and duties commencing on January 3, 2005. (Def. Rule 56.1 Stat. PP 123, 137; Johnson Aff., Ex. A at 176, Ex. R) By the first week of December 2004, Plaintiff had accepted the Newburgh principal position. (Def. Rule 56.1 Stat. P 126; Pltf. Rule 56.1 Resp. P 126) Ragin never disclosed to Defendant that she had accepted the Newburgh principal position ⁴ and instead -- on December 9, 2004 -- arranged for her union counsel to attempt to negotiate a settlement with Defendant in which Ragin would resign from her position at Fleetwood in exchange for a grant of tenure and $ 125,000. (Def. Rule 56.1 Stat. PP 127-29; Pltf. Rule 56.1 Resp. PP 127-29; Johnson Aff., Ex. B)

⁴  The parties have cited no evidence indicating that Defendant was even aware that Ragin had sought employment in Newburgh.

**I.** *Plaintiff's Termination*

On December 14, 2004, at least one week after Ragin had accepted the Newburgh position, Principal Simmons sent a letter to Assistant Superintendent Cruz recommending that Plaintiff's employment be terminated. (Def. Rule 56.1 Stat. P 131; Simmons Aff. P 8, Ex.

[*14] N; Cruz Aff. P 12) In explaining her recommendation, Simmons cited, *inter alia*, Plaintiff's "frequent and unannounced absences, inability to focus on work, and erratic and unprofessional behavior." (Simmons Aff. PP 5, 8; Johnson Aff., Ex. N; *see also* Def. Rule 56.1 Stat. P 132)

On December 15, 2004, Assistant Superintendent Cruz sent a letter to Superintendent Friedman concurring in Simmons' recommendation. (Def. Rule 56.1 Stat. P 133; Friedman Aff. P 9; Cruz Aff. P 12; Johnson Aff., Ex. U) Later that day, Superintendent Friedman sent a letter to Ragin informing her that he would recommend to the East Ramapo Board of Education that Plaintiff's employment with the District be terminated. (Def. Rule 56.1 Stat. P 134; Friedman Aff. P 10; Johnson Aff., Ex. S) Friedman's letter instructed Ragin to no longer report to Fleetwood, but stated that she would receive full pay and benefits through her termination date of February 18, 2005. (Johnson Aff., Ex. S)

After Ragin demanded that Superintendent Friedman explain the reasons for his recommendation, Friedman sent Ragin a letter dated December 22, 2004, listing the deficiencies in her job performance. (Def. Rule 56.1 Stat. P 135; Friedman Aff. [*15] P 11; Johnson Aff., Ex. O) Friedman's letter notes, *inter alia*, that Ragin had failed to comply with directives from her superiors, was frequently absent without explanation, had consistently arrived late to school and left early, had failed to complete a substantial amount of her assigned work, had shown consistently weak performance in the areas of "scheduling, budgets, and communications with the Central Administrative offices," and spent an excessive amount of time on her computer and cell phone attending to non-school related matters. (Friedman Aff. P 11; Johnson Aff., Ex. O; Simmons Aff. PP 5, 8; Cruz Aff. PP 10-12; *see also* Def. Rule 56.1 Stat. P 136) Friedman also noted that Plaintiff "often acted in an unprofessional manner with various staff members, demonstrating a pattern of negative interactions with them" (Friedman Aff. P 11; Johnson Aff., Ex. O; Simmons Aff. PP 5, 8; Cruz Aff. PP 10-12; *see also* Def. Rule 56.1 Stat. P 136), and that she had "show[n] an inability to compromise and accept input from others without becoming angry and defensive." (Friedman Aff. P 11; Johnson Aff., Ex. O; Simmons Aff. PP 5, 8; Cruz Aff. PP 10-12; *see also* Def. Rule 56.1 Stat. P 136)

On January [*16] 18, 2005, the District's Board of Education accepted Superintendent Friedman's recommendation and voted to terminate Ragin's employment. (Def. Rule 56.1 Stat. P 143; Friedman Aff. P 13; Johnson Aff., Ex. T) On February 18, 2005, Plaintiff's termination became official and she was removed from the District's payroll. (Def. Rule 56.1 Stat. P 144; Friedman Aff. P 13; Johnson Aff., Ex. T)

Plaintiff's appointment to the Newburgh school principal position became effective on January 3, 2005, and she began collecting a salary for this position on that date. (Def. Rule 56.1 Stat. PP 123, 137; Johnson Aff., Ex. A at 176, Ex. R) Between January 3, 2005, and February 18, 2005, Plaintiff held full-time administrative positions in both Newburgh and East Ramapo, and was receiving a salary for both positions. (Def. Rule 56.1 Stat. P 140; Johnson Aff., Ex. A at 173-75, Ex. K at 241-42)

On January 6, 2005, Plaintiff filed a charge of discrimination with the EEOC alleging sexual harassment, hostile work environment, race discrimination, retaliation, and "disability accommodation concerns." (Johnson Aff., Ex. AA; Johnson Reply Aff., Ex. EE) On March 30, 2005, the EEOC dismissed Plaintiff's complaint, finding [*17] that she had failed to state a claim. Ragin commenced the instant action on June 29, 2005. [5] (Def. Rule 56.1 Stat. PP 148-49; Johnson Aff., Ex. BB; Docket No. 2)

5   This case was reassigned to this Court on November 17, 2008. (Docket No. 40)

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).

"It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," and that "the salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less [*18] to discrimination cases than to . . . other areas of litigation." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (internal quotation omitted). As in any other case, "an employment discrimination plaintiff faced with a properly supported summary judgment motion must 'do more than simply show that there is some metaphysical doubt as to the material facts.' . . . She must come forth with evidence sufficient to allow a reasonable jury to find in her favor." Brown v. Henderson, 257 F.3d 246,

252 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

"Mere conclusory statements, conjecture or speculation" by the plaintiff will not defeat a summary judgment motion. Gross v. National Broad. Co., Inc., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); see also Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) ("Even in the discrimination context ... a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."). Instead, the plaintiff must offer "concrete particulars." Bickerstaff v. Vassar Coll., 196 F.3d 435, 451-52 (2d Cir. 1999) (disregarding plaintiff's Rule 56(e) affidavit because it [*19] lacked "concrete particulars"); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

### II. LEGAL ANALYSIS

#### A. Timeliness of Claims

Defendant argues that Ragin's claims are time-barred because she did not commence this action within 90 days of receipt of a right-to-sue letter. See Sherlock v. Montefiore Medical Ctr., 84 F.3d 522, 525 (2d Cir. 1996) ("In order to be timely, a claim under Title VII . . . must be filed within 90 days of the claimant's receipt of a right to sue letter.") (emphasis added); 42 U.S.C. § 2000e-5(f)(1).

Ragin's right-to-sue letter from the EEOC is dated March 30, 2005. (Def. Rule 56.1 Stat. P 148; Johnson Aff., Ex. BB) It may be assumed, in the absence of a challenge, that a notice provided by a government agency has been mailed on the date indicated on the notice. Sherlock, 84 F.3d at 526 (citing Baldwin County Welcome Center v. Brown, 466 U.S. 147, 148, 104 S. Ct. 1723, 80 L. Ed. 2d 196 & n.1 (1984) (per curiam)). "Normally it is assumed that a mailed document is received three days after its mailing." [*20] See id. at 525. Here, the parties do not dispute that the EEOC right-to-sue letter was mailed on March 30, 2005, and that Plaintiff received the letter three days later, on April 2, 2005. See Williams v. Salvation Army, 108 F. Supp. 2d 303, 307 (S.D.N.Y. 2000). Because the statutory clock is triggered by Ragin's receipt of the EEOC letter on April 2, 2005, she had until July 1, 2005, to commence this action.

Although this action was not officially commenced until July 18, 2005 -- after the ninety-day period had expired (Docket No. 2) -- Plaintiff filed her complaint with this Court's Pro Se office on June 29, 2005. [6] (Sussman Aff. Ex. 8) At that time, Plaintiff also filed an

*in forma pauperis* application with the Court, which was eventually granted. (Docket No. 1)

> 6  Plaintiff filed this action *pro se* but later retained counsel. (Docket No. 16)

In *Toliver v. County of Sullivan, 841 F.2d 41, 42 (2d Cir. 1988) (per curiam)*, the Second Circuit held that "[a]t least when in forma pauperis relief is granted, the action should be treated as timely, provided the complaint was received by the clerk's office prior to the expiration of the limitations period." Defendant argues, however, that this [*21] equitable tolling rule should not apply here, because Ragin's *in forma pauperis* application is fraudulent, in that she affirmed under penalty of perjury (and dismissal of her case) that her income was only $ 4,600 per month when in fact she was earning $ 8,151 per month. (Def. Reply Br. at 4-5; *see* Johnson Aff., Ex. A at 173-74, Ex. R; Johnson Reply Aff., Ex. DD) Defendant further argues that Ragin is a highly experienced litigant, having sued four separate employers, including Defendant, for alleged discrimination and/or sexual harassment. (Def. Reply Br. at 5; *see* Def. Rule 56.1 Stat. PP 3-4, 154-56)

While Defendant's allegations are disturbing, they do not provide a basis for this Court to find that Plaintiff's claims are time-barred. As an initial matter, Defendant improperly raised this argument for the first time in its reply brief. *See, e.g., Playboy Enters., Inc. v. Dumas, 960 F. Supp. 710, 720 n.7 (S.D.N.Y.1997)* ("Arguments made for the first time in a reply brief need not be considered by a court."). Moreover, "[i]n the wake of *Toliver*, district courts are ruling that all complaints filed by pro se litigants are filed at the time of receipt by the Pro Se Office, regardless [*22] of whether they are accompanied by an *in forma pauperis* application." *Smith v. Henderson, 137 F. Supp. 2d 313, 317 (S.D.N.Y. 2001)* (citing *Judge v. New York City Transit Auth., No. 99 Civ. 0927 (JGK), 1999 U.S. Dist. LEXIS 20031, 1999 WL 1267462, at *1 (S.D.N.Y. Dec. 29, 1999); Johnson v. National Football League, No. 99 Civ. 8582 (DC), 1999 U.S. Dist. LEXIS 15983, 1999 WL 892938, at *2 (S.D.N.Y. Oct. 18, 1999); Shabazz-Allah v. Guard Mgmt. Serv., No. 97 Civ. 8194 (LBS), 1999 U.S. Dist. LEXIS 2582, 1999 WL 123641, at *1 n.1 (S.D.N.Y. Mar. 8, 1999)).*

Because Plaintiff commenced this action as a matter of law on June 29, 2005, when she filed her complaint with the Pro Se Office, this action was initiated within the requisite ninety-day period after receipt of the EEOC's right-to-sue letter. Accordingly, Plaintiff's claims are timely.

**B. *Title VII Race Discrimination Claim***

The framework for analyzing Title VII cases is well established:

> [Under] the familiar "burden-shifting" framework set forth for Title VII cases by the Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)* and *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981),* . . . the plaintiff bears the initial burden of establishing [*23] a prima facie case of discrimination. If the plaintiff does so, the burden shifts to the defendant to articulate "some legitimate, non-discriminatory reason" for its action. If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of . . . discrimination. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

*Holcomb, 521 F.3d at 138 (quoting Burdine, 450 U.S. at 253).*

To establish a *prima facie* case of race discrimination, Plaintiff must show: "(1) that she belonged to a protected class; (2) that she was qualified for the position she held; (3) that she suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb, 521 F.3d at 138.* Here, Defendant asserts that Ragin cannot establish the third and fourth elements of a *prima facie* case, and that even if she could, the School District has [*24] articulated legitimate, non-discriminatory reasons for its actions, which Plaintiff has not rebutted. (Def. Br. 11)

Plaintiff's burden in establishing a *prima facie* case "'is not onerous'" -- indeed, it is "de minimis," *Beyer, 524 F.3d at 163* -- and is satisfied by "'evidence that raises a reasonable inference that the action taken by an employer was based on an impermissible factor.'" *Holcomb, 521 F.3d at 138 (quoting Burdine, 450 U.S. at 253).* While a low standard applies to the *prima facie* case determination, "a plaintiff's case must fail if [she] cannot carry this preliminary burden." *Beyer, 524 F.3d at 163.*

Here, Plaintiff's claim that she suffered an adverse employment action rests solely on her termination. [7] De-

fendant argues that because Ragin had already accepted alternate employment when she was told that the Superintendent would be recommending her termination, she cannot be found to have suffered an adverse employment action. Defendant further argues that even if Plaintiff's termination could constitute an adverse employment action, it did not occur under circumstances giving rise to an inference of discriminatory intent. Each argument is considered separately below.

7    In her [*25] opposition brief, Plaintiff withdraws any claim that she was denied a promotion because of her race. (Pltf. Br. 30 n.5)

### 1. Adverse Employment Action

Defendant argues that it is entitled to summary judgment on Plaintiff's race discrimination claim because, at the time Plaintiff was suspended and notified of her impending termination, she had already accepted new employment as principal of the Horizons-on-Hudson Elementary School in Newburgh. (Def. Br. 9-10) Accordingly, Defendant asserts that Plaintiff cannot be said to have suffered an adverse employment action and therefore cannot state a *prima facie* case of race discrimination under the *McDonnell-Douglas* framework. (*Id.*) Neither party cites a case involving similar circumstances, and this Court has found no case directly on point.

As discussed above, it is undisputed that Plaintiff was appointed by Newburgh's board of education to fill a full-time principal position on December 1, 2004, and that she had accepted that position by the first week of December, before Defendant had taken any adverse employment action against her. (Johnson Aff., Ex. R, Ex. K at 241, Ex. A at 174-75) Ragin did not disclose to Defendant that she had accepted [*26] the Newburgh principal position and would have to resign from her East Ramapo job, however, because she was, at the same time, attempting to persuade Defendant to pay her to resign from a position that she had already effectively abandoned. Accordingly, on December 9, 2004, Ragin arranged for her union counsel to send a proposed settlement agreement to Defendant, pursuant to which Ragin would resign in exchange for, *inter alia*, a grant of tenure and $ 125,000. (Def. Rule 56.1 Stat. PP 127-29; Pltf. Rule 56.1 Resp. PP 127-29; Johnson Aff., Ex. B) Superintendant Friedman instead chose to recommend her termination on December 15, 2004 (Johnson Aff., Ex. S; Def. Rule 56.1 Stat. P 134), and the East Ramapo Board of Education voted to terminate Plaintiff's employment on January 18, 2005, with an effective date of February 18, 2005. (Johnson Aff., Ex. T)

In the context of a race discrimination claim, for conduct to constitute "an adverse employment action" it must cause a "materially adverse change in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)*. This nation's discrimination laws speak of "material adversity" because "it is [*27] important to separate significant from trivial harm." *Burlington Northern & Sante Fe R.R. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)*. Here, Ragin did not suffer any materially adverse change in the terms and conditions of her East Ramapo employment, because -- by accepting the fulltime principal position in Newburgh -- she had already effectively abandoned her East Ramapo assistant principal job. *Cf. Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997)* ("Title VII . . . protects individuals from actions injurious to *current* employment or the ability to *secure future* employment"; holding "that the loss of an office and phone by an employee who has already been informed of a termination decision, and is waiting out his numbered days on the payroll . . . does not . . . amount to adverse employment action") (emphasis in original).

While Plaintiff argues that Defendant "has not shown that plaintiff would have left the District and commenced employment in Newburgh absent the adverse action which commenced with her December 14, 2004 suspension" (Pltf. Br. 11), this argument is misplaced. Ragin has not alleged in either her brief or her Rule 56.1 Statement that she intended to stay at [*28] East Ramapo. Indeed, all of the evidence is to the contrary. Ragin made her choice during the first week of December when she accepted the Newburgh position. (Johnson Aff., Ex. R, Ex. K at 241, Ex. A at 174-75) She chose not to disclose that choice as part of a campaign to extract a settlement from the School District, but Ragin's scheme does not change the fact that she had chosen to accept the Newburgh position and therefore surrender the East Ramapo position before Defendant took any adverse employment action against her.

In accepting the Newburgh position before Defendant had taken any adverse employment action against her, Ragin effectively voluntarily resigned from her East Ramapo job. In this Circuit, in the race discrimination context, once an employee has voluntarily resigned or informed their employer of their intention to resign, the employee cannot suffer an adverse employment action. *See, e.g., Memnon v. Clifford Chance US, LLP, No. 08 Civ. 2874 (HB), 667 F. Supp. 2d 334, 2009 U.S. Dist. LEXIS 99936, at *16-18 (S.D.N.Y. Oct. 27, 2009)* (concluding that there had been no adverse employment action because all adverse acts took place after plaintiff had executed a settlement agreement that provided [*29] for her resignation); *Regis v. Metropolitan Jewish Geriatric Ctr., No. 97 Civ. 0906 (ILG), 2000 U.S. Dist. LEXIS 2215, at *20-21 (E.D.N.Y. Jan. 11, 2000)* (finding that

plaintiff had failed to make out a *prima facie* case of retaliation where the adverse actions took place after she tendered her notice of resignation); *see also Evans v. Davie Truckers, Inc.*, 769 F.2d 1012, 1014 (4th Cir. 1985) (because the "evidence clearly established that [the employee] voluntarily resigned his employment with the defendant, [he] suffered no adverse employment action at the hand of the defendant" (internal quotation marks omitted)).

In *Memnon v. Clifford Chance US, LLP*, the plaintiff was a law firm associate who asserted race discrimination and retaliation claims. *See Memnon*, 667 F. Supp. 2d 334, 2009 U.S. Dist. LEXIS 99936, at *2-3. After complaining about the firm's allegedly discriminatory practices, the plaintiff resigned pursuant to a settlement agreement. *Id.* The plaintiff later sued the firm for employment discrimination, however, claiming that it had refused to provide a recommendation letter and gave negative references to prospective employers. *See id.* The district court ruled that the plaintiff could not establish [*30] a *prima facie* case: "there has been no adverse employment action taken against her because all of the conduct that gives rise to her allegations against Clifford Chance occurred after she resigned pursuant to the Settlement Agreement." *Id. at *16-17.*

Similarly, in *Regis v. Metropolitan Jewish Geriatric Ctr.*, the court concluded that the plaintiff had failed to establish a *prima facie* case of retaliation where she had tendered her notice of resignation before the asserted adverse employment action took place. *Regis*, 2000 U.S. Dist. LEXIS 2215, at *20-21. In *Regis*, the plaintiff -- a nurse -- resigned on July 18, 1994, with her resignation effective on August 26, 1994. *Id. at *13.* On July 25, 1994, the plaintiff accepted employment with another agency. After an altercation between the plaintiff and another of the defendant's employees on July 25, 1994 about whether Regis would complete certain work before she left, the employer decided that Regis' employment would be terminated immediately and that she would not work through August 26. Regis argued that she suffered an adverse employment action when the employer moved up her resignation date. *Id. at *20.* The court disagreed. In deciding [*31] that the plaintiff had suffered no adverse employment action, the court placed particular emphasis on the fact that the employee had already accepted new employment. *Id. at *20* ("At that time, [plaintiff] already had one job in hand . . . [and] was offered a second new job."). [8] Similarly, by the time Ragin was informed of the Superintendent's decision to recommend her termination, she not only had been offered new employment, she had accepted it. (Def. Rule 56.1 Stat. P 126; Johnson Aff., Ex. K at 241)

[8]   The *Regis* decision was issued before *White, 548 U.S. at 67*, in which the Supreme Court held that "Title VII's substantive provision and its antiretaliation provision are not coterminous," and that the scope of the anti-retaliation provision extends beyond workplace-related or employment-related acts and harm. The logic of *Regis* is directly applicable to Ragin's race discrimination claim, however, where the more restrictive test for "adverse employment action" applies.

By accepting the fulltime Newburgh position, Ragin voluntarily gave up her East Ramapo position, although she chose not to disclose this to Defendant for strategic reasons. [9] Having taken steps that required her to resign [*32] from her East Ramapo position before Defendant took any adverse employment action against her, Ragin cannot be said to have suffered a "materially adverse change in the terms and conditions of employment" when Defendant announced that she would be terminated. *Galabya, 202 F.3d at 640.* Accordingly, Defendant is entitled to summary judgment on Ragin's race discrimination claim.

[9]   Whether the employer is aware that the employee has accepted another position that requires him or her to resign is beside the point, because the analysis turns on whether the employee has suffered a "materially adverse change in the terms and conditions of employment," *Galabya, 202 F.3d at 640*, and not on the employer's knowledge.

### 2. *Inference of Discriminatory Intent*

Even if this Court could find that Ragin suffered an adverse employment action, she has failed to offer evidence that could allow a reasonable jury to find that her termination occurred under circumstances giving rise to an inference of discrimination. "[D]rawing all inferences in Plaintiff's favor," Ragin has not met the "low threshold" and minimal showing necessary to make out the fourth element of a *prima facie* case. *Holcomb, 521 F.3d at 139* (citing [*33] *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)*).

"It is well-settled that an inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to . . . the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Leibowitz v. Cornell University, 584 F.3d 487, 502 (2d Cir. 2009)*. Here, the only evidence in the record that could possibly

show racially discriminatory animus involves Kaplicer's alleged actions and comments.

Plaintiff alleges that Kaplicer yelled at her for inviting an NAACP official to address students at Lime Kiln (Ragin Aff. P 143), and that after he was passed over for a promotion to superintendent, Kaplicer told her that the District favored minorities. (Pltf. Rule 56.1 Resp. P 20; Ragin Aff. P 8) Plaintiff also claims that Kaplicer "had distanced himself" from the planning of an event celebrating Motown and "had offered weak support for it." (Pltf. Rule 56.1 Resp. P 28)

Assuming *arguendo* [*34] the truth of these assertions, they provide no basis for denying summary judgment. The critical question here is whether those involved in the decision to terminate Ragin's employment -- Principal Simmons, Assistant Superintendent Cruz, and Superintendant Friedman -- acted with discriminatory animus. Kaplicer's comments are not probative on that point. Kaplicer retired in June 2004, more than five months before the District decided to terminate Plaintiff, and Ragin has offered no evidence suggesting that the retired principal in any way influenced Simmons, Cruz, or Friedman when they made their decisions that Plaintiff's employment should be terminated. In sum, no jury could rationally infer from Kaplicer's alleged statements that Simmons, Cruz, or Friedman acted with discriminatory intent, and Kaplicer's alleged discriminatory animus cannot be imputed to them. *See Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 115-16 (2d Cir. 2007)* (stating that "all comments pertaining to a protected class are not equally probative of discrimination," and explaining that "[t]he relevance of discrimination-related remarks . . . depend[s] . . . on their tendency to show that the *decision-maker* [*35] was motivated by assumptions or attitudes relating to the protected class" (emphasis added)); *see also McLee v. Chrysler Corp., 109 F.3d 130, 137 (2d Cir. 1997)* (evidence of racial bias on part of employee who did not make decision to fire plaintiff and was not consulted about decision "provide[s] no basis for imputing to . . . [the decision-maker] an invidious motivation for discharge").

As to the individuals responsible for recommending Plaintiff's termination -- Simmons, Cruz, and Friedman -- no jury could rationally infer that they acted with discriminatory intent.

Cruz and Simmons -- who was Ragin's direct supervisor and whose complaints and poor reviews formed the basis for Ragin's termination -- are both African-American women. [10] (Def. Rule 56.1 Stat. P 105; Simmons Aff P 1; Cruz Aff. P 3) The fact that two of the three alleged decision-makers -- including Ragin's direct supervisor -- are African-American undermines any inference of discriminatory animus. *See Eder v. City of*

New York, No. 06 Civ. 13013 (RWS), 2009 U.S. Dist. LEXIS 11501, at *23 (S.D.N.Y. Feb. 12, 2009)* (Plaintiff and his "immediate supervisor [--] who assessed Plaintiff's performance and determined that it was [*36] lacking [--] are members of the same protected class. . . . Thus, any inference of discrimination, without additional evidence, is not warranted."); *Tucker v. New York City, No. 05 Civ. 2804 (GEL), 2008 U.S. Dist. LEXIS 76900, at *17 (S.D.N.Y. Sept. 30, 2008)* ("[A]ny inference of race discrimination is further undermined by the fact that all three superintendents under whom [plaintiff] worked as well as three of his four direct supervisors at the DOE were also African-American." (citing *Fosen v. New York Times, No. 03 Civ. 3785 (KMK) (THK), 2006 U.S. Dist. LEXIS 75662, *5 (S.D.N.Y. Oct. 11, 2006)* (noting that any inference of discrimination is undermined by the fact that the decision-makers belonged to the same protected class as the plaintiff))); *see also Marlow v. Office of Court Admin., 820 F. Supp. 753, 757 (S.D.N.Y. 1993), aff'd, 22 F.3d 1091 (2d Cir. 1994)* (relying in part on inference against discrimination where person who participated in the allegedly adverse decision is also a member of the same protected class); *Toliver v. Cmty. Action Comm'n, 613 F. Supp. 1070, 1074 (S.D.N.Y. 1985), aff'd, 800 F.2d 1128 (2d Cir. 1986)* (where decision-maker is in the same protected class [*37] as plaintiff, claims of discrimination are less plausible).

10   In her Rule 56.1 Statement (Pltf. Rule 56.1 Resp. P 158), Plaintiff denies -- without any explanation or supporting citations -- that Cruz is African-American. This is not sufficient to put this fact into dispute. "[D]istrict courts in the Southern and Eastern Districts of New York have interpreted current *Local Rule 56.1* to provide that where there are no[] citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion." *Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001)*. Cruz attests in her affidavit (Cruz Aff. P 3) that she is of African-American and Hispanic descent, and given that Plaintiff has not presented any evidence to the contrary, the Court accepts her representation as true.

As for Superintendant Friedman, although he is a white male, Plaintiff has offered no evidence that he acted with discriminatory intent. Friedman recommended to the Board of Education that Ragin be appointed to the assistant principal position in 2002. (Friedman Aff. P 3) "[W]here the person who made the decision to fire was the same person who made [*38] the decision to hire, it is difficult to impute to [that person] an invidious motivation that would be inconsistent with the decision to hire." *Schnabel v. Abramson, 232 F.3d 83, 91 (2d Cir.*

*2000)*. Where, as here, a relatively short period of time elapsed between the hiring and firing decision, the same actor inference is a "highly relevant" factor in this Court's inquiry. *See Schnabel, 232 F.3d at 91* (finding the "same actor" inference "highly relevant" and affirming a grant of summary judgment where there was a three-year gap between hiring and firing).

In sum, Plaintiff has not offered any evidence raising an inference of discriminatory intent on the part of those who made the decision to terminate her employment. Accordingly, she has not established the fourth element of a *prima facie* case, and Defendant is entitled to summary judgment on her race discrimination claim. [11]

> 11 Even if Ragin had established a *prima facie* case, Defendant would still be entitled to summary judgment, because it has offered legitimate, non-discriminatory reasons for terminating Plaintiff's employment: Plaintiff was often absent or arrived late to work; was not present during critical time periods such as [*39] lunchtime; refused to sign a memorandum setting out her job responsibilities; had "often acted in an unprofessional manner with various staff members, demonstrating a pattern of negative interactions with them"; failed to complete a substantial amount of her assigned work, including her teacher evaluations; and showed consistently weak performance in the areas of "scheduling, budgets, and communications with the Central Administrative offices." (Friedman Aff. P 11, Ex. O; Simmons Aff. PP 5, 8; Cruz Aff. PP 10-12)

To defeat summary judgment, Plaintiff must "raise[] sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision to fire [her] was based, at least in part, on the fact" that she is African-American. *Holcomb, 521 F.3d at 141.* Plaintiff attempts to meet this burden by showing that Defendant's "stated reason[s] for the adverse employment action [are] . . . pretextual." *Holcomb, 521 F.3d at 141* (explaining that "in many cases, a showing of pretext, when combined with a prima facie case of discrimination, will be enough to permit a rational finder of fact to decide that the decision was motivated by an improper motive"). However, [*40] "[i]n a discrimination case . . . [courts] are decidedly not interested in the truth of the allegations against plaintiff . . . and [instead] are interested in what motivated the employer. . . ." *McPherson v. New York City Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006)* (internal quotation omitted)). Thus, the question is not whether the District gave fair rea-

sons for terminating Plaintiff, but rather whether the District had a good faith belief that Plaintiff's conduct warranted termination.

Here, Plaintiff argues that Defendant's reasons are pretextual because certain of the reasons given are not requirements of her job, such as signing the expectations memo and being present during the school's lunch period. (Pltf. Br. 12, 14) However, "[a]bsent a showing by the plaintiff that the employer's demands were made in bad faith, an employer who is sued on allegations of . . . discrimination is not compelled to submit the reasonableness of its employment criteria to the assessment of either judge or jury." *Thornley v. Penton Publ'g, Inc., 104 F.3d 26, 29 (2d Cir. 1997))* (internal quotation omitted), Ragin also asserts that her classroom observations were not completed in a timely manner [*41] because she was unable to type due to a medical condition. The excuses that Plaintiff offers for her performance deficiencies and lack of cooperation, however, do not demonstrate that Defendant's reasons are pretextual.

At other points, Ragin simply disagrees with Defendant's characterizations of her attitude and assessments of her contribution. (Pltf. Br. 5; Pltf. Rule 56.1 Resp. P 132) However, "[t]he mere fact that an employee disagrees with her employer's assessments of her work . . . cannot standing on its own show that her employer's asserted reason for termination was pretextual." *Ricks v. Conde Nast Publ'ns, Inc., 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000).* "Indeed, an employer may terminate an employee for a good reason, bad reason, or no reason at all, provided such reason is not discriminatory." *Gobin v. N.Y. City Health & Hosp. Corp., No. 04 Civ. 3207 (WHP), 2006 U.S. Dist. LEXIS 48952 (S.D.N.Y. July 19, 2006)* (citing *Malatesta v. Credit Lyonnais, No. 03 Civ. 3690 (MBM), 2004 U.S. Dist. LEXIS 8845, at *7 (S.D.N.Y. Nov. 21, 2005))*; see also *Slatky v. Healthfirst, Inc., No. 02 Civ. 5182 (JGK), 2003 U.S. Dist. LEXIS 20608, at *5 (S.D.N.Y. Nov. 17, 2003).* In addition, to the extent [*42] that Plaintiff relies on the contrast between her earlier favorable performance reviews and Friedman's ultimate criticism of her work, "prior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual. To hold otherwise would be to hold that things never change, a proposition clearly without basis in reality." *Shabat v. Blue Cross Blue Shield of Rochester Area, 925 F.Supp. 977, 988 (W.D.N.Y. 1996)).*

Based on the record before this Court, Plaintiff has failed to present evidence "sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or part on discrimination." *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997).

### C. *Title VII Retaliation Claim*

Courts evaluate Title VII retaliation claims using a three-step burden-shifting analysis:

First, the plaintiff must establish a prima facie case. That is, an employee must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *McMenemy v. City of Rochester*, 241 F.3d 279, 282-83 (2d Cir. 2001). [*43] The burden of proof that must be met to permit a Title VII plaintiff to survive a summary judgment motion at the prima facie stage has been characterized as "'minimal' and 'de minimis.'" *Woodman v. WWOR-TV*, 411 F.3d 69, 76 (2d Cir. 2005) (quoting *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001)). In determining whether this initial burden is satisfied in a Title VII retaliation claim, the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987).

If a plaintiff sustains the initial burden, a presumption of retaliation arises. In turn, under the second step of the burden-shifting analysis, the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998). Finally, as for the third step, once an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial [*44] reason for the adverse employment action.

*Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

A plaintiff may show retaliatory intent with direct evidence "of retaliatory animus directed against the plaintiff" or with circumstantial evidence, including evidence that "the protected activity was followed closely by discriminatory treatment" or evidence of "disparate treatment of fellow employees who engaged in similar conduct." *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001) (internal quotation omitted) (describing how a plaintiff may meet her burden at the third stage); *see also McNair v. New York City Health & Hosp. Co.*, 160 F. Supp. 2d 601, 604 (S.D.N.Y. 2001) (listing same types of evidence as sufficient to establish fourth element of prima facie case). Moreover, at the third stage, "[u]nder some circumstances, retaliatory intent may also be shown, in conjunction with the plaintiff's prima facie case, by sufficient proof to rebut the employer's proffered reason for the [adverse employment action]." *Raniola, 243 F.3d at 625*.

Defendant argues that Ragin cannot establish a *prima facie* case of retaliation because there is no basis to infer a causal connection between [*45] the alleged adverse employment actions and her protected activity. (Def. Br. 13) For the reasons explained below, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

#### 1. *Protected Activity*

In considering whether Plaintiff has established a *prima facie* case of retaliation, this Court must first decide whether Plaintiff engaged in protected activity that was known to the District. Defendant does not dispute that Plaintiff engaged in protected activity when she submitted a written complaint to Mary Sculnick, the District's Director of Personnel and Title IX coordinator, on June 25, 2004, alleging sexual harassment. (Def. Br. 14)

Defendant argues, however, that Ragin's verbal complaints to Kaplicer about Manion in November 2003 and January 2004 were not protected activity because "Kaplicer did not consider Plaintiff's remark about Manion as a sexual harassment complaint," nor should Kaplicer have understood the remarks in that manner under the circumstances. (Def. Reply Br. 9)

To find that a plaintiff engaged in protected activity and that the employer knew about that activity, a court must find that "the employer . . . understood, or could reasonably have understood, [*46] that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). Drawing all rational inferences in Plaintiff's favor, this Court concludes that a

rational jury could find that Plaintiff's verbal complaints about Manion constituted protected activity under Title VII.

In the Amended Complaint, Ragin asserts that on two occasions Manion "improperly touched Plaintiff in a sexual manner in a supply closet," and that she reported this sexual harassment to Kaplicer. (Am. Cmplt. PP 9-10) During his deposition, Kaplicer testified that Ragin had come to him in November 2003 and stated, "I don't know what happened, but you need to speak to Manion. I was in the closet with him and I think he might have touched me." Kaplicer judged Ragin's affect as "confused, perhaps hurt, and upset, to some degree." (Sussman Aff., Ex. 2 at 45)

This sort of verbal complaint directly relating to unwanted physical conduct has been deemed to constitute "protected activity" under Title VII. *See Lupacchino v. ADP, Inc., No. 02 Civ. 2281 (MRK), 2005 U.S. Dist. LEXIS 1687, at *8-9 (D. Conn. Jan. 21, 2005)* (determining that **[*47]** "[t]here can be no serious dispute that [plaintiff] engaged in protected activity that was known to [defendant] when she complained verbally to the HR department" regarding another employee who had "purposely brushed her chest"). While Defendant now asserts that Kaplicer did not understand that "the alleged behavior was gender-based" (Def. Reply Br. 9), Kaplicer admits that he confronted Manion and told him that "'Ms. Ragin said that you touched her.'" Kaplicer advised Manion to "be more careful." (Sussman Aff., Ex. 2 at 47; Pltf. Rule 56.1 Resp. PP 42-45; Sussman Aff., Ex. 1 at 9-11, 15; Johnson Aff., Ex. Q at 8) Kaplicer had also received at least one other complaint about Manion from a female employee. (Johnson Aff., Ex. Q at 5-8) Under all the circumstances, Kaplicer "could reasonably have understood that plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri-Ambrosini, 136 F.3d at 292.*

The Court concludes that Plaintiff engaged in protected activity on five occasions prior to her termination: (1) her verbal complaint to Kaplicer about Manion in November 2003; (2) her verbal complaint to Kaplicer about Manion in January 2004; (3) her verbal complaint **[*48]** to Schwartz and Sculnick about Manion in May 2004 (Sculnick Aff. P 5; Schwartz Aff. P 5); (4) her written complaint to Kaplicer about Manion in June 2004 (Johnson Ex. H); and (5) her formal written complaint to Sculnick on June 25, 2004, concerning the pornographic images and Kaplicer's alleged failure to follow up on her complaints about Manion. (Johnson Aff., Ex. J)

### 2. Adverse Employment Action

To establish a *prima facie* case of retaliation, Plaintiff must also show that she suffered an adverse employment action. In the context of a retaliation claim, an adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe R.R. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)* (internal quotations omitted). "[P]etty slights, minor annoyances, and simple lack of good manners" will not normally constitute adverse employment actions for purposes of a retaliation claim. *Id.* A plaintiff must show "*material* adversity," because "it is important to separate significant from trivial harms." *Id.* (emphasis in original). "[A]lleged adverse employment action must be viewed from the perspective of the reasonable employee, **[*49]** 'because [Title VII's] standard for judging harm must be objective' to avoid 'the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings.'" *Pacheco v. N.Y. Presbyterian Hosp., 593 F. Supp. 2d 599, 627 (S.D.N.Y. 2009)* (quoting *id. at 68-69*).

Although Plaintiff's termination constitutes the only asserted adverse employment action underlying her race discrimination claim (Pltf. Br. 11-15), Plaintiff's retaliation claim is based on a much wider array of alleged conduct by Defendant. In the retaliation context, a plaintiff can establish an "adverse employment action" by proof

> that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Alywahby v. Shinseki, No. 01 Civ. 6512 (NGG), 2009 U.S. Dist. LEXIS 120668, at *10-11 (E.D.N.Y. Dec. 24, 2009)* (quoting *White, 548 U.S. at 68* (internal quotation marks omitted)) ; *see also Gentile v. Potter, 509 F. Supp. 2d 221, 238-39 (E.D.N.Y. 2007)* (noting that adverse employment actions in the context of a retaliation claim cover **[*50]** a broader range of conduct than in the discrimination context); *Paulose v. N.Y. City Dep't of Educ., No. 05 Civ. 9353 (DLC), 2007 U.S. Dist. LEXIS 34146, at *35 (S.D.N.Y. May 10, 2007)* ("[An] adverse employment action in the context of a retaliation claim is not limited to actions that effect the terms and conditions of employment . . . [because] on a retaliation claim, the plaintiff must show that the action 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'") (quoting *Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 207 (2d Cir. 2006)*).

Plaintiff appears to contend that the following constitute adverse employment actions for purposes of her retaliation claim:

> (1) Kaplicer's January 2004 evaluation;

> (2) Kaplicer's June 2004 evaluation;

> (3) Kaplicer's failure to commence a sexual harassment investigation after her complaints about Manion;

> (4) the District's failure to investigate Plaintiff's complaints of sexual harassment after she had verbally informed Schwartz and Sculnick of the Manion incidents;

> (5) Kaplicer's withdrawing of support for the Motown production;

> (6) Kaplicer publicly upbraiding Plaintiff;

> (7) Kaplicer yelling  [*51] at Plaintiff when an NAACP official came to visit Lime Kiln;

> (8) Failing to provide Plaintiff with necessary accommodation when she lost the use of her hands and could not type her teacher evaluations;

> (9) Kaplicer's assigning Plaintiff to investigate the pornographic images that had been downloaded on the school's computers;

> (10) the District's decision not to promote Plaintiff to any of the vacant principal positions which she had applied for;

> (11) the decision to transfer Plaintiff from Lime Kiln to Fleetwood Elementary; and

> (12) Plaintiff's suspension and Superintendent Friedman's recommendation that she be terminated on December 15, 2004.

(See Pltf. Br. 15-25)

### a. *Kaplicer 's Negative Evaluations*

Plaintiff asserts that Kaplicer's June 2004 evaluation, rating her work as "unsatisfactory," and his January 2004 evaluation -- which rated her as satisfactory but contained criticism -- constitute adverse employment actions.

In the retaliation context, it is clear from *post-White* decisions in this Circuit that a negative or critical evaluation will not constitute an adverse employment action unless the evaluation is accompanied by other adverse consequences. *See Martinez-Santiago v. Zurich N. Am. Ins. Co., No. 07 Civ. 8676 (RJH), 2010 U.S. Dist. LEXIS 4246, at *37-38 (S.D.N.Y. Jan. 15, 2010)*  [*52] ("A reasonable employee would not be dissuaded from filing a discrimination complaint merely because her supervisor gave her constructive employment-based criticism."); *Pacheco, 593 F. Supp. 2d at 629* ("Plaintiff's supervisor's unfavorable comparison of his work to that of a more senior employee is not actionable as retaliation because Plaintiff provides the Court with no reason to believe that the criticism . . . had any tangible job consequences."); *Carmellino v. District 20 of New York City Dep't of Educ., No. 03 Civ. 5942 (PKC), 2006 U.S. Dist. LEXIS 63705, at *95 (S.D.N.Y. Sept. 6, 2006)* (holding that negative evaluations were not actionable, especially when they did not result in "any negative consequences").

Here, Plaintiff has presented no evidence that she suffered any direct adverse consequences from Kaplicer's January 2004 and June 2004 evaluations. Plaintiff, however, has argued in conclusory fashion that Kaplicer's evaluations "created a foundation for the adverse actions which followed," including the failure to promote her and the termination decision. (Pltf. Br. 18)

As to the termination decision, it is clear that the core of the District's complaints about Ragin's performance  [*53] related to her activities at Fleetwood while she was under the supervision of Principal Simmons. In the letter Superintendent Friedman provided to Plaintiff at the time of her termination, he discussed a number of tasks that Simmons had assigned and that Ragin had "either not done or done poorly," and then listed the following additional deficiencies in her attitude and performance while at Fleetwood:

> (1) Ragin's failure to integrate technology into the curriculum at Fleetwood;

> (2) Ragin's failure to collect access forms for the Internet at Fleetwood;

> (3) Ragin's refusal to comply with repeated directives from Simmons to sign the welcome letter listing Ragin's tentative assignments;

> (4) Ragin's refusal to comply with Simmons' directive that she prepare a mock schedule for Simmons' review;

(5) Ragin's tendency to remain in her own office and failure to participate in Fleetwood's day-to-day operations;

(6) Ragin's failure to comply with a directive to take over the Fleetwood initiative to address students who are consistently late or absent;

(7) Ragin's failure to conduct a "morning walk-through" each day at Fleetwood in order to ensure that teachers were beginning the instructional day in [*54] a timely fashion;

(8) Ragin's unavailability during the lunch hour at Fleetwood to provide supervision;

(9) Ragin's failure to develop a list of students in need of tutorial services or organize tutorial services for students at Fleetwood;

(10) Ragin's unprofessional manner with Simmons and the fact that she had "rais[ed] her voice to speak to her";

(11) Ragin's tendency to spend the majority of her time on her computer or cell phone tending to non-school related matters while at Fleetwood;

(12) Ragin's poor attendance at Fleetwood and failure to inform the school of her absences at all, or calling in late in the day;

(13) Ragin's failure to provide a doctor's note for some of her absences;

(14) Ragin's failure to return Dr. Cruz's telephone calls during her time at Fleetwood;

(15) Ragin's belligerent tone with clerical staff; and

(16) Ragin's lack of "a clear vision of how programs and schedules function together within the Fleetwood School."

(Johnson Aff., Ex. O) Plaintiff has offered no contrary evidence.

Similarly, as to the promotion decision, Plaintiff has offered no evidence indicating that Kaplicer's January 2004 evaluation -- which rated her as "satisfactory" and included only minor [*55] criticisms -- was relied upon during the promotion process. [12] Plaintiff's conclusory

suggestion to the contrary is insufficient to create a material issue of fact. *See Jackson v. City Univ. of N.Y., No. 05 Civ. 8712 (JSR), 2006 U.S. Dist. LEXIS 43338, at *3 (S.D.N.Y. June 26, 2006)* ("As to the negative employment evaluations plaintiff received, there is no evidence in the record that any negative consequences resulted from those evaluations, nor did plaintiff produce any evidence as to the more general significance of these evaluations in the context of plaintiff's place of employment. Accordingly, there is no basis to conclude that the negative evaluations were materially adverse to the plaintiff.").

> 12  Kaplicer's June 2004 evaluation could not have influenced Ragin's promotion application, because she was notified that she would not be promoted on May 21, 2004. (Def. *Rule 56*.1 Stat. P 51)

Accordingly, Kaplicer's January 2004 and June 2004 evaluations do not constitute adverse employment actions for purposes of Plaintiff's retaliation claim.

**b. *Failure to Commence Sexual Harassment Investigation***

Ragin claims that Kaplicer, Sculnick, and Schwartz's failures to initiate a sexual harassment [*56] investigation after her verbal complaints about Manion constitute adverse employment actions. (Pltf. Br. 17-18) The law is clear, however, that such a failure to investigate does not, in and of itself, constitute an adverse employment action in the retaliation context. As the court explained in *O'Dell v. Trans World Entm't Corp.*, "an alleged deficiency in an employer's internal complaint procedure or internal investigation of a sexual harassment complaint -- even if the deficiency is little more than an attempt to strengthen an employer's defense -- is not a retaliatory adverse employment action." *153 F. Supp. 2d 378, 395-97 (S.D.N.Y. 2001); see also Pilgrim v. McGraw-Hill Companies, Inc., 599 F. Supp. 2d 462, 478 (S.D.N.Y. 2009)* (finding that failure to investigate complaints of discrimination did not constitute retaliation) (citing *Thomlison v. Sharp Elecs. Corp., No. 99 Civ. 9539 (CM), 2000 U.S. Dist. LEXIS 18979, 2000 WL 1909774, at *4 (S.D.N.Y. Dec. 22, 2000)* (noting that a failure to investigate is not retaliatory)).

Application of the *White* standard -- which requires that "the challenged action . . . well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *548 U.S. at 68* [*57] -- underscores the flaw in Plaintiff's argument. The failure to investigate clearly did not dissuade Plaintiff from pursuing her sexual harassment claim. For example, Kaplicer's failure to investigate did not dissuade Ragin from making oral complaints to Sculnick and Schwartz, and their

failure to investigate did not dissuade Ragin from ulti-mately filing a written complaint.

Ragin has also not shown any "material adversity" flowing from the alleged initial failures to investigate. The District eventually conducted a full investigation of Plaintiff's claims and issued a written report concerning them.

### c. *Withdrawing Support for Motown Production, Publicly Upbraiding Plaintiff, Yelling at Plaintiff After NAACP Visit*

Kaplicer's alleged withdrawal of support for the Motown production that Plaintiff was involved in organizing does not rise to the requisite level of material adversity required to show an adverse employment action, and represents a trivial harm that would not dissuade a reasonable employee from "making or supporting a charge of discrimination." *White*, 548 U.S. at 68. Such a "petty slight" is not sufficient under *White*. *Id.*

Similarly, assuming *arguendo* that Kaplicer yelled at [*58] Ragin after the NAACP official visited Lime Kiln, and that Kaplicer publicly upbraided her in front of other staff, such reprimands without other consequences do not constitute an adverse employment action. *See Alywahby, 2009 U.S. Dist. LEXIS 120668, at *15-16* (finding no adverse employment action for purposes of retaliation claim because "reprimands are routinely considered insufficiently material to constitute adverse action under Title VII"); *Nieves v. District Council 37, No. 04 Civ. 8181(RJS), 2009 U.S. Dist. LEXIS 112653, 2009 WL 4281454, at *8 (S.D.N.Y. Nov. 24, 2009)* ("Cases within the Second Circuit, interpreting [*White*], have held that performance warnings, without more, do not constitute a materially adverse action."); *Lucenti v. Potter, 432 F. Supp. 2d 347, 364 (S.D.N.Y. 2006)* ("Reprimands, threats of disciplinary action, and excessive scrutiny do not constitute adverse employment actions."); *Dunphy v. Delta Airlines, Inc., 290 F. Supp. 2d 311 (E.D.N.Y. 2003)* (finding rude comments to, and criticism of, employee following employee's claim of discrimination not retaliatory where supervisor's comments amounted to mere annoyances, and employee was not formally disciplined). Plaintiff has not shown that [*59] these alleged reprimands carried any consequences that might make these acts adverse employment actions. *See Alywahby, 2009 U.S. Dist. LEXIS 120668, at *15-16* (noting that "the reprimand does not appear in Plaintiff's personnel file" in determining that it did not constitute an adverse employment action in the retaliation context).

### d. *Failure to Provide Plaintiff with Accommodation for Her Alleged Medical Condition*

Ragin asserts that Kaplicer was aware that she suffered from a medical condition that made it impossible for her to type, and that his failure to provide an accommodation promptly was a form of retaliation. (Pltf. Br. 18) Ragin submitted a doctor's note to the District on May 6, 2004, indicating that she suffered from "arthralgia of hands" [13] and stating that she had "limited use of [her] right hand." (Ragin Aff., Exs. 35, 36; Pltf. Rule 56.1 Resp. P 75; Ragin Aff. P 26) On June 8, 2004, the District began providing Plaintiff with an accommodation for the difficulty she was experiencing in typing. The District took this step the same day that she delivered a letter of complaint to Schwartz. (Ragin Aff., Ex. 21)

> 13   Arthalgia is defined as "sharp, severe pain, extending along [*60] a nerve or group of nerves, experienced in a joint and/or joints." Dorland's Medical Dictionary for Health Consumers (2007), http://medical-dictionary.thefreedictionary.com/a rthalgia (last visited Feb. 9, 2010).

Plaintiff has not demonstrated that the District failed to provide her with an accommodation within a reasonable period after she requested it. The fact that it took the District several weeks after she first complained and submitted a doctor's note to provide an accommodation -- typing by the secretarial staff -- does not rise to the level of an adverse employment action. *See Shannon v. Verizon N.Y., Inc., No. 05 Civ. 0555 (LEK), 2007 U.S. Dist. LEXIS 28096, at *21-22 (N.D.N.Y Apr. 13, 2007)* (finding allegation that "[d]efendant refused to respond to [plaintiff's] complaints in retaliation for protected activity" was unfounded where "in response to his concerns that his condition was being aggravated. Defendant offered Plaintiff the opportunity to request a reasonable accommodation and submit medical documentation in support of the request").

Furthermore, the alleged failure to quickly accommodate Plaintiff's condition does not constitute an adverse employment action under Title [*61] VII, because Plaintiff's condition did not qualify her as disabled under the Americans With Disabilities Act ("ADA"). [14] As the court explained in *Seldon v. Total Sys. Servs., 653 F. Supp. 2d 1349 (M.D. Ga 2009)*, a retaliation case, simply because a plaintiff has submitted a doctor's note does not mean that the plaintiff is entitled to an accommodation, and a failure to provide such an accommodation is not in and of itself an adverse employment action:

> [N]o reasonable person in Plaintiff's position could have considered [the supervisor's] alleged failure to adjust Plaintiff's work schedule in 2005 to be materially adverse. Plaintiff was certainly not entitled to any accommodation based on

the 2005 doctor's note alone; "[e]mployers have no duty to accommodate an employee if the employee is not disabled under the [Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA")]." *Swain v. Hillsborough County Sch. Bd., 146 F.3d 855, 858 (11th Cir. 1998).* Plaintiff has not alleged that she is disabled within the meaning of the ADA; a reasonable person in Plaintiff's situation would therefore understand that she might not get an accommodation even after requesting one.

*Id. at 1378-79* **[*62]** (citing *White* standard for adverse employment action in the retaliation context).

14   While Plaintiff's initial complaint stated a claim under the ADA, Plaintiff's amended complaint dropped the claim. In any event, there is no evidence that Ragin was disabled under the ADA; she has not shown that "her impairment . . . substantially limit[ed] the major activity of working." *See Smith v. St. Luke's Roosevelt Hosp., No. 08 Civ. 4710 (GBD)(AJP), 2009 U.S. Dist. LEXIS 69995, at \*51-52 (S.D.N.Y. Aug. 11, 2009)* ("[I]n order for a plaintiff to be found substantially limited in the major life activity of working, the plaintiff must be unable to work in a broad class of jobs . . . accordingly, [t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." (quotations and citations omitted)). Even if Plaintiff's conditions somehow qualified her as disabled under the ADA, she failed to put the District on notice of such a disability prior to early June -- when she formally requested an accommodation for a "disability" -- because merely complaining of pain or her symptoms is not sufficient to show that an employer knew that **[*63]** a plaintiff was disabled. *See Cozzi v. Great Neck Union Free Sch. Dist., No. 05 Civ. 1389 (ENV), 2009 U.S. Dist. LEXIS 74305, at \*41-42 (E.D.N.Y. Aug. 21, 2009)* ("[A]n employer's knowledge of a plaintiff's symptoms does not establish, as a matter of law, that it knew the plaintiff was disabled.") (citing *Pacenza v. IBM Corp., No. 04 Civ. 5831 (PGG), 2009 U.S. Dist. LEXIS 29778, 2009 WL 890060, at \*10 (S.D.N.Y. Apr. 2, 2009); Watson v. Arts & Entm't Network, No. 04 Civ. 1932 (HBP), 2006 U.S. Dist. LEXIS 50373, at \*14 (S.D.N.Y. Mar. 26, 2008)* (collecting cases)).

In sum, the record indicates that the District accommodated Plaintiff's condition and her difficulty typing in June 2004. The fact that the District did not act as promptly as Ragin would have wished does not establish that she suffered an adverse employment action.

**e. Direction to Investigate Misuse of School Computers by a Student**

Ragin argues that she suffered an adverse employment action when Kaplicer "assign[ed] [her] to investigate internet misuse involving graphic male homosexual images," because Kaplicer "could have conducted the investigation himself, rather than embarrass plaintiff." (Pltf. Br. 18)

This incident does not constitute an adverse employment **[*64]** action. It is undisputed that as Assistant Principal, Ragin was responsible for both student discipline and technology at Lime Kiln. (Def. Rule 56.1 Stat. P 78; Schwartz. Aff. P 6; Johnson Aff., Ex. Y at 120) In being assigned a task well within her job responsibilities, Ragin did not suffer an adverse employment action. *See Martin v. MTA Bridges & Tunnels, 610 F. Supp. 2d 238, 254 (S.D.N.Y. 2009)* ("No reasonable employee would think being asked to perform tasks that are part of her job description constituted a materially adverse employment action." (citing *White, 548 U.S. at 69*)).

**f. Failure to Promote Plaintiff to Vacant Principal Positions**

On February 12, 2004, Plaintiff applied for three vacant principal positions in the District for the 2004-05 school year. (Def. Rule 56.1 Stat. P 32) After surviving an initial screening process designed to narrow the applicant pool, Plaintiff was interviewed for the Lime Kiln vacancy on March 30, 2004. (*Id.* PP 35-36; Sculnick Aff. P 13; Johnson Aff., Ex. E) Ragin was one of only thirteen candidates selected for a second-round interview. (Def. Rule 56.1 Stat. PP 21, 44) Plaintiff was not selected as a finalist for the Lime Kiln position, however **[*65]** (Def. Rule 56.1 Stat. PP 46, 49-50), and the position was ultimately offered to another female African-American candidate. (Johnson Aff., Ex. P).

Plaintiff asserts that the District's decision not to offer her one of the vacant principal positions constitutes an adverse employment action. (Pltf. Br. 18-19) "A decision not to promote an employee to an available position may constitute an adverse action." *Morrison v. Johnson, No. 01 Civ. 636 (RFT), 2006 U.S. Dist. LEXIS 70405, at \*46-47 (N.D.N.Y Sept. 28, 2006)* (citing *Carmellino, 2006 U.S. Dist. LEXIS 63705, at \*12-13* (citing *Terry v. Ashcroft, 336 F.3d 128, 139 (2d Cir. 2003)))*. Indeed, failure to promote an employee is considered one of the archetypal examples of an adverse employment action under Title VII. *See Treglia v. Manlius, 313 F.3d 713,*

720 (2d Cir. 2002) ("[A] claim of discriminatory failure to promote falls within the core activities encompassed by the term 'adverse action.'" (quoting *Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)); see also Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006)* (failure to promote is an adverse employment action).

Accordingly, the District's decision not to promote Plaintiff to a vacant **[\*66]** principal position constitutes an adverse employment action for purposes of her retaliation claim.

### g. *Plaintiff's Transfer to Fleetwood Elementary School*

Plaintiff next asserts that her reassignment from Lime Kiln to Fleetwood for the 2004-05 school year constitutes an adverse employment action.

After *White*, a court analyzing whether a lateral transfer constitutes an adverse employment action in the retaliation context must consider whether such a transfer "well might . . . dissuade[] a reasonable worker from making or supporting a charge of discrimination." *White, 548 U.S. at 68.* In making this determination, courts consider a wide variety of factors, including whether the reassignment or transfer led to a diminution in responsibilities, prestige, or opportunity for advancement. *See, e.g., Pacheco, 593 F. Supp. 2d at 627* (holding that plaintiff's transfer did not constitute an adverse employment action and would not "deter a reasonable employee from complaining about an employer's employment practices" because plaintiff's new job was not "less desirable or disadvantageous than his prior job" and plaintiff had not suffered "adverse consequences"); *Alers v. New York City Human Res. Admin., No. 06 Civ. 6131(SLT), 2008 U.S. Dist. LEXIS 72949, 2008 WL 4415246, at \*7 (E.D.N.Y. Sep. 24, 2008)* **[\*67]** (plaintiff's "dissatisfaction with her duties" after transfer, without more (such as a diminution in pay or a loss of prestige), is not a sufficient basis to find that an employment action was materially adverse).

*Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205 (2d Cir. 2006)* illustrates application of the "adverse employment action" test in the transfer context: [15]

> Applying the *White* standard to the present case, we conclude that Kessler presented evidence sufficient to create a genuine triable issue as to whether the reassignment to which he was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination. The evidence . . . viewed in the light most favorable to Kessler, shows that prior to his

transfer . . . Kessler had responsibilities and performed functions as set out in the official DSS description of the job of an Assistant Commissioner, and that upon his transfer, . . . although he retained the title of Assistant Commissioner, he was stripped of those responsibilities and not allowed to perform those functions. . . . From this evidence, a rational factfinder could permissibly infer that a reasonable **[\*68]** employee . . . could well be dissuaded from making a charge of discrimination if doing so would result in a transfer to an office in which, *inter alia*, he would not be allowed to perform the broad discretionary and managerial functions of that position, no one would report to him, and he would be forced to do work normally performed by clerical and lower-level personnel. We conclude that summary judgment on the basis that Kessler failed to adduce evidence that his reassignment was materially adverse was inappropriate.

*Kessler, 461 F.3d at 210; see also White, 548 U.S. at 71* ("[T]he jury had before it considerable evidence that the track laborer duties were 'by all accounts more arduous and dirtier'; that the 'forklift operator position required more qualifications, which is an indication of prestige'; and that the forklift operator position was objectively considered a better job.").

15     Although *Kessler* is an ADEA case, "the same standards and burdens apply to [retaliation] claims under [the ADEA and Title VII]." *Kessler, 461 F.3d at 205.*

Here, Ragin has not succeeded in demonstrating that there is a triable issue of fact as to whether her transfer constituted an adverse employment action. **[\*69]** She has offered no evidence indicating that she suffered any diminution in responsibilities, prestige, managerial authority, or other adverse consequences due to her transfer. It is undisputed that while at Fleetwood, Ragin had the same job title, pay and benefits that she had enjoyed at Lime Kiln. (Def. Rule 56.1 Stat. P 104; Friedman Aff. P 8); *see Ludwig v. Rochester Psychiatric Ctr., 550 F. Supp. 2d 394, 398 (W.D.N.Y. 2008)* (where "reassignment resulted in [plaintiff] performing the same responsibilities on the same shift for the same compensation" there was no adverse employment action in retaliation context); *Grennan v. Nassau County, No. 04 Civ. 2158 (DRH)(WDW), 2007 U.S. Dist. LEXIS 23087, at \*30-31 (E.D.N.Y. Mar. 29, 2007)* (noting that plaintiff's transfer

was not an adverse employment action because it "did not entail a dramatic change, or even any change, in the nature of [plaintiff's] work"). Accordingly, Plaintiff's transfer would not have dissuaded "a reasonable worker from making or supporting a charge of discrimination," *White*, 548 U.S. at 57, and does not constitute an adverse employment action.

### h. *Plaintiff's Termination*

Finally, Plaintiff alleges that her termination [*70] constitutes an adverse employment action. Termination is indeed the archetypal example of an adverse employment action. [16] *See Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) ("Examples of materially adverse changes include termination of employment. . . . ).

> 16  Although Plaintiff's termination is not -- because of her acceptance of the Newburgh principal position -- an adverse employment action for purposes of her race discrimination claim, it may constitute an adverse employment action in the retaliation context, where the disputed action "need not affect the terms and conditions of employment." *See Memnon*, 667 F. Supp. 2d 334, 2009 U.S. Dist. LEXIS 99936, at *20-21 (distinguishing between proof necessary to prevail on race discrimination and retaliation claims in voluntary resignation context).

### 3. *Causal Connection Between Adverse Employment Actions and Protected Activity*

In order for Ragin to establish a *prima facie* case of retaliation as to the District's failure to promote her to a principal position, and the decision to terminate her employment, she must offer evidence from which a jury could infer a causal connection between these actions and her protected activity.

"Proof of causal connection can [*71] be established indirectly by showing that the protected activity was followed closely by [the adverse employment action]" or by evidence of disparate treatment of fellow similarly situated employees, *Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir. 1986), or directly through evidence of retaliatory animus addressed to plaintiff by the defendant. *De Cintio v. Westchester County Med. Dep.*, 821 F.2d 111, 115 (2d Cir. 1987); *see also McNair v. New York City Health & Hosp. Co.*, 160 F. Supp. 2d 601, 604 (S.D.N.Y. 2001) (restating same three methods of establishing causal connection).

Here, Ragin has not demonstrated a causal connection between her protected activity and the adverse employment actions, because there is no direct evidence of retaliatory animus by the decision-makers who engaged in the adverse employment actions, there is no evidence

of disparate treatment, and the temporal proximity between Plaintiff's protected activity and the adverse employment actions is too attenuated.

### a. *Decision Not to Promote*

The District officially notified Plaintiff on May 21, 2004, that she had not been selected to fill one of the vacant principal positions. (Def. Rule 56.1 Stat. P 51; [*72] Johnson Aff., Ex. G) As discussed above, the District made this decision after Plaintiff had passed through two rounds of interviews. (*Id.* PP 35 - 36, 44; Sculnick Aff. P 13, Ex. E; Johnson Aff., Ex. A at 146) At the initial interview stage, Plaintiff was selected for a second round interview for the Lime Kiln principal position only. (Def. Rule 56.1 Stat. PP 39-41) It is undisputed that no one involved in the first round of interviews had knowledge of Ragin's complaints about sexual harassment. (Def. Rule 56.1 Stat. P 38) Ragin's second-round interview for the Lime Kiln principal position took place on April 27, 2004. That committee did not select her as a finalist for the Lime Kiln position, however. (Def. Rule 56.1 Stat. PP 44, 46) The finalists that were chosen by the committee were then interviewed by Dr. Cruz and other Assistant Superintendants (Def. Rule 56.1 Stat. P 47; Cruz Aff. P 9; Sculnick Aff. P 13), and on May 18, 2004, they selected another female African-American candidate, Lori Lowe-Stokes, for the Lime Kiln principal position. (Def. Rule 56.1 Stat. PP 46, 48-50)

Although Ragin was officially notified on May 21, 2004, that she would not be promoted, it is not disputed [*73] that this decision was made between her second-round interview on April 27, 2004, and May 12, 2004. *See* Sculnick Aff. P 13 (stating that the decision was made between April 27, 2004, when the second-round interviews ended, and May 12, 2004).

As discussed above, this Court has determined that Plaintiff engaged in protected activity when she (1) verbally complained to Kaplicer about Manion in November 2003, (2) verbally complained to Kaplicer about Manion in January 2004, (3) verbally complained to Schwartz and Sculnick about Manion on May 12, 2004 (Sculnick Aff. P 5; Schwartz Aff. P 5), (4) submitted a written complaint about Manion to Kaplicer on June 4, 2004 (Johnson Ex. H), and (5) submitted a formal written complaint to Sculnick alleging sexual harassment on June 25, 2004. (Johnson Aff., Ex. J)

Only the two verbal complaints to Kaplicer in November 2003 and January 2004 preceded the decision not to grant Plaintiff a final-round interview for the Lime Kiln position. Three months or more elapsed between Ragin's January 2004 protected activity and the failure to grant her a final round interview for the Lime Kiln vacancy. Although the Second Circuit "has not drawn a bright line to define [*74] the outer limits beyond

which a temporal relationship is too attenuated to establish a causal relationship," *Gorman-Bakos v. Cornell Co-op Extension of Schenectady*, 252 F.3d 545, 554 (2d Cir. 2001), many courts in this circuit have held that periods of two months or more defeat an inference of causation. *See, e.g., Harrison v. North Shore Univ. Hosp.*, No. 04 Civ. 2033 (WDW), 2008 U.S. Dist. LEXIS 17330, 2008 WL 656674, at *12 (E.D.N.Y. March 6, 2008) ("[C]ase law indicates that a gap of up to one to two months between the protected activity and the adverse action may establish the requisite causal connection," while "[l]onger gaps . . . have been found to be too attenuated to establish a causal connection."); *Garrett v. Garden City Hotel, Inc.*, No. 05 Civ. 0962 (JFB) (AKT), 2007 U.S. Dist. LEXIS 31106, 2007 WL 1174891, at* 21 (E.D.N.Y. Apr. 19, 2007) (no causal connection found where there was a two-and-a-half month gap between protected activity and adverse employment action); *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation."); *Hussein v. Hotel Employees & Rest. Union, Local 6*, No. 98 Civ. 9017 (SAS), 2002 U.S. Dist. LEXIS 19, 2002 WL 10441 (S.D.N.Y. Jan. 3, 2002) [*75] (two month gap defeats retaliatory nexus); *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) ("Claims of retaliation are routinely dismissed when as few as three months elapse between the protected EEO activity and the alleged act of retaliation."); *Ponticelli v. Zurich Am. Ins. Group*, 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998) (two-and-a-half month gap too long to give rise to inference of causal connection); *but see Burkybile v. Bd. of Educ. of the Hastings-on-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005) (stating that this Circuit "has not established a specific delay between protected activity and adverse employment action that defeats an inference of causation" and noting that an inference of retaliatory intent has been found in cases involving a gap of as long as eight months). There is no reason to vary from the general rule here.

Even if the time period between Ragin's protected activity and the alleged retaliatory act was not too attenuated, however, she has failed to demonstrate that anyone involved in the decision not to grant her a final round interview for the Lime Kiln principal vacancy [*76] was aware they she had complained about sexual harassment. Without such proof, Ragin's retaliation claim must fail. *See Lindner v. IBM*, No. 06 Civ. 4751 (RJS), 2010 U.S. Dist. LEXIS 6499, at *10-11 (S.D.N.Y. Jan. 21, 2010) ("The first deficiency in Plaintiff's retaliation claims is that there is no admissible evidence showing that . . . the individuals alleged to have provided Plaintiff's prospective employers with negative references . . . knew that Plaintiff had engaged in protected activity pri-

or to Plaintiff's filing this lawsuit.") (citing *Philippeaux v. Fashion Inst. of Tech.*, No. 93 Civ. 4438 (SAS), 1996 U.S. Dist. LEXIS 4397, 1996 WL 164462, at *6 (S.D.N.Y. Apr. 9, 1996) (noting that a retaliation claim requires the actual decision-maker to have knowledge of the plaintiff's protected activity)); *Murray v. Visiting Nurse Servs. of NY*, 528 F. Supp. 2d 257, 271 (S.D.N.Y. 2007) ("[D]istrict courts have consistently held that, with regard to the causation prong of the prima facie standard, absent any evidence to support an inference that the decisionmakers knew of plaintiff's complaints, plaintiff cannot rely on circumstantial evidence of knowledge as evidence of causation."); *Laurin v. Pokoik*, No. 02 Civ.1938 (LMM), 2005 U.S. Dist. LEXIS 6728, 2005 WL 911429, at *5 (S.D.N.Y. April 18, 2005) [*77] (noting that, in order to establish a prima facie case of retaliation, the plaintiff "must demonstrate not only that [the defendant corporation] as an entity knew of [the plaintiff's] engagement in the protected activities, but also that the actual decisionmaker(s) knew about her protected activities as well").

Plaintiff offers no evidence that anyone other than Kaplicer knew of her protected activity before May 12, 2004, when she first informed Sculnick and Schwartz of her allegations. (Sculnick Aff. P 5; Schwartz Aff. P 5) While Assistant Superintendant Cruz was involved in the interview process for all three positions that Ragin applied for, there is no evidence that Cruz knew of Plaintiff's harassment allegations when any of the promotion decisions were made. Similarly, Superintendent Friedman states in his affidavit that he first became aware of Ragin's sexual harassment allegations in June 2004, after the promotion decision was made. (Friedman Aff. P7) There is likewise no evidence that anyone who served on the initial and second round interview committees was aware of Ragin's sexual harassment complaints.

Because the record demonstrates that only Kaplicer was aware of Ragin's [*78] protected activity when her bid for promotion was rejected, Ragin's promotion-related retaliation claim can survive only if she has offered proof that Kaplicer played a direct role in, or influenced, the decision not to promote Plaintiff to the vacant principal positions. Plaintiff has offered no such evidence as to the non-Lime Kiln principal positions. With respect to the Lime Kiln position, Ragin has failed to offer evidence that Kaplicer was a member of the committee that decided not to select her as a finalist, and Defendant has offered contrary evidence. (Kaplicer Aff. P 4; Johnson Aff., Ex. A at 145-46)

Plaintiff alleges in her affidavit, however, that Kaplicer selected the teachers who served on the interview committee for the Lime Kiln vacancy. (Ragin Aff. P 17) There is no evidence that Kaplicer said or communicated anything to these teachers about Ragin, however,

or that he told them that she had complained of sexual harassment. While Plaintiff claims that "Kaplicer spoke with a parent, Marci, who advised a teacher at the school, Andi Kramer, that he [*i.e.*, Kaplicer] would do all in his power to see that I did not become principal" (Ragin Aff. P 18), this is inadmissible [*79] hearsay that cannot be relied on to oppose a summary judgment motion. *See Fed. R. Civ. P. 56(e)(1)* (stating that affidavit opposing summary judgment "must be made on personal knowledge, set[ting] out facts that would be admissible in evidence"); *Feingold v. New York, 366 F.3d 138, 155 n.17 (2d Cir. 2004)* ("In reviewing the district court's grant of summary judgment, . . . we may only consider admissible testimony.").

Because Ragin has not offered evidence that any decision-maker was aware of her protected activity when her bid for promotion was rejected, she has not demonstrated causation, and thus the District is entitled to summary judgment on her promotion-related retaliation claim.

### b. *Termination*

On December 14, 2004, Ragin's direct supervisor, Principal Patricia Simmons, sent a memorandum to Assistant Superintendant Cruz requesting that Plaintiff be terminated. (Johnson Aff., Ex. N) On December 15, 2004, Cruz sent a memorandum to Superintendent Friedman concurring in Simmons' recommendation (Johnson Aff., Ex. U), and on December 15, 2004, Superintendant Friedman sent a letter to Ragin notifying her of his decision to recommend to the Board of Education that her employment be terminated. [*80] (Johnson Aff., Ex. S)

As noted above, a plaintiff who suffers an adverse employment action can demonstrate a causal connection between the action and her protected activity by showing "(1) direct proof of retaliatory animus directed against the plaintiff; (2) disparate treatment of similarly situated employees; or (3) that the retaliatory action occurred close in time to the protected activities." *McNair, 160 F. Supp. 2d at 604*. Because Ragin has made no disparate treatment argument, her termination-related retaliation claim fails unless she has offered proof of retaliatory animus on the part of the decision-makers, or has demonstrated that her termination took place close in time to her protected activity.

Plaintiff has offered no evidence of retaliatory animus on the part of the three individuals who were part of the decisional chain that effected her termination: Simmons, Cruz, and Friedman. [17] As to Cruz, Plaintiff attempts to demonstrate that she exhibited retaliatory animus when she reprimanded Ragin in a June 2, 2004 memorandum for not appearing for a scheduled meeting. (Ragin Aff., Ex. 16) Ragin claims that she had obtained

permission from Kaplicer to attend a wedding that day. [*81] (Pltf. Br. 24; Ragin Aff. P 22, Ex. 3) The fact that Cruz reprimanded Plaintiff for missing a previously-scheduled meeting, however, is no evidence of retaliatory animus, particularly given Plaintiff's allegation that Cruz reprimanded her because Kaplicer had represented to Cruz that Plaintiff was "AWOL." (Pltf. Br. 4; Pltf. Rule 56.1 Counter-Stat. PP 95-96)

> 17   Defendant does not dispute that Cruz and Friedman were aware that Plaintiff had complained of sexual harassment when they recommended her termination. *See* Friedman Aff. P 6.

As to Superintendent Friedman, Plaintiff offers no evidence and no argument that he acted with retaliatory animus.

As to Simmons, Ragin points to the fact that when she first arrived at Fleetwood, Simmons asked her to sign a document listing her responsibilities and Simmons' expectations. Ragin notes that Simmons' list was not District-approved. (Pltf. Br. 7-8) Simmons used this same sort of expectations and duties memorandum with at least two other assistant principals, however, and obtained the list of job responsibilities from another principal in the District who used it as a management tool. (Simmons Reply Aff. P 2) Neither Simmons' use of this list [*82] nor her critical evaluation of Plaintiff's work performance constitutes direct evidence of retaliatory animus.

Plaintiff is thus left to establish a causal connection by showing temporal proximity between her protected activity and her termination. Here, this proximity is lacking, because Plaintiff's last protected activity occurred on June 25, 2004, when she submitted a formal written complaint to Sculnick alleging sexual harassment by both Manion and Kaplicer. (Johnson Aff., Ex. J) Simmons, Cruz and Friedman made their recommendations concerning Plaintiff's termination on December 14 and 15, 2004. Accordingly, nearly six months elapsed between Plaintiff's termination and her last involvement in protected activity.

As discussed above in connection with Plaintiff's promotion-related retaliation claim, although there is no bright line rule as to when "a temporal relationship is too attenuated to establish a causal relationship," *Gorman-Bakos, 252 F.3d at 554*, many courts have held that a two month gap between protected activity and an adverse employment action defeats an inference of causation. *See supra* pp. 47-48. "[B]ecause the Second Circuit has found periods well beyond two months [*83] to be sufficient to suggest a causal relationship under certain circumstances, [however,] courts must carefully consider

the time lapse in light of the entire record." *Grana, 2009 U.S. Dist. LEXIS 13159, at *37-38.*

Here, the nearly six month gap between Plaintiff's protected activity and her termination defeats any inference of causation. Plaintiff's sole support for her termination-related retaliation claim is temporal proximity. Moreover, the only supervisor that Plaintiff even alleges expressed animosity towards her retired six months before her termination, and there is no evidence that he influenced the decision-makers in any fashion. Under these circumstances, the six month gap between Plaintiff's termination and her protected activity is too attenuated to suggest a causal connection. Accordingly, though the burden of establishing a *prima facie* case is "de minimis," Plaintiff has not offered evidence meeting that minimal standard. *See Jute, 420 F.3d at 173.*

#### 4. *Legitimate Non-Discriminatory Reasons and Pretext*

Even if Plaintiff had established a *prima facie* case of retaliation, Defendant has come forward with non-retaliatory reasons for its decision to terminate Plaintiff's employment. [*84] *See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998).*

In his December 22, 2004 letter to Ragin, Superintendant Friedman laid out a litany of performance-related reasons for why he had recommended Plaintiff's termination, including: (1) her failure to complete a number of her work assignments; (2) her frequent failure to respond to supervisors' directives; (3) her failure to complete her classroom observations in a timely manner; (4) her weak performance in the areas of scheduling and budgeting; (5) her refusal to sign Principal Simmons' expectations and duties memorandum, (6) her failure to participate adequately in Fleetwood's day-to-day operations, (7) her failure to conduct morning walk-throughs as instructed by her supervisor, (8) her unavailabilty during student lunch hour to provide supervision, (9) addressing her supervisor in an unprofessional manner, (10) her negative interactions with staff members, (11) time spent on non-school related matters during the school day; (12) her poor attendance, frequent failure to give the school advance notice of her absences, and failure to provide doctor's notes; and (13) her failure to return phone calls from Assistant [*85] Superintendant Cruz on multiple occasions. (Johnson Aff., Ex. O)

The performance-related reasons offered by Defendant for its termination decision are sufficient to meet Defendant's burden. *See Auguste v. New York Presbyterian Med. Ctr., 593 F. Supp. 2d 659, 666 (S.D.N.Y. 2009)* ("[P]oor work performance has often been recognized as a legitimate, non-discriminatory reason for termination" in retaliation cases); *Weber v. Parfums Givenchy, Inc., 49 F. Supp. 2d 343, 357 (S.D.N.Y. 1999)* (employer's

explanation that employee had a "poor attitude" and did not work well with co-workers was "sufficient to meet its burden" of articulating a legitimate non-discriminatory reason for adverse employment action).

Because Defendant has produced legitimate, non-retaliatory reasons for its actions, "the presumption of retaliation dissipates," and Plaintiff must offer evidence from which a jury could find "that retaliation was a substantial reason for the adverse employment action." *Jute, 420 F.3d at 173.* The Second Circuit has recognized that "under some circumstances, retaliatory intent may . . . be shown, in conjunction with the plaintiff's prima facie case, by sufficient proof to rebut the employer's [*86] proffered reason for the [adverse employment action]." *Raniola, 243 F.3d at 625.* Moreover, summary judgment may be improper where there is evidence that the defendant's proffered reasons are partially pretextual. *See, e.g., Ebanks v. Neiman Marcus Group, Inc., 414 F. Supp. 2d 320, 331 (S.D.N.Y. 2006)* (summary judgment inappropriate because there were genuine factual disputes as to whether employer's reasons for the adverse employment actions "were in part pretextual"); *Rooney v. Capital Dist. Transp. Auth., 109 F. Supp. 2d 86, 98-99 (N.D.N.Y. 2000)* (summary judgment inappropriate because there was "a sufficient basis for a trier of fact to conclude . . . that the reasons defendant offered for plaintiff's dismissal were at least partially pretextual").

Here, Plaintiff has not offered evidence that the reasons given for her termination were pretextual. Indeed, Plaintiff does not so much challenge Defendant's account of her performance deficiencies as supply arguments as to why Defendant should have excused those deficiencies. This is not sufficient to establish pretext.

With respect to Simmons' expectations/duties list, for example, Plaintiff argues that her refusal to sign it was justified, [*87] because such a list was "not in general use in the district." (Pltf. Br. 12) Simmons supplied an affidavit, however, demonstrating that she and at least one other principal had used such a list in the past with other assistant principals. (Simmons Reply Aff. P 2) This assertion stands unrebutted. Even if Simmons had not used such a list before as a management tool, Ragin does not explain why it was improper for Simmons to use it in her case.

Similarly, with respect to her frequent absences, Plaintiff does not deny that she was absent twenty-two days during the September to mid-December time period. Instead, she argues that she was entitled under her union contract to twenty-two sick days a year, and had not exceeded that number. (Pltf. Br. 12; Ragin Aff., Ex. 44) Clearly, the School District was entitled to take into account, however, the fact that Ragin had used her entire

annual allotment of sick days in a three month period and had not always obtained doctor's notes justifying those absences. (Johnson Aff., Ex. O)

With respect to Defendant's assertion that Ragin was frequently late to work, left early, and left the building during lunch breaks, Ragin simply denies such conduct. Plaintiff [*88] adopts a similar approach with respect to her alleged failure to complete work assignments. Such bare assertions in Plaintiff's own affidavit are not sufficient to defeat summary judgment, however. *See, e.g., Giglio v. Buonnadonna ShopRite, LLC, No. 06 Civ. 5191 (JS), 2009 U.S. Dist. LEXIS 90111, at \*16-17 (E.D.N.Y. Sept. 25, 2009)* ("Plaintiff cites his own self-serving affidavit as the only piece of evidence. . . . [Such] 'unsupported allegations do not create a material issue of fact.'") (quoting *Weinstock, 224 F.3d at 41*).

While Ragin clearly disagrees with Defendant's evaluation of her job performance, "[t]he mere fact that an employee disagrees with her employer's assessments of her work . . . cannot standing on its own show that her employer's asserted reason for termination was pretextual." *Ricks, 92 F. Supp. 2d at 347; see also Taylor v. Records, No. 94 Civ. 7689 (CSH), 1999 U.S. Dist. LEXIS 2583, 1999 WL 124456, at \*10 (S.D.N.Y. March 8, 1999)* (plaintiff's attempt to rebut employer's explanation "by parsing the details of selected incidents, generally disputing her supervisors' assessments, and providing her own contrary appraisal of her work, is unavailing" in showing that firing was pretextual).

Ragin [*89] has not demonstrated that Defendant's proffered reasons for her termination were pretextual, and has offered no evidence "that retaliation was a substantial reason for the adverse employment action." *Jute, 420 F.3d at 173.* Accordingly, Defendant is entitled to summary judgment on her retaliation claim.

### D. *Hostile Work Environment Claim*

"To prevail on a claim of sexual harassment based on a hostile work environment, a plaintiff must establish two elements: '"(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."'" *Petrosino v. Bell Atl., 385 F.3d 210, 221 (2d Cir. 2004)* (quoting *Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003), cert. denied, 540 U.S. 1016, 124 S. Ct. 562, 157 L. Ed. 2d 428 (2003)* (quoting *Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999)*)).

Satisfying this standard entails "showing both 'objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objec-

tively hostile or abusive work environment,' and the [*90] [plaintiff] must also subjectively perceive that environment to be abusive." *Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004)* (quoting *Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)*) (internal quotation omitted). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Alfano, 294 F.3d at 374* (quoting *Perry, 115 F.3d at 149*). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Alfano, 294 F.3d at 374; see Petrosino v. Bell Atlantic, 385 F.3d 210, 224 (2d Cir. 2004)* ("isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment"). "But it is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano, 294 F.3d at 374.*

Here, Plaintiff's hostile work environment claim rests on her allegations that (1) custodian Manion grazed her buttocks on two occasions, and (2) that Kaplicer improperly directed her to investigate pornographic images printed out on a school computer. (Pltf. Br. 24)

As [*91] discussed above in connection with Ragin's retaliation claim (*see supra* p. 40), Kaplicer's request that Ragin investigate pornographic images that had been printed from a school computer was entirely proper. Plaintiff was responsible for both student discipline and technology at Lime Kiln, and Kaplicer's request fell well within her job responsibilities. There is no evidence that Kaplicer's request was anything other than a routine assignment, and certainly there is no suggestion in the record that Kaplicer gave Ragin this assignment because of her sex. Under such circumstances, a supervisor's request that an employee perform a task within the employee's job description cannot provide a basis for a hostile work environment claim. *See Alfano, 294 F.3d at 378.* ("Facially neutral incidents may be included, of course, among the totality of the circumstances that courts consider in any hostile work environment claim [so long as a] reasonable fact-finder could conclude that they were, in fact, based on sex. . . . [This inference] requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory.").

Ragin's allegation that Manion [*92] grazed her buttocks on two occasions is likewise insufficient to make out a hostile work environment claim. As noted above, "'[a]s a general rule, incidents [forming the basis for a hostile work environment claim] must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive'. . . . Conduct that is 'merely offensive, unprofessional or childish is not discriminatory conduct proscribed by Title VII.'" *Trini-*

*dad v. New York City Dep't of Corr.*, 423 F. Supp. 2d 151, 164 (S.D.N.Y. 2006) (quoting *Alfano*, 294 F.3d at 373; *Cosgrove v. Federal Home Loan Bank, No. 90 Civ. 6455 (RPP), 92 Civ. 4225 (RPP), 1999 U.S. Dist. LEXIS 7420, at *20 (S.D.N.Y Mar. 23, 1999)).* "[A] plaintiff 'must establish both that [s]he subjectively perceived the environment to be abusive and that a reasonable person would have perceived it as such.'" *Trinidad, 423 F. Supp. 2d at 164 (S.D.N.Y. 2006)* (quoting *Perks v. Town of Huntington, 251 F. Supp. 2d 1143, 1155 (E.D.N.Y. 2003))*.

Here, the Manion incidents that took place in November 2003 and January 2004 are not sufficient to make out a hostile work environment claim. As an initial matter, Ragin's account of these episodes [*93] has changed over time. In her June 4, 2004, memorandum to Kaplicer, Ragin described the incidents as follows:

> In November 2003, I asked Mr. Robert Manion, the Head Custodian at Lime Kiln at the time, to get some construction paper for me. He unlocked the door to the supply closet and we both entered. I began looking at the different color construction paper when I felt Mr. Manion's hand *graze upon my buttock.*
>
> * * *
>
> On or about January 24, 2004, I had the need to ascertain [sic] some supplies. The storage room was locked. I asked Mr. Robert Manion to open the door. This time I entered the storage room alone. I was searching the shelves for some binders when Mr. Robert Manion entered the storage room. He asked me what I was looking for and I stated some binders. As he drew near in an attempt to look for the binders, his hand *grazed my buttocks* again.

(Johnson Aff., Ex. H) (emphasis added) In her opposition brief, however, one of the Manion grazing incidents has been transformed into "cupping": "Manion cupped his hands around plaintiff's buttocks." (Pltf. Br. 2) There is no supporting citation for this assertion, and it will be disregarded.

Ragin's claim that Manion's hand grazed her buttocks [*94] in November 2003 and January 2004 does not allege severe enough conduct to have created the type of pervasively hostile environment that is required to state a hostile work environment claim. *See, e.g., Quinn v. Green Tree Credit Corp., 159 F.3d 759, 763-64* (2d Cir. 1998) (rejecting hostile work environment claim where co-worker "brushed against [plaintiff's] breasts with papers he was carrying"); *Lewis v. N. Gen. Hosp., 502 F. Supp. 2d 390 (S.D.N.Y. 2007)* (three incidents of male plaintiff's female supervisor brushing her breasts up against him in a three-month period were not objectively severe); *Ballance v. Energy Trans. Corp., No. 00 Civ. 9180 (LMM), 2001 U.S. Dist. LEXIS 16763, 2001 WL 1246586, at *11 (S.D.N.Y. Oct. 18, 2001)* (holding that one incident in which defendant allegedly untied plaintiff's apron and touched her buttocks did not "amount to an environment permeated with discrimination"); *Salvatore v. KLM Royal Dutch Airlines, No. 98 Civ. 2450 (LAP), 1999 U.S. Dist. LEXIS 15551, at *31 (S.D.N.Y. Sept. 30, 1999)* (holding that allegations that plaintiff's supervisor "brushed up against her on 'some occasions'" were insufficient to support claim of hostile work environment); *Francis v. Chemical Banking Corp., 62 F. Supp. 2d 948, 959 (E.D.N.Y. 1999)* [*95] (no actionable conduct where supervisor "brushed his hand against [plaintiff's] buttocks"); *Gregg v. New York State Dep't of Taxation and Finance, No. 97 Civ. 1408 (MBM), 1999 U.S. Dist. LEXIS 5415, 1999 WL 225534, at *12 (S.D.N.Y. Apr. 15 1999)* (finding four instances of touching, including a "pat on the behind," over a three to four month period not "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment'") (quoting *Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993))*; *Lucas v. S. Nassau Communities Hosp., 54 F. Supp. 2d 141, 147 (E.D.N.Y. 1998)* (dismissing sexual harassment claims where plaintiff alleged that her supervisor had briefly touched her on several occasions). The two brief, isolated acts of touching alleged by Ragin do not meet the requisite threshold of severity or pervasiveness. *Alfano, 294 F.3d at 374* ("Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness.").

Recognizing that the two Manion incidents do not make out a hostile work environment claim, Plaintiff's opposition brief lists fourteen other acts allegedly committed by Kaplicer that, according to Plaintiff, demonstrate that Ragin was [*96] "subjected to a hostile work environment":

> (1) False criticism of Ragin in her January 2004 performance review;
>
> (2) Withdrawing support from the Motown production;
>
> (3) Publicly upbraiding Ragin in front of staff;
>
> (4) Allowing staff to treat Ragin rudely;

(5) Screaming at Plaintiff because of the presence of the NAACP;

(6) Publicly announcing that he would block plaintiff from succeeding him as principal;

(7) Failing to accommodate her medical condition;

(8) Not informing Cruz on the day of the June 1, 2004 meeting that Ragin had taken a personal day;

(9) Allowing Manion to visit the school after he retired;

(10) Continuing not to provide accommodations to plaintiff even after being directed to do so;

(11) Demanding an accounting for the Motown event three months after it had been held;

(12) Fabricating his June 11, 2004 review in a manner contrary to prior reviews dealing with the same issues;

(13) Providing a baseless unsatisfactory end of the year evaluation which, without mention of the failure to provide timely, reasonable accommodation, discredits Ragin for not completing teacher reviews in a timely manner; and

(14) Assigning plaintiff to do an investigation which Kaplicer knew would embarrass [*97] her and which he could have done himself.

(Pltf. Br. 25-26)

These incidents do not demonstrate that Ragin was subjected to a hostile work environment, because they all reference facially-neutral, work-related conduct. *See, e.g., Walter v. Westdeutscher Rundfunk, ARD German Radio N.Y.*, No. 03 Civ. 5676 (LAK)(JCF), 2004 U.S.

Dist. LEXIS 8181, at *15-16 (S.D.N.Y. May 11, 2004) (Report and Recommendation adopted by District Court) (allegations that plaintiff was "criticized . . . given conflicting orders . . . and harassed about her visa" are not "cognizable in a Title VII claim of sexual harassment" because they "are not gender based");

*Gregg v. New York State Dep't of Taxation and Finance,* No. 97 Civ. 1408 (MBM), 1999 U.S. Dist. LEXIS 5415, 1999 WL 225534 (S.D.N.Y. Apr. 15 1999) is instructive on this point. In *Gregg,* the plaintiff attempted to support his hostile work environment claim by citing such facially-neutral incidents as a "requirement that he check in via e-mail every day," "the demand that he move his office nearer [to his supervisor], his increased workload, [and] his loss of a state car." *1999 U.S. Dist. LEXIS 5415, [WL] at * 13.* The court determined that "these incidents do not rescue [plaintiff's] claims, either because they were  **[*98]** unobjectionable or insufficiently pervasive and abusive." *Id; see also Trinidad, 423 F.Supp. 2d at 168* ("[E]xamining the totality of the circumstances here, most of which comprise unrebutted facially neutral behavior that plaintiff has failed to clothe in discriminatory dress, plaintiff's claim . . . clearly fails to meet the necessary standard for actionable gender hostility." (quotations omitted)).

Because Plaintiff's allegations and evidence fail to make out a hostile work environment claim, Defendant is entitled to summary judgment on this claim.

**CONCLUSION**

For the reasons stated above, Defendant's motion for summary judgment is GRANTED. The Clerk of the Court is directed to terminate Defendant's motion (Docket No. 25) and to close this case.

Dated: New York, New York

March 31, 2010

SO ORDERED.

/s/ Paul G. Gardephe

Paul G. Gardephe

United States District Judge

# EXHIBIT T



MICHAEL E. SAUNDERS, SR., Plaintiff, -against- NEW HORIZONS COMPUT-
ER LEARNING CENTER OF METROPOLITAN NEW YORK, Defendant.

99 Civ. 9532 (AGS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2002 U.S. Dist. LEXIS 9495*

**May 28, 2002, Decided
May 29, 2002, Filed**

**SUBSEQUENT HISTORY:** *Affirmed by Saunders v. New Horizons Computer Learning Ctr. of Metro. N.Y., 2003 U.S. App. LEXIS 12305 (2d Cir. N.Y., June 18, 2003)*

**DISPOSITION:**   **[*1]**  Plaintiff's motion in limine denied and defendant's motion for summary judgment granted. Plaintiff's claims dismissed.

**COUNSEL:** For MICHAEL E. SAUNDERS, SR., plaintiff: Michael E. Saunders, Sr., Newark, NJ.

For NEW HORIZONS COMPUTER LEARNING CENTER OF METROPOLITAN NEW YORK, defendant: Scott A. Gold, Schulte Roth & Zabel LLP, New York, NY.

**JUDGES:** Allen G. Schwartz, United States District Judge.

**OPINION BY:** Allen G. Schwartz

**OPINION**

**MEMORANDUM ORDER**

SCHWARTZ, Allen G., District Judge.

Plaintiff Michael E. Saunders, Sr. ("plaintiff"), proceeding *pro se*, brings the above entitled action alleging unlawful termination, retaliation, and failure to accommodate in violation of the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12102 et seq.* Plaintiff also alleges that defendant New Horizons Computer Learning Center of Metropolitan New York, Inc. ("defendant" or "New Horizons") published false statements about plaintiff in violation of New York state libel law. Before the Court are (i) plaintiff's motion *in limine* to preclude certain evidence; and (ii) defendant's motion for summary judgment dismissing the complaint. For the reasons set forth below,  **[*2]**  plaintiff's motion is denied and defendant's motion is granted.

**Factual Background**

The following facts are not disputed. Plaintiff applied for employment as an account executive with defendant in 1997. (See Defendant's Statement Pursuant to Local Rule 56.1 ("Def. 56.1") P 1. In his application for employment plaintiff did not tell defendant or any of its employees that he was disabled, or that he was a recovered alcoholic. (Id. P 8). Plaintiff's employment with defendant began on September 8, 1997, and lasted approximately one week. (Id. P 9, 30). On his first day of employment, plaintiff completed an Employee Voluntary Self-Identification Record, a questionnaire that New Horizons asks its employees to complete for purposes of complying with federal and state reporting laws, but which the company does not include in employees' personnel files. (Id. P 10; Affidavit of Scott A. Gold ("Gold Aff."), Exh. E; Defendant's Memorandum in Opposition to Plaintiff's Motion *in Limine* at 2 n.1). In completing the Self-Identification Record, plaintiff answered "No" to a question asking whether he had any "physical, mental or emotional impairments, handicaps or mobility limitations  **[*3]**  which substantially limits any major life activity." (Id. P 10; Gold Aff., Exh. E). Plaintiff was also given a copy of defendant's Employee Handbook, which he reviewed. (Def. 56. *4 Mont. 513, 1 P 11;* Deposition

of Michael E. Saunders, Sr. ("Plaintiff Depo.") at 53). The Employee Handbook contains a policy prohibiting employees from being under the influence of alcohol while on defendant's premises or while performing defendant's business. (Def. 56. *1 P 15*; Gold Aff. Exh. H). The Handbook states that violation of the company's alcohol policy will subject employees "to immediate disciplinary action up to and including termination." (Def. 56. *1 P 16*; Gold Aff. Exh. H). The Handbook also contains an "at-will" provision stating that defendant has the right to terminate its employees with or without cause. (Def. 56. *1 P 17*; Gold Aff. Exh. I).

New Horizon account executives begin their employment by attending a two-week training and orientation course. (Def. 56. *1 P 18*). The course that plaintiff attended in September 1997 was conducted by Wayne Rader, a sales trainer, and Leon Byrd, a sales manager. ( *Id. PP 19-21*). On September 17, 1997, plaintiff **[*4]** was late returning from lunch and missed part of the training session. ( *Id. P 25*). The next morning, plaintiff was late reporting to work. (Id.). As a result of these two instances of lateness, Byrd spoke to plaintiff. ( *Id. P 26*). During this conversation, Byrd smelled alcohol on plaintiff's breath and came to the conclusion that plaintiff had violated defendant's alcohol use policy by reporting to work under the influence. ( *Id. P 27-28*). Based on that conclusion, as well as the fact that plaintiff had already been late to work twice, Byrd terminated plaintiff's employment. ( *Id. P 30*). At that time, Byrd had no knowledge of plaintiff's history of alcoholism, nor did Byrd regard plaintiff as an alcoholic. ( *Id. P 31*).

**I. Plaintiff's Motion *in Limine***

Plaintiff moves to preclude his Employee Voluntary Self-Identification Record, arguing that it is inadmissible because defendant assured plaintiff that the Record would "not be included in plaintiff's personnel file." (See Gold Aff., Exh. E). However, defendant's promise not to include the document in plaintiff's personnel file does not **[*5]** prevent defendant from offering the Self-Identification Record as evidence in this action. Courts routinely consider documents that are prohibited by law from being included in employees' personnel files. See, e.g., *Fagan v. United Int'l Ins. Co., 128 F. Supp.2d 182 (S.D.N.Y. 2001)* (Motley, J.) (considering doctor's note provided to employer in determining that plaintiff employee was not disabled under the ADA). Accordingly, plaintiff's motion to preclude the Self-Identification Record is denied; the Court will consider that document in deciding defendant's motion for summary judgment.

**II. Defendant's Motion for Summary Judgment** [1]

1  Plaintiff argues that defendant's summary judgment motion should be dismissed on procedural grounds because defendant's counsel did not provide plaintiff with a notice explaining *Fed.R.Civ.P. 56*, as required by Local Rule 56.2. (See Plaintiff's Notice of Motion at 1). However, failure to notify a *pro se* litigant of the nature and consequences of a summary judgment motion will not defeat such motion if the *pro se* litigant has otherwise been adequately notified. See, e,g, *M.B. v. Reish, 119 F.3d 230, 232 (2d Cir. 1997)*. In this case, it is clear that plaintiff was adequately notified of the nature and consequences of defendant's motion. First, plaintiff's opposition papers include a copy of the very statement that he complains he should have received from defense counsel. Also, his papers contain a Rule 56.1 Statement, a memorandum of law citing several cases that address the summary judgment standard, and fourteen exhibits. The Court finds that plaintiff had a sufficient understanding of *Rule 56* and the need for him to demonstrate a genuine issue of fact in his opposition to defendant's motion. Accordingly, defendant's failure to comply with Local Rule 56.2 does not provide grounds to deny the motion for summary judgment.

**[*6] A. Legal Standard**

A court may grant summary judgment only if it is satisfied that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact, which may be satisfied if it can point to the absence of evidence necessary to support an essential element of the non-moving party's claim. See *Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.1995)*; see also *Celotex Corp. v. Catrett, 477 U.S. 317, 322- 23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. If the moving party meets its burden, the opposing party must produce evidentiary proof in admissible form sufficient to raise a material question of fact to defeat the motion for summary judgment, or in the alternative, demonstrate an acceptable excuse for its failure to meet this requirement. See *Ortiz v. Makram, 2000 U.S. Dist. LEXIS 18428*, No. 96 Civ. 3285(AGS), 2000 WL 1876667, at *4 (S.D.N.Y. Dec. 21, 2000). "Mere conclusory **[*7]** allegations, speculation or conjecture will not avail a party resisting summary judgment." *Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir.1996)*. All reasonable inferences and ambiguities are resolved in favor of the party against whom summary judgment is sought. See

*Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir.1994).* The court's function on a motion for summary judgment is not to weigh the evidence, but to determine if there is an issue for trial. See *Anderson, 477 U.S. at 249.* There is an issue for trial if the party opposing summary judgment offers sufficient evidence for that party to obtain a favorable jury verdict at trial. See Id. Summary judgment is proper when reasonable minds could not differ as to the import of the proffered evidence. See *Id. at 250-52; Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.1991).*

## B. Plaintiff's ADA Claims

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that (i) his employer is subject to the ADA; (ii) he suffers from a disability within the meaning of the ADA; (iii) **[*8]** he could perform the essential functions of his job with or without reasonable accommodation; and (iv) he suffered an adverse employment decision. See *Reeves v. Johnson Controls World Services, Inc. 140 F.3d 144 (2d Cir. 1998).* To suffer from a disability within the meaning of the ADA, a plaintiff must (i) have an actual disability; (ii) have a record of a disability; or (iii) have been regarded as having a disability. See *42 U.S.C. § 12102.* In this case plaintiff has failed to adduce any evidence showing that he suffers from a disability under any of the three definitions contained in the ADA.

## 1. Actual Disability

To demonstrate that he was actually disabled during the period he worked for defendant, plaintiff must show that he had "a physical impairment that substantially limits one or more of [his] major life activities." *42 U.S.C. § 12102(2)(A).* According to the Equal Employment Opportunity Commission, "Major Life Activities mean functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *29 C.F.R. § 1630.2(i)* **[*9]** . Plaintiff alleges that he was discriminated against as a recovering alcoholic, but in his deposition he testified that since 1996, none of his major life activities have been substantially limited by his alcoholism. (See Plaintiff Depo. at 41-42, 44). [2] Thus, at the time plaintiff was employed by New Horizons he was not actually disabled under the ADA.

2   Plaintiff's deposition was taken on March 20, 2001. On April 6, 2001, defendant's counsel sent a transcript of plaintiff's deposition to plaintiff and advised him that under *Fed.R.Civ.P. 30(e)* plaintiff had 30 days to indicate any errors in the transcript. Plaintiff did not submit an errata sheet for his deposition until October 3, 2001, the same

day on which he submitted his opposition to defendant's summary judgment motion. Since this errata sheet was not filed in compliance with *Fed.R.Civ.P. 30(e),* the Court does not consider it in deciding the instant motion. Accordingly, the new, corrected testimony regarding the limitation of life activities that plaintiff cites in his opposition papers cannot serve as a basis to defeat defendant's summary judgment motion. See *Margo v. Weiss, 213 F.3d 55, 60-61 (2d Cir. 2000)* ("plaintiffs cannot defeat a motion for summary judgment . . . by submitting errata sheets long after their depositions were taken.")

## [*10] 2. Regarded as Disabled

To demonstrate that New Horizons regarded him as being disabled, plaintiff must show that defendant perceived him as having an impairment that substantially limited his ability to perform a major life activity. See *Johnson Controls, supra, 140 F.3d at 152-53.* In this case, plaintiff has failed to show that any New Horizons employees knew that plaintiff was an alcoholic prior to his termination. Plaintiff testified that he did not disclose his problems with alcohol during his employment interview or during any other part of the application process. (See Plaintiff Depo. at 26, 47, 112-13). He also testified that he never told anyone at New Horizons that he had a problem with alcohol, nor did he tell anyone at New Horizons that he was a recovered alcoholic. (See *Id. at 79, 112-13).*

Plaintiff maintains that defendant knew about his alcoholism -- and thus regarded him as disabled -- because New Horizons sales manager Leon Byrd had worked at the plaintiff's previous employer and may have been told by persons at that company that plaintiff had been convicted for driving while intoxicated ("DWI"). (See *Id. at 117-18;* Plaintiff's **[*11]** Opposition Brief at 11-12). However, plaintiff offers no evidence to support his assertion that Byrd contacted his former employer and learned of plaintiff's DWI conviction. The only evidence in the record regarding Byrd's knowledge of plaintiff is Byrd's sworn statement that he did not call plaintiff's former employer to obtain information about plaintiff and he did not perceive plaintiff to be disabled. (See Affidavit of Leon Byrd PP 12, 15). Accordingly, plaintiff cannot sustain a claim of discrimination based on perceived disability.

## 3. Record of Disability

To qualify as disabled under this prong of the ADA, a plaintiff must show (i) that he had a record of impairment; (ii) that his employer was aware of that record; and (iii) that the employer relied on that record in evaluating the plaintiff. See *Whalley v. Reliance Group Holdings,*

*Inc., 2001 U.S. Dist. LEXIS 427, 2001 WL 55726*, at *8 (S.D.N.Y. Jan. 22, 2001) (Marrero, J.). Because plaintiff has offered no evidence indicating that anyone at New Horizons knew of his problems with alcohol or his status as a recovering alcoholic, see Section II.B.2., supra, there is no record of impairment upon which defendant could have [*12] relied in reaching the decision to terminate plaintiff. Accordingly, plaintiff cannot be considered disabled based on a record of disability.

Because plaintiff has not offered any evidence indicating that he was disabled under any of the three definitions contained in the ADA, his claim for disability discrimination fails. But even assuming, arguendo, that plaintiff had established a prima facie case of discrimination, defendant has offered a legitimate, non-discriminatory reason for plaintiff's termination -- specifically, his lateness and Byrd's belief that plaintiff had violated New Horizons' alcohol policy. See *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)* (defendant's obligation to articulate a legitimate, non-discriminatory reason for an adverse employment decision arises only after plaintiff has established a *prima facie* case.) Plaintiff offers no evidence indicating that this reason was pretextual, but rather argues that the reason was unfounded because defendant did not perform any tests to determine whether plaintiff was under the influence of alcohol on the morning he was fired. (See Plaintiff's Opposition [*13] Brief at 5, 9). However, an employer's belief that an employee violated company policy need not be accurate to serve as a legitimate reason for termination, as long as that belief was honestly held. See *Dister v Cont'l. Group, Inc., 859 F.2d 1108, 1112 (2d Cir. 1988)* (holding that poor business judgment or decision by an employer is insufficient to establish a genuine issue of fact as to the credibility of the employer's reason for termination when the employer's belief is honestly held). Accordingly, even if plaintiff had established a *prima facie* case of disability discrimination, defendant would still be entitled to summary judgment on the basis of its legitimate, non-discriminatory reason for terminating plaintiff.

**4. Retaliation**

Plaintiff's also alleges in his complaint that plaintiff retaliated against him in violation of the ADA. However, it is unclear whether plaintiff is actually asserting this cause under the ADA because he testified that his retaliation claim has "nothing to do with" his disability or perceived disability. (See Plaintiff Depo. at 113). Even assuming that the claim is being asserted under the ADA plaintiffs claim still fails [*14] because he has not offered any evidence showing that he was engaged in an activity protected by the ADA. See, eg. *Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999)* (to establish a prima facie case of retaliation plaintiff must show that he was engaged in a an activity protected by the ADA and that there was a causal link between that activity and an adverse employment action). Accordingly, defendant's motion with respect to the retaliation claim is also granted.

**5. Failure to Accommodate**

Finally, plaintiff alleges that defendant discriminated against him by failing to accommodate his disability. However, even if plaintiff could be considered disabled under the ADA, his failure to accommodate claim would fail because plaintiff never notified New Horizons of his purported disability, nor did he ever request an accommodation. (See Plaintiff Depo. at 79, 112-13). "It is axiomatic that if an employee fails to request an accommodation, the employer cannot be held liable for not providing one." *Whalley, supra, 2001 U.S. Dist. LEXIS 427, 2001 WL 55726*, at *8. Accordingly, defendant's motion is granted with respect to the plaintiff's claim for [*15] failure to accommodate.

**C. Plaintiff's Libel Claim**

Plaintiff claims that defendant libeled him in the fall of 1997 when it allegedly published false statements about him to others in his training class and to a prospective employer. (See Plaintiff Depo. at 114). However, New York law provides a one-year statute of limitations for libel claims. See *N.Y. C.P.L.R. § 215(3)*. Plaintiff filed his complaint on June 22, 1999 -- nearly two years after the alleged libel occurred. (See Complaint at 5). Accordingly, his libel claim is barred by the statute of limitations.

**Conclusion**

For the reasons set forth above, plaintiff's motion *in limine* is denied and defendant's motion for summary judgment is granted. Plaintiff's claims are dismissed and the Clerk of the Court is ordered to close the file in this action.

SO ORDERED.

Allen G. Schwartz

United States District Judge

Dated: New York, New York

May 28, 2002

# EXHIBIT U



Randy Scheiner, Royce Scheiner, Cindy Royce Creations, Inc., and Maximus Jewelry Creations, Ltd., Plaintiffs, - against - Derek Wallace, Brian Daniels, Paul Hunt, and David Williams, sued on their own behalf and on behalf of all other Lloyd's Underwriters subscribing to Policy Numbers ZJB8901346 251NM and ZJB8900233 255M, White, Fleischner, Fino and Wade, Dennis Wade, Holmes Protection of New York, Inc., Hartley Cooper Associates, Ltd., Levmore-Finch, Inc., John Finch, John Finch Associates, Ltd., Graham Miller, Inc., Shaun Coyne, Karl Alizade, City Safe, Inc., and J.M. McNicholas, Defendants.

93 Civ. 0062 (RWS) (RLE)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*1996 U.S. Dist. LEXIS 9843*

July 11, 1996, Decided

**SUBSEQUENT HISTORY:** [*1] Adopting Order of September 10, 1996, Reported at: *1996 U.S. Dist. LEXIS 13411.*

**COUNSEL:** For RANDY SCHEINER, ROYCE SCHEINER, CINDY ROYCE CREATIONS, INC., MAXIMUS CREATIONS LIMITED, plaintiffs: Hein J. Hazenberg, Hein J. Hezenberg, New York, NY. Robert P. Frankel, Esq., Miami, FL. Alan P. Rosefielde, 1, New York, NY.

For DEREK WALLACE, BRIAN DANIELS, PAUL HUNT, DAVID WILLIAMS, Sued on their own behalf and on behalf of all other Lloyd's Underwriters subscribing to Policy Numbers ZJB8901346 251NM and ZJB900233255M, WHITE, FLEISCHNER, FINO & WADE, defendants: Michael C. Silberberg, Morvillo, Abramowitz, Grand, Iason, New York, NY.

For DENNIS WADE, HOLMES PROTECTION OF NEW YORK, INC., defendants: Michael C. Silberberg, Elliot Schnapp, Mangone & Schnapp, New York, NY.

For GRAHAM MILLER, INC., defendant: Michael C. Silberberg, Elliot Schnapp, Mangone & Schnapp, New York, NY.

For SHAUN COYNE, KARL ALIZADE, CITY SAFE, INC., J.M. MCNICHOLAS, defendants: Michael C. Silberberg, Elliot Schnapp, Mangone & Schnapp, New York, NY.

For HARTLEY COOPER ASSOCIATES LIMITED, HARTLEY COOPER ASSOCIATES LIMITED, cross-claimants: Lawrence J. Bowles, Nourse & Bowles, New York, NY.

For DEREK WALLACE, BRIAN DANIELS, PAUL HUNT, DAVID WILLIAMS, WHITE, FLEISCHNER, FINO & WADE, [*2] DENNIS WADE, GRAHAM MILLER, INC., KARL ALIZADE, CITY SAFE, INC., J.M. MCNICHOLAS, counter-claimants: Michael C. Silberberg, Morvillo, Abramowitz, Grand, Iason, New York, NY.

**JUDGES:** The Honorable Ronald L. Ellis, United States Magistrate Judge

**OPINION BY:** Ronald L. Ellis

**OPINION**

REPORT AND RECOMMENDATION

**To the HONORABLE ROBERT W. SWEET, U.S.D.J.:**

# I. INTRODUCTION

Plaintiffs Cindy Royce Creations, Inc. ("Royce") and Maximus Jewelry Creations, Ltd. ("Maximus") seek damages following a default judgment entered in their favor by Judge Robert W. Sweet on November 17, 1995 against defendant John Finch Associates, Ltd. ("JFA") because of defendant's failure to respond to plaintiffs' negligence/malpractice claim. The matter was referred to the undersigned for an assessment of the damages against John Finch Associates, Ltd. Plaintiffs originally sought relief against JFA in excess of $ 20,000,000, but has since modified its damages claim to $ 4,975,000. [1] For the reasons which follow, I recommend an award of $ 4,975,000 in compensatory damages. I also recommend that interest of nine per centum per annum, accruing from November 17, 1995, be added to the award.

> [1] Plaintiffs sought damages in excess of $ 20,000,000 in the amended complaint. An expert report submitted by plaintiffs stated that they had been damaged in excess of at least $ 8,100,000, and in a letter to the court dated January 19, 1996, plaintiffs stated that witnesses were available to testify that plaintiffs' damages were at least $ 12,000,000. In plaintiffs' memorandum of law in support of their claim for damages, submitted to the court on June 26, 1996, plaintiffs request that this court award $ 4,975,000 in damages.

## [*3] II. BACKGROUND

Royce and Maximus are New York corporations in the business of manufacturing and selling jewelry. Am. Compl. PP 5-6. [2] JFA is a New York corporation that performed brokerage services for Royce and Maximus. Am. Compl. P 19.

> [2] "Am. Compl.     " refers to the Amended Complaint.

In July of 1989, Lloyds Underwriters ("Lloyds") issued Jewellers Block Policy No. ZJB8901346 251NM (the "primary" policy) for a premium of approximately $ 130,000. The primary policy insured Royce and Maximus for a period of twelve months, starting July 10, 1989, against loss by theft up to a maximum of $ 2,500,000, with a deductible of $ 25,000. Am. Compl. P 20. Additionally, Lloyds issued Jewellers Block Policy No. ZJB8900233 255M (the "excess" policy), on behalf of plaintiffs, to cover any losses in excess of $ 2,500,000 up to a maximum of $ 2,500,000. Am. Compl. P 20. Thus, total coverage from the primary and excess policies totalled $ 5,000,000, less the $ 25,000 deductible.

On August 18, 1989, the [*4] premises of Royce and Maximus were burglarized. A "Proof of Loss" doc-

ument of over $ 5,000,000 was filed with Lloyds on November 2, 1989. Am. Compl. P 23. Lloyds rejected the "Proof of Loss" on December 19, 1989 on the grounds that: (1) Royce and Maximus had failed to cooperate with Lloyds in providing information pertaining to the burglary; and (2) a criminal investigation into the burglary was still in progress. Am. Compl. P 24.

On January 7, 1990, Royce and Maximus initiated a civil suit in England against Lloyds, seeking damages of $ 2,475,000 from the Primary policy and $ 2,500,000 from the Excess policy, plus interest. Royce and Maximus abandoned their suit in England and a dismissal for the defendants was entered on October 3, 1991. [3]

> [3] All information pertaining to the English action comes from Judge Sweet's previous ruling on this case. *Scheiner v. Wallace, 832 F. Supp. 687, 690 (S.D.N.Y. 1993).*

On January 6, 1993, plaintiffs filed this action against Lloyds and other defendants. [4] The amended [*5] complaint, filed on April 11, 1994, included JFA as an additional defendant on a pendent state law claim of negligence/malpractice. Am. Compl. P 116. Plaintiffs claimed that JFA, acting as an insurance broker for plaintiffs, misrepresented the financial condition of the Lloyds Underwriters and their timeliness in settling large claims, and that plaintiffs had been damaged due to their reliance on JFA's misrepresentations. Am. Compl. PP 112-117. Plaintiffs allege that JFA's acts constituted negligence and malpractice and that as a result they have been damaged in excess of $ 20,000,000. Am. Compl. P 117.

> [4] The complaint included multiple federal and state law claims, including a claim under the Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C. §§ 1961-1968*, and another under *42 U.S.C. § 1983.* See amended complaint for a complete listing of all claims against defendants.

## III. ANALYSIS

Under *New York Insurance Law § 2120*, an insurance broker owes a fiduciary duty to the principal. In instances [*6] where an insurance broker does not provide for the insurance specified by the principal, the broker is liable for the amount that the principal would have received had the insurance been properly provided for, with liability limited to the amount of insurance coverage that should have been obtained. *Andriaccio v. Borg and Borg, Inc., 198 A.D.2d 253, 253, 603 N.Y.S.2d 528, 529 (App. Div. 1993); Royal Ins. Co. of Am. v. Cathy Daniels, Ltd., 684 F. Supp. 786, 792 (S.D.N.Y. 1988); Kinns v. Schultz, 131 A.D.2d 957, 959, 516 N.Y.S.2d 817, 819 (App. Div. 1987).* In this case, had

plaintiffs' insurer not rejected the insurance claims, plaintiffs could not have expected to receive any more than $ 4,975,000, the amount of insurance coverage they had been insured for, minus the deductible. Am. Compl. P 20. Thus, compensatory damages should be limited here to $ 4,975,000.

Plaintiffs also wish to recover attorneys' fees from defendant JFA, presumably for both this action and the previous litigation in England. Plaintiffs have not provided any strong support to justify an award for attorneys' fees for either this action or the previous litigation.[5]

5    Plaintiffs' counsel is advised that it has not met its burden of properly submitting documentation of reasonable attorneys' fees. *See Hensley v. Eckerhart*, 461 U.S. 424, 434, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1993) ("The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.").

[*7]  With respect to attorneys' fees for the instant action, the rule is that absent contractual or statutory provision, litigation expenses, including attorneys' fees, are not recoverable as general or special damages.[6] *Alloy Briquetting Corp. v. Niagara Vest, Inc.*, 802 F. Supp. 943, 947 (W.D.N.Y. 1992); *see also City of Elmira v. Larry Walter, Inc.*, 150 A.D.2d 129, 546 N.Y.S.2d 183 (App. Div. 1989) (attorneys' fees not available in the absence of statutory or contractual authority). It is unclear if plaintiffs are actually seeking attorneys' fees for the instant action. In any case, nothing has been presented to the court to substantiate any award for attorneys' fees for the instant action. Thus, I find that plaintiffs are not entitled to attorneys' fees for the instant action.

6    Despite acknowledging the fact that attorneys' fees are not awarded absent statutory or contractual provision, plaintiffs contend that there is no case law which would preclude such an award. Pls.' Mem. of Law at 3. This argument has no merit.

[*8]  Plaintiffs do, however, clearly seek litigation expenses arising from their prior litigation in England. Letter at 1.[7] Plaintiffs state that they are unable to find any case law on point regarding this issue, but that in legal malpractice, courts have held the professional liable for legal fees in pursuing the underlying case. Letter at 1.

7    "Letter" refers to a letter submitted to the court by plaintiffs' counsel regarding plaintiffs' damages and litigation expenses in England, dated January 19, 1996.

Although plaintiffs have not submitted any case law dealing with the recovery of legal fees for legal malpractice, there is ample case law regarding the recovery of expenses from third-party litigation. The general rule is that absent contractual or statutory provision, litigation expenses, including attorneys' fees, are not recoverable. One of the principal cases in New York illustrating an exception to this rule is *Shindler v. Lamb*, 25 Misc. 2d 810, 211 N.Y.S.2d 762 (Sup. Ct. 1959), *aff'd*, [*9] 10 A.D.2d 826, 200 N.Y.S.2d 346 (App. Div. 1960), *aff'd*, 9 N.Y.2d 621, 210 N.Y.S.2d 226, 172 N.E.2d 79 (1961). The **Shindler** exception states that "if, through the wrongful act of his present adversary, a person is involved in earlier litigation with a third person in bringing or defending an action to protect his interests, he is entitled to recover the reasonable value of attorneys' fees and other expenses thereby suffered or incurred." 25 Misc. 2d at 812, 211 N.Y.S.2d at 764-65. **Shindler**, and the cases that follow it, apply this exception uniformly; no differences in application are made with respect to the occupation of the adversary, whether that adversary be an insurance broker, a legal professional, or any other person. *See, e.g.*, 25 Misc. 2d 810, 211 N.Y.S.2d 762 (directors of steel corporation); *Sahn v. Afco Industries*, 192 A.D.2d 480, 597 N.Y.S.2d 294 (App. Div. 1993) (insurance broker); *In re Emergency Beacon Corp.*, 48 Bankr. 341 (Bankr. S.D.N.Y. 1985)(bankrupt corporation).

However, the **Shindler** exception does not apply to this case. The prior litigation in England against Lloyds was not necessary [*10] to protect the plaintiffs' interests, as they are allowed to recover directly from the party who acted as broker. *Long Island Lighting v. Steel Derrick Barge "FSC 99"*, 725 F.2d 839, 841 (2d Cir. 1984).

Plaintiffs voluntarily chose the English forum and had sought $ 4,975,000, the same amount recoverable against JFA. Furthermore, they had a full and fair opportunity to litigate their claims against Lloyds in England but voluntarily abandoned their suit and refiled their claims in the Southern District of New York. To force JFA to pay for the costs of litigation that plaintiffs voluntarily chose and voluntarily abandoned not only has no support from statute or case law but also strikes the court as unfair and unjust. Thus, the court declines to award attorneys' fees to plaintiffs for litigation expenses arising from the English action.

As for punitive damages, such damages were not specifically prayed for in the amended complaint, and, moreover, the court does not find that defendant's failure to procure the desired insurance warrants an assessment of punitive damages in this case. Generally, in order to receive an award of punitive damages, plaintiffs must prove not only [*11] that the defendant's conduct was improper, but that such misconduct was "aimed at the

public generally, is gross and involves high moral culpability." *Walker v. Sheldon, 10 N.Y.2d 401, 406, 223 N.Y.S.2d 488, 491, 179 N.E.2d 497 (Ct. App. 1961).* Most New York state courts, as well as the Southern District of New York, do allow claims for punitive damages against first-party insurers. [8] *See Tinlee Enterprises, Inc. v. Aetna Casualty & Surety Co., 834 F. Supp. 605, 610-11 (E.D.N.Y. 1993)* (First, Third and Fourth Departments of the New York Supreme Court, Appellate Division, and the Federal District Court in the Southern District of New York allow an award of punitive damages in a first-party insurance action). Whether New York state courts would sustain such a claim against third-party insurance brokers is dubious. [9] Assuming that punitive damages are available in the instant case, plaintiffs nevertheless have not sufficiently pled such a claim in their amended complaint.

> [8]   "First-party insurer" means the party that directly issues the insurance policy. In this case, Lloyds is the first-party insurer.

[*12]

> [9]   The Superintendent of Insurance of New York has the power to revoke a broker's license and assess penalties on any broker who violates any law governing insurance brokers. Insurance Law § 2127. However, Insurance Law § 2127 does not give any private right of action.

Plaintiffs' only allegation that JFA's misconduct was directed generally at the public states:

> 113.   The defendants Hartley Cooper Associates, Ltd. John Finch, and Levmore-Finch, Inc. led Cindy Royce and Maximus *and the public at large* to believe and represented that the Lloyds Underwriters which they selected, were financially sound and settled large claims within a number of weeks.

Am. Compl. P 113 (emphasis added). However, plaintiffs must plead with more detail any such misconduct directed at the general public. *See Excel Electronics & Photo Corp. v. Aetna Casualty & Surety Co., 1991 U.S. Dist. LEXIS 17161,* No. 90 Civ. 6508, 1991 WL 259257, at *5 (S.D.N.Y. Nov. 27, 1991) ("Moreover, in terms of pleading, the New York courts have required more than conclusory allegations that the defendant acted mali-

ciously or [*13]  in bad faith or has 'engaged in a pattern and practice' of improper claims handling activity."). Plaintiffs' single statement of "and the public at large," without any additional support, is insufficient to warrant an award of punitive damages.

The court thus awards plaintiffs compensatory damages in the amount of $ 4,975,000 from JFA. The court also awards interest from the time of the default judgment, November 17, 1995, until the time it is paid, in accordance with Civil Practice Law and Rules 5003. The applicable rate under New York law is "nine per centum per annum". Civ. Prac. L. & R. 5004. The interest thus accumulates at a rate of approximately $ 1,226.7123 per day. As of July 11, 1996, the amount of the interest award is $ 289,504.11.

## IV. CONCLUSION

I recommend that plaintiffs Cindy Royce Creations, Inc. and Maximus Jewelry Creations, Ltd. be awarded $ 4,975,000 in compensatory damages, plus interest of nine per centum per annum from November 17, 1995 against defaulting defendant John Finch Associates, Ltd.

Pursuant to *Rule 72, Federal Rules of Civil Procedure,* the parties shall have ten (10) days after being served with a copy of the recommended disposition to file [*14]  written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Robert W. Sweet, 500 Pearl Street, Room 1920, and to the chambers of the undersigned, Room 740. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn, 474 U.S. 140, 150, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985); Small v. Secretary of Health and Human Services, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam); 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed. R. Civ. P. 72, 6(a), 6(e).*

DATED: July 11, 1996

New York, New York

Respectfully Submitted,

The Honorable Ronald L. Ellis

United States Magistrate Judge

# EXHIBIT V



ELLA LOUISE SMITH, Plaintiff, v. REGIONAL PLAN ASSOCIATION, INC.,
ROBERT YARO, THOMAS WRIGHT, AND JAMES FINCH, Defendants.

10 Civ. 5857 (BSJ) (KNF)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2011 U.S. Dist. LEXIS 117712*

October 7, 2011, Decided
October 7, 2011, Filed

**COUNSEL:** **[*1]** For Ella Louise Smith, Plaintiff:
Olugbenga Olatokunbo Abiona, Law Offices of Olu O.
Abiona, Philadelphia, PA.

For Regional Plan Association, Inc., Robert Yaro,
Thomas Wright, James Finch, Defendants: Lindsey Tay-
lor Knapp, Sharon Katz, Davis Polk & Wardwell L.L.P.,
New York, NY.

**JUDGES:** Barbara S. Jones, UNITED STATES DIS-
TRICT JUDGE.

**OPINION BY:** Barbara S. Jones

**OPINION**

<u>Memorandum & Order</u>

   BARBARA S. JONES
   UNITED STATES DISTRICT JUDGE

**OPINION & ORDER**

   Plaintiff Ella Louise Smith asserts claims of race and
disability discrimination, retaliation, and hostile work
environment against Defendants Regional Plan Associa-
tion, Inc. ("RPA"), Robert Yaro, as President of RPA,
Thomas Wright, as Executive Vice President of RPA,
and James Finch, as Director of Human Resources at
RPA. The Amended Complaint ("Complaint") alleges
violations of Title VII and *§ 1981* of the Civil Rights Act
of 1964, *42 U.S.C. § 2000e et seq.*, *42 U.S.C. § 1981*
("Title VII" and "*§ 1981*," respectively), the Americans
with Disabilities Act, *42 U.S.C. § 12112 et seq.*
("ADA"), the Family and Medical Leave Act, *29 U.S.C.*

*§ 2611 et seq.* ("FMLA"), and New York State and City
Human Rights Law ("NYSHRL" and "NYCHRL"). Be-
fore the Court is Defendants' motion to dismiss. **[*2]**
For the reasons below, the motion is granted in part and
denied in part.

**BACKGROUND**

   Smith was employed as a research assistant by RPA
from May 2002 to November 2008. She is an African
American female and identifies herself as a person with
disabilities. Complaint, ¶ 10.

**A. Allegations relating to her race-based claims**

   Smith alleges that her employers began harassing
her approximately two weeks after she started at RPA.
Smith's desk was located outside of Wright's office, and,
soon after her arrival, he allegedly began subjecting her
"to numerous inappropriate racial and disability remarks,
that he never subjected the Caucasian employees to."
Complaint, ¶ 13. Smith alleges the following specific
incidents as examples of such racial harassment: on one
occasion, Smith overheard Wright say to Yaro that he
wanted someone with more "sex appeal" sitting outside
of his office. Id. ¶ 14. On another occasion, Wright al-
legedly remarked to Smith that "[t]he only way you can
get my attention is to sit on my desk in lotus position."
Id. ¶ 15. Between June and November 2002, Wright
supposedly made other "unwanted racial jokes" to Smith.
She told him that his comments were offensive to her. Id.
¶ 16. **[*3]** Wright then apparently told Finch that Smith
was "unfriendly" because she did not laugh at his jokes.
Id. Smith claims that there were other comments that
offended her as an African American. For example, in

one incident, Wright purportedly walked by Smith's desk and stated, "God I hate the smell of the food that poor people eat." Id. ¶ 18. She also alleges that Wright (and other employees) made several comments, one of which she identifies as taking place around September 2008, implying that Smith was ugly. Id. ¶¶ 21, 24.

With respect to Finch, Smith claims that he "subliminally referred to [her] as a monkey." Id. ¶ 17. In one interaction, Finch remarked to another employee that they were hiring someone new, to which Smith chimed in, "oh really." In response. Finch apparently said, "Yes, we're going to be hiring a monkey, it'll be friendlier and get more work done," then laughed and walked away. Id. Also, sometime in April 2003, when another employee was describing a recent vacation to Costa Rica, Finch remarked in Smith's presence, "You'll find plenty of monkeys right here in New York"; he then apparently looked at her with a "smirk." Id. ¶ 20. Smith claims that she complained to  [*4] Finch that she found these comments offensive. Id. Additionally, Smith alleges an incident in which a group of employees was eating pizza in the conference room and, while collecting the garbage, Finch remarked to Smith, "come here and climb into this trash bag! You [sic] trash, you're trash!" Id. ¶ 19.

Smith also claims that racially insensitive or offensive emails were circulated by other employees in the office. Sometime around February 2006, an email circulated referring to "urban renewal" and "negro removal." Id. ¶ 22. She also claims that, around this time, employees would pass by her desk singing racially provocative songs such as "Sweet Georgia Brown" or "Zippyde do da, zippy de day." Id. Smith alleges that she complained to Yaro about this behavior, but no remedial action was taken. Later, in the fall of 2008, an email was circulated describing how the 1950's were "white and white." Id. ¶ 45. Another set of emails circulated in November 2008 in connection with the Presidential election. In one November 5, 2008 email, noting how "great" it was to be an American on that day, the sender attached a drawing of forty white faces and one black face--President Obama--at the end. Id.  [*5] ¶ 46. In another email around that time. an image was attached depicting President Obama shining Sarah Palin's shoes. Id. Smith complained about these emails and asked to be removed from the lists, both in 2006 and in 2008, yet no remedial action was taken to stop their circulation or remove her from the listservs. Id. ¶¶ 22, 46. Smith also alleges that she overheard a comment made in September 2008 by two employees, that "Now the Country is going to be run by 'big scary inner-city black people.'" Id. ¶ 23.

She generally alleges that Yaro, Wright, and Finch "regularly shouted at [her], called her stupid, told her that she stunk, and generally degraded her," but never treated Caucasians this way. Id. ¶ 37.

Finally, Smith makes several allegations related to the 2008 hiring of Elizabeth Case, a Caucasian employee. Smith alleges that many of her substantive job responsibilities were transferred to Case while Smith was out of the office visiting her ill father in July 2008, and that these responsibilities were not re-assigned to Smith subsequent to her return. As a result, after Case's arrival, Smith was left with principally data entry work. Id. ¶ 42. In October 2008, she complained to  [*6] Wright that she was being treated differently from Case, in particular, of the fact that her job duties had been shifted to Case. Id. ¶ 25.

## B. Allegations related to her disability-based claims

Around May 2004, Smith fractured her ankle, causing her to limp and/or use crutches at work. She identifies this as her disability. She claims that defendants "constantly disparaged and humiliated [her] because of her disability or perceived disabilities, published derogatory statements about her, and disclosed confidential personnel and medical information about [her] to her co-workers." Id. ¶ 32. Specifically, she alleges several incidents in which other employees commented on her ankle injury. On one occasion, another employee, Lilly Chin, purportedly said that Smith's crutches made her look like a disabled person and Chin "hated looking at disable[d] people." Id. ¶ 34. Smith claims that she complained to Defendants about that comment. In another incident, around January 2008, another employee asked a coworker as Smith walked by, "Did you see her limp? You know she plans to make money off of that leg." Id. ¶ 39. It is based on that comment that Smith suggests Defendants had revealed personnel  [*7] and/or medical information about her to other employees.

Smith attributes another series of putatively discriminatory comments to Finch. She alleges that he began referring to her as a "lame duck" around January 2008 and once commented that the company did not "want to spend any more money on that lame duck," referring to an information request from Smith's personal injury attorney. Id. ¶¶ 35, 36. Finch also allegedly referred to Smith as a "crippled criminal." Id. ¶ 38. Around May 16, 2008, Smith complained to Yaro of this "disrespectful and unprofessional behavior." Id. ¶ 41.

In addition to these comments, Smith alleges an incident in which the Defendants failed to accommodate her disability. In April 2008, Smith claims that a large number of heavy boxes were placed in front of her desk, which she was told "were her problem," and which she was instructed to move from the front hall to the mailroom. Id. ¶ 40. Smith alleges that she told Defendants that this instruction was in violation of her disability accommodation--which she claims was granted by her immediate supervisor "to accommodate her injuries and

disability." Id. ¶¶ 40, 33. Defendants apparently then left the boxes in front [*8] of her desk for several weeks, which Smith contends constituted a failure to accommodate her disability. Id. ¶ 40.

In November 2008, Smith's position was terminated. On February 5, 2009, she filed a charge with the New York State Division of Human Rights ("NYSDHR") and the Equal Employment Opportunity Commission ("EEOC"), alleging, *inter alia*, violations of State and City Human Rights Law, Title VII, and the ADA, based on claims of race and disability discrimination and retaliation. In March 2009, Smith filed a rebuttal to RPA's response, alleging more factual instances of discriminatory and/or retaliatory treatment than she had included in her initial charge. The instant action was commenced on November 10, 2010.

**LEGAL STANDARD**

To survive a Rule 12(b)(6) motion, a plaintiff must plead sufficient factual allegations in the complaint to "state a claim [for] relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955. 167 L. Ed. 2d 929 (2007)*. The facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level." *Id. at 555*. On a motion to dismiss, a plaintiff gets the benefit of all reasonable inferences, see, e.g., *Goodrich v. Long Island R.R. Co., No. 10-2809-cv, 654 F.3d 190, 2011 U.S. App. LEXIS 16836, 2011 WL 3559997, at *2 (2d Cir. 2011)* [*9] , but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)*. Though a plaintiff need not establish a prima facie case at the pleading stage in employment discrimination cases, "the claim must be "facially plausible and must give fair notice to the defendants of the basis for the claim." *Ortiz v. Standard & Poor's, No. 10-cv-8490, 2011 U.S. Dist. LEXIS 99122, 2011 WL 4056901, at *2 (S.D.N.Y. 2011)* (emphasis in original) (quoting *Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d 210, 215 (S.D.N.Y. 2010)*).

**DISCUSSION**

**A. Claims of Race Discrimination under Title VII and § 1981 (Counts 1 and 2 )[1]**

  1   The standard of proof for claims brought under § 1981 is identical to that of Title VII claims. See *Ruiz v. Cnty. of Rockland, 609 F.3d 486, 491-92 (2d Cir. 2010)*.

Smith alleges that Defendants subjected her to disparate treatment and a hostile work environment because of her race, in violation Title VII and § 1981.

**1. Disparate Treatment Theory of Race Discrimination**

To establish a prima facie case of race discrimination, "[i]n the context of an alleged [*10] discriminatory discharge, a plaintiff must show that (1) [s]he is a member of a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz, 609 F.3d at 491-92*. When a disparate treatment theory of discrimination is alleged, an inference of discrimination can be established by facts showing that a similarly situated Caucasian employee was treated differently. See *Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 63 (1997)*.

Here, Smith has alleged facts sufficient to satisfy each prong of this test.

**2. Hostile Work Environment**

"[R]acially offensive comments or incidents of racial harassment, though different in kind and occurring in different locations, may create a racially hostile work environment in violation of Title VII." *Abdullah v. Panko Elec. & Maint., Inc., No. 3:08-cv-0598, 2011 U.S. Dist. LEXIS 29663 , 2011 WL 1103762, at *13 (N.D.N.Y. Mar. 23, 2011)*. However, Title VII is not "a general civility code." *Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)*. "[S]imple teasing, offhand comments, and isolated incidents (unless [*11] extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1988)* (internal citation and quotation marks omitted). Ultimately, "whether a work environment is sufficiently hostile to violate Title VII is one of fact" and depends on the totality of the circumstances. *Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 75 (2d Cir. 2001)*; *Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007)*. Relevant considerations include "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) 'whether it unreasonably interferes with an employee's work performance.'" *Patane, 508 F.3d at 113* (quoting *Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993))*.

Here, though many of the incidents Smith alleges are race-neutral, the Court nonetheless finds that the balance of her pleadings alleges facts that, if believed by a reasonable jury, would be legally sufficient to show a hostile work environment. See *id. at 113*. ("Ultimately, to avoid dismissal under *FRCP 12(b)(6)*, a plaintiff need

only plead facts sufficient to support [*12] the conclusion that she was faced with harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, and we have repeatedly cautioned against setting the bar too high in this context." (internal quotation marks omitted)).

Therefore, Defendants' motion to dismiss Counts 1 and 2 is denied.

## B. Retaliation under Title VII and § 1981 (Counts 3 and 4)

Smith alleges that Defendants retaliated against her for complaining of or opposing the race discrimination and hostile work environment, in violation Title VII and § 1981.

To state a claim for retaliation in violation of Title VII, a plaintiff must allege facts tending to show that "(1) she participated in a protected activity known to the defendant'; (2) the defendant took an employment action disadvantaging her; and (3) there exists a causal connection between the protected activity and the adverse action." *Id.* at 115.

Smith has sufficiently alleged that (1) she complained to Defendants on numerous occasions that their (and the other employees') comments and conduct were racially offensive to her; (2) Defendants stripped Smith of many of her substantive duties and then [*13] fired her; and (3) based on the proximity in time between her last few complaints in the fall of 2008 and her termination, a causal connection between the protected activity and the adverse action, see *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988)* ("Proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.").

Therefore, Smith has alleged a plausible claim for retaliation under Title VII and § 1981 and, accordingly, Defendants' motion to dismiss Counts 3 and 4 is denied.

## C. Claims of Disability Discrimination under the ADA (Count 7)

Smith asserts that Defendants: (1) discriminated against her because of her disability; (2) subjected her to a hostile work environment; and (3) failed to accommodate her disability.

### 1. Disability Discrimination

A prima facie case of discrimination under the ADA include facts showing that: (1) RPA was subject to the ADA; (2) Smith was disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (4) she suffered an adverse [*14] employment action because of [her] disability. *Jacques v. DiMarzio, Inc., 386 F.3d 192, 198 (2d Cir. 2004)*.

For one, Smith has not alleged facts sufficient to support a claim that she was disabled within the meaning of the ADA. The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. *42 U.S.C. § 12102(1)*. Fractured bones do not generally qualify as a disability within the meaning of the ADA. See *Morse v. City, 00-cv-2528, 2001 U.S. Dist. LEXIS 12795, 2001 WL 968996, at \*7 (S.D.N.Y. Aug. 24, 2001)*. To the extent Smith alleges walking as a major life activity that was affected by her fracture, she has not pled facts suggesting that her ability to walk was substantially limited. "[A] plaintiff must meet a demanding standard to establish a claim of disability based on difficulties walking." *Watson v. Arts & Entm't Television Network, No. 04-cv-1932, 2008 U.S. Dist. LEXIS 24059, 2008 WL 793596, at \*13 (S.D.N.Y. Mar. 26, 2008)*. Merely alleging "difficulty walking" does not pass this threshold. Nor has Smith pled facts adequate to show that her employers perceived her as [*15] disabled. She merely offers the conclusory statement that "Defendants perceived Plaintiff as a disabled person." Complaint, ¶ 29. That formulaic recitation of an element of her cause of action will not do under *Twombly. 127 S. Ct. at 1959*.

Moreover, Smith has not claimed that she was subject to any adverse action (*i.e.*, that she was terminated or stripped of job duties) because of her disability. "Without actual facts demonstrating discriminatory animus, discrimination is just one possibility for [RPA's] actions--as such, plaintiff's claim . . . may be conceivable, but it is certainly not plausible." *Ortiz, 2011 U.S. Dist. LEXIS 99122, 2011 WL 4056901, at \*4*.

### 2. Failure to Accommodate

As discussed, Smith has not alleged facts sufficient to demonstrate that she was disabled within the meaning of the ADA. Therefore, she has not stated a claim for failure to accommodate.[2]

> 2   To state a claim for failure to accommodate under the ADA, a plaintiff must plead facts tending to show that she was "(1) a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; [*16] and (4) the em-

ployer has refused to make such accommodations." *McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 97 (2d Cir. 2009)*

### 3. Hostile Work Environment[3]

> 3   Hostile work environment claims under the ADA are evaluated under the same standards as hostile work environment claims under Title VII. See *Disanto v. McGraw-Hill, Inc./Platt's Div., No. 97 Civ. 1090, 1998 U.S. Dist. LEXIS 12382, 1998 WL 474136, at *5 (S.D.N.Y. Aug. 10, 1998)*

As noted above, in order to state a claim for a hostile work environment, a plaintiff must plead facts that would tend to show, *inter alia*, that the complained of conduct "is objectively severe or pervasive--that is, . . . creates an environment that a reasonable person would find hostile or abusive." *Patane, 508 F.3d at 113*.

In support of her hostile work environment claim, Smith alleges six incidents: (1) an employee's comment that she "hated looking at disabled people"; (2) another comment that Smith was trying to "make money off of that leg"; (3) Finch's references to her at various times as a "lame duck", (4) on whom they did not "want to spend any more money"; (5) Finch's references to her as "crippled" or a "crippled . . . criminal"; (5) and the time that boxes were left in   [*17] front of her desk for several weeks. In the first instance, several of these incidents are alleged to have occurred prior to April 11, 2 008--including the "lame duck" and "make money" comments. These incidents are time barred because they occurred more than 300 days prior to her February 5, 2009 filing of the EEOC/NYSDHR complaint. See *Flores v. N.Y. City Human Res. Admin., No. 10-cv-2407, 2011 U.S. Dist. LEXIS 91356, 2011 WL 3611340, at *1 (S.D.N.Y. 2011)*. Even if they were not, these six allegations show, at most, "[s]imple teasing, offhand comments, or isolated incidents of offensive conduct," which do not demonstrate harassment of such a quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse. *Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir. 2004)*.

Thus, Smith has not made a plausible claim for hostile work environment under the ADA, assuming such a cause of action is available to her.[4] Defendants' motion to dismiss Count 7 is therefore granted.

> 4   The Court notes that the Second Circuit has yet to decide whether a hostile work environment claim is available under the ADA. See *Ragusa y. Malverne Union Free Sch. Dist., 381 Fed. Appx. 85, 88 (2d Cir. 2010)*.

### D.   [*18] Claims of Retaliation under the ADA (Count 8)

Smith alleges that she was "subjected to adverse employment actions because she engaged in protected activities" within the meaning of the ADA. Complaint, ¶ 70.

This claim fails because Smith has not identified a protected activity related to her disability or an adverse employment action taken because of her disability, let alone a causal connection between the two. Thus, Defendants' motion to dismiss Count 8 is granted.

### F. FMLA Claim (Count 11)

To state a claim under the FMLA, a plaintiff must plead facts showing that (1) she is an eligible employee under the FMLA and (2) RPA is an employer under the FMLA; (3) she was entitled to leave under the FMLA; and (4) she gave notice to RPA of her intention to take leave. *Vicioso v. Pisa Bros. Inc., No 98-CV-2027, 1998 U.S. Dist. LEXIS 9729, 1998 WL 355415, at *2 (S.D.N.Y. July 1, 1998)*. Plaintiff has not alleged facts in connection with any of these four elements. Thus, she has failed to state a plausible FMLA claim and Defendants' motion to dismiss count 11 is granted.

### F. Claims of Race/Disability Discrimination and Retaliation under NYSHRL and NYCHRL (Counts 5, 6, 9, 10)

#### 1. State law claims

"In this Circuit, a disability-based   [*19] discrimination claim under the NYSHRL . . . involve[s] the 'same elements' as an ADA claim." See *Crawford-Bey v. N.Y. & Presbyterian Hosp , No. 08-cv-5454, 2011 U.S. Dist. LEXIS 113073, 2011 WL 4530193, at *5 n.6 (S.D.N.Y. Sept. 30, 2011)* (internal quotation marks omitted). Because, as discussed above, Smith has failed to state any adverse action taken against her because of her disability, the Court finds that she has failed to state a corresponding claim for discrimination or retaliation under the NYSHRL.

#### 2. City law claims

Likewise, disability-based discrimination claims arising under the NYCHRL have the same elements as an ADA claim. Id. However, the Court must construe these claims "independently from and more liberally than their state and federal counterparts," to fulfill that law's "uniquely broad and remedial purposes." *Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir.2009)* (internal quotation marks omitted). With respect to retaliation in particular, the Court recognizes that a "plaintiff need not prove any 'adverse' employment

action,' to establish a claim, but only "that something happened that would be reasonably likely to deter a person from engaging in protected activity." See *Gioia v. Forbes Media LLC, No. 09-cv-6114, 2011 U.S. Dist. LEXIS 113999, 2011 WL 4549607, at *10 n.5 (S.D.N.Y. Sept. 30, 2011)* [*20] . However, the NYCHRL's more liberal standard has no impact here: Smith has "failed to link any action on behalf of Defendant[s] to a retaliatory motivation" related to her disability. *Kaur v. N.Y. City Health & Hosps. Corp., 688 F. Supp. 2d 317, 340 (S.D.N.Y. 2010)*. Thus, she has failed to state a claim for disability discrimination or retaliation under the NY-CHRL and, accordingly, the claims are dismissed.

By contrast, the Court finds that Smith has stated plausible state and city law claims for race-based discrimination, retaliation, and hostile work environment as "[t]he standards for liability under [the NYSHRL and NYCHRL] are the same as those under the equivalent federal antidiscrimination laws," such as Title VII. *Ferraro v. Kellwood Co, 440 F.3d 96, 99 (2d Cir.2006)*; see also *Torres v. Pisano, 116 F.3d 625, 629 n.1 (2d Cir. 1997)*. Thus, for the reasons discussed above, the Court will not dismiss these claims.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to dismiss is granted in part and denied in part. The motion to dismiss Counts 1, 2, 3, and 4 is DENIED. The motion to [*21] dismiss Counts 7, 8, and 11 is GRANTED. The motion to dismiss Counts 5 and 6 is GRANTED without prejudice only insofar as those claims relate to disability, and not race, discrimination and retaliation. Likewise, the motion to dismiss Counts 9 and 10 is GRANTED without prejudice only insofar as those claims relate to disability, and not race, discrimination and retaliation, respectively.

**SO ORDERED:**

/s/ Barbara S. Jones

**Barbara S. Jones**

**UNITED STATES DISTRICT JUDGE**

Dated: New York, New York
October 7, 2011

# EXHIBIT W



**ELISE STUEVECKE, Plaintiff, -against- THE NEW YORK HOSPITAL MEDI-CAL CENTER OF QUEENS, Defendant.**

**No. 01-CV-326 (FB) (RLM)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 14793*

**August 26, 2003, Decided**

**DISPOSITION:** [*1] Defendant's motion for summary judgment granted as to Plaintiff's accommodation and retaliation claims. Court declined to exercise supplemental jurisdiction on Plaintiff's state law claims. Complaint dismissed, but without prejudice as to non-federal claims.

**COUNSEL:** For Plaintiff: MICHAEL J. D'ANGELO, ESQ., Somma, Zabell & Associates, LLP, Farmingdale, NY.

For Defendant: BARBARA E. HOEY, ESQ., K. LESLI LIGORNER, ESQ., Kelley Drye & Warren LLP, New York, NY.

**JUDGES:** FREDERIC BLOCK, United States District Judge.

**OPINION BY:** FREDERIC BLOCK

**OPINION**

**MEMORANDUM AND ORDER**

**BLOCK, District Judge:**

Plaintiff Elise Stuevecke ("Stuevecke") brings this action against her former employer, defendant New York Hospital Medical Center of Queens (the "Medical Center"), alleging that the Medical Center failed to provide accommodations for her foot injury and later terminated her in retaliation for requesting the accommodations. The Medical Center moves for summary judgment. For the reasons stated below, the motion is granted.

**BACKGROUND**

The following facts, drawn from the pleadings, depositions, affidavits, and Local *Rule 56.1* statements submitted to the Court, [*2] are uncontested. *See Fed. R. Civ. P. 56.* The Court construes them in the light most favorable to Stuevecke, the non-moving party. *See Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).*

Stuevecke began her employment with the Medical Center in 1990 and at all times relevant to this action was a secretary in the Medical Center's case management department. As part of her daily duties, Stuevecke was required to transport medical records and often carried approximately thirty pounds of records up stairs and between buildings. Beginning in 1996, Stuevecke began to experience lengthy absences from work due to recurrent foot problems. She underwent surgery for her foot in July, November, and December of 1996, June of 1998, and April, August and November of 1999. With the exception of notations that she had these prolonged absences, Stuevecke consistently received exemplary written reviews from her supervisors.

The Medical Center's Medical Leaves of Absence Policy ("Leaves Policy") authorizes its employees to take up to twenty-six weeks' disability leave. Before returning to work, an employee must receive clearance from the Medical Center's Employee Health [*3] Service and present a doctor's note authorizing return to work. "If the [employee's] disability exceeds 26 weeks and the employee is unable to return to full duty, the employee will be released from payroll." Leaves Policy, P 2.1.2. The Leaves Policy also provides that "if, at a later date, the employee is able to return to the workforce, the Medical Center will accept the employee's application and make

every effort to place the individual in a suitable available position for which he/she qualifies." *Id.*, P 3.1. Stuevecke testified at her deposition that she was unaware of the Leave Policy, but acknowledged that she had received a copy of the Medical Center's employee handbook containing the policy.

Following her 1998 surgery, and after receiving the necessary clearance to return to work, the Medical Center permitted Stuevecke to wear an open-toed surgical boot, which was contrary to the Medical Center's usual practice of requiring closed-toe footwear. Stuevecke was also provided with a wheeled filing cabinet to assist her in transporting records within and between buildings. Stuevecke was unable to use the cart on a regular basis, however, because its wheels would fall off [*4] and it could not fit through some of the Medical Center's doorways. Instead, Stuevecke occasionally used shopping bags to carry the records.

After her April 1999 surgery, Stuevecke's treating physician, Dr. Peteris Dzenis ("Dr. Dzenis"), certified that Stuevecke was continuously totally disabled from the date of her surgery (April 19, 1999) through May 31, 1999. On June 9, 1999, Stuevecke met with Ken Praga ("Praga"), a nurse practitioner in Employee Health Services. Stuevecke did not have clearance from Dr. Dzenis to return to work. Calling Stuevecke "a liability," Stuevecke Dep. at 244, Praga refused to clear Stuevecke because her swollen foot did not permit her to wear closed-toe shoes and because she lacked permission from her physician. Praga acknowledged at his deposition that he had permitted at least one other employee to wear an open surgical boot, even though it would also be considered a sandal or open shoe, but claimed that the other employee did not walk as much as Stuevecke.

Stuevecke did not return to work and thereafter underwent the August 1999 surgery. She convalesced throughout September and October of that year, but was not fully healed and required additional [*5] surgery, which was scheduled for November of 1999. Between her June 9, 1999 meeting with Praga and November 16, 1999, Stuevecke did not tell anyone at the Medical Center that she planned to return to work.

By letter dated November 16, 1999, Paul Davin ("Davin"), the Medical Center's director of Human Resources, terminated Stuevecke. Davin testified at his deposition that he terminated Stuevecke after concluding that she had exceeded the amount of leave permitted under the Leaves Policy. Davin had previously terminated two to four dozen other employees for the same reason, although the record before the Court does not disclose over what period of time the other terminations occurred. There is no evidence before the Court that

Davin consulted Praga in connection with Stuevecke's termination.

On August 8, 2000, Stuevecke filed a form complaint against the Medical Center with the EEOC and the New York State Division of Human Rights. She checked the form's box for discrimination based on "disability," but not for "retaliation." In the narrative section, Stuevecke alleged that she had requested a cart to transport medical records and that she be relocated to the building containing the [*6] Medical Center's Admissions Department, which had elevators; rather than accommodate her, the Medical Center had placed her on long-term disability and later terminated her. The EEOC issued a right to sue letter on October 23, 2000.

On January 19, 2001, Stuevecke filed this action. Her six-count complaint contains three counts alleging unlawful failure to provide reasonable accommodations under the *Americans with Disabilities Act* ("ADA"), the *New York Human Rights Law* ("NYHRL"), and the *New York City Human Rights Law* ("NYCHRL"), respectively, and three counts alleging unlawful retaliation for having requested these accommodations under the same three statutes.

## DISCUSSION

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. *See Fed. R. Civ. P. 56(c)*; *see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. The burden is on the moving party to identify those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits that [*7] demonstrate the absence of a genuine issue of material fact. *See Celotex Corp., 477 U.S. at 323*. Once the moving party has carried this burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... The non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)* (quoting *Fed. R. Civ. P. 56(e)*) (other citations omitted).

### 1. Federal Claims

#### A. Reasonable Accommodation

"An employer violates the ADA when it fails to 'make reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability ... unless [the employer] can demonstrate that the accommodation would impose an undue hardship ....'" *Jacques v. DiMarzio, Inc., 200 F. Supp. 2d*

*151, 161 (E.D.N.Y. 2002)* (quoting *42 U.S.C. § 12112(b)(5)(A)*). "ADA regulations further state that an employer is required to make 'modifications or adjustments to the work environment, [*8] or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position.'" *Id.* (quoting *29 C.F.R. § 1630.2(o)(1)(ii)*).

The Medical Center contends that Stuevecke's failure to accommodate claim is time-barred; alternately, it argues that Stuevecke was not "disabled" within the meaning of the statute, and to the extent she was disabled, did not request nor require an accommodation to perform her essential job duties. The Court need not address the Medical Center's alternate arguments because it concludes that Stuevecke's failure to accommodate claim under the ADA is untimely.

A plaintiff may bring an ADA action in federal court only after timely filing a complaint with the Equal Employment Opportunity Commission ("EEOC") and receiving a right-to-sue letter. *See Legnani v. Alitalia Linee Aeree Italiane, S.P.A, 274 F.3d 683, 686 (2d Cir. 2001); Tewksbury v. Ottaway Newspapers, 192 F.3d 322, 325 (2d Cir. 1999)* (recognizing that the ADA subjects ADA claims to the same administrative exhaustion [*9] requirement as Title VII claims). In New York, a claimant must file a charge with the EEOC within 300 days of the alleged unlawful act and provide notice of the circumstances and date of the charge. *See 42 U.S.C. § 2000e-5(e)(1); Tewksbury, 192 F.3d at 327-28.* The filing requirement acts as a statute of limitations to bar all claims falling outside the 300-day period. *See Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 712 (2d Cir. 1996)*

Stuevecke "alleges that [the Medical Center] failed to reasonably accommodate her in June of 1999[.]" Plaintiff's *Rule 56.1* Counter Statement, P 2, at 1. Thus, she had 300 days from then - until April of 2000 - to file her complaint with the EEOC. She did not do so until August 8, 2000.

That Stuevecke's November 16, 1999 termination occurred within the 300-day window is immaterial. The Medical Center's alleged failure to provide reasonable accommodations and its termination of her employment are discrete acts. *See AMTRAK v. Morgan, 536 U.S. 101, 113. 153 L. Ed. 2d 106, 122 S. Ct. 2061 (2002)* (discrete discriminatory acts include termination, failure to promote. denial of [*10] transfer, and refusal to hire); *see also Lovejoy-Wilson v. Noco Motor Fuel, Inc., 263 F.3d 208, 218 (2d Cir. 2001)* (failure to provide reasonable accommodation for an otherwise-qualified employee with a disability). "Discrete discriminatory acts are not

actionable if time barred, even when they are related to acts allegedly in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." *AMTRAK 536 U.S. at 113.* Thus, a plaintiff cannot "use a termination that [falls] within the limitations period to pull in [a] time-barred discriminatory act." *Id.* (citation omitted).

Stuevecke argues that her reasonable accommodation claim should be considered timely because the Medical Center's repeated failure to accommodate her, culminating in her termination, amounted to a "continuing violation." The continuing violation exception to the 300-day filing period provides that if a plaintiff "files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely [*11] even if they would be untimely standing alone." *Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993); see also Harris v. City of New York, 186 F.3d 243, 248 (2d Cir. 1999)* ("In that situation the existence of such a continuing discriminatory practice or policy may delay the commencement of the statute of limitations period until the last discriminatory act in furtherance of it.") While the continuing violation doctrine is "usually associated with a discriminatory policy[,] ... [a] continuing violation may be found 'where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.'" *Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001)* (citing *Cornwell v. Robinson, 23 F.3d 694, 704 (2d Cir.1994))*.

Rather than allege a policy or practice of discrimination, Stuevecke's complaint points to three separate instances where the hospital allegedly failed to provide her with an accommodation: failing to provide her with a working cart, failing to move her to an office building that had elevators, and failing [*12] to permit her to wear a surgical boot while on duty. It is undisputed, however, that the Medical Center had previously permitted Stuevecke to wear an open-toed boot, that it provided her with a cart (albeit an allegedly ineffective one), and that Stuevecke did not have her doctor's permission to return to work when Praga refused to clear her in June of 1999. Under the circumstances, there is no factual basis for the Court to infer that defendant's actions arose from any explicit or implicit policy or practice to deny disabled employees reasonable accommodations. Accordingly, there was no continuing violation, and Stuevecke's ADA failure to accommodate claim, filed more than 300 days after the claim arose, is time-barred.

### B. Retaliation

As an initial matter, the Medical Center contends that it is entitled to summary judgment on Stuevecke's retaliation claim because Stuevecke did not raise it in her EEOC complaint. Although the Court generally has "no jurisdiction to hear claims not alleged in an employee's EEOC charge[,] ... claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are 'reasonably related' to those [*13] that were filed with the agency." *Shah v. New York State Dep't of Civ. Serv.*, 168 F.3d 610, 613-14 (2d Cir. 1999). "A claim raised for the first time in the district court is 'reasonably related' to allegations in an EEOC charge 'where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 83 (2d Cir. 2001) (citing *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402 (2d Cir.1993)).

Although Stuevecke did not check the "retaliation" box on the EEOC Charge form, her narrative description of the Medical Center's alleged wrongdoing could reasonably have prompted an investigation of retaliatory conduct based on Stuevecke's allegation that "*Instead of allowing me to return to work my former employer placed me on long term disability and subsequently terminated* my services on or about November 16, 1999." Charge of Discrimination, at 1 (emphases added). The Court concludes that Stuevecke's retaliation claim is reasonably related to her EEOC claim of failure [*14] to provide reasonable accommodations, and fell within the scope of the EEOC investigation. Since Stuevecke's termination occurred within the 300 day period preceding the filing of her EEOC complaint, her retaliation claim is timely.

The ADA prohibits "retaliation against any individual who has asserted rights under the ADA[.]" *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999). Retaliation claims under the ADA are analyzed under the familiar *McDonnell-Douglas* burden-shifting framework. *See Treglia*, 313 F.3d at 719. To establish a *prima facie* case for retaliation, plaintiff has a *de minimus* burden to prove that: "(1) she engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Id.* If plaintiff carries this burden, the defendant has a burden of production to demonstrate a non-discriminatory reason for its action. *Id.* "The ultimate question is whether the employer intentionally discriminated, and proof that 'the [*15] employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason ... is correct.' In other words, 'it is not

enough ... to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.'" *Reeves Sanderson Plumbing Products, Inc.* 530 U.S. 133, 146-47, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993))).

Assuming, without deciding, that Stuevecke has satisfied the first three elements, the Court concludes that she has not satisfied the causality element. To establish a causal connection between the adverse employment action (her termination) and the protected activity (seeking reasonable accommodation), Stuevecke "must show that the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent." *Treglia*, 313 F.3d at 721.

Stuevecke has not presented facts which would permit a reasonable jury to infer that the decision to fire her was motivated by her request for accommodations. Davin, [*16] the director of the Medical Center's Human Resource Department, testified that he terminated Stuevecke to comport with company policy regarding excessive absences and had terminated between two and four dozen employees for precisely the same reason. The Medical Center's policy in this respect was set forth in the employees' handbook, a copy of which Stuevecke had received. There is no evidence that Davin had any knowledge of Praga's June 9, 1999 meeting with Stuevecke or that he terminated Stuevecke for any reason other than absences from work. And while the Second Circuit "has held that a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation[,]" *id.*, the Medical Center's alleged failure to accommodate and Stuevecke's termination occurred more than five months apart -- a period which is too distant to permit a jury to find a causal connection between the two events based on time proximity. *Cf. id.*, 313 F.3d at 721 (events occurred a month apart); *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (events occurred twelve [*17] days apart). Having failed to make out a *prima facie* case, the Court grants summary judgment in favor of the Medical Center on Stuevecke's retaliation claim under the ADA.

## 2. State Claims

Stuevecke's remaining failure to accommodate and retaliation claims are based on the NYHRL and NY-CHRL. Because the parties are not diverse, the Court would have jurisdiction over these claims only by the exercise of supplemental jurisdiction. *See* 28 U.S.C. § 1367. The Supreme Court and Second Circuit have instructed that district courts ordinarily should decline to decide pendent state claims. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7, 98 L. Ed. 2d 720. 108 S.

*Ct. 614 (1988)* ("In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine - judicial economy, convenience, fairness, and comity - will point towards declining to exercise jurisdiction over the remaining state-law claims."); *Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001)* ("We think that in the absence of any remaining federal claims, **[*18]** the appropriate analytic framework to be applied to discrimination claims based on a 'disability' as defined by New York state and municipal law is a question best left of the courts of the State of New York."); *Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998)* ("In general, where the federal claims are dismissed before trial the state claims should be dismissed as well."); *see also Sussle v. Sirina Protection Sys. Corp., 269 F. Supp. 2d 285, 2003 U.S. Dist. LEXIS 9627, 2003 WL 21346935, at *26 (S.D.N.Y. 2003)* (declining to exercise supplemental jurisdiction over NYHRL and NYCHRL disability discrimination claims). The Court recognizes that the state courts are better positioned to "decide for themselves whatever questions of state law this case may present," *Giordano, 274 F.3d at 754*, and will not exercise jurisdiction over the remaining claims.

## CONCLUSION

The Court grants summary judgment in favor of the Medical Center as to Stuevecke's accommodation and retaliation claims grounded in the ADA, and declines to exercise supplemental jurisdiction on her claims under the NYHRL and NYCHRL. Accordingly, the complaint is dismissed, but without prejudice **[*19]** as to the non-federal claims.

## SO ORDERED.

FREDERIC BLOCK

United States District Judge

August 26, 2003