UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

RICHARD LeBLANC,

       *Plaintiff*,

       *v*.

UNITED PARCEL SERVICE, INC.,

       *Defendants*.

---------------------------------------------------------------X

**11 CV 6983 (KPF)**

**AFFIDAVIT OF RICHARD LeBLANC IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I, Richard LeBlanc, being duly sworn, depose and say that:

    1.    I am the Plaintiff in the above-referenced action, was born July 5, 1963 and was terminated by UPS in retaliation for being too old, too costly to insure, too disabled, and for bothering them with too many requests for reasonable accommodation.

    2.    I am of clear, sound, and healthy mind and understand fully the circumstances that led to the illegal termination of my employment by United Parcel Service, Inc.

    3.    I was the victim of illegal discrimination in that I was denied a reasonable accommodation related to my medical condition and terminated from my employment due to my repeated requests for an accommodation.

    4.    My requests for accommodation were repeatedly ignored and thereby denied by UPS.

    5.    On about April 15, 1991, I was hired by UPS as a Driver at their Elmsford location, earning fifteen dollars ($15) per hour with benefits.

    6.    Up until April 20, 2011, I worked at UPS, receiving promotions, positive performance evaluations, and salary increases yearly until 2011, when in retaliation for seeking

repeatedly seeking accommodation, I was demoted from Driver to On-Car supervisor to a Pre-Load Dispatch Supervisor ("PDS").

7. Through my employment with UPS, I never once received a negative performance review.

8. Before May 2007, I had never had a serious medical condition. However, in about May 2007, I was admitted to the hospital and diagnosed as having had a heart attack.

9. As a result of my heart attack, I was out of work on medical leave for six (6) weeks and therefore unable to renew my DOT Card, which would have enabled me to drive for UPS.

10. I was not eligible for the DOT card after I began taking medication for my heart condition. I could perform all of my job duties at UPS except driving trucks.

11. Due to my medical condition, my cardiologist wrote a letter to UPS requesting that I be accommodated, specifically that I should be transferred to a location closer to where I lived because my daily commute to work exacerbated my medical condition.

12. A transfer closer to my home would have reduced my commute by two (2) to two and one-half (2.5) hours per day, thus alleviating an extremely stressful commute that exacerbated my medical condition.

13. For example, I could have been transferred to Watertown, a UPS location situated four (4) miles away from my former home, or to Brookfield, another UPS location situated about ten (10) miles away from my former home.

14. On about February 15, 2008, I submitted the letter from my cardiologist to UPS Human Resources Manager, Yvonne Quinones.

15. When I submitted the letter from my cardiologist to HR, they were not responsive and did not take my request seriously. I followed up on my request for a medical accommodation multiple times by telephoning HR and discussing the request with my supervisors, Dennis Quinn and Mike Feroney. *See also*, *Affidavit of Dennis Quinn*, sworn to October 20, 2011, ¶¶ 5–9.

16. UPS, however never provided me with any accommodation, and I was never directed to take any further action other than to wait for a response, which was never provided except that they were "looking into it," or "working on it." *See* ¶¶ 26–27 below. UPS failed to provide me with any accommodation whatsoever.

17. In about March 2009, I again submitted a letter to Rita Tureios.

18. Although there were open positions in both Watertown and Brookfield, two (2) UPS locations closer to where I lived, my request for this necessary and legitimate medical accommodation was repeatedly ignored and denied without reason.

19. In fact, not only was my request for medical accommodation ignored and denied without justification, in May 2008 I was demoted to night shifts as a PDS. I believe that this retaliatory action was taken because of my medical condition and my legitimate and good faith requests for accommodation, which UPS found irritating.

20. The only reason given to me was that I was unable to obtain a DOT card, a fact directly related to my medical condition and about which my supervisor, Division Manager Mike Michalak, complained frequently.

21. I deny that I was demoted to PDS in response to a request for accommodation or that it accommodated any request. My commute from Newtown, Connecticut to Bronx, New

York was between two (2) and two and one-half (2.5) hours daily, which exacerbated my health problems.

22. When UPS demoted me to PDS, I was made to work night shifts with arduous hours, which further exacerbated my medical condition and created undue stress. I was working twelve to thirteen (12–13) hours a day and was suffering from insomnia. This created a serious strain on my heart condition and overall health in addition to straining my relationship with my family.

23. I continued to seek a position closer to my home as well as a position that did not require that I work at night and try to sleep during the day.

24. In about February 2010, I again submitted a letter from my cardiologist to Roberta Ellis, an HR supervisor, and then telephoned her multiple times regarding the requested medical accommodation.

25. The high level of stress and anxiety caused by my job, my hours and the unreasonable commute caused me to be hospitalized for chest pains two (2) additional times, both of which resulted in me having to stay in the hospital for three (3) consecutive days.

26. In about February 2011, I again asked Rita Tureios about the transfer, at which point she told me again that she was "looking into it."

27. That same month, I also asked Pat Shepard, the Division Manager, about my request for a medical accommodation, to which Mr. Shepard responded that he was "working on it."

28. Ruth Herring, another UPS employee, requested a move to Atlanta, Georgia for personal reasons, not even motivated by any medical issues. This request was granted shortly after it was made.

29. I was never provided with any medical accommodation whatsoever, in spite of my repeat submission of medical documentation and repeated follow-up requests. In addition, at no point did anyone even imply that I was required to take additional steps to request a transfer. If fact, I was repeatedly told the opposite by UPS's HR and management: that I did not need to do anything else and they were "looking into it," or "working on it."

30. In about March 2011, seven (7) employees under my direct supervision participated in hazmat training.

31. After the training, at which I was present, all seven (7) employees signed the roster, vouching that they had been present for the hazmat training.

32. As per the protocol and practice of UPS, I handed the signed roster to the Safety Supervisors, who in the past had frequently lost various important documents, including signed rosters.

33. The morning that Keter, a company that was hired to do inspections of safety was scheduled to do an audit of UPS, the same Safety Supervisors who previously had in their possession the signed roster approached me and requested that all seven (7) employees repeat the hazmat training because they had misplaced the signed roster.

34. At least two (2) other supervisors, John Argiento and Donna Manuza, were asked that their employees re-complete the hazmat or other trainings because the signed rosters had been lost.

35. Because the Safety Supervisors approached these three (3) supervisors at 10:00 a.m. when the employees had left at 8:00 a.m., and because the hazmat training had to be completed before the Keter audit that day, I, along with the two (2) other supervisors, re-created

the same safety roster which had been lost by the Safety Supervisors and previously signed by approximately eight (8) to ten (10) employees.

36. In about April 2011, I was approached about the safety roster, which was submitted as part of the Keter audit, by a Security Manager.

37. I never denied re-creating the safety roster, which had been lost by the Safety Supervisors who had been present for the hazmat training of all employees and were able to confirm that they had all been present.

38. I never denied placing about thirty (30) U.S.P.S. and FedEx packages next to a mailbox in the Bronx after I tried to bring them to the Post Office. My manager at the time, Dennis Flood, directed me to place them there. Mr. Flood was not disciplined or terminated. Billy Connect drove me to the mailbox where the packages were left. Mr. Connect was not disciplined or terminated. I was not disciplined or terminated for this activity.

39. Despite never having previously received a negative performance evaluation in my twenty-one (21) years of employment at UPS and having received a salary increase three (3) weeks prior based on positive performance reviews, I was summarily terminated. The reason alleged by UPS at that time was dishonesty with regard to the list.

40. In addition to my exemplary performance, in the last few years with UPS, there had not had any injuries among the ninety-four (94) people whom I supervised as a Safety Supervisor. This excellent result is extremely rare and potentially unprecedented in the country.

41. However, based on my continuous requests for medical accommodation, which were always ignored and denied and the commendation that I received immediately prior to my termination, UPS terminated me. It was part of their retaliation for my continuously seeking reasonable accommodation.

42. Both supervisors who were accused by Defendant UPS of the same actions concerning the safety roster were not terminated. Neither had a disability and neither requested accommodation.

43. At a UPS Peer Review of my termination, the review board voted to reinstate my job. UPS decided not to reinstate me anyway.

44. UPS Peer Review did not raise, at any point, the issue regarding packages placed near a mailbox in the Bronx.

45. It is extremely uncommon for UPS employees to not have their jobs reinstated when the peer review board votes to reinstate that employee. I am not aware of it ever having occurred before.

46. The second of my two (2) hospitalizations occurred about four (4) weeks before my termination. Due to that stay, I was out of work for three (3) days.

47. Moreover, Division Manager Mike Michalak vocalized at least three (3) times his frustrations with scheduling me because I no longer had a DOT card, as a direct result of my medication and medical condition. Accordingly, I was limited in my position as a PDS.

48. As a result of my termination, I suffered from even more stress and anxiety— creating further strain on my health and my family life.

49. After my termination, I was not able to find work in Newtown, Connect and had to move my family, including three (3) school-aged children to Tennessee.

50. I declare under penalty of perjury that the foregoing facts are known by me to be true and correct of my own knowledge.

Dated: October 4, 2013

Richard LeBlanc

Sworn to before me on October 4, 2013

Notary Public