UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  April 11, 2014

RICHARD LeBLANC,

                    Plaintiff,

           v.

UNITED PARCEL SERVICE,

                   Defendant.

------------------------------------------------------X

11 Civ. 6983 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

      Richard LeBlanc was terminated from his employment at United Parcel Service ("UPS") in April 2011 after two incidents in which he admitted to conduct that was violative of UPS company policies.  LeBlanc then brought this lawsuit against UPS, claiming that the proffered reasons for his termination were pretextual; that he was disabled during the relevant time period; and that he had suffered discrimination, retaliation, and an unlawful failure to provide reasonable accommodation for his disability, all in violation of the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 8-131 (the "NYCHRL").  UPS has moved for summary judgment on all claims.  That motion is granted in part and denied in part.

# BACKGROUND[1]

## A.   Factual Background

### 1.   Plaintiff's Employment at UPS from 1991 to 2007

Plaintiff Richard LeBlanc was hired by Defendant UPS as a Helper in or about April 1991.  (Am. Compl. ¶ 6).  Shortly thereafter, Plaintiff was promoted to a full-time Package Car Driver, a position he held for approximately 10 years.  (Def. 56.1 ¶ 2).

In February 2001, Plaintiff was promoted to the position of On-Road Supervisor, a position that required him to obtain and maintain a card from the Department of Transportation (the "DOT") that indicated that Plaintiff was medically fit to drive a commercial motor vehicle.  (Def. 56.1 ¶ 3; LeBlanc Tr. 23:24-25:7).  In his role as On-Road Supervisor, Plaintiff worked approximately 13 to 14 hours a day, beginning at around 6:00 a.m. each day, and spent about 90 percent of his time on the road.  (Def. 56.1 ¶ 4; LeBlanc Tr. 16:22-25, 23:21-23).  In this capacity, Plaintiff was posted to the UPS

---

[1]   Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York (the "Local Rules") requires a party moving for summary judgment to submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Rule 56.1(a).  The movant's asserted facts are deemed to be admitted unless specifically controverted by the statement served by the opposing party.  Local Rule 56.1(c).

The facts in this Opinion are drawn from Defendant's Rule 56.1 Statement ("Def. 56.1"); Plaintiff's responses thereto ("Pl. 56.1 Response"); Plaintiff's affidavit of October 4, 2013 ("LeBlanc Aff.") (Dkt. #48); the declaration of Christine Rowan (Dkt. #44); the declaration of Walker G. Harman and the exhibits thereto (Dkt. #50), including the affidavit of Dennis Quinn (Harman Decl., Ex. C); and the affirmation of Heather Weine Brochin and exhibits thereto (Dkt. #45).  For convenience, citations to a deposition transcript will be referred to as "[Name] Tr."  Defendant's supporting memorandum is referred to in this Opinion as "Def. Br."; Plaintiff's opposition memorandum as "Pl. Opp."; and Defendant's reply memorandum as "Def. Reply."

facility in Elmsford, New York, and later was transferred to the facility located
on Brush Avenue in the Bronx, New York.  (Def. 56.1 ¶ 5; LeBlanc Tr. 17:6-15).
The Brush Avenue facility was approximately one hour and ten minutes from
Plaintiff's home in Newtown, Connecticut, which resulted in an approximately
two-hour daily commute.  (Def. 56.1 ¶ 5; LeBlanc Tr. 19:16-22, 120:5-7).

### 2.     Plaintiff's Employment at UPS from 2007 through Early 2008

In May 2007, Plaintiff suffered a sudden heart attack and, as a result,
took a two-month leave of absence from his employment with Defendant.  (Def.
56.1 ¶ 6; LeBlanc Tr. 32:22-33:21).  In August 2007, following his leave of
absence, Plaintiff returned to his position as On-Road Supervisor at the Brush
Avenue facility.  (Def. 56.1 ¶ 7; LeBlanc Tr. 37:8-20).  Plaintiff continued his
role as On-Road Supervisor at the Brush Avenue facility until approximately
May 2008, at which time Plaintiff was transferred to the position of Preload and
Dispatch Supervisor ("PDS").   (Def. 56.1 ¶ 11; Pl. 56.1 Response ¶ 11; LeBlanc
Tr. 37:21-24, 38:4-21).  Plaintiff's position as a PDS did not require him to be
on the road, but instead required him to unload packages and dispatch other
UPS drivers.  (LeBlanc Tr. 41:17-23, 47:23-48:3).  This position required that
Plaintiff work from approximately 1:00 a.m. to 1:00 p.m., or approximately 12
hours a day.  (*Id.* at 38:4-17, 46:18-23, 49:3-5).

### a.     Plaintiff's Requests for Accommodation

As detailed in this section, Plaintiff claims that on numerous occasions
between 2008 and 2011, he asked Defendant to transfer him to a facility closer
to his home, so that, in light of his heart attack, he would have more time to

3

exercise, and would not be subjected to a stressful, two-hour commute.

Defendant has no record of Plaintiff having made such requests.  (Rowan

Decl. ¶ 5).

### i.    The 2008 Request to Yvonne Quinones

On February 12, 2008, Plaintiff received a letter from his treating

physician, Dr. Harvey Kramer, that stated in relevant part:

> To whom it may concern:
>
> This 44-year-old gentleman had a myocardial infarction (heart attack) in May 2007.  He is having some chest pain at this point.  His cholesterol is not adequately controlled and his weight remains a problem.  Because of his long commute to work in the Bronx, he does not have time to exercise.
>
> I have strongly recommended that he be transferred to a job with your company closer to his home here in Newtown, Connecticut.  This would help him better maintain his health and be a long-term better employee for UPS with fewer days of absenteeism due to health problems.  He would be able to exercise if he saved some time on his commute to work.
>
> I hope you will consider this recommendation.

(Brochin Aff., Ex. E).

Shortly after receiving this letter, in the spring of 2008, Plaintiff provided

it to a UPS Human Resources Manager, Yvonne Quinones.  Plaintiff initially

testified that he did so after he was transferred to PDS, because the transfer to

the night shift impacted his sleep patterns and caused him stress.  (LeBlanc

Tr. 115:17-116:25, 119:8).  When it was pointed out to him that his transfer to

PDS occurred in May 2008, several months after the date of the letter, Plaintiff

reversed himself and stated that he provided the letter to Quinones while he

was still an On-Road Supervisor and that he experienced stress because of that job. (*Id.* at 125:18-126:6). Plaintiff testified that he told Quinones that he wished to transfer to UPS's Connecticut facilities in Danbury or Watertown, in either a pre-load or a sort position. (*Id.* at 130:2-14).

Quinones informed Plaintiff after receiving the doctor's letter that she would give the letter to the relevant division manager. (LeBlanc Tr. 128:6-15). Quinones did not instruct Plaintiff to file a transfer request or any other documentation formally requesting a transfer to another facility, and Plaintiff did not do so. (*Id.* at 129:3-10). Plaintiff followed up with Quinones regarding the status of his transfer request approximately one week after the initial request and again approximately four weeks later. (*Id.* at 130:15-18). After "nothing happened," Plaintiff again followed up with Quinones, and she informed Plaintiff that there were no vacant positions available due to a company-wide hiring freeze. (*Id.* at 130:2-14, 131:17-132:7).

### ii.   The 2009 Requests to Rita Turcios

According to Plaintiff, in March 2009, with no progress evident on the transfer request he had made approximately one year earlier, Plaintiff approached Rita Turcios, another Human Resources Manager at UPS, about his desire to transfer, and provided her with a copy of the doctor's letter. (LeBlanc Tr. 132:15-133:10). Dennis Quinn, Plaintiff's supervisor at the time, was aware of this request. (Quinn Aff. ¶¶ 5-6). Plaintiff overheard Quinn tell Turcios to "[s]ee what you can do. Get him a little closer." (LeBlanc Tr. 134:23-135:6). Plaintiff testified that he spoke with Turcios three or four times

5

about his desire to transfer to a UPS facility closer to his home in Connecticut. (*Id.* at 135:7-9; *see also id.* at 138:5-17 (acknowledging the absence of any written documentation of his interactions with Turcios)).  Turcios did not explain how to apply for a transfer, and did not follow up with Plaintiff regarding his request.  (*Id.* at 136:12-137:5).

### iii.    The 2010 Requests to Mike Feroni and Roberta Ellis

In or about February 2010, approximately one year after his conversations with Turcios and two years after his conversations with Quinones, Plaintiff spoke with a UPS Division Manager, Mike Feroni.  (LeBlanc Tr. 142:17-143:5).[2]  Plaintiff asked Feroni if he knew anyone in the Danbury facility who could help Plaintiff transfer to that location; Plaintiff conveyed that the reason he wished to transfer was to be closer to home because of his heart condition.  (*Id.* at 144:12-21, 145:5-12; *see also* Quinn Aff. ¶¶ 7-8).[3]  At or around this same time, Plaintiff spoke with Roberta Ellis, a UPS Human Resources supervisor, about his request to transfer to a facility closer to his home.  (LeBlanc Tr. 167:2-168:12).  Again, nothing happened with respect to Plaintiff's request.

---

[2]    Feroni's name is spelled differently throughout Plaintiff's opposition papers.  (*See, e.g.*, LeBlanc Tr. 144 ("Feroni"); Pl. Opp. 22 ("Ferony"); Quinn Aff. ¶¶ 5-6 ("Feroney")).

[3]    Plaintiff also recalled speaking with Feroni about his condition in or about the fall of 2007, after Plaintiff returned from medical leave.  (LeBlanc Tr. 163:17-164:18).  In those discussions, the two men spoke of, among other things, Plaintiff's desire for a transfer because of the stress of his job as an On-Road Supervisor.  Plaintiff recalled that, as a result of those conversations, Feroni helped move Plaintiff to PDS in order to shorten his work day.  (*Id.* at 163:21-164:14).  Plaintiff does not claim in opposing the instant motion that the transfer was an accommodation for his medical condition, but he in fact claims that the transfer was a "demotion" evidencing discrimination on the part of UPS.  (LeBlanc Aff. ¶¶ 19, 21).

### iv.  The 2011 Requests to Pat Sheppard and a UPS Regional Representative

At some point in 2011, Plaintiff asked Pat Sheppard, a Division Manager, for his help to transfer to a facility closer to his home.  (LeBlanc Tr. 147:12-148:3).  Plaintiff asked Sheppard if he could help him move closer to home because of his heart condition.  (*Id.* at 147:25-148:6).  Plaintiff also sought assistance from an unnamed UPS regional representative who worked in the Danbury area and was visiting the Brush Avenue facility for an inspection.  When the representative returned to the facility a week or two later, he indicated to Plaintiff that he was "still looking," ostensibly for a new position for Plaintiff.  (*Id.* at 151:20-153:10).  Yet again, nothing happened with respect to Plaintiff's request.

Plaintiff testified that all of these individuals were aware that his request to transfer closer to his home stemmed from his heart condition.  (LeBlanc Tr. 150:13-21).  Defendant has no record of receiving any paperwork from Plaintiff relating to his requests for medical accommodation, and Plaintiff conceded that no written requests attended these oral transfer requests. (Rowan Decl. ¶ 5; LeBlanc Tr. 146:14-16, 168:8-10).  Plaintiff contends, however, that it was UPS's obligation to "direct[ him] to take any further action other than to wait for a response."  (LeBlanc Aff. ¶ 16; *see also id.* at ¶ 29 ("[A]t no point did anyone even imply that I was required to take additional steps to request a transfer.")).  Indeed, at his deposition, Plaintiff testified that each of the individuals to whom he made an unsuccessful transfer request — including Yvonne Quinones, Rita Turcios, Dennis Quinn, Mike Michalak, and Roberta

Ellis — had discriminated against him by "not lead[ing him] to the right process for the information [he] needed."  (LeBlanc Tr. 275:20-21; *see generally id.* at 268:4-277:2 (amplifying claim)).

      **b.**     **Plaintiff's Transfer to PDS**

      While the Court is appropriately reluctant to wade into factual disputes in the context of a summary judgment motion, it is compelled to do so with respect to several issues as to which Plaintiff has presented markedly contradictory evidence, including the issue of Plaintiff's transfer to PDS.  In his affidavit, Plaintiff contends that: (i) he was "demoted to night shifts at PDS"; (ii) the alleged demotion was a "retaliatory action [that] was taken because of my medical condition and my legitimate and good faith requests for accommodation"; (iii) the transfer to PDS was not "in response to any request for accommodation," nor did it "accommodate[] any request."  (LeBlanc Aff. ¶¶ 19, 21).  These are very serious allegations, and the Court takes them very seriously.  Precisely for this reason, the Court is troubled that Plaintiff testified to nothing of the sort at his deposition.

      When first asked about the move to PDS, Plaintiff testified simply, "That's where they put me."  (LeBlanc Tr. 38:21).  Plaintiff recalled the decision being made by Division Manager Mike Feroni; while Plaintiff recalled no explanation being given, he acknowledged that it was "typical for UPS supervisors to be moved around."  (*Id.* at 45:7-8; *see also id.* at 18:22-23 (testifying that UPS "just move[d] supervisors wherever they need them")).  Plaintiff also acknowledged that the PDS position was a "full-time operations supervisor

job," as had been his prior position of On-Road Supervisor, and that his compensation remained the same. (*Id.* at 45:17-22, 48:14-15). Moreover, Plaintiff acknowledged that he never sought a transfer back to On-Road Supervisor at the Brush Avenue facility, because he enjoyed working at PDS. (*Id.* at 49:11-50:6).

Later on in his deposition, however, Plaintiff suggested that his transfer to PDS was in fact a recognition of lingering medical issues Plaintiff had upon his return to UPS, inasmuch as it was the product of discussions with Mike Feroni concerning the stress of Plaintiff's job as an On-Road Supervisor:

> A. Quite a few times. Me and Mike [Feroni] . . . talked a lot.
>
> Q. When you had these conversations, were you suggesting that it would be better for you and you would be happier if you moved closer to home?
>
> A. And it would help my health.
>
> Q. So you specifically talked about your health?
>
> A. Yes.
>
> * * *
>
> Q. During [the approximately four-week period when Plaintiff returned from medical leave and was supervised by Feroni], did you have any conversations with [Feroni] about a transfer?
>
> A. Yes.
>
> Q. You did?
>
> A. Yes.
>
> Q. Tell me your conversations.

9

> A. *It was just that, you know, it was very stressful.*
> *That working so many hours, 5 hours a day on car.*
> *And that's when he got me to work the preload [PDS].*
>
> Q. So after you told him that you were working a lot of
> hours on car, he moved you to [PDS]?
>
> A. Yes.
>
> Q. To shorten your day a little bit?
>
> A. (The witness nods head.)
>
> Q. You have to speak.
>
> A. Yes.

(LeBlanc Tr. 161:25-164:14 (emphasis added)).  And, in fact, Plaintiff's transfer
from On-Road Supervisor to PDS shortened his work day by two hours.  (*Id.* at
121:19-122:4).

### c.   Plaintiff's DOT Card

The parties do not dispute that Plaintiff's DOT card expired in 2007 and
was not renewed.  (LeBlanc Tr. 38:22-39:14).  Plaintiff claimed that his DOT
card expired in 2007, after his heart attack, at a time when he was on
medication "for his platelets" that caused lightheadedness; as a result, he could
not renew the card.  (*Id.* at 8:22-48:16).  Plaintiff testified, however, that he
stopped taking the medication that that impaired his driving ability before he
was transferred to PDS.  (*Id.* at 80:20-81:7, 232:23-233:22).  Thus, Plaintiff
testified that he allowed his DOT card to remain expired after May 2008
because he did not need it for his job at PDS, and not because he was on
medication that would have prevented him from renewing the card.  (*Id.* at
80:20-81:7).

In this litigation, Plaintiff claims that his alleged demotion to PDS was a product of his failure to renew the card, which he claims was "directly related to [his] medical condition and about which my supervisor, Division Manager Mike Michalak, complained frequently." (LeBlanc Aff. ¶ 20).   However, that "direct relation" was not borne out by Plaintiff's testimony.   According to Plaintiff, Michalak's request did not come until three weeks prior to Plaintiff's termination in April 2011.   (LeBlanc Tr. 299:15-300:12).   Thus, instead of being unable to renew his DOT card because of medical reasons, Plaintiff failed to renew his DOT card because he "didn't have the chance by the time" Michalak asked him.  (*Id.* at 299:13-14).

### 3.    Plaintiff's Termination from UPS

Defendant UPS is, and was during the relevant period, required by law to comply with various safety obligations set forth by the Occupational Safety and Health Administration ("OSHA").  (Def. 56.1 ¶¶ 25-26).  During the course of his employment, Plaintiff was responsible for training those employees whom he supervised regarding their compliance with these regulations.  (LeBlanc Tr. 85:9-11).  In 2011, Plaintiff conducted a hazardous materials training for approximately 87 employees.  Each employee was required to sign in and attend the training session, watch a video, and answer a series of multiple-choice questions about the video.  (*Id.* at 85:22-87:25).

In March 2011, Defendant's Brush Avenue facility was audited by an outside consultant to ensure that Defendant was in compliance with its mandated safety obligations.  (Def. 56.1 ¶ 25).  Thereafter, auditors approached

11

Daniel Minesinger, a UPS manager, with concerns that some of the training rosters submitted to the auditors had been falsified. (Minesinger Tr. 44:1-45:1). Minesinger expressed these concerns to Jim Fitzgerald, the director of security for UPS's North Atlantic District, who then launched an investigation of the Brush Avenue facility. (*Id.* at 44:2-46:9).

In the course of his investigation, Fitzgerald uncovered evidence that: (i) a manager had contacted his drivers and informed them that they (the drivers) did not have to speak to the auditors, but rather could simply punch out and go home; (ii) various managers had conducted improper training procedures; (iii) managers had falsified training documents; (iv) managers had failed to require certain employees to verify that they had completed the training; and (v) certain employees had abandoned numerous packages at a United States Post Office. (Minesinger Tr. 48:20-49:19). Fitzgerald provided Minesinger with the names of management employees, including Plaintiff, who were suspected of wrongdoing. (*Id.* at 52:5-13, 54:3-14).

Following Fitzgerald's internal investigation and corresponding recommendations, Defendant determined that Plaintiff had falsified training documents submitted in connection with the outside audit. (Minesinger Tr. 67:7-13). When questioned shortly thereafter, Plaintiff admitted to an employee in UPS's Loss Prevention Department that he had falsified the training records by signing the names and filling out the multiple-choice examinations for approximately eight to ten employees. (LeBlanc Tr. 90:5-23). Plaintiff also admitted that he had attempted to make the handwriting on all of

these forged records slightly different in order to make them appear more authentic. (*Id.* at 93:16-19).  On March 30, 2011, Plaintiff signed a written statement acknowledging that he forged the training records. (Brochin Aff., Ex. H).[4]  Plaintiff further acknowledged at his deposition that the falsification of these records was inconsistent with UPS's integrity policy and codes of conduct. (LeBlanc Tr. 91:5-10).

In or around March 2011, Plaintiff was implicated in, and admitted to, a second violation of UPS company policy.  As part of his employment as a PDS, Plaintiff was responsible for addressing, sorting, and arranging for the transport of certain United States Postal Service ("USPS") packages to nearby post offices for delivery. (LeBlanc Tr. 53:3-54:22).  Over the course of several weeks, Plaintiff left literally dozens of USPS packages on the street next to a post office mailbox in the middle of the night. (*Id.* at 60:21-63:19).  Plaintiff initially suggested during his deposition that his supervisors wanted him to "get rid" of the USPS packages, but then acknowledged that he had never been instructed by anyone at UPS to abandon the USPS packages in the manner that he employed. (*Id.* at 65:8-14, 68:2-10).

On one such occasion, on March 16, 2011, Plaintiff left a number of USPS packages by a mailbox in the Bronx; shortly thereafter, a local

---

[4]     Plaintiff's written statement to Defendant states:

> I Richard LeBlanc fals[ified] the hazmat[] sign-[in] sheets and test because [the auditor] was coming and they were overdue.  I signed the[ir] names and did the test.  This was the first time that I had done this.  I planned on doing them over this week but have been on the belt because we [have] been really crazy.  [No] one knew I did this I took it upon myself to do it.

(Brochin Aff., Ex. H).

newspaper published an article detailing the event.  (Brochin Aff., Ex. J).
Plaintiff was subsequently questioned by UPS's Loss Prevention Department
and admitted to leaving the USPS packages unattended alongside of a post
office mailbox.  (LeBlanc Tr. 74:10-23).  On March 30, 2011, Plaintiff signed a
written statement admitting that he had abandoned the USPS packages.
(Brochin Aff., Ex. I).

Plaintiff was terminated from UPS on April 20, 2011, approximately three
weeks after he admitted to the falsification of the training documents and the
overnight abandonment of the USPS packages.  (LeBlanc Tr. 106:21-107:14,
175:9-13).  Plaintiff was informed by his supervisors that the reason for his
termination was dishonesty.  (*Id.* at 107:12-14).[5]

Plaintiff subsequently sought review of his termination through
Defendant's Employee Dispute Resolution process ("EDR").  (LeBlanc Tr. 174:9-
18).  Plaintiff elected to pursue peer review, in which a panel of three UPS
employees hears both sides of a story and issues a non-binding

---

[5]    Plaintiff attempts to create a material issue of fact by alleging that Defendant's
witnesses gave divergent reasons for Plaintiff's termination.  In particular, Plaintiff
argues that Defendant's Rule 30(b)(6) witness, Beverly Riddick, stated that Plaintiff was
terminated only because he abandoned the USPS packages, while a different witness,
Daniel Minesinger, cited the falsification of documents as the reason.  (Pl. Opp. 11).  A
review of the deposition transcripts, however, demonstrates no such contradiction.
While Riddick testified to her recollection of meetings in which the USPS incident was
discussed, the testimony cited by Plaintiff concerned the appropriate classification for
Plaintiff's termination in Defendant's computer system, and she made clear that she did
not recall the precise reason for Plaintiff's termination, except that it involved Plaintiff's
misconduct.  (*Compare* Riddick Tr. 42:20-43:12, *with id.* at 92:9-13).  In any event, the
mere fact that Defendant's 30(b)(6) witness testified to only one of Defendant's
legitimate, non-retaliatory reasons would not suffice to defeat an otherwise appropriate
motion for summary judgment.  Minesinger, the person responsible for Plaintiff's
ultimate termination, consistently testified that Plaintiff was terminated for violations of
Defendant's integrity policies, which included *both* the falsification of documents and
the abandoned USPS packages.  (Minesinger Tr. 48:18-49:17, 97:6-12, 122:2-10).

recommendation.  (Minesinger Tr. 98:12-18).  In his peer review request form, Plaintiff described his work-related issue as "[s]igning of forms were done and lost packages."  (LeBlanc Tr. 185:17-18).  Significantly for purposes of the present motion, Plaintiff did not include any allegations of disability discrimination, nor did he mention any requests to transfer to a different facility.  (*Id.* at 186:6-187:11).

Following Plaintiff's peer review hearing, the panel recommended that Plaintiff be reinstated to his previous position.  (Minesinger Tr. 100:13-16).  Defendant rejected the peer review panel's recommendation to reinstate Plaintiff and upheld his termination.  (*Id.* at 102:24-103:20).  Minesinger testified that the recommendation was rejected because UPS believed that the facts presented by Plaintiff to the peer review panel differed dramatically from those uncovered during the disciplinary investigation.  (*Id.* at 102:24-103:11).

## B.   The Instant Litigation

### 1.   Procedural History

Plaintiff initiated this action on October 5, 2011.  (Dkt. #1).  The case was reassigned to the undersigned on June 19, 2013.  (Dkt. # 36).  Pursuant to the briefing schedule endorsed by the Honorable J. Paul Oetken, the District Judge then assigned to the case (Dkt. #16), and as modified by this Court (Dkt. #41), Defendant moved for summary judgment on September 13, 2013 (Dkt. #42).  Plaintiff filed his opposition on October 5, 2013 (Dkt. #49), and the motion was fully briefed as of the filing of Defendant's reply on October 18, 2013 (Dkt. #51).

### 2.    Plaintiff's Allegations Under the NYCHRL

Plaintiff alleges a disability based on his May 2007 heart attack, which disability resulted in a one-week hospitalization and a six-week leave of absence from UPS.  (LeBlanc Tr. 32:17-33:23).  In particular, Plaintiff alleges that he was subjected to discrimination from various supervisors and Human Resources personnel at UPS, who were aware of his heart attack and subsequent medical concerns and yet undertook no efforts to accommodate his requests for a transfer to a facility closer to his home, and in fact demoted him before terminating his employment.  (*See, e.g.*, Pl. Opp. 6, 8; LeBlanc Tr. 276:9-12).  Alternatively, Plaintiff alleges discrimination in the form of disparate treatment, i.e., that other, similarly situated employees who did not request transfers for medical reasons were treated more favorably than Plaintiff.  (Pl. Opp. 12-14; LeBlanc Tr. 253:13-254:6).

Plaintiff also asserts that Defendant failed to provide Plaintiff with any reasonable accommodations for his disability.  (Pl. Opp. 14-17).  Here, Plaintiff alleges that over the course of nearly three years, he repeatedly made requests to be transferred to a facility closer to his home to accommodate his heart condition by shortening his work day.  Plaintiff asserts that he repeatedly provided copies of the February 2008 doctor's letter in conjunction with his request to be transferred, beginning in approximately February or March 2008, but that Defendants failed to accommodate him, and similarly failed to engage in an "interactive process" to determine whether a reasonable accommodation was possible.  (Pl. Opp. 15; LeBlanc Tr. 115:17-20).

16

Finally, Plaintiff advances a claim of retaliation, alleging that he was fired in retaliation for his heart condition and related requests to be moved to a different facility.  (Pl. Opp. 17-22; LeBlanc Tr. 206:9-25, 289:19-290:2). Plaintiff reiterates the allegations of discriminatory conduct discussed above and recasts them as further evidence of his retaliation claim.[6]

## DISCUSSION

### A.   Applicable Law

### 1.   Summary Judgment Generally

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of

---

[6]     Plaintiff asserted a hostile work environment claim in the Amended Complaint.  (Am. Compl. ¶ 47).  The parties have advised the Court, however, that Plaintiff has withdrawn this claim.  (Def. Br. 6 n.7; *see* Brochin Aff., Ex. K (letter to Court withdrawing claim)).

proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. (1985)).

### 2.  Reviewing the Evidence in Summary Judgment Motions

On a motion for summary judgment, a court "should not weigh evidence or assess the credibility of witnesses." *Hayes* v. *N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (citing *United States* v. *Rem*, 38 F.3d 634, 644 (2d Cir. 1994)). However, the Second Circuit has recognized that, "in the rare circumstance where the plaintiff relies almost exclusively on his own

testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys* v. *City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks and citations omitted).

Likewise, in *Rojas* v. *Roman Catholic Diocese of Rochester*, the Second Circuit affirmed the district court's decision to grant defendant's motion for summary judgment. 660 F.3d 98 (2d Cir. 2011) (per curiam), *cert. denied*, 132 S. Ct. 1744 (2012). In *Rojas*, evidence submitted by plaintiff in opposition to the motion directly contradicted factual allegations made in her pleadings. 660 F.3d at 103-06. The Court determined that the district court did not err when, after the plaintiff failed to explain her inconsistent remarks, it granted summary judgment on the basis that no reasonable jury could credit the plaintiff's latter, inconsistent allegations. *See id.* at 106.

Relatedly, "[i]t is well settled in [the Second Circuit] that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *Mack* v. *United States*, 814 F.2d 120, 124-25 (2d Cir. 1987) (citing, *inter alia, Perma R & D Co.* v. *Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)); *accord Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment

and that affidavit contradicts [his] own prior deposition testimony." (internal citations omitted)), *quoted in Ramos* v. *Baldor Specialty Foods, Inc.*, 687 F.3d 554, 556 n.2 (2d Cir. 2013).  Such a rule serves to prevent a party from creating, *post hoc*, a triable issue of fact, thus defeating a motion for summary judgment.  *Mack*, 814 F.2d at 124-25.

Some courts have suggested, however, that this principle will not bar an affidavit when "an issue was not fully explored in the deposition, or the deponent[']s responses were ambiguous." *Giliani* v. *GNOC Corp.*, No. 04 Civ. 2935 (ILG), 2006 WL 1120602, at *3 (E.D.N.Y. Apr. 26, 2006) (citing *Palazzo* v. *Corio*, 232 F.3d 38, 43 (2d Cir. 2000)).  Similarly, courts have found that "where a party's conflicting affidavit statements are corroborated by other evidence, the affidavit may be admissible, since the concern that the affidavit is a 'sham' is alleviated." *Id.*

### 3.    Summary Judgment in Employment Discrimination Cases

The Second Circuit "has repeatedly emphasized the need for caution about granting summary judgment to an employer in a discrimination case where … the merits turn on a dispute as to the employer's intent." *Gorzynski* v. *JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (internal quotation marks and citation omitted).  "Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp* v. *Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks and citations omitted).  "Even in the discrimination

context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment, and show more than 'some metaphysical doubt as to the material facts.'" *Gorzynski*, 596 F.3d at 101 (internal citations omitted).

**B.    Analysis**

### 1.    Certain of Plaintiff's Claims Are Barred by the Statute of Limitations

Defendant argues that Plaintiff's claims under the NYCHRL for conduct occurring before October 5, 2008, are time-barred.  (Def. Br. 24).  Plaintiff does not respond to this argument.  As Defendant correctly identifies, the statute of limitations under the NYCHRL is three years from the date that the claim accrues.  *Quinn* v. *Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998) ("[Plaintiff's] cause of action under New York's Human Rights Law is governed by a three-year statute of limitations, measured from the filing of the action in court." (internal citations omitted)), *abrogated in part by Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101 (2002) (limiting the strict application of the statutory period to "discrete" acts of harassment).  Plaintiff's initial request to Quinones for an accommodation and submission of the February 2008 letter occurred no later than March 2008; Plaintiff's transfer to PDS occurred in May 2008.  Therefore, any of Plaintiff's claims that stem from his complaint to Quinones or his transfer to PDF are time-barred because they fall outside the statute of limitations.

This Court heeds the Supreme Court's admonition that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire . . .

constitute[] a separate actionable 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp*, 536 U.S. at 114. As a practical matter, this means that Plaintiff cannot claim discrimination or retaliation relating to his transfer to PDS. His claims regarding Defendant's refusal to transfer him are analyzed somewhat differently, however. The separate allegations accompanying Plaintiff's claims are identical in substance, but each constitutes a separate denial of transfer and, as such, a discrete allegation of an unlawful employment action. Therefore, even though Plaintiff's initial transfer request to Quinones in 2008 falls outside the applicable statute of limitations, he made identical complaints to other UPS representatives that fall within the statute of limitations.

### 2.   Plaintiff Has Failed to Establish a Prima Facie Case of Disability Discrimination Related to His Termination

#### a.   Analyzing Discrimination Claims Under the NYCHRL

The more significant problem facing Plaintiff's claims is his failure to identify evidence sufficient to create a material issue of fact as to whether his termination was the result of any discrimination based on any disability he may have suffered.[7]

The NYCHRL provides in pertinent part that:

> [i]t shall be an unlawful discriminatory practice [f]or an employer or an employee or agent thereof, because

---

[7]   Defendant suggests in reply that Plaintiff was not disabled in 2011, when he was terminated. (Def. Reply 3 n.2). The Court notes that Plaintiff has presented evidence of his hospitalization in 2011. (*See, e.g.*, LeBlanc Aff. ¶ 46). It will therefore accept, for purposes of resolving this motion, that Plaintiff has established that he had a qualifying disability in 2011, or, at least, that Defendant has not demonstrated the absence of a genuine issue of material fact concerning the existence of a disability in 2011.

of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

N.Y. City Admin. Code § 8-107(1)(a).  "Disability," in turn, is defined as "any physical, medical, mental or psychological impairment, or a history or record of such impairment," *id.* § 8-102(16)(a), including "an impairment of any system of the body; including, but not limited to . . . the cardiovascular system," *id.* § 8-102(16)(b)(1).

For years, courts interpreted the NYCHRL as being coextensive with the corresponding federal and state law under both Title VII of the Civil Rights Act of 1964 and the New York State Human Rights Law ("NYSHRL").  *Loeffler* v. *Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009).  However, in 2005, the New York City Council rejected this similarity and "amended the City HRL in a variety of ways, including by confirming the legislative intent to abolish 'parallelism' between the City HRL and federal and state anti-discrimination law.  *Id.* (quoting The Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), N.Y.C. Local Law No. 85 (2005)).  The Second Circuit has recognized that "[i]n amending the NYCHRL, the City Council expressed the view that the NYCHRL had been 'construed too narrowly' and therefore 'underscore[d] that the provisions of New York City's Human Rights Law are to be construed independently from similar or identical provisions of New York

23

state or federal statutes.'" *Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (quoting Restoration Act § 1).[8]

Plaintiff's discrimination claims reflect a trend of bringing claims exclusively under the more liberal NYCHRL, but not its statutory counterparts, Title VII, the Americans with Disabilities Act ("ADA"), and the NYSHRL.[9]  But "[w]hile the NYCHRL is indeed reviewed 'independently from and more liberally than' federal or state discrimination claims, it still requires a showing of some evidence from which discrimination can be inferred."  *Ben-Levy* v. *Bloomberg L.P.*, 518 F. App'x 17, 19-20 (2d Cir. 2013) (summary order) (quoting *Loeffler*, 582 F.3d at 278); *accord Lugo* v. *City of New York*, 518 F. App'x 18, 30 (2d Cir. 2013) (summary order); *see generally Mihalik*, 715 F.3d at 113 ("[A] defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory . . . motives, or if the defendant proves the conduct was nothing more than 'petty slights or trivial inconveniences.'" (quoting *Williams* v. *New York City Hous. Auth.*, 872 N.Y.S.2d 27, 41 (1st Dep't 2009))); *cf. Matter of*

---

8   In *Mihalik*, the Court held that federal courts reviewing claims made under the NYCHRL should consider the following factors: (i) NYCHRL claims should be analyzed separately and independently from federal and state discrimination claims; (ii) the court should consider the "totality of the circumstances" and the overall context in which the conduct occurred; (iii) the court should no longer apply the "severe or pervasive" standard of liability to NYCHRL claims; (iv) the court should not allow the NYCHRL to act as a general civility code; (v) the court can still properly dismiss meritless discrimination claims under the NYCHRL, but should consider that even a single comment can be actionable under this law; (vi) summary judgment is still proper in NYCHRL cases if the record demonstrates that no reasonable trier of fact could find in the plaintiff's favor.  715 F.3d at 112-13.  The Court's analysis is guided by these principles.

9   Plaintiff does not allege any causes of action based in federal law.  Plaintiff is a resident of Connecticut, and Defendant is an Ohio corporation that maintains its principal place of business in Georgia.  As such, the Court has jurisdiction over this case on the basis of diversity of citizenship under 28 U.S.C. § 1332, and because the amount in controversy requirement is satisfied.  (*See* Am. Compl. ¶ 9).

*McEniry* v. *Landi*, 84 N.Y.2d 554, 558 (1994) ("A complainant states a prima facie case of discrimination if the individual suffers from a disability and the disability caused the behavior for which the individual was terminated.").

For purposes of summary judgment, "in analyzing whether a plaintiff has raised a triable issue of fact as to whether [his] termination was motivated by discriminatory animus under the NYCHRL, the courts have continued to employ the familiar burden-shifting analysis of *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973)." *Kerman-Mastour* v. *Fin. Indus. Regulatory Auth., Inc.*, 814 F. Supp. 2d 355, 366 (S.D.N.Y. 2011) (internal citations omitted). The salient difference is that "[w]hile the *McDonnell Douglas* burden-shifting framework still applies, at the final step the plaintiff has a 'lesser burden of raising an issue as to whether the action was motivated at least in part by discrimination or, stated otherwise, was more likely than not based in whole or in part on discrimination.'" *White* v. *Pacifica Found.*, No. 11 Civ. 2192 (PGG), 2013 WL 5288851, at *12 (S.D.N.Y. Sept. 19, 2013) (quoting *Melman* v. *Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 41 (1st Dep't 2012)); *see also Mihalik*, 715 F.3d at 110 n.8 ("While it is unclear whether *McDonnell Douglas* continues to apply to NYCHRL claims and, if so, to what extent it applies, the question is also less important because the NYCHRL simplified the discrimination inquiry: the plaintiff need only show that [his] employer treated [him] *less well*, at least in part for a discriminatory reason. The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis *only if the*

*record establishes as a matter of law that 'discrimination play[ed] no role' in its actions.*" (emphases added) (internal citation omitted)).

### b. Plaintiff Has Not Established a Prima Facie Case of Disability Discrimination Related to His Termination

Under the familiar *McDonnell Douglas* framework, "a plaintiff 'bears the burden of establishing a prima facie case of discrimination,' which includes demonstrating that 'he suffered an adverse employment action . . . under circumstances giving rise to an inference of discriminatory intent.'" *Maraschiello* v. *City of Buffalo Police Dep't*, 709 F.3d 87, 92 (2d Cir. 2013) (quoting *Mathirampuzha* v. *Potter*, 548 F.3d 70, 78 (2d Cir. 2008)). "'Once the prima facie case has been shown, the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action.'" *Id.* (quoting *United States* v. *Brennan*, 650 F.3d 65, 93 (2d Cir. 2011)). To establish a prima facie case in the instant litigation, Plaintiff must show that (i) he is a member of a protected class; (ii) he was qualified for the position he held; (iii) he suffered an adverse employment action; and (iv) the adverse action took place under circumstances giving rise to an inference of discrimination. *See, e.g., Reynolds* v. *Barrett*, 685 F.3d 193, 202 (2d Cir. 2012); *Ruiz* v. *Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010).

The Court finds for purposes of this analysis that Plaintiff is a member of a protected class, and that he was qualified for the position he held. The parties dispute the particular adverse action or actions Plaintiff claims to have suffered. That is, both parties agree that Plaintiff's termination could suffice as

an adverse action.  (Def. Br. 8-9; Pl. Opp. 6; *see also* Am. Compl. ¶¶ 35-45).

However, for the first time in his opposition to Defendant's motion, Plaintiff

advances a second adverse employment action, namely, his "demotion" from

On-Road Supervisor to PDS.  (Pl. Opp. 6).  Such a claim is not only improperly

raised for the first time on summary judgment, but more importantly is time-

barred, as discussed *supra*, and will not be considered by the Court.  *See*

*Maharishi Hardy Blechman Ltd.* v. *Abercrombie & Fitch Co.*, 292 F. Supp. 2d

535, 544 (S.D.N.Y. 2003) ("A summary judgment opposition brief is not a

substitute for a timely motion to amend the complaint.").[10]

The parties also dispute the remaining factor: whether the adverse action

occurred under circumstances giving rise to an inference of discrimination.

(Def. Br. 9; Pl. Opp. 7-9).  An inference of discrimination may be discerned from

a variety of circumstances, including, "the employer's continuing, after

discharging the plaintiff, to seek applicants from persons of the plaintiff's

qualifications to fill [the] position"; the employer's "invidious comments about

others in the employee's protected group"; and "the more favorable treatment of

employees not in the protected group."  *Chambers* v. *TRM Copy Ctrs. Corp.*, 43

F.3d 29, 37 (2d Cir. 1994) (internal citations omitted).

---

[10]    While the Court may not consider the transfer to PDS as an adverse employment event,
it does consider the circumstances of the transfer as "background evidence" in
determining whether Plaintiff has identified evidence of discriminatory animus.  The
Second Circuit has concluded that so long as at least "one alleged adverse employment
action ... occurred within the applicable filing period[,] ... evidence of an earlier alleged
retaliatory act may constitute relevant 'background evidence in support of [that] timely
claim.'"  *Jute* v. *Hamilton Sundstrand Corp.*, 420 F.3d 166, 176 (2d Cir. 2005) (quoting
and altering *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113); *see also Petrosino* v. *Bell Atl.*,
385 F.3d 210, 220 (2d Cir. 2004) (allowing background evidence "to assess liability on
the timely alleged act").

The standard under the NYCHRL is liberal, but not boundless, and it does not extend to encompass Plaintiff's claims of disability discrimination related to his termination.  The only evidence of discriminatory animus to which Plaintiff points is the argument that Plaintiff was "demoted to a PDS without ever requesting it — changing his sleep pattern and further harming his health." (Pl. Opp. Br. 7).  As a threshold matter, there is nothing in the record, nor in Plaintiff's brief, to suggest that the transfer to PDS was a demotion.  As a PDS and as an On-Road Supervisor, Plaintiff was considered a full-time operations supervisor and he was paid the same salary.  (LeBlanc Tr. 45:17-22, 48:14-15).  *See generally Galabya* v. *N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly material responsibilities or other indices . . . unique to a particular situation." (internal quotation marks and citation omitted)).  Furthermore, Plaintiff testified that it was typical for supervisors to be transferred to different positions and different locations.  (LeBlanc Tr. 45:7-13; *see also id.* at 18:22-23 (testifying that UPS "just move[d] supervisors wherever they need them")).

Critically, Plaintiff's own testimony negates his claim that his transfer to PDS was a demotion.  Plaintiff initially testified that he was transferred to PDS because "that's where they put me"; he later revised the narrative, admitting that the transfer was the product of conversations with Mike Feroni shortly after Plaintiff returned to work from his medical leave, during which Plaintiff

told Feroni that his long hours were stressful and harmful to his health. (LeBlanc Tr. 163:21-164:14; *see also id.* at 164:7-14 ("Q. So after you told [Feroni] that you were working a lot of hours on car, he moved you to [PDS]? A. Yes.  Q. To shorten your day a little bit? . . .  A. Yes.")).  Having acknowledged that the transfer was made in response to his request, and given the other circumstances of the transfer, Plaintiff can demonstrate neither demotion nor discriminatory animus.

Even if the Court were to consider the allegations of discriminatory intent that are sprinkled throughout Plaintiff's sworn statements, but that are not actually relied upon by Plaintiff in his brief, it could not find a genuine issue of material fact.  Plaintiff attempts, for instance, to impute discriminatory animus to the fact that on several occasions his division manager, Mike Michalak, complained that Plaintiff's DOT card had expired, which expiration occurred "as a direct result of his medication and medical condition."  (LeBlanc Aff. ¶ 47).  Yet again, Plaintiff's contentions are undercut by his own testimony.  At his deposition, Plaintiff repeatedly testified that he made no effort to renew his DOT card after its expiration because he did not need it for his job at PDS. (*See, e.g.*, LeBlanc Tr. 38:22-42:10).  More importantly, Plaintiff testified that Michalak's requests that he renew his DOT card were made three weeks prior to Plaintiff's termination, at a time when no medical issue precluded Plaintiff from obtaining the card.  (*Id.* at 299:13-300:6).  Instead, Plaintiff acknowledged, he had simply been busy with other things.  (*Id.* at 299:13-14).

Plaintiff testified that no one at UPS ever said anything to him bespeaking an intent to harass or discriminate against him.  (LeBlanc Tr. 276:5-8).  The record evidence bears out this point.  Ultimately, Plaintiff is unable to establish a prima facie case of discrimination because he puts forth no evidence from which a reasonable trier of fact could find that his termination was motivated by discriminatory intent.

### c.    Defendant Has Proffered Legitimate, Non-Discriminatory Reasons for Terminating Plaintiff

Even assuming, *arguendo*, that Plaintiff had established his prima facie case, Defendant proffers two legitimate, non-retaliatory reasons for Plaintiff's termination: (i) Plaintiff falsified mandated hazardous material training records, and (ii) Plaintiff failed to deliver USPS packages on several occasions, instead abandoning them by a mailbox in the middle of the night.  (Def. Br. 10-15).  While attempting in his affidavit to minimize his behavior, Plaintiff does not dispute that he forged his co-worker's signatures on documents concerning the hazardous materials training, or that he violated company policy by placing USPS packages outside of a mailbox late at night.  In fact, Plaintiff readily admitted that these actions violated Defendant's integrity policy.  (LeBlanc Tr. 91:5-10).[11]

---

[11]    The seriousness with which UPS treated Plaintiff's abandonment of USPS packages in the middle of the night was almost certainly enhanced by the fact that a local newspaper published a story detailing the "mysterious" abandoned packages on March 24, 2011.  (Brochin Aff., Ex. J; LeBlanc Tr. 68:11-17, 73:10-12).

In connection with the instant motion, Plaintiff avers that he was directed to jettison the USPS packages by his supervisor, Dennis Flood.  (LeBlanc Aff. ¶ 38; Pl. 56.1 Response ¶ 35).  This revisionist history is patently incredible in the face of Plaintiff's detailed deposition testimony that his supervisors wanted him to remove the packages from the Brush Avenue facility, but were in no way aware that he was dumping them by a local

Defendant has demonstrated legitimate, non-discriminatory reasons for Plaintiff's termination.  *See, e.g.*, *Pacenza* v. *IBM Corp.*, No. 04 Civ. 5831 (PGG), 2009 WL 890060, at *12 (S.D.N.Y. Apr. 2, 2009) (finding that discharge of plaintiff for violating company "internet usage and harassment policies" was a legitimate, non-discriminatory reason for termination); *Brown* v. *The Pension Boards*, 488 F. Supp. 2d 395, 406 (S.D.N.Y. 2007) ("'Certainly, an employer is entitled to discharge an employee who fails to follow company rules. . . .'" (internal citation omitted)).  The burden now shifts back to Plaintiff to demonstrate that Defendant's legitimate, non-retaliatory reason for terminating Plaintiff was actually a pretext for discrimination.  *See Brightman* v. *Prison Health Serv., Inc.*, 970 N.Y.S.2d 789, 792 (2d Dep't 2013) ("The plaintiff must either counter the defendant's evidence by producing evidence that the reasons put forth by the defendant were merely a pretext, or show that, regardless of any legitimate motivations the defendant may have had, the defendant was motivated at least in part by an impermissible motive." (internal citations omitted)).

> ### d. Plaintiff Is Unable to Establish that Defendant's Proffered Reasons for Termination Are a Pretext for Discrimination

Once the employer has proffered its nondiscriminatory reason, the plaintiff raising a claim under the NYCHRL retains the "lesser burden of raising an issue as to whether the action was motivated at least in part by discrimination or, stated otherwise, was more likely than not based in whole or

---

mailbox in the middle of the night.  (*See, e.g.*, LeBlanc Tr. 59:23-60:1, 64:12-65:14, 67:23-68:14).

in part on discrimination.'" *White*, 2013 WL 5288851, at *12 (quoting *Melman*, 946 N.Y.S.2d at 41). "A plaintiff may satisfy his or her burden at the pretext stage by showing that similarly situated employees outside the protected class received more favorable treatment than the plaintiff did." *Anderson* v. *Hertz Corp.*, 507 F. Supp. 2d 320, 327 (S.D.N.Y. 2007) (citing *Graham* v. *Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). Such comparators must be "similarly situated in all material respects." *Shumway* v. *United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997) (citing *Mitchell* v. *Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

"What constitutes 'all material respects' . . . varies somewhat from case to case and . . . must be judged based on [i] whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and [ii] whether the conduct for which the employer imposed discipline was of comparable seriousness. In other words there should be an 'objectively identifiable basis for comparability.'" *Conway* v. *Microsoft Corp.*, 414 F. Supp. 2d 450, 459-60 (S.D.N.Y. 2006) (citing *Graham*, 230 F.3d at 40 (internal citations omitted)). "Finally, while the determination of whether two employees are similarly situated is normally a question of fact for the jury, this 'rule is not, however, an absolute. A court can properly grant summary judgment where no reasonable jury could find the similarly situated prong met.'" *Spiegler* v. *Israel Disc. Bank of New York*, No. 01 Civ. 6364 (WK), 2003 WL 21983018, at *2 (S.D.N.Y. Aug. 19, 2003) (internal citations omitted).

Here, Plaintiff argues that Defendant's proffered reasons for his termination were pretextual because other employees who were caught violating company policy as a result of the audit were not terminated for their disciplinary infractions. (Pl. Opp. 12-14). Plaintiff's argument falls short because, simply put, Plaintiff is — and admits to being — not similarly situated to any of the other individuals implicated in the audit infractions. Preliminarily, Plaintiff admits to being unaware of whether any of the other disciplined employees suffered from any medical condition or disability. (LeBlanc Tr. 263:2-10).

More importantly, Plaintiff's offenses were qualitatively different than those of his putative comparators: Plaintiff not only forged training materials, but also repeatedly dumped dozens of USPS packages next to a mailbox in the middle of the night. A review of Plaintiff's testimony in this regard is instructive. First, Plaintiff alleges that John Argiento, a co-worker, was similarly situated to Plaintiff because Argiento "did something wrong." (LeBlanc Tr. 255:14). Specifically, Argiento was supposed to show a subordinate a safety video, but did not, so Argiento instructed the subordinate to sign a form saying that he had watched that video. (*Id.* at 254:8-255:14). Argiento lost his stock options for the year as a result. (*Id.*). However, Plaintiff conceded that Argiento did not forge the employee's signature; the employee took the test himself; and Argiento did not leave any packages by a mailbox in

violation of UPS regulations.  (*Id.*).  For these reasons, Plaintiff concedes that Argiento "didn't do exactly the same thing as" Plaintiff did.  (*Id.*).[12]

Second, Plaintiff alleges that three other co-workers, Dave Colantonio, Louie Santana, and an unnamed manager, were similarly situated because each, too, did something "wrong."  (LeBlanc Tr. 259:24).  Specifically, they told their subordinate drivers to punch out without coming in the building, so as to avoid being questioned by the safety auditor.  (*Id.* at 257:3-260:2).  Colantonio and Santana were not reprimanded, but the unnamed manager was demoted. (*Id.* at 261:20-24).  However, none of the three forged the signatures of any employees, nor left packages by a mailbox in the middle of the night.  (*Id.*). Accordingly, Plaintiff concedes that what they did was different from what he did.  (*Id.*).

Third and last, Plaintiff alleges that his co-worker Keith Russell was similarly situated because he also did something wrong.  (LeBlanc Tr. 260:9-261:13).  Russell improperly scanned certain packages, when they should have instead been left in the building.  (*Id.*).  Russell too lost his stock options for the year.  (*Id.*).  As Plaintiff himself concedes, his combined violations are objectively more serious than his counterparts, and, as such, there is not an objectively identifiable basis for comparability.

---

[12]    Plaintiff alleges that Donna Mannuzza, another co-worker, also forged an employee's signature on a test, but concedes that he does not have first-hand knowledge of Mannuzza's behavior, and only heard about it second-hand through John Argiento. (LeBlanc Tr. 255:15-257:2).  Accordingly, his testimony in this regard is inadmissible hearsay and the Court disregards it.  Nonetheless, even if it were admissible, Plaintiff conceded that Mannuzza did not forge the signatures of more than one employee, or leave packages by a mailbox in the middle of the night, and for these reasons, Plaintiff conceded that Mannuzza "did something different than" Plaintiff.  (*Id.* at 255:15-257:2).

34

Furthermore, to the extent that Plaintiff's burdens under *McDonnell Douglas* are altered by the Restoration Act, Plaintiff cannot even satisfy the reduced burden under the NYCHRL of showing that he was treated "less well" than his counterparts in part because of a discriminatory intent. *See Mihalik*, 715 F.3d at 110-12. In *Mihalik*, the Court noted that even though the Plaintiff's burden in demonstrating discrimination is less than under federal law, the "plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive." *Id.* at 110. Plaintiff makes no such showing here. Even considering, as the Court must, the "totality of the circumstances," there is simply no indication that Plaintiff's termination was motivated by anything other than his disciplinary infractions. This finding is bolstered by the fact that, according to Plaintiff, Defendant was on notice of his disability beginning in 2008 and continued to give Plaintiff positive performance reviews and annual salary increases. (Harman Decl., Ex. J). It was only after Plaintiff's company policy violations were uncovered that he was terminated.

In short, Plaintiff has failed to establish that his termination was mere pretext; that similarly situated employees were treated differently; or that discrimination played any role in his termination. *Mihalik* makes clear that summary judgment is warranted in Defendant's favor under the NYCHRL "only if the record establishes as a matter of law that 'discrimination play[ed] no role' in [Defendant's] actions." 715 F.3d 110 n.8, 113 (internal citations omitted). This is such a case, and Defendants are entitled to summary judgment on Plaintiff's disability discrimination claim.

### 3. Material Issues of Fact Preclude Summary Judgment on Plaintiff's Failure to Accommodate Claim

While the Amended Complaint contained extensive factual allegations related to Defendant's failure to accommodate Plaintiff's disability, it did not specifically allege a failure to accommodate cause of action. (*See* Am. Compl. ¶¶ 11-26, 47). A party generally may not "assert a cause of action for the first time in response to a summary judgment motion," but a complaint may include allegations sufficient to put a defendant on notice that the plaintiff intended to allege a certain claim. *Greenidge* v. *Allstate Ins. Co.*, 312 F. Supp. 2d 430, 436-37 (S.D.N.Y. 2004) (internal citations omitted); *Ragusa* v. *Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 89 (2d Cir. 2010) (summary order) (finding that a complaint provided sufficient notice of a retaliation claim); *Tse* v. *New York Univ.*, No. 10 Civ. 7207 (DAB), 2013 WL 5288848, at *9-10 (S.D.N.Y. Sept. 19, 2013) (finding that a complaint provided sufficient notice of failure to accommodate and discrimination claims). Defendant clearly had notice that Plaintiff intended to assert a failure to accommodate claim: it moved for summary judgment on that claim, and included extensive briefing to that effect. (*See* Def. Br. 16-20; Def. Reply 7-8). Accordingly, the Court finds Plaintiff to have properly alleged a failure to accommodate claim, and proceeds with the analysis.

A claim for failure to accommodate is a type of disability discrimination that can properly be raised under the NYCHRL. *See Tse*, 2013 WL 5288848, at *10. Again, the more liberal framework enunciated in *Mihalik* applies to Plaintiff's claim. *See Weber* v. *City of New York*, No. 11 Civ. 5083 (MKB), 2013

36

WL 5416868, at *24 (E.D.N.Y. Sept. 29, 2013).  Under the NYCHRL, "[a]

plaintiff states a prima facie failure to accommodate claim by demonstrating

that [i] plaintiff is a person with a disability under the meaning of the [statute];

[ii] an employer covered by the statute had notice of his disability; [iii] with

reasonable accommodation, plaintiff could perform the essential functions of

the job at issue; and [iv] the employer has refused to make such

accommodations."  *McMillan* v. *City of New York*, 711 F.3d 120, 125-26 (2d Cir.

2013).

The NYCHRL defines "reasonable accommodation" as "such

accommodation that *can* be made that shall not cause undue hardship in the

conduct of the [employer's] business.  The [employer] shall have the burden of

proving undue hardship."  NYCHRL § 8-102(18) (emphasis added).  Put

somewhat differently, under the NYCHRL, "there are no accommodations that

may be 'unreasonable' if they do not cause undue hardship."  *Phillips* v. *City of

New York*, 884 N.Y.S.2d 369, 378 (1st Dep't 2009).  Again, the Court accepts

for purposes of analysis that Plaintiff has made the requisite showing that he

was disabled under the NYCHRL and that Defendant had notice of the

disability.

Defendant first argues that Plaintiff's claim fails because he did not

follow its procedures for requesting an accommodation.  (Def. Br. 16-17).[13]

---

[13]   The case cited by Defendant in support of its argument that a plaintiff must follow the
proper procedures for requesting an accommodation is factually inapposite.  (*See* Def.
Br. 16).  In that case, the plaintiff failed to show that she was disabled, or to tie her
accommodation requests to any claimed disability; Plaintiff has done both.  *See Bresloff-
Hernandez* v. *Horn*, No. 05 Civ. 0384 (JGK), 2007 WL 2789500, at *10 (S.D.N.Y. Sept.
25, 2007) ("Without more definite notice from the plaintiff, namely, *some indication of a*

However, under the NYCHRL, once an employee requests an accommodation from his employer, it becomes the employer's duty, not the employee's, to engage in an "interactive process" aimed at reaching a reasonable accommodation. *See* 9 NYCRR § 466.11(j)(4) ("*[t]he employer has a duty to move forward* to consider accommodation once the need for accommodation is known or requested" (emphasis added)).[14]  Thus, upon receiving notice from Plaintiff of his disability and of his numerous concomitant requests for an

*disability and how the disability relates to the request for an accommodation*, the defendant was unable to participate in the interactive process that the ADA envisions. Therefore, the plaintiff never notified the DOC properly of the plaintiff's request for a reasonable accommodation for an alleged disability." (emphasis added)).

[14]  Following the Second Department's decision in *Phillips*, several courts in New York State and in this Circuit found that, unlike the ADA, an employer's failure to engage in an "interactive process" constituted an independent violation of the NYCHRL.  *See Phillips*, 884 N.Y.S.2d 369 (concluding that, under the NYSHRL and the NYCHRL, "the first step in providing a reasonable accommodation is to engage in a good faith interactive process that assesses the needs of the disabled individual and the reasonableness of the accommodation requested," and that "failure to consider the accommodation . . . is a violation of [the NYCHRL]"); *see also Morse* v. *JetBlue Airways Corp.*, 941 F. Supp. 2d 274, 302 n.16 (E.D.N.Y. 2013) ("Unlike the ADA, under the NYSHRL and the NYCHRL, an employer's failure to engage in the interactive process is, by itself, a violation of the law." (citing *Phillips*)); *Vangas* v. *Montefiore Med. Ctr.*, No. 11 Civ. 6722 (ER), 2014 WL 1100153, at *16-17 (S.D.N.Y. Mar. 20, 2014) (same); *Martin* v. *United Parcel Serv. of Am., Inc.*, 961 N.Y.S.2d 663 (4th Dep't 2013) (holding that the trial court "properly determined that defendant failed to eliminate all triable issues of fact," including "whether defendant engaged in an interactive process to ascertain plaintiff's needs and whether a reasonable accommodation was possible"); *cf. McBride* v. *BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 100-01 (2d Cir. 2009) (holding that under the ADA," failure to engage in an interactive process does not form the basis of a disability discrimination claim in the absence of evidence that a reasonable accommodation was possible.").

Notably, however, the New York Court of Appeals has recently limited *Phillips*, in holding that an employer's failure to engage in an interactive process is not a *per se* violation of the NYCHRL, but is nonetheless an important consideration when evaluating a failure to accommodate claim.  *See Jacobson* v. *New York Health & Hosp. Corp.*, — N.E.3d —, N.Y. Slip Op. 02098 (Ct. App. Mar. 27, 2014) (under the NYCHRL, "the employer does not automatically fail to establish the affirmative defense premised on the lack of any reasonable accommodation solely because it did not participate in an interactive process, though that failure poses a formidable obstacle to the employer's attempt to prove that no reasonable accommodation existed for the employee's disability").  As discussed above, because there are material issues of fact as to whether Defendant engaged in an "interactive process," the Court is unable to determine whether a reasonable accommodation existed for Plaintiff, and as a result, summary judgment is inappropriate.

accommodation, it was Defendant's obligation, not Plaintiff's, to follow up on that request and move it forward.  *See* Background Sec. A(2)(a); Quinn Aff. ¶¶ 5-9.  There is no evidence this was done; in fact, Defendant has no record of any of Plaintiff's requests.  (Rowan Decl. ¶ 5).  The Court finds that, accepting Plaintiff's testimony as true, Defendant was on notice of Plaintiff's disability and requests for accommodation.

Under the NYCHRL, once an employer is made aware of an employee's disability, it is obligated to engage in an "interactive process" with the employee in order to arrive at a reasonable accommodation.  "The 'interactive process' requirement requires the employer to 'investigate an employee's request for accommodation and determine its feasibility.'"  *Vangas*, 2014 WL 1100153, at 16 (citing *Phillips*, 884 N.Y.S.2d 369; *Lovejoy-Wilson* v. *NOCO Motor Fuel, Inc.*, 263 F.3d 208, 218-19 (2d Cir. 2001) (the interactive process may include "meeting with the employee who requests an accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she specifically wants, showing some sign of having considered the employee's request, and offering and discussing available alternatives when the request is too burdensome." (internal quotation marks, brackets, and citation omitted)).

There are material issues of fact as to whether Defendant in fact engaged in an "interactive process" in order to determine whether it was possible to accommodate Plaintiff's disability.  Plaintiff testified that he requested an accommodation on no less than a dozen separate occasions, but Defendant

made no effort to engage him in an "interactive process" at any time.  (*See* Pl.
Opp. 15).  Conversely, the record indicates that at least some of Defendant's
employees "worked on" or "looked into" Plaintiff's request; in addition,
Defendant argues that it afforded Plaintiff a "de facto" accommodation by
transferring him to a position that required approximately two fewer hours of
work per day.  (*See* Def. Br. 19-20; *but see* Pl. Opp. 15 (arguing that Defendant
"made no effort to engage Mr. LeBlanc to determine his needs and provide him
with accommodation in view of his disability")).

Because the NYCHRL presumes all accommodations to be reasonable
until proven otherwise, Defendant bears the burden of demonstrating, as an
affirmative defense, that the requested accommodation was overly burdensome,
or that Plaintiff could not perform the essential functions of his job even with a
reasonable accommodation.  *See* N.Y. City Admin. Code § 8-102(18) ("The
[employer] shall have the burden of proving undue hardship."); *Phillips*, 884
N.Y.S.2d at 378 ("the employer, not the employee, has the 'pleading obligation'
to prove that the employee 'could not, with reasonable accommodation, satisfy
the essential requisites of the job'"; further recognizing the New York City
Council's "legislative policy choice to deem all accommodations reasonable
except for those a defendant proves constitute an undue hardship").
Defendant has failed to put forth any evidence to discharge its burdens,
particularly because it has put forth no evidence that it engaged in an attempt
to find a reasonable accommodation, as discussed *infra*.

Defendant instead argues that because Plaintiff has failed to demonstrate that a vacant position existed, it is entitled to summary judgment on his failure to accommodate claim.  (*See* Def. Br. 17-18; Def. Reply 8).  However, Plaintiff bears no such initial burden under the NYCHRL, and the cases Defendant cites for this proposition either arise under the ADA or are factually inapposite. (*See, e.g.*, Def. Reply 8 (citing to *Hart* v. *New York Univ. Hosp. Ctr.*, No. 09 Civ. 5159 (RWS), 2011 WL 4755368, at *5 (S.D.N.Y. Oct. 7, 2011), *aff'd sub nom. Hart* v. *New York Univ. Hosp. Ctr.*, 510 F. App'x 22 (2d Cir. 2013) (summary order) (citing to cases applying only the ADA standard); *Brice* v. *State Dep't of Health*, 901 N.Y.S.2d 898 (1st Dep't 2009) (finding, in case where defendant first proved that it engaged in an "interactive process" to address plaintiff's request for a reasonable accommodation, that plaintiff had failed to demonstrate that a vacant position existed)).

In short, Defendant's apparent failure to engage in an interactive process leaves a hole in this record concerning whether such process could have yielded a substantive, reasonable accommodation for Plaintiff's disability. Accordingly, the Court finds that material issues of fact preclude summary judgment on Plaintiff's failure to accommodate claim.

### 4. Plaintiff Cannot Establish a Prima Facie Case of Retaliation Under the NYCHRL

Plaintiff also advances a claim of retaliation.  After passage of the Restoration Act, retaliation claims under the NYCHRL cover a broader range of conduct than their state and federal counterparts.  "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that [he] took an action

41

opposing [his] employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (internal citations omitted). The Second Circuit has instructed, however, that "the NYCHRL is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by … retaliatory motives, of if the defendant proves the conduct was nothing more than 'petty slights or trivial inconveniences.'" *Id.* at 113 (quoting *Williams*, 872 N.Y.S.2d at 41).

Plaintiff has failed to raise a genuine issue of material fact that Defendant engaged in any conduct that was reasonably likely to deter an employee from complaining against discrimination. For purposes of this analysis, the Court will assume, without deciding, that Plaintiff's repeated requests for a transfer amount to "an action opposing . . . discrimination." His evidence of retaliation, however, consists solely of the facts that (i) Plaintiff had a heart attack; (ii) Plaintiff requested numerous times over a period of years to be transferred to another facility; and (iii) Plaintiff was subsequently fired. (LeBlanc Tr. 206:17-19). Plaintiff does not, and, it would seem, cannot, proffer evidence of a causal nexus between his requests for transfer and Defendant's decision to terminate. In fact, the record is devoid of any evidence that these were anything other than factually distinct instances wholly unrelated to one another. As such, even were the Court to paint the factual scenario with the broadest brush possible, there is no genuine issue of material fact as to

whether Defendant terminated Plaintiff because of Plaintiff's requests to transfer to a different facility because of his disability.

To the extent that this Court should continue, after *Mihalik*, to consider the Title VII standard for retaliation claims, it must conclude that Plaintiff's claims fail under that analysis as well.  "To establish a prima facie case of retaliation under Title VII, a plaintiff must show '[i] that [he] was engaged in protected activity by opposing a practice made unlawful by [statute]; [ii] that the employer was aware of that activity; [iii] that [he] suffered adverse employment action; and [iv] that there was a causal connection between the protected activity and the adverse action.'"  *Holtz* v. *Rockefeller & Co., Inc.*, 258 F.3d 62, 79 (2d Cir. 2001) (quoting *Galdieri-Ambrosini* v. *Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir. 1998)).

As noted, even if Plaintiff's persistent requests to be transferred were deemed a protected activity, Plaintiff has not shown that his termination was in any way related to his complaints over the course of three years prior to his termination.  The lack of temporal proximity between the protected activity and the alleged retaliatory conduct underscores the absence of any causal connection.  *See Clark Cnty. Sch. Dist.* v. *Breeden*, 532 U.S. 268, 273 (2001) (noting that to establish a prima facie case, the temporal proximity must be "very close" to be sufficient evidence of causality between "an employer's knowledge of protected activity and an adverse employment action"); *Burkybile* v. *Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005) (the passage of more than a year defeated a showing of

causation).  Plaintiff's termination occurred approximately three years after his first transfer request and several months after his last transfer request.  This time lapse refutes any inference of causation.

Plaintiff himself highlights that he received positive performance reviews throughout his employment "until three weeks before he was fired."  (Pl. Opp. 20).  It is no coincidence that Plaintiff's wrongful conduct was discovered at approximately the same time, and this convergence of facts leads to the irrefutable inference that Plaintiff's termination had nothing to do with his disability and everything to do with his violations of Defendant's policies.  (Minesinger Tr. 120:18-121:3).  Plaintiff has failed to raise any factual issue as to a retaliatory motive.  Defendant, therefore, cannot be liable to Plaintiff for violating the NYCHRL's anti-retaliation provision.  Accordingly, Defendant's motion for summary judgment as to Plaintiff's claim for retaliation under the NYCHRL is granted.

### 5.  Plaintiff Cannot Establish a Hostile Work Environment Claim Under the NYCHRL

Finally, Plaintiff has advanced, but has elected not to pursue, his hostile work environment claim.  The Court could simply deem those claims abandoned, and grant summary judgment in favor of Defendant.  *See Bronx Chrysler Plymouth, Inc.* v. *Chrysler Corp.*, 212 F. Supp. 2d 233, 249 (S.D.N.Y. 2002) (dismissing claim as abandoned because non-movant "ma[d]e no argument in support of th[e] claim at all" in its summary judgment opposition papers).  However, because the claim has not been formally dismissed, the Court will consider this portion of Defendant's summary judgment motion as

44

unopposed.  (*See* Def. Br. 25 (requesting "that the Court grant its motion for summary judgment and dismiss the Complaint with prejudice in its entirety")).

"[I]n considering a motion for summary judgment, [the court] must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." *Vermont Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004) (quoting *Custer* v. *Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993)).  Hostile work environment claims under the NYCHRL are governed by a "more permissive" standard for liability.  *Brown* v. *City of New York*, No. 11 Civ. 2915 (PAE), 2013 WL 3789091, at *18 (S.D.N.Y. July 19, 2013).  The alleged conduct need not be "severe and pervasive"; rather, "the plaintiff need only demonstrate 'by a preponderance of the evidence that [he] has been treated less well than other employees because of [his] gender.'" *Mihalik*, 715 F.3d at 110 (quoting *Williams*, 872 N.Y.S.2d at 38); *see also Urquhart* v. *Metro. Transp. Auth.*, No. 07 Civ. 3561 (DAB), 2013 WL 5462280, at *11 (S.D.N.Y. Sept. 25, 2013) ("In determining whether a claim of hostile work environment survives summary judgment under the NYCHRL, the relevant consideration is whether there is a triable issue of fact as to whether the plaintiff has been treated less well than other employees because of his protected status." (internal quotation marks and citation omitted)); *see also Tse*, 2013 WL 5288848, at *15 (holding that "[h]ostile work environment claims brought pursuant to the NYCHRL are analyzed under the same provision as discrimination claims.  With hostile work environment claims, the NYCHRL does not require either materially adverse

45

employment actions or severe and pervasive conduct.  Rather, to prevail, a

plaintiff must prove by a preponderance of the evidence that [he] has been

treated less well than other employees because of [his] protected status."

(internal quotation marks and citations omitted)).

A review of the record indicates that there is no triable issue of fact as to

whether Plaintiff was treated less well than other employees due to his

protected status.  To the contrary, at his deposition Plaintiff testified as follows:

> Q. It also says in here you suffered a hostile work
> environment. I understand your lawyer's objection but
> I'm asking you from a lay perspective, what do you feel
> was hostile about your work environment?
>
> A. I don't know what you're asking.
>
> Q. Did you experience any conduct that you felt was
> unwelcome?
>
> A. No.
>
> Q. Did you ever have any comments that were made to
> you that you felt were inappropriate while at UPS?
>
> A. No.
>
> Q. Did you feel that anything about your work
> environment was intolerable?
>
> A. It wasn't intolerable.

(LeBlanc Tr. 290:6-21).

Even viewing all facts, most of which stem from Plaintiff's own testimony,

in the light most favorable to Plaintiff, there is no evidence indicating that

Plaintiff suffered a hostile work environment.  Instead, Plaintiff seemed to enjoy

his employment with Defendant and get along well with his fellow employees

and supervisors.  (LeBlanc Tr. 49:25-51:23).  For these reasons, Defendant's

motion for summary judgment as to Plaintiff's claim for hostile work environment under the NYCHRL is granted.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is DENIED with respect to Plaintiff's failure to accommodate claim, and GRANTED with respect to all other claims.  The Clerk of Court is directed to terminate Docket Entry 42.

The parties shall appear for a pretrial conference on May 2, 2014, at 2:00 p.m.

SO ORDERED.

Dated:  April 11, 2014
        New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge

47